**<u>ORAL ARGUMENT NOT YET SCHEDULED</u>**

**<u>IN THE UNITED STATES COURT OF APPEALS</u>**
**<u>FOR THE DISTRICT OF COLUMBIA CIRCUIT</u>**

Nos. 25-1164; 25-1168

---

ENVIRONMENTAL DEFENSE FUND, *et al.,*
*Petitioners,*

v.

LEE ZELDIN, *et al.,*
*Respondents.*

---

Petition for Review of Final Administrative Action of the
United States Environmental Protection Agency

---

**APPENDIX TO PETITIOENRS' MOTION FOR SUMMARY VACATUR**

DATED: August 18, 2025

Respectfully submitted,

*/s/ Margaret A. Coulter*
Margaret A. Coulter
Jason C. Rylander
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, D.C. 20005
(202) 961-4820
mcoulter@biologicaldiversity.org
jrylander@biologicaldiversity.org

*Counsel for Center for Biological
Diversity*

*/s/ Mary Y. Sasso*
Mary Y. Sasso
Darin Schroeder
Francis W. Sturges, Jr.
Clean Air Task Force
114 State St., 6th Floor
Boston, MA 02109
(617) 624-0234
msasso@catf.us
dschroeder@catf.us
fsturges@catf.us

*Counsel for Earthworks*

*/s/ Wendy Bloom*
Wendy Bloom
Environmental Law & Policy Center
35 East Wacker Drive, Suite 1600
Chicago, IL 60601
(312) 673-6500
wbloom@elpc.org

*Counsel for Environmental Law &
Policy Center*

*/s/ Grace M. Smith*
Grace M. Smith
Edwin LaMair
Rosalie Winn
Peter Zalzal
Vickie Patton
Environmental Defense Fund
2060 Broadway, Ste. 300
Boulder, CO 80302
(303) 447-7560
gsmith@edf.org
elamair@edf.org
rwinn@edf.org
pzalzal@edf.org
vpatton@edf.org

Sean H. Donahue
Keri R. Davidson*
Donahue, Goldberg & Herzog
1008 Pennsylvania Ave., SE
Washington, D.C. 20003
(202) 277-7085
sean@donahuegoldberg.com
*Not admitted in District of Columbia.

*Counsel for Environmental Defense
Fund*

*/s/ Alexandra O. Schluntz*
Alexandra O. Schluntz
Robin Cooley
Earthjustice
633 17th Street #1600
Denver, CO 80202
(303) 996-9612
aschluntz@earthjustice.org
rcooley@earthjustice.org

*/s/ Meredith Hankins*
Meredith Hankins
David Doniger
Natural Resources Defense Council
1152 15th Street, NW, Suite 300
Washington, D.C. 20005
(646) 448-3818
mhankins@nrdc.org

*Counsel for Natural Resources
Defense Council*

*Counsel for Clean Air Council, Dakota
Resource Council, Food & Water
Watch, Fort Berthold Protectors of
Water & Earth Rights, and
GreenLatinos*

*/s/ Andres Restrepo*
Andres Restrepo
Sierra Club
50 F St., NW, Eighth Floor
Washington, D.C. 20001
(856) 240-0964
Andres.Restrepo@sierraclub.org

*Counsel for Sierra Club*

## TABLE OF CONTENTS

| Attachment No. | Title | Page |
|---|---|---|
| 1 | "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule" ("Delay Rule"), 90 Fed. Reg. 35,966 (July 31, 2025) | 001 |
| 2 | Declaration of Lois Bower-Bjorson, Clean Air Council and Earthworks | 022 |
| 3 | Declaration of Brian Buma, Environmental Defense Fund | 038 |
| 4 | Declaration of Elizabeth DelBueno, Environmental Law & Policy Center | 077 |
| 5 | Declaration of Lisa Deville, Fort Berthold POWER | 094 |
| 6 | Declaration of Gillian Graber, Sierra Club | 111 |
| 7 | Declaration of Patrick Grenter, Sierra Club | 122 |
| 8 | Declaration of Paul Jeffrey, Natural Resources Defense Council | 126 |
| 9 | Declaration of Mitch Jones, Food & Water Watch | 137 |
| 10 | Declaration of Carol Kuehn, Food & Water Watch | 144 |
| 11 | Declaration of Paula Leach, Environmental Law & Policy Center | 150 |
| 12 | Declaration of John MacFarlane, Sierra Club | 163 |
| 13 | Declaration of Mark Magaña, GreenLatinos | 173 |
| 14 | Declaration of Ryan Maher, Center for Biological Diversity | 180 |
| 15 | Declaration of Shirley (Sug) J. McNall, Sierra Club | 188 |
| 16 | Declaration of Robert Michaels, Environmental Law & Policy Center | 197 |
| 17 | Declaration of Jeremy Nichols, Center for Biological Diversity | 207 |
| 18 | Declaration of Lauren Pagel, Earthworks | 221 |
| 19 | Declaration of Virginia Palacios, Environmental Defense Fund | 226 |
| 20 | Declaration of Jeremy Proville and Laura Mirtich, Environmental Defense Fund | 244 |
| 21 | Declaration of Maricruz Ramirez, GreenLatinos | 262 |
| 22 | Declaration of Todd Richardson, Sierra Club | 273 |

| 23 | Declaration of Don Schreiber, Environmental Defense Fund | 282 |
|----|---------------------------------------------------------|-----|
| 24 | Declaration of Veronica Southerland and Meagan Weisner, Environmental Defense Fund | 300 |
| 25 | Declaration of Joseph A. Satrom, Environmental Law & Policy Center | 345 |
| 26 | Declaration of Linda Weiss, Dakota Resource Council | 356 |
| 27 | Declaration of Joyce Yeung, Natural Resources Defense Council | 366 |

# Attachment 1

"Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule" ("Delay Rule"), 90 Fed. Reg. 35,966 (July 31, 2025)

to the public interest.'' *See Nat. Res. Def. Council* v. *Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 114 (2nd Cir. 2018) (noting that an agency may invoke the good-cause exception when notice and comment are ''unnecessary'' in ''those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry [ ] and to the public'').

By statute, Congress has authorized an aggregate period of 81 months of assistance to individuals who use Chapter 35 benefits combined with benefits from other programs listed in section 3695(a). VA's authority is limited to implementing the statutes as enacted by Congress. Therefore, additional public comment would be superfluous and unnecessary.

The APA also requires a 30-day delayed effective date, except for ''(1) a substantive rule which grants or recognizes an exemption or relieves a restriction; (2) interpretative rules and statements of policy; or (3) as otherwise provided by the agency for good cause found and published with the rule.'' 5 U.S.C. 553(d). For the reasons stated above, the Secretary finds that there is also good cause for this rule to be effective immediately upon publication. Any delay in implementation would be unnecessary for purposes of 5 U.S.C. 553(d)(3).

## Executive Orders 12866, 13563, and 14192

VA examined the impact of this rulemaking as required by Executive Orders 12866 (Sept. 30, 1993) and 13563 (Jan. 18, 2011), which direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits. The Office of Information and Regulatory Affairs has determined that this rulemaking is not a significant regulatory action under Executive Order 12866, as supplemented by Executive Order 13563. This final rule is a deregulatory action under Executive Order 14192. The Regulatory Impact Analysis associated with this rulemaking can be found as a supporting document at *www.regulations.gov.*

## Regulatory Flexibility Act

The Regulatory Flexibility Act, 5 U.S.C. 601–612, is not applicable to this rulemaking because notice of proposed rulemaking is not required. 5 U.S.C. 601(2), 603(a), 604(a).

## Unfunded Mandates

The Unfunded Mandates Reform Act of 1995 requires, at 2 U.S.C. 1532, that agencies prepare an assessment of anticipated costs and benefits before issuing any rule that may result in the expenditure by State, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more (adjusted annually for inflation) in any one year. This final rule will have no such effect on State, local, and tribal governments, or on the private sector.

## Paperwork Reduction Act

This final rule contains no provisions constituting a collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3521).

## Congressional Review Act

Pursuant to the Congressional Review Act (5 U.S.C. 801 *et seq.*), the Office of Information and Regulatory Affairs has designated this rule as not a major rule, as defined by 5 U.S.C. 804(2).

## List of Subjects in 38 CFR Part 21

Administrative practice and procedure, Armed forces, Civil rights, Claims, Colleges and universities, Conflict of interests, Defense Department, Education, Employment, Grant programs—education, Grant programs—veterans, Health care, Loan programs—education, Loan programs—veterans, Manpower training programs, Reporting and recordkeeping requirements, Schools, Travel and transportation expenses, Veterans, Vocational education, Veteran readiness.

## Signing Authority

Douglas A. Collins, Secretary of Veterans Affairs, approved this document on July 24, 2025, and authorized the undersigned to sign and submit the document to the Office of the Federal Register for publication electronically as an official document of the Department of Veterans Affairs.

**Taylor N. Mattson,**
*Alternate Federal Register Liaison Officer, Department of Veterans Affairs.*

For the reasons stated in the preamble, VA amends 38 CFR part 21 as set forth below:

## PART 21—VETERAN READINESS AND EMPLOYMENT AND EDUCATION

### Subpart D—Administration of Educational Assistance Programs

■ 1. The authority citation for part 21, subpart D continues to read as follows:

**Authority:** 10 U.S.C. 2141 note, ch. 1606; 38 U.S.C. 501(a), chs. 30, 32, 33, 34, 35, 36, and as noted in specific sections.

■ 2. Amend § 21.4020 by:
■ a. In paragraph (a)(4), by removing ''35,'';
■ b. Revising paragraph (a)(5);
■ c. Removing the authority citation following paragraph (a)(8); and
■ d. Adding paragraph (c) before the authority citation at the end of the section.

The revisions and addition read as follows:

### § 21.4020  Two or more programs.

(a) * * *
(5) 10 U.S.C. chapters 107, 1606, 1607, and 1611;

*      *      *      *      *

(c) *Limit of Aggregate Assistance.* The aggregate period for which any person may receive assistance under 38 U.S.C. chapter 35 in combination with any of the provisions of law referred to in paragraph (a) of this section may not exceed 81 months (or the part-time equivalent thereof).

*      *      *      *      *

[FR Doc. 2025–14486 Filed 7–30–25; 8:45 am]

**BILLING CODE 8320–01–P**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 60

[EPA–HQ–OAR–2025–0162; FRL–12675–01–OAR]

RIN 2060–AW61

## Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Interim final rule; request for comments.

**SUMMARY:** The U.S. Environmental Protection Agency (EPA) is taking interim final action to extend certain deadlines within the final rule titled ''Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review,'' 89 FR 16820 (March 8, 2024) (hereafter ''2024 final rule''). Specifically, the EPA is extending deadlines for certain provisions related to control devices, equipment leaks, storage vessels, process controllers, and covers/closed vent systems in ''Subpart

OOOOb—Standards of Performance for Crude Oil and Natural Gas Facilities for Which Construction, Modification or Reconstruction Commenced After December 6, 2022'' (NSPS OOOOb). The EPA also is extending the date for future implementation of the SuperEmitter Program. Finally, the EPA is extending the state plan submittal deadline in ''Subpart OOOOc—Emissions Guidelines (EG) for Greenhouse Gas Emissions From Existing Crude Oil and Natural Gas Facilities'' (EG OOOOc). The EPA is requesting comments on all aspects of this interim final rule and will consider all comments received in determining whether amendments to this rule are appropriate after the conclusion of the comment period.

**DATES:** This interim final rule is effective on July 31, 2025. Comments on this interim final rule must be received on or before September 2, 2025.

**ADDRESSES:** You may send comments, identified by Docket ID No. EPA–HQ–OAR–2025–0162, by any of the following methods:

• *Federal eRulemaking Portal: https://www.regulations.gov* (our preferred method). Follow the online instructions for submitting comments.

• *Email: a-and-r-docket@epa.gov.* Include Docket ID No. EPA–HQ–OAR–2025–0162 in the subject line of the message.

• *Mail:* U.S. Environmental Protection Agency, EPA Docket Center, Docket ID No. EPAHQ–OAR–2025–0162, Mail Code 28221T, 1200 Pennsylvania Avenue NW, Washington, DC 20460.

• *Hand/Courier Delivery:* EPA Docket Center, WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. The Docket Center's hours of operation are 8:30 a.m.–4:30 p.m., Monday–Friday (except Federal Holidays). Comments received may be posted without change to *https://www.regulations.gov,* including any personal information provided. For detailed instructions on sending comments, see the ''Public Participation'' heading of the General Information section of this document.

**FOR FURTHER INFORMATION CONTACT:** Amy Hambrick, Sector Policies and Programs Division (E143–05), 109 T.W. Alexander Drive, P.O. Box 12055, Office of Air Quality Planning and Standards, United States Environmental Protection Agency, Research Triangle Park, North Carolina 27711; telephone number: (919) 541–0964; and email address: *hambrick.amy@epa.gov.* Individuals who are deaf or hard of hearing, as well as individuals who have speech or communication disabilities may use a relay service. To learn more about how to make an accessible telephone call to any of the numbers shown in this document, visit the web page for the relay service of the Federal Communications Commission. Additional questions may be directed to the following email address: *O&GMethaneRule@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

*Preamble acronyms and abbreviations.* Throughout this document the use of ''we,'' ''us,'' or ''our'' is intended to refer to the EPA. We use multiple acronyms and terms in this preamble. While this list may not be exhaustive, to ease the reading of this preamble and for reference purposes, the EPA defines the following terms and acronyms here:

| | |
|---|---|
| APA | Administrative Procedure Act |
| AVO | audible, visual, and olfactory |
| CAA | Clean Air Act |
| CBI | Confidential Business Information |
| CFR | Code of Federal Regulations |
| CRA | Congressional Review Act |
| CVS | closed vent systems |
| ECD | enclosed combustion device |
| EG | emissions guidelines |
| EPA | Environmental Protection Agency |
| FR | Federal Register |
| GC | gas chromatograph |
| GHG | greenhouse gas |
| LPE | legally and practicably enforceable |
| Mcf | thousand cubic feet |
| MS | mass spectrometer |
| NAICS | North American Industry Classification System |
| NIE | no identifiable emissions |
| NHV | net heating value |
| $NHV_{cz}$ | combustion zone net heating value |
| $NHV_{dil}$ | dilution parameter net heating value |
| NSPS | new source performance standards |
| OGI | optical gas imaging |
| OMB | Office of Management and Budget |
| ppmv | parts per million by volume |
| PRA | Paperwork Reduction Act |
| RFA | Regulatory Flexibility Act |
| RULOF | remaining useful life and other factors |
| SEP | super emitter program |
| SIP | state implementation plan |
| TOC | total organic compounds |
| tpy | tons per year |
| UMRA | Unfunded Mandates Reform Act |
| U.S.C. | United States Code |
| VOC | volatile organic compound(s) |

*Organization of this document.* The information in this preamble is organized as follows:

I. General Information
  A. Public Participation
  B. Potentially Affected Entities
  C. Statutory Authority
  D. Judicial Review and Administrative Review
II. Regulatory Revisions
  A. Background and Summary
  B. Deadline Extensions for NSPS OOOOb
  C. Deadline Extensions for EG OOOOc
III. Rulemaking Procedures
IV. Request for Comment
V. Statutory and Executive Order Reviews
  A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
  B. Executive Order 14192: Unleashing Prosperity Through Deregulation
  C. Paperwork Reduction Act (PRA)
  D. Regulatory Flexibility Act (RFA)
  E. Unfunded Mandates Reform Act of 1995 (UMRA)
  F. Executive Order 13132: Federalism
  G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments
  H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks
  I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51
  K. Congressional Review Act (CRA)

# I. General Information

## A. Public Participation

Submit your written comments, identified by Docket ID No. EPA–HQ–OAR–2025–0162, at *https://www.regulations.gov* (our preferred method), or by the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit to the EPA's docket at *https://www.regulations.gov* any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. This type of information should be submitted as discussed in the *Submitting CBI* section of this document. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.,* on the web, cloud, or other file sharing system). Please visit *https://www.epa.gov/dockets/commenting-epa-dockets* for additional submission methods; the full EPA public comment policy; information about CBI or multimedia submissions; and general guidance on making effective comments.

*Submitting CBI.* Do not submit information containing CBI to the EPA through *https://www.regulations.gov.* Clearly mark the part or all the information that you claim to be CBI. For CBI on any digital storage media

that you mail to the EPA, note the docket ID, mark the outside of the digital storage media as CBI, and identify electronically within the digital storage media the specific information that is claimed as CBI. In addition to one complete version of the comments that includes information claimed as CBI, you must submit a copy of the comments that does not contain the information claimed as CBI directly to the public docket through the procedures outlined in the Public Participation section of this document. If you submit any digital storage media that does not contain CBI, mark the outside of the digital storage media clearly that it does not contain CBI and note the docket ID. Information not marked as CBI will be included in the public docket and the EPA's electronic public docket without prior notice. Information marked as CBI will not be

disclosed except in accordance with procedures set forth in 40 Code of Federal Regulations (CFR) part 2.

Our preferred method to receive CBI is for it to be transmitted electronically using email attachments, File Transfer Protocol (FTP), or other online file sharing services (*e.g.,* Dropbox, OneDrive, Google Drive). Electronic submissions must be transmitted directly to the OAQPS CBI Office at the email address *oaqps_cbi@epa.gov,* and as described above, should include clear CBI markings, and note the docket ID. If assistance is needed with submitting large electronic files that exceed the file size limit for email attachments, and if you do not have your own file sharing service, please email *oaqps_cbi@epa.gov* to request a file transfer link. If sending CBI information through the postal service, please send it to the following address: OAQPS Document Control

Officer (C404–02), OAQPS, U.S. Environmental Protection Agency, 109 T.W. Alexander Drive, P.O. Box 12055, Research Triangle Park, North Carolina 27711, Attention Docket ID No. EPA–HQ–OAR–2025–0162. The mailed CBI material should be double wrapped and clearly marked. Any CBI markings should not show through the outer envelope.

*B. Potentially Affected Entities*

The source category that is the subject of this action is the Crude Oil and Natural Gas source category, regulated under Clean Air Act (CAA) section 111. The North American Industry Classification System (NAICS) codes for the industrial source categories affected by the new source performance standards (NSPS) portion of this action are summarized in table 1.

TABLE 1—INDUSTRIAL SOURCE CATEGORIES AFFECTED BY THE NSPS

| Category | NAICS code [1] | Examples of regulated entities |
|---|---|---|
| Industry .................................................... | 211120 | Crude Petroleum Extraction. |
| | 211130 | Natural Gas Extraction. |
| | 221210 | Natural Gas Distribution. |
| | 486110 | Pipeline Distribution of Crude Oil. |
| | 486210 | Pipeline Transportation of Natural Gas. |
| Federal Government ................................. | ....................... | Not affected. |
| State and Local Government ................... | ....................... | Not affected. |
| Tribal Government .................................... | 921150 | American Indian and Alaska Native Tribal Governments. |

[1] North American Industry Classification System (NAICS).

This table is not intended to be exhaustive, but rather to provide a guide for readers regarding entities likely to be affected by the deadline extensions. Other types of entities not listed in the table could also be affected by this action. To determine whether your entity is affected by any of the deadline extensions in this action, you should carefully examine the applicability criteria found in NSPS OOOOb. If you have questions regarding the applicability of this action to a particular entity, consult the person listed in the **FOR FURTHER INFORMATION CONTACT** section.

The deadline extensions in EG OOOOc does not impose binding requirements directly on existing sources. The EG codified in 40 CFR part 60, subpart OOOOc, applies to states in the development, submittal, and implementation of state plans to establish performance standards to reduce emissions of greenhouse gases (GHG) from designated facilities that are existing sources on or before December 6, 2022. Under the Tribal Authority Rule (TAR), eligible tribes may seek approval to implement a plan under

CAA section 111(d) in a manner similar to a state. See 40 CFR part 49, subpart A. Tribes may, but are not required to, seek approval for treatment in a manner similar to a state for purposes of developing a tribal implementation plan (TIP) implementing the EG codified in 40 CFR part 60, subpart OOOOc. The TAR authorizes tribes to develop and implement their own air quality programs, or portions thereof, under the CAA. However, it does not require tribes to develop a CAA program. Tribes may implement programs that are most relevant to their air quality needs. If a tribe does not seek and obtain the authority from the EPA to establish a TIP, the EPA has the authority to establish a Federal CAA section 111(d) plan for designated facilities that are located in areas of Indian country.[1] A Federal plan would apply to all designated facilities located in the areas of Indian country covered by the

[1] See the EPA's website, *https://www.epa.gov/ tribal/tribes-approved-treatment-state-tas,* for information on those tribes that have treatment as a state for specific environmental regulatory programs, administrative functions, and grant programs.

Federal plan unless and until the EPA approves a TIP applicable to those facilities.

*C. Statutory Authority*

Statutory authority to issue the amendments finalized in this action is provided by the same CAA provisions that provided authority to issue the regulations being amended: CAA section 111(b)(1)(B) (requirement to review, and if appropriate, revise, standards of performance for new sources at least every 8 years) and CAA section 111(d) (requirement to issue EG for existing sources for certain pollutants to which a NSPS would apply if such existing source were a new source). These statutory provisions, along with administrative agencies' authority to reconsider prior regulations, provide the EPA's statutory authority for the targeted amendments to compliance deadlines finalized in this action.[2]

[2] *See FDA v. Wages & White Lion Invs., LLC,* 145 S. Ct. 898 (2025); *FCC v. Fox TV Stations, Inc.,* 556 U.S. 502 (2009); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983).

Statutory authority for the rulemaking procedures followed in this action is provided by Administrative Procedure Act (APA) section 553(b)(B), 5 United States Code (U.S.C.) 553(b)(B) (good cause exception to notice-and-comment rulemaking), and statutory authority for making this action, which meets the criteria under 5 U.S.C. 804(2), effectively immediately is provided by 5 U.S.C. 808(2). As explained in section III of this preamble, the EPA finds good cause to forego prior notice and comment because such procedures are unnecessary and impracticable under the circumstances detailed in section II of this preamble.

### D. Judicial Review and Administrative Review

Under CAA section 307(b)(1), judicial review of this final action is available only by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit by September 29, 2025. Under CAA section 307(b)(2), the requirements established by this final action may not be challenged separately in any civil or criminal proceedings brought by the EPA to enforce the requirements.

## II. Regulatory Revisions

### A. Background and Summary

On November 15, 2021, the EPA published a proposed rule ("November 2021 Proposal") to reduce GHG and volatile organic compound (VOC) emissions from the oil and natural gas industry,[3] specifically the Crude Oil and Natural Gas source category.[4][5] In the November 2021 Proposal, the EPA proposed revised standards of performance under CAA section 111(b) for GHG and VOC emissions from new, modified, and reconstructed sources in this source category, as well as changes to standards of performance already codified at 40 CFR part 60, subparts

OOOO and OOOOa. The EPA also proposed EG under CAA section 111(d) for GHG emissions from existing sources.[6] The EPA also updated the NSPS OOOO and NSPS OOOOa provisions in the Code of Federal Regulations (CFR) in response to Congress' disapproval of the EPA's final rule titled, "Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Review," September 14, 2020 ("2020 Policy Rule"), under the CRA. Lastly, the EPA proposed a protocol under the NSPS general provisions for optical gas imaging (OGI).

On December 6, 2022, the EPA published a supplemental proposed rule ("December 2022 Supplemental Proposal") that was composed of two main additions.[7] First, the EPA proposed to update, tighten, and expand the NSPS OOOOb standards proposed in November 2021 under CAA section 111(b) for GHG and VOC emissions from new, modified, and reconstructed sources. Second, the EPA proposed to update, tighten, and expand the EG OOOOc presumptive standards proposed in November 2021 under CAA section 111(d) for GHG emissions from existing sources. For purposes of EG OOOOc, the EPA also proposed implementation requirements for state plans.

On March 8, 2024, the EPA published a final rule for the Crude Oil and Natural Gas source category under CAA section 111(b) and (d). First, the EPA finalized NSPS OOOOb for GHG and VOC emissions from new, modified, and reconstructed sources in this source category. Second, the EPA finalized EG OOOOc for GHG emissions from existing sources in this source category. Third, the EPA finalized various amendments in response to Congress' disapproval of the 2020 Policy Rule. The 2024 final rule became effective on May 7, 2024.

After publication of the 2024 final rule, the EPA received multiple petitions for reconsideration and has now determined, through ongoing and recent communications with stakeholders and review of the relevant regulatory language, that certain discrete provisions in the final rule present immediate problems related to

compliance. The issues raised in petitions for reconsideration that are relevant to this interim final rule are described in individual sections below. In this action, the EPA is amending certain compliance deadlines and timeframes for implementation in response to information received after promulgation of the 2024 final rule to address legitimate concerns, raised by stakeholders, that certain regulatory provisions are not currently workable or contain problematic regulatory language that frustrates compliance.

The 2024 final rule is extensive, covering many individual emissions sources of different types at thousands of facilities in the oil and natural gas source category across the country. As explained in more detail in the sections below, the 2024 rule included several provisions that subsequent developments have shown to be untenable from a compliance perspective on the original timeframes set out in the 2024 rule. These timing difficulties were not anticipated in or intended by the 2024 rule, and it is in the public interest and consistent with the purposes of the CAA to provide regulated entities sufficient time to achieve the emissions reductions envisioned by the 2024 rule. Based on information received in petitions for reconsideration and from ongoing conversations with regulated entities, the EPA finds that the targeted revisions to compliance deadlines set forth below are necessary, appropriate, and consistent with the purposes of the 2024 rule and the CAA.

Each regulatory change included in this final action is severable from the other. First, each of the deadlines amended in this action is functionally independent from the others—*i.e.*, may operate in practice independently of the other requirements being amended here, such that the amendment of a deadline in one set of requirements does not turn on the amendment of a deadline in any other set of requirements. For example, amendments to individual compliance deadlines in NSPS OOOOb function separately from amendments to the state plan submittal deadline in EG OOOOc. Similarly, amendments to the implementation deadline for the Super-Emitter Program and amendments to timing for EPA action on methane detection technology for use in the Super-Emitter Program function separately from amendments to individual compliance deadlines to other aspects of the 2024 final rule. Second, as explained in section II.B of this preamble, the reasoning for each regulatory change is distinct and independent from the others. For

---

[3] The EPA characterizes the oil and natural gas industry operations as being generally composed of 4 segments: (1) Extraction and production of crude oil and natural gas ("oil and natural gas production"), (2) natural gas processing, (3) natural gas transmission and storage, and (4) natural gas distribution.

[4] "*Standards of Performance for New, Reconstructed, and Modified Sources: Oil and Natural Gas Sector Climate Review.*" Proposed rule. 86 FR 63110 (November 15, 2021).

[5] The EPA defines the Crude Oil and Natural Gas source category to mean: (1) crude oil production, which includes the well and extends to the point of custody transfer to the crude oil transmission pipeline or any other forms of transportation; and (2) natural gas production, processing, transmission, and storage, which include the well and extend to, but do not include, the local distribution company custody transfer station, commonly referred to as the "city-gate."

[6] The term "designated facility" means "any existing facility which emits a designated pollutant and which would be subject to a standard of performance for that pollutant if the existing facility were an affected facility." See 40 CFR 60.21a(b).

[7] "*Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review.*" Supplemental notice of proposed rulemaking. 87 FR 74702 (December 6, 2022).

example, amendments to individual compliance deadlines in NSPS OOOOb are separately justified, based on the recent information received by the Agency, from the amendments made to the state plan submittal deadline in EG OOOOc based on recent information gathered by the Agency on a distinct set of issues related to OOOOc. Similarly, amendments to individual implementation deadlines for the SEP are separately justified, based on information received by the Agency, from amendments made in response to information received on distinct compliance issues under the other provisions of the 2024 final rule.

The EPA continues to review other issues related to the 2024 final rule that have been brought to the Agency's attention but are not substantively addressed in this action.[8][9] Thus, this action does not reopen the substance of the 2024 final rule or address the substantive amendments requested in various petitions for reconsideration. As noted in section IV of this preamble, the EPA seeks comment on the compliance deadline amendments at issue in this action and will consider appropriate revisions in reviewing comments. However, the EPA does not seek comment on the substance of the 2024 final rule and will seek and respond to comments on further amendments to the substance of the 2024 final rule at an appropriate time in future rulemaking.

*B. Deadline Extensions for NSPS OOOOb* [10]

1. Control Devices

In the 2024 final rule, the EPA finalized monitoring requirements for control devices that included vent gas net heating value (NHV) continuous monitoring requirements and an alternative performance test (sampling demonstration) option for flares and enclosed combustion devices (ECDs). In the 2024 final rule, with exceptions for catalytic vapor incinerators, boilers and

process heaters, and enclosed combustors where temperature is an indicator of destruction efficiency, all flares and enclosed combustors must maintain the NHV of the gas sent to the device above a minimum NHV if the combustion device is pressure-assisted or uses no assist gas. If an owner or operator uses a steam- or air-assisted flare or ECD, the owner or operator must maintain the combustion zone NHV ($NHV_{cz}$) above a minimum level. If the owner or operator uses an air-assisted enclosed flare or ECD, the owner or operator must maintain the NHV dilution parameter ($NHV_{dil}$) above a minimum level. The $NHV_{cz}$ and $NHV_{dil}$ parameter terms account for the reduction in heating value caused by the introduction of air or steam. These terms ensure that the assist gas does not overwhelm the heating value provided by the vent gas to the point where proper combustion is no longer occurring. Owners or operators also have the option to apply to use an alternative test method that either demonstrates continuous compliance with the combustion efficiency limit or directly demonstrates continuous compliance with the $NHV_{cz}$ operating limit and, if applicable, the $NHV_{dil}$ operating limit.

For each flare or ECD used to control gases other than associated gas from a well site affected facility, the owner or operator must conduct continuous monitoring using a calorimeter, gas chromatograph (GC), or mass spectrometer (MS) in order to determine the NHV of the vent stream. As an alternative to continuous monitoring of NHV, the owner or operator may conduct a performance test to demonstrate the NHV of the vent stream consistently exceeds the applicable NHV operating limit in one of two ways: (1) Continuous sampling for 14 consecutive days plus ongoing (3 samples every 5 years) sampling, or (2) manual sampling (twice daily for 14 consecutive days) plus ongoing (3 samples every 5 years) sampling. The minimum collection time for each individual, manually collected sample must be at least 1 hour. If inlet gas flow is intermittent such that collecting 28 samples in 14 days is infeasible, an owner or operator must continue to collect samples beyond 14 days in order to collect a minimum of 28 samples. Owners or operators also have the option to use an alternative test method [11][12] that demonstrates

continuous compliance with the combustion efficiency limit. If there are no values of the combustion efficiency measured by the alternative test method over the 14-day period that are less than 95 percent, the gas stream is considered to consistently exceed the applicable NHV operating limit, and the owner or operator is not required to continuously monitor or conduct sampling of the NHV of the inlet gas to the flare or ECD. Owners or operators of steam-assisted and air-assisted enclosed combustors and flares also must monitor the vent gas and assist gas flow rates and calculate $NHV_{cz}$ and $NHV_{dil}$ in accordance with the provisions in 40 CFR 63.670 (*i.e.*, the refinery maximum achievable control technology rule, or Refinery MACT). Alternatively, owners or operators of air-assisted flares may provide a one-time demonstration based on maximum air assist rates, minimum waste gas flow rates (based on back pressure regulator setting), and minimum NHV from the most recent sampling rather than continuously monitor vent gas and assist gas flow rates.

Multiple petitions for reconsideration and communications with stakeholders after promulgation of the 2024 final rule raised concerns regarding the availability of equipment and personnel necessary [13] to comply with the NHV provisions in the 2024 final rule. Due to the thousands of control devices immediately subject to the OOOOb NHV requirements, number of samples required to be taken, and existing supply chain constraints for monitoring equipment and sampling vendors,[14] petitioners have credibly asserted that

---

[8] See 90 FR 3734. On January 15, 2025, the EPA proposed amendments to NSPS OOOOb and EG OOOOc in response to petitions for reconsideration. The January 2025 proposal includes discrete technical changes to two aspects of the 2024 final rule. The two issues addressed in the January 2025 proposal are temporary flaring provisions for associated gas in certain situations and vent gas NHV continuous monitoring requirements and alternative performance test (sampling demonstration) option for flares and ECDs.

[9] In a press release dated March 12, 2025, the EPA Administrator announced various reconsideration efforts including NSPS OOOOb and EG OOOOc. *https://www.epa.gov/newsreleases/trump-epa-announces-oooo-bc-reconsideration-biden-harris-rules-strangling-american.*

[10] Changes made to the SEP discussed in section II.B.6 of this preamble also apply to 40 CFR part 60, subparts OOOO and OOOOa.

[11] Under the provisions outlined in 40 CFR 60.5412b(d) and 60.5415b(f)(1)(xi), sources can request to use an "equivalent method" pursuant to 40 CFR 60.8(b)(2), or "an alternative method the

results of which [the Administrator] has determined to be adequate for indicating whether a specific source is in compliance" pursuant to 40 CFR 60.8(b)(3). The EPA is currently accepting and reviewing applications for alternative (ALT) test methods for NHV monitoring in the oil and natural gas sector. See *https://www.epa.gov/emc/oil-andgas-alternative-test-methods#:~:text=The%20application%20portal%20can%20be,Air%20Emission%20Measurement%20Center%20web* page. Since the rule's publication date of March 8, 2024, two alternative test method requests have been approved by the EPA for use under NSPS subpart OOOOb: (1) ALT–156 Alternative Test Method to monitor the NHV of the flare combustion zone at facilities Subject to NSPS OOOOb and (2) ALT–157 Alternative Test Method for determining NHV from gas sent to an ECD or Flare subject to NSPS OOOOb. A list of the EPA's approved alternative test methods can be found at *https://www.epa.gov/emc/broadlyapplicable-approved-alternative-test-methods.*

[12] Per 40 CFR 60.8(b)(5), the EPA has more general authority to approve alternative test methods involving "shorter sampling times and smaller sample volumes when necessitated by process variables or other factors."

[13] See EPA–HQ–OAR–2024–0358–0023 attachment 1 at page 9.

[14] See EPA–HQ–OAR–2024–0358–0016 at page 6.

compliance would be very challenging to achieve within the compliance timeline.[15] Moreover, petitioners credibly asserted that even if the samples could be taken within the prescribed period, there is also insufficient analytical laboratory capacity to conduct the necessary analyses for each sample in a timely manner. One of the petitioners stated that vent gas flow from midstream sources to control devices tends to be sporadic and at low pressure and this is particularly true for storage vessels that either have low flows generally or have pressure control valves that only release short bursts of gas to control devices.[16] Other stakeholders added that even if continuous monitoring was technically feasible, there is a lack of available monitoring equipment,[17] and that it will take owners and operators several months to procure continuous monitoring equipment and installation will take additional time. Furthermore, stakeholders have credibly asserted that discussions with vendors indicated that calorimeters would take between 8 to 12 weeks for delivery and continuous monitoring devices will take up to 26 weeks [18] with installation requiring an additional 2 to 3 weeks.[19]

Additionally, one of the petitioners credibly asserted that the 2024 final rule does not provide an adequate period of time to perform the alternative testing procedures under 40 CFR 60.5412b(d) and does not provide any time for testing at all, putting owners and operators at risk of being deemed out of compliance for operating a modified source before and during testing. The petitioner added that the alternative testing protocol (40 CFR 60.5312b(d)(1)–(5)) requires the combustion device to already be operating in order to determine destruction efficiency and inspect for visible emissions, unlike continuous monitoring, which can be installed prior to the startup of a new source. Therefore, petitioners stated that full compliance with the current deadlines across the industry is not feasible. These concerns have been reiterated [20] in public comments submitted by industry groups on the EPA's proposed reconsideration related to NHV monitoring.[21] Commenters have pointed out that testing equipment requires significant lead times, often multiple months in advance.[22]

In the 2024 final rule, in addition to the NHV requirements described in this section, the EPA also finalized performance testing requirements for ECDs applicable to well, centrifugal compressor, reciprocating compressor, storage vessel, process controller, pump, or process unit equipment affected facilities. These performance test requirements consist of a minimum of 3 test runs at least 1 hour long at the inlet of the first control device and at the outlet of the final control device to determine compliance with a total organic compound (TOC) percent reduction requirement of 95.0 percent by weight or greater, or reduce the concentration of TOC in the exhaust gases at the outlet to the control device to a level equal to or less than 275 ppmv as propane on a wet basis corrected to 3 percent oxygen.

According to reconsideration petitioners, the performance testing provisions for ECDs are currently untenable for NSPS OOOOb control devices. Due to the sheer volume of ECDs that require testing under NSPS OOOOb, coupled with the limited number of specialized source testing firms that are available to perform these tests, the petitioners stated that additional time is needed to conduct performance testing for ECDs at affected facilities constructed, modified, or reconstructed since December 6, 2022. The petitioners also expressed concerns over the workload and backlog for the EPA or delegated state and local authorities to process alternative performance testing requests for potentially hundreds of ECD test programs. The petitioners credibly asserted that relying on delegated authorities to address performance testing issues provides no solution on most tribal lands, where the EPA is often the sole agency responsible for implementing NSPS OOOOb.[23] Petitioners stated that while owners and operators utilizing ECDs to comply with standards in a state or Federal plan under EG OOOOc will likely have years to address these challenges, these performance testing issues present an immediate and untenable scenario for NSPS OOOOb control devices.

The petitioners expressed additional concerns over the amount of time required (*i.e.,* minimum test run duration) and the need for supplemental gas to conduct three 1-hour test runs on sources that have intermittent flow (*e.g.,* storage vessels). A testing crew is typically able to conduct up to two performance tests per day where vapor flow is sufficient. Where vapor flow is low and/or intermittent, as can be the case for many storage vessels, it may take multiple days of waiting to find a window with sufficient flow to accommodate a 1-hour test run, and in many cases, there will never be sufficient vapor flow to accommodate a 1-hour test run under normal operating conditions. Therefore, petitioners stated, performing these tests as prescribed in the 2024 final rule is not always feasible.

Additionally, petitioners stated the installation of monitoring equipment or sampling ports on existing ECDs requires specialized "hot tap" work. A "hot tap" requires specialized vendors and a site shutdown to perform this work. This work exacerbates the already challenging compliance timeline given the existing supply chain constraints, which will prevent most affected facilities from obtaining the necessary monitoring equipment, and the large number of needed retrofits.[24] Therefore, petitioners said this work cannot be accomplished across the industry prior to the deadline for compliance demonstrations.

In this action, the EPA is extending the compliance dates related to NHV monitoring of flares and ECDs found in 40 CFR 60.5417b(d)(8)(i) through (iv) and (vi) by 120 days from publication of this interim final rule to address the supply chain, personnel, and laboratory limitations identified by petitioners which make compliance with the requirements promulgated in the 2024 final rule infeasible. On January 15, 2025, the EPA proposed amendments to the NSPS and EG related to NHV requirements based on reconsideration petitions. The Agency is working towards finalizing these amendments and expects a final rule to be issued soon. Because a separate rulemaking action will address the substantive problems raised with the NHV provisions in the 2024 final rule, we have determined that an extension to November 28, 2025 is sufficient for present purposes. The EPA solicits comments on this extension of 120 days.

---

[15] See EPA–HQ–OAR–2024–0358–0009 at page 1.

[16] See EPA–HQ–OAR–2024–0358–0016 at page 6.

[17] See EPA–HQ–OAR–2024–0358–0020 attachment 3 at page 5.

[18] See EPA–HQ–OAR–2024–0358–0020 attachment 3 at page 13.

[19] See EPA–HQ–OAR–2024–0358–0013 at pages 2–3.

[20] See EPA–HQ–OAR–2024–0358–0083 at page 16, submitted to the EPA on March 4, 2025.

[21] On January 15, 2025, the EPA proposed amendments to the 2024 final rule based on reconsideration of two discrete issues related to NHV monitoring and temporary flaring. See 90 FR 3734 for the January 2025 reconsideration proposal. See Docket ID No. EPA–HQ–OAR–2024–0358 for public comments submitted on the January 2025 reconsideration proposal.

[22] See EPA–HQ–OAR–2024–0358–0046 at page 8.

[23] See EPA–HQ–OAR–2024–0358–0009 at page 5.

[24] See EPA–HQ–OAR–2024–0358–0009 at page 2 and attachment 1 to the petition.

**35972**    **Federal Register** / Vol. 90, No. 145 / Thursday, July 31, 2025 / Rules and Regulations

If, based on comments or otherwise, additional adjustment to the compliance timeline for the NHV requirements is needed, the EPA may address that issue via additional amendments following this action, including potentially in the separate reconsideration action.

Additionally, the EPA is extending the requirement to conduct performance tests on ECDs in 40 CFR 60.5413b(b) until January 22, 2027 to provide affected facilities sufficient lead time to retrofit sources and to plan and execute the performance tests required by the final rule. The EPA notes that even though the Agency is extending the deadline to complete the prescribed NHV monitoring on these source types, the visible emission observation requirements of 40 CFR 60.5417b(d)(8)(v) will continue to apply in order for sources to demonstrate compliance with the prescribed emission standards as of the 2024 final rule effective date of May 7, 2024, or 180 days after startup, whichever is later, as required in 40 CFR 60.5370b(a)(9)(ii).

2. Covers and Closed Vent Systems

As in NSPS OOOO and OOOOa, NSPS OOOOb contains requirements for closed vent systems (CVS) and covers.[25] CVS route emissions from well (*i.e.,* oil wells when routing associated gas to a control device), centrifugal compressor, reciprocating compressor, process controller, pump, storage vessel and process unit affected facilities to a control device or to a process. Pursuant to the 2024 final rule, each CVS used for compliance with an NSPS OOOOb standard must be designed and operated to capture and route all gases, vapors, and fumes to a process or to a control device with "no identifiable emissions" (NIE) and these systems must be inspected within 30 days of startup of the affected facility and annually thereafter to verify NIE. Covers must form a continuous impermeable barrier over the entire surface area of the liquid in the storage vessel, over the centrifugal compressor wet seal fluid degassing system, or over the reciprocating compressor rod packing emissions collection system. Each cover opening shall be secured in a closed, sealed position (*e.g.,* covered by a gasketed lid or cap) whenever material is in the unit on which the cover is installed, except during those times when it is necessary to use an opening,

such as to inspect equipment or to remove material from the equipment.

Under the final 2024 rule, initial and continuous compliance of the NIE requirement can be demonstrated through OGI, EPA Method 21, or audio, visual and olfactory inspections (AVO) inspections conducted at the same frequency as the fugitive emissions monitoring for the type of site where the cover and CVS are located. Alternatively, an owner or operator could demonstrate ongoing compliance with the NIE requirement for covers and CVS using the periodic screening or continuous monitoring requirements for advanced methane detection technologies in 40 CFR 60.5398b. Where AVO inspections are required, the CVS and cover are determined to operate with NIE if no emissions are detected by AVO means. Where OGI monitoring is conducted, the CVS and cover are determined to operate with NIE if no emissions are imaged by the OGI camera. Where EPA Method 21 monitoring is conducted, the CVS and covers are determined to operate with NIE if the readings obtained using EPA Method 21 are less than 500 parts per million by volume (ppmv) above background. Emissions detected by AVO, OGI, or EPA Method 21 constitute a deviation of the NIE requirement until a subsequent inspection determines that the CVS and cover operate with NIE. Where monitoring is conducted using advanced methane detection technologies, covers and CVS are determined to operate with NIE if no emissions are detected by the periodic screening survey or, where continuous monitoring is conducted, the site remains under the action levels. If emissions are detected from the site during a periodic screening survey or the site exceeds an action level, the cover and CVS are still determined to operate with NIE unless a follow-up inspection with EPA Method 21, OGI, or AVO indicates that the cover and CVS do not operate with NIE.

Each CVS must be inspected to ensure that the CVS operates with NIE initially within 30 calendar days after startup of the affected facility routing emissions through the CVS. Specifically, for the well sites and centralized production facilities where a CVS is present, quarterly OGI or EPA Method 21 and bimonthly AVO would be required; for compressor stations, quarterly OGI or EPA Method 21 and monthly AVO would be required. For CVS and covers located at onshore natural gas processing plants, AVO inspections are required annually and instrument monitoring for NIE must be conducted either bimonthly with OGI following the

procedures in appendix K or quarterly in accordance with EPA Method 21. For CVS joints, seams, and connections that are permanently or semi-permanently sealed, owners and operators are not required to conduct periodic instrument monitoring with OGI or EPA Method 21, but the owner or operator must still conduct initial instrument monitoring and periodic AVO monitoring. Additionally, annual visual inspections must be conducted for all CVS to check for defects, such as cracks, holes, or gaps. If the CVS is equipped with a bypass, the bypass must include a flow monitor and sound an alarm to alert personnel or send a notification via remote alarm to the nearest field office that a bypass is being diverted to the atmosphere, or it must be equipped with a car-seal or lock-and-key configuration to ensure the valve remains in a non-diverting position. To ensure proper design, an assessment of the CVS must be conducted and certified by a qualified professional engineer or inhouse engineer.

Any emissions or defects detected during an inspection of a cover or CVS is subject to repair, with a first attempt at repair within 5 days after detecting the emissions or defect and final repair within 30 days after detecting the emissions or defect. While awaiting final repair, covers must have a gasket-compatible grease applied to improve the seal. Delay of repair is allowed where the repair is infeasible without a shutdown, or it is determined that immediate repair would result in emissions greater than delaying repair. In all instances, repairs must be completed by the end of the next shutdown. Owners and operators may designate parts of the CVS as unsafe to inspect or difficult to inspect but must have a written plan of the inspection of this equipment. Equipment that is unsafe to inspect would expose inspecting personnel to an imminent potential danger; this equipment must be inspected as frequently as practicable, during safe to inspect times. Equipment that is difficult to inspect would require elevating inspecting personnel more than 2 meters above a support surface; this equipment must be inspected at least once every 5 years.

As to this set of issues, the reconsideration petitioners have credibly asserted that it is not technically achievable over the long-term to maintain NIE compliance with these systems.[26] They state that fugitive emissions will occur over time due to normal wear and tear during typical operation of the equipment and leak

---

[25] Also, as in NSPS OOOOa, CVS and covers that are not associated with an affected facility are fugitive emissions components.

[26] See EPA–HQ–OAR–2024–0358–0009 at page 7.

detection and repair (LDAR) programs are typically designed to allow operators to address them promptly and responsibly.[27] The petitioners state that affected facilities will not be able to prevent inevitable minor fugitive emissions from covers and CVS, and thus the requirement to achieve and maintain NIE is untenable. According to the petitioners, this unrealistic requirement will inevitably yield widespread non-compliance with the NIE requirements in the 2024 final rule due to normal operation of these affected sources because detected leaks are treated as deviations without first allowing for repair.[28] These concerns related to compliance with a requirement viewed as unworkable have been reiterated by stakeholders in subsequent meetings with the EPA.[29 30]

In this action, the EPA is extending the compliance date for NIE requirements until January 22, 2027. Based on information received since promulgation of the 2024 final rule, the EPA has serious concerns regarding the ability of owners/operators to meet the NIE inspection requirements in the 2024 rule on the existing compliance schedule and finds it necessary, appropriate, and in the public interest to extend the compliance deadline given credible workability concerns. We note that other compliance requirements for affected facilities that would otherwise be subject to NIE requirements continue to apply consistent with the substantive requirements and goals of the 2024 final rule. In other words, owners and operators still must design and install a CVS and perform initial and ongoing inspections to ensure that the system has no leaks consistent with the requirements of the 2024 final rule and repair any leaks that are found within 30 days. The only requirements that are being delayed are the inspections to confirm that systems operate with NIE during which identifying a leak would be considered a deviation of the standard.

### 3. Equipment Leaks

In the 2024 final rule, the EPA promulgated requirements for equipment leaks that included provisions for repairs when equipment leaks are detected. For each valve where a leak is detected, regulated entities must comply by repacking the existing valve with a low emitting (low-E)

packing, replacing the existing valve with a low-E valve; or performing a drill and tap repair with a low-E injectable packing.[31] An owner or operator is not required to utilize a low-E valve or low-E packing to replace or repack a valve if the owner or operator demonstrates that a low-E valve or low-E packing is not technically feasible. Low-E valve or low-E packing that is not suitable for its intended use is considered to be technically infeasible. Factors that may be considered in determining technical infeasibility include the following: retrofit requirements for installation (*e.g.*, re-piping or space limitation), commercial unavailability for valve type, or certain instrumentation assemblies.

Reconsideration petitioners have credibly asserted that requiring replacement of leaking valves with low-E valves without first providing an opportunity for an attempt at repair of the existing valve is technically and economically infeasible, did not follow proper notice and comment requirements, and creates confusion regarding when replacement is considered feasible in an enforcement proceeding.[32] Based on cost estimates provided in the petitions for reconsideration, petitioners claim that such equipment (low-E valves and packing) is not commercially available at costs that make widespread replacement of valves with low-E equipment viable across the industry.

The EPA acknowledges that regulatory language in the 2024 final rule introduced unintended compliance difficulties related to equipment leak repair requirements. As currently written, the regulatory language in 40 CFR 60.5400b(h)(2)(ii)(A) appears to require a source to repack an existing valve with low-E packing, and then the language is unclear as to whether a source must also comply with paragraph (B) or (C), which require that they either replace the valve with a low-E valve or perform a drill and tap repair with a

low-E injectable packing, respectively. It was not the EPA's intention to require that a source repack an existing valve and replace that valve during the same repair. Furthermore, the CFR erroneously includes two versions of paragraph 60.5401b(i). The EPA discovered since promulgation of the 2024 final rule that these two copies of the repair requirements paragraph differ and create confusion for affected facilities. The first of the two copies included in the CFR is correct while the second contains similar errors to those present in 40 CFR 60.5400b(h)(2)(ii). In order to alleviate the compliance confusion created by the conflicting regulatory language, and to provide potentially affected sources additional time to undertake planning to obtain needed low-e equipment given the cost and widespread need for such equipment, the EPA is extending the compliance date for equipment leak repair requirements contained in 40 CFR 60.5400b(h)(2)(ii) and 60.5401b(i)(2)(ii) until January 22, 2027 or 180 days after startup of the affected source, whichever is later.

### 4. Process Controllers

Process controllers are automated instruments used for maintaining a process condition, such as liquid level, pressure, pressure difference, or temperature. Historically, in the oil and gas industry, many process controllers were powered by pressurized natural gas and therefore would emit natural gas to the atmosphere. However, process controllers may also be powered by electricity or compressed air, and these types of controllers do not use or emit natural gas. In the December 2022 Supplemental Proposal, the EPA proposed a "zero emissions" VOC and methane standard for most process controllers in NSPS OOOOb and a "zero emissions" methane presumptive standard for most process controllers in EG OOOOc. This standard can be achieved by using a process controller that is not powered by natural gas, by capturing the emissions from the natural gas-driven controllers and routing them to a process, or by using self-contained controllers. The 2024 final rule includes the "zero emissions" VOC standard proposed in December 2022 along with different standards for process controllers in Alaska at locations where access to electrical power from the power grid is not available. The requirements for these sources in Alaska are to use lower emitting natural gas-driven process controllers and to perform inspections to ensure that they are operating properly.

---

[27] See EPA–HQ–OAR–2024–0358–0012 at page 1.

[28] See EPA–HQ–OAR–2024–0358–0013 at page 14.

[29] See EPA–HQ–OAR–2024–0358–0046 at page 16.

[30] See EPA–HQ–OAR–2024–0358–0023 at page 16.

[31] The 2024 final rule includes the following definitions: *Low-E valve* means a valve (including its specific packing assembly) for which the manufacturer has issued a written warranty or performance guarantee that it will not emit fugitives at greater than 100 ppm in the first five years. A valve may qualify as a low-e valve if it is as an extension of another valve that has qualified as a low-e valve. *Low-e packing* means a valve packing product for which the manufacturer has issued a written warranty or performance guarantee that it will not emit fugitives at greater than 100 ppm in the first five years. Low-e injectable packing is a type of low-e packing product that is a low-e packing product for which the manufacturer has also issued a written warranty or performance guarantee and that can be injected into a valve during a "drill-and-tap" repair of the valve.

[32] See EPA–HQ–OAR–2024–0358–0013 at pages 7–11.

The process controller standards apply to the collection of new, modified, and reconstructed natural gas-driven process controllers at a site (*i.e.,* a well site, centralized production facility, onshore natural gas processing plant, or compressor station). Process controllers that are emergency shutdown devices (ESD) or that are not natural gas-driven are not included in the affected facility definition.

The standards that apply differ depending on the location of the site and whether access to electrical power is available at the site, which are sites that have commercial line power onsite. For any site outside of Alaska, the standard for all process controllers is zero emissions of VOC and methane. Zero emissions of VOC and methane may be achieved by using process controllers that are not driven by natural gas (and thus not affected facilities), by routing natural gas-driven process controller vapors through a CVS to a process, by using self-contained natural gas-driven process controllers, or by another means that achieves the numerical standard of zero emissions of methane and VOC. For sites in Alaska with access to electrical power the standard for all process controllers at the site is also zero emissions of VOC and methane. For sites in Alaska without access to electrical power, owners/operators must use natural gas-driven process controllers with low natural gas emission rates. These process controllers include continuous bleed controllers with an emissions rate (or bleed rate) of less than or equal to 6 standard cubic feet per hour (scfh) and intermittent vent controllers, which are process controllers that only emit natural gas when they actuate, rather than emitting continuously. Intermittent vent controllers are subject to monitoring requirements. Further, as an alternative, sites in Alaska without access to electrical power may route emissions from natural gas-driven process controllers to a control device achieving a 95 percent emissions reduction. Table 12 of the March 2024 final rule preamble (89 FR 16882) summarizes the emissions standards for process controllers.

Based on comments the EPA received in 2022 and 2023 expressing concerns about new sources' ability to obtain the equipment necessary to demonstrate compliance with the final standard of zero emissions immediately upon the effective date of the final rule, the EPA finalized a NSPS compliance deadline for process controllers that allows up to 1 year from the effective date of the final rule to come into full compliance with the final standard of zero emissions.

Until that final date of compliance, owners and operators must demonstrate compliance with an interim standard which mirrors the requirements for sites in Alaska that do not have access to electrical power. See 89 FR 16929–30.

According to reconsideration petitioners, in the 2024 final rule, existing sites that trigger the OOOOb modification provisions, and thus become subject to the NSPS, have to convert all process controllers in a process controller affected facility to comply with the zero-emission standard by May 7, 2025, or upon modification, whichever is later. Reconsideration petitioners have credibly asserted that this will place a significant demand on the equipment, supplies, and service vendors during the compliance time frame and add more strain to a supply chain that currently requires 12–18 months to deliver certain types of components necessary for the conversion of large natural gas driven controllers to an air driven system.[33] According to petitioners, if an operator is unable to complete the conversion due to reasons beyond its control, the operator will have to make a decision whether to continue operating, potentially in a non-compliant state; or shut down that "compressor station, thereby reducing its ability to move gas during peak demand periods, pursuant to their Federal Energy Regulatory Commission approved tariffs.[34] Petitioners also state that the EPA's regulatory language is ambiguous and creates confusion regarding the types of processes potentially subject to the standards. Specifically, petitioners have credibly asserted that the 2024 final rule is unclear with respect to whether certain high-pressure applications are included in the scope of the regulations.[35] Therefore, even more sources may require the equipment necessary to achieve the zero emissions standard which puts even more demand on a limited supply, resulting in further compliance delays that EPA did not intend to create in promulgating the 2024 final rule.

In this final action, the EPA is extending the second phase of the phased-in compliance deadline for the zero emission standards applicable to process controllers to January 22, 2027 to address the supply chain and logistical issues raised by petitioners. The EPA has determined that the additional compliance time is needed to

ensure that sufficient equipment can be sourced, obtained, and installed in timelines that are achievable by affected sources. In the meantime, consistent with the substantive provisions and goals of the 2024 final rule, the interim standard continues to apply to process controller affected facilities (*i.e.,* the same standard applicable to sites in Alaska without access to electricity).

5. Storage Vessels

In the 2024 final rule, the EPA promulgated requirements that defined a storage vessel affected facility as a tank battery that has the potential for VOC emissions equal to or greater than 6 tons per year (tpy) or methane emissions equal to or greater than 20 tpy. A storage vessel is a tank or other vessel that contains an accumulation of crude oil, condensate, intermediate hydrocarbon liquids, or produced water, and that is constructed primarily of non-earthen materials. A tank battery is a group of all storage vessels that are manifolded together for liquid transfer. For purposes of this rule, a tank battery may consist of a single storage vessel if only one storage vessel is present. The 2024 final rule includes language in 40 CFR 60.5365b(e)(ii) that describes how a source should determine the potential emissions from storage vessels. Specifically, the final rule states that potential for VOC and methane emissions must be calculated using a generally accepted model or calculation methodology that accounts for flashing, working, and breathing losses, based on the maximum average daily throughput to the tank battery determined for a 30-day period of production.

Storage vessel affected facilities must reduce emissions of VOC and methane by 95 percent. The standard reflects the degree of emission limitation achievable through application of a combustion control device or vapor recovery unit (VRU). For storage vessel affected facilities not at a well site or centralized production site, and without potential for flashing emissions, owners and operators may choose to comply by using an internal or external floating roof to reduce emissions in accordance with 40 CFR part 60, subpart Kb (NSPS for Volatile Organic Liquid Storage Vessels). The rule allows removal of a control device from a storage vessel affected facility if the owner or operator maintains the uncontrolled actual VOC emissions at less than 4 tpy and the actual methane emissions at less than 14 tpy as determined monthly for 12 consecutive months.

Storage vessel affected facilities which use a control device to reduce emissions must equip each storage

---

[33] See EPA–HQ–OAR–2024–0358–0014 at page 10.

[34] See EPA–HQ–OAR–2024–0358–0014 at page 10.

[35] See EPA–HQ–OAR–2024–0358–0043 attachment 2 at page 4.

vessel in the tank battery with a cover and must equip the tank battery with one or more CVS which route all emissions to a process or one or more control devices. Owners and operators of flares and other control devices must conduct monitoring, recordkeeping, and reporting to ensure that the control device is continuously achieving the required 95 percent reduction. More information on the flare and other control device monitoring and compliance provisions is provided in section X.H of the March 2024 final rule preamble (89 FR 16963) and information regarding covers and CVS may be found in section X.K of the March 2024 final rule preamble (89 FR 16984).

The EPA finalized an affected facility-specific definition of "modification" for storage vessels to include specific physical changes that trigger the modification requirements. Those changes include adding an additional storage vessel, replacing existing storage vessel(s) that result in an increased capacity of the tank battery, receiving additional throughput from production well(s) at tank batteries at well sites or centralized production facilities, or receiving additional fluids which cumulatively exceed the throughput used in the most recent determination of the potential for VOC or methane emissions not located at a well site or centralized production facility, including each tank battery at compressors stations or onshore natural gas processing plants that also result in exceeding the applicability threshold for either VOC or methane. The EPA defined "reconstruction" for OOOOb storage vessels to mean at least half of the storage vessels are replaced in the existing tank battery that consists of more than one storage vessel, or the provisions of 40 CFR 60.15 are met for the existing tank battery and the resulting emissions exceed the applicability threshold for either VOC or methane.

Further, in the 2024 final rule, the EPA finalized criteria that must be met for a permit limit or other requirement to qualify as a legally and practicably enforceable (LPE) limit for purposes of determining whether a tank battery is an affected or designated facility under NSPS OOOOb or EG OOOOc, respectively. The 2024 final rule established that a LPE limit must include a quantitative production limit and quantitative operational limit(s) for the equipment, or quantitative operational limits for the equipment; an averaging time period for the production limit, if a production-based limit is used, that is equal to or less than 30 days; established parametric limits for

the production and/or operational limit(s), and where a control device is used to achieve an operational limit, an initial compliance demonstration (*i.e.,* performance test) for the control device that establishes the parametric limits; ongoing monitoring of the parametric limits that demonstrates continuous compliance with the production and/or operational limit(s); recordkeeping by the owner or operator that demonstrates continuous compliance with the limit(s); and periodic reporting that demonstrates continuous compliance.

Reconsideration petitioners have raised concerns with provisions related to how sources determine potential emissions,[36] the triggers for modification, and the specific criteria for limits on potential to emit to be considered LPE.[37] Some reconsideration petitioners credibly asserted that the applicability determination language in 40 CFR 60.5365b(e)(2)(ii) is ambiguous for tanks that commenced construction, modification, or reconstruction after the date of the supplemental proposal (December 6, 2022) and prior to the OOOOb effective date ("pre-effective date tanks"), May 7, 2024.[38] The petitioners also stated that it is unclear what "30-day period of production" operators must use to determine the maximum average daily throughput to calculate the potential for VOC and methane emissions for pre-effective date tanks.[39] Without clarification, operators may not know with certainty the scope of affected storage vessels that must comply with OOOOb by the compliance deadline. The petitioners also credibly asserted that requiring a determination earlier than the OOOOb effective date imposes compliance obligations before they are effective. Additionally, the petitioners stated this is compounded by defining a "legally and practicably enforceable limit," which effectively eliminated the ability to rely on permit limits for applicability determinations under OOOOb. Stakeholders have continued to reiterate these concerns in further discussions with the EPA.[40] Petitioners further stated that the LPE requirements apply to storage vessels for which states do not have the authority or mechanisms to apply such limits in permits.[41]

[36] See EPA–HQ–OAR–2024–0358–0043 at page 17.
[37] See EPA–HQ–OAR–2024–0358–0016 at pages 2–4.
[38] See EPA–HQ–OAR–2024–0358–0009 at page 7.
[39] See EPA–HQ–OAR–2024–0358–0010 at page 5.
[40] See EPA–HQ–OAR–2024–0358–0046 at page 15.
[41] See EPA–HQ–OAR–2024–0358–0043 attachment 2 at page 5.

According to petitioners, the expansive storage vessel modification provisions will immediately and automatically trigger new source requirements for tens of thousands of tanks and tank batteries (far more than the EPA predicted when formulating those provisions). The EPA agrees that the modification provisions finalized in 2024 contain a degree of vagueness such that it is possible that far more midstream storage vessels could trigger modification than the EPA estimated in the 2024 final rule. We did not anticipate that these provisions would affect the large number of sources cited by petitioners and agree that additional compliance time is needed for the large number of potentially affected sources.

The petitioners also stated the EPA should allow more time than afforded in the 2024 final rule to allow state, local, and tribal agencies to adopt and implement conformant LPE limits. The EPA is extending the date for the specific provisions required for a limit to be considered LPE limits in 40 CFR 60.5365b(e)(2)(i)(A)–(F) until January 22, 2027. This action will ensure there is enough time for sources to work with delegated authorities to establish limits that are LPE without foreclosing the use of LPE limits already established that may or may not contain the same level of specificity as the requirements in NSPS OOOOb during that time. Additionally, the EPA is extending the date at which the throughput-based modification triggers become effective by 18 months in order to provide time for the potentially large number of sources that would trigger those provisions to make any needed adjustments to facility planning, equipment procurement, and process changes needed to comply with the requirements. Finally, the EPA is extending the date by which sources must calculate potential emissions using the 30-day period of production by 18 months to allow facilities to obtain additional information and make the requisite decisions related to their facilities that may be subject to these requirements. We note that until the provisions that we are extending come into effect, there are still provisions in place that establish what other activities constitute a modification, *i.e.,* sources that add an additional vessel or replace a vessel with one that has increased capacity still trigger modification. Sources are still required to determine the potential emissions from storage vessels. The only change to these provisions is that, in the interim period, sources need not use the (confusing) 30-day period of production calculation

and limits on potential emissions can be considered LPE with or without the specific criteria included in the 2024 final rule. Any sources that do trigger modification provisions will still be subject to the standards in the 2024 final rule and this action does not change those standards.

### 6. Super Emitter Program

The EPA included the Super Emitter Program (SEP) in the 2024 final rule, previously proposed as the Super Emitter Response Program in the December 2022 Supplemental Proposal. For purposes of the 2024 final rule, a "super emitter event" is defined as any emissions event that is located at or near an oil and natural gas facility and that is detected using remote detection methods and has a quantified emission rate of 100 kg/hr of methane or greater.

As described in the preamble to the 2024 final rule, this program was designed to provide a mechanism by which the EPA would provide owners and operators with timely notifications of super-emitter emissions data collected by EPA-certified third parties using EPA-approved remote sensing technologies. See 89 FR 16877. Where such an event is attributable to an oil or natural gas source regulated under CAA section 111 (NSPS OOOO, OOOOa, or OOOOb, or a state or Federal plan implementing EG OOOOc), the responsible owner or operator would take action in response to such notifications in accordance with the applicable regulation. *Id.* Section X.C of the 2024 final rule preamble describes the SEP in detail. See 89 FR 16876.

In implementing this novel program, the EPA has experienced unanticipated difficulties and concerns that require additional time for effective and lawful administration of various program procedures.[42] For example, while the rule requires a third-party notifier to provide a significant amount of information regarding a super emitter event as part of submitting a notification of the event to the EPA, the attribution of who owns or operates a site is not a required element. While the EPA has developed tools to aid certified third parties in the attribution of identified events, in limited practice, the certified third parties that have submitted information to date have chosen not to include an owner/operator attribution in the submitted notification. In the absence of this information, to meet the program's goals of providing the submitted information about these events to the owners or operators of the appropriate facilities, the EPA must

itself determine and then confirm the owner/operator attribution. This process has proven time- and labor-intensive and generated unanticipated concerns about improper attribution and related consequences for enforcement and compliance efforts more generally.

Though the super-emitter program has thus far received relatively few submittals of notifications of super-emitter events from a certified third party, we expect that the number of submittals would grow extensively if more cost-effective technologies were approved (*e.g.,* satellite sensors). With the potential increase in the number of submitted notifications, the EPA's ability to provide timely notification of these events to the facility owner or operator would be hampered given the existing challenges identified in determination attribution for each owner or operator. Similarly, if the number of notifications that the EPA receives based on the currently approved remote-sensing technology were to substantially increase, the EPA's ability to timely provide the notification to the appropriate owner and operator would be constrained by the EPA's ability to make and confirm the owner or operator attribution. These limitations would lead to delays in providing notifications to the appropriate owner or operator that are inconsistent with the program's design and intended function. A central element of the program's design is to provide information about these emissions events in a timely fashion to the appropriate owners and operators, so that they can quickly conduct the investigations into the event required under the rule and take any necessary corrective action if the source is subject to the rule. Delays in providing the notifications to owners and operators would result in the information being stale when received, or superseded by intervening events, limiting both the value of information that could be discovered through the required investigation and the opportunity to take corrective action.

Additionally, implementation of the program to date indicates that application of this program has been broader than the EPA anticipated in promulgating the 2024 final rule. For instance, part of the definition of a super-emitter event under 40 CFR 60.5371b is that the event be located at or near an oil and natural gas facility. In limited practice, this definition has resulted in the EPA receiving notifications of an event at a downstream production site not subject to any upstream oil and gas regulation. Specifically, a notification was provided

to a renewable fuel refinery in Bakersfield, California on January 21, 2025. Though this facility is within an oil and gas production basin and an emission was detected from the site, it does not appear to be the type of oil and gas facility that the EPA intended to cover in the SEP. This distinction is important since these types of emissions are likely tied to short-term process conditions which are typical at downstream production sites. While the program requires the EPA to review the submitted notifications of super-emitter events for completeness and accuracy, it does not allow the EPA the discretion to not post or provide a notification to an owner or operator identified in the notification for other reasons, such as the EPA's judgment on the appropriateness of a notification. In the absence of such discretion, the EPA is required to provide a notification to an owner or operator of who is identified in the notification, so long as the EPA had reviewed the notification and determined that it is complete and does not contain information that the EPA finds to be inaccurate to a reasonable degree of certainty, even if other reasons might counsel against providing the notification, such as when that site has already received a notification of a particular emissions event, or if the EPA has determined that a notification relates to an emissions event that is not regulated or prohibited under the EPA's oil and gas rules.

For these reasons, the EPA is extending the date for future implementation of the super-emitter program until January 22, 2027. This extension also impacts the timing for EPA action on methane detection technology under 40 CFR 60.5398b(d)(1)(iii) for use in the SEP. Because the EPA is extending the date for future implementation of the SEP, there is no need for the EPA to act on submissions of remote-detection technology for use in the program in the intervening period. Therefore, the EPA is extending the provisions that include conditional approval of methane detection technology for use in the SEP that occurs if the EPA does not act on submissions of those technologies by the timelines prescribed by the rule until January 22, 2027.

### 7. Flare Pilot Flame and Alarm Requirements

In the 2024 final rule, the EPA finalized requirements that all enclosed combustion devices, other than boilers and process heaters, that introduce the vent stream with the primary fuel into the flame zone or use the vent stream as the primary fuel, as well as all catalytic

---

[42] See EPA–HQ–OAR–2024–0358–0010 at 27–32.

incinerators, that operate above a minimum flow rate established by the manufacturer must install and operate a continuous burning pilot or combustion flame. Additionally, the combustion devices must have a way to alert the nearest control room whenever the pilot or combustion flame is unlit.

The 2024 final rule also requires that all flares (*e.g.,* unassisted, pressure-assisted, and steam-assisted) have a continuous burning pilot or combustion flame and have a system that provides an alert to the nearest control room whenever the pilot or combustion flame is unlit. Additionally, the flow rate to a flare must be maintained at a level that ensures compliance with the flare tip velocity limits in the 40 CFR part 60 General Provisions, and the flow rate to an enclosed combustion device must be below a maximum flow rate established during the performance test or by the manufacturer, if the initial performance test is performed by the manufacturer.

Flares and enclosed combustion devices that use pressure-assisted tips to promote mixing at the burner tip are not subject to this maximum flow rate limit because these units are designed to operate at high flow rates. All flares and all enclosed combustion devices used to comply with the standards must also operate with a continuous burning pilot flame and with no visible emissions, except for periods not to exceed a total of 1 minute during any 15-minute period. Compliance with the visible emissions requirement can be confirmed either through monthly testing using EPA Method 22 or through continuous use of a video surveillance camera. The 2024 final rule requires that if owners and operators use certain flares and enclosed combustion devices to comply with the standards, they must install a system to send an alarm to the nearest control room if an unlit pilot flame is detected on a flare or enclosed combustion device. Additionally, during each fugitive emissions inspection conducted using an OGI camera, including those conducted in response to periodic screening events using alternative technologies, owners and operators must observe each enclosed combustion device and flare to determine if it is operating properly, including ensuring that a flame is present and that there is no indication of uncontrolled emissions. During each fugitive emissions inspection conducted using AVO, owners and operators must observe each enclosed combustion device and flare to determine if it is operating properly, visually confirming that the pilot flame is lit and operating properly.

Owners and operators also have the option to request an alternative test method to demonstrate continuous 95.0 percent control of emissions. Using this option, the owner or operator would demonstrate that the combustion device continuously achieves 95.0 percent combustion efficiency or that the combustion device continuously complies with the combustion zone NHV and NHV dilution parameter requirements. The alternative test method, if approved by the EPA, would be used in lieu of the other monitoring required for combustion device (*e.g.,* vent gas NHV, flow rate).

In addition to information that must be reported, owners and operators must keep records of continuous compliance with the monitoring requirements, including information about the pilot flame being lit, CPMS limits, CPMS hourly and average values, and results of visible emissions observations or surveillance camera feed.

Petitioners have raised concerns that the 2024 final rule requirements for continuous pilot flames pose significant logistical challenges. These challenges relate to providing supplemental fuel to maintain a continuous pilot flame at intermittently operating processes for affected facilities that are located far from reliable sources of such fuel.[43] Petitioners have also described challenges in obtaining and installing communications equipment capable of reliably transmitting an alarm to the nearest control room.[44] Due to the large number and remote geographic location of many flares and enclosed combustion devices used to achieve compliance with the EPA's standards, industry requires additional time to prepare and install needed equipment to maintain continuous pilot flames that alarm in the nearest control room when the pilot is unlit. Therefore, in this action, we are extending the date by which owners and operators who utilize these flares and enclosed combustion devices must: (1) ensure that flares and enclosed combustion devices operate with a continuous pilot flame, and (2) install and operate a system to send an alarm to the nearest control room when a pilot flame is unlit to 18 months from publication of this interim final rule. The emission reduction requirements for flares and enclosed combustion devices and the other monitoring of such devices described above are not affected by this extension. Put another way, during this extension owners and operators are still required to ensure that emissions being routed to a flare or enclosed combustion devise are reduced by 95.0 percent, and there are still other applicable requirements in the 2024 final rule to ensure compliance.

*C. Deadline Extensions for EG OOOOc*

1. State Plan Submittal Deadline

In the 2024 final rule, the EPA finalized a state plan submittal deadline of 24 months after publication of the final EG OOOOc (March 9, 2026).[45] While the EPA did not receive any petitions for reconsideration on this deadline, since the rule was finalized, the EPA has regularly engaged with various states regarding their concerns. For example, one state has informally asked their respective EPA Region for an extension of the state plan submittal deadline; other states have been inquiring as to the consequences of late state plan submissions. These compliance assistance efforts from the EPA to the states prompted the EPA to assess the status of the state plan submittals. This assessment has led the EPA to determine that states planning to submit state plans need additional time to develop their plans to achieve the emissions-reduction goals of the 2024 final rule in an effective and efficient manner.

The EPA expects approximately 21 states to submit state plans. Since publication of the 2024 final rule, states should now be approximately halfway completed with the plan development process because state plans are due on March 9, 2026; in other words, we are over 1 year into the 2-year time allowance. For those states relying entirely or mostly on the EPA's model rule included in the final EG without modification, the EPA would expect states to have completed, or be near completing, at least some of the following development milestones: (1) Conduct and document meaningful engagement with pertinent stakeholders pursuant to 40 CFR 60.5363c(a)(6) and 60.23a(i); (2) identify the types of designated facilities within the state that will be covered by the state plan; (3) produce a draft of major portions of the state plan, including standards of performance, compliance schedules, increments of progress, and compliance assurance measures, incorporating relevant sections of the model rule in EG OOOOc; (4) determine and/or draft enforceable regulatory mechanisms to implement the state plan (*e.g.,* general permits, state regulations, etc.); and (5)

---

[43] See EPA–HQ–OAR–2024–0358–0010 at page 13.

[44] See EPA–HQ–OAR–2024–0358–0010 at page 13–14.

[45] See 89 FR 17010.

notice the draft state plan for public comment in accordance with state laws.

Further, for those states not relying predominantly on the model rule but which are instead leveraging pre-existing state programs and/or invoking remaining useful life and other factors (RULOF) to apply less stringent standards than the presumptive standards in EG OOOOc, the EPA would expect states to have completed, or be near completing, at least some of the following milestones: (1) Conduct and document meaningful engagement with pertinent stakeholders; (2) identify the types of designated facilities within the state that will be covered by the state plan; (3) compile and compare all relevant pre-existing state regulations (or statutes, permits, or other legal authorities) to corresponding coverage of EG OOOOc and determine which state regulations to leverage for purposes of satisfying state plan obligations; (4) determine changes necessary, if any, to harmonize pre-existing state regulations with state plan requirements of EG OOOOc (*e.g.*, changes to designated facilities, designated pollutants, types of standards, etc.); (5) conduct and document analyses to demonstrate equivalency between pre-existing state regulations and EG OOOOc in terms of emissions reductions; (6) begin state rulemaking process to make changes to existing state regulations, if any are necessary; (7) collect and document information to support RULOF demonstrations, if any, for less stringent standards (or longer compliance schedules) than those in EG OOOOc; (8) determine alternative standards to apply in any case where invoking RULOF; and (9) draft other portions of the state plan (those not leveraging pre-existing state regulations and/or invoking RULOF).

The EPA, however, has identified twelve states that have yet to identify how they plan to implement EG OOOOc. Several of these states are still seeking to identify all the potentially impacted facilities within their borders before deciding whether to develop a state plan. The EPA has also identified that 18 of 21 states intending to submit a state plan have yet to share significant portions of those plans with the EPA for feedback. The EPA expects approximately nine states to leverage at least some pre-existing state regulations to satisfy state plan obligations. While at least four states have identified some revisions necessary to harmonize their pre-existing programs with EG OOOOc, the EPA is aware of no state that has begun its rulemaking process to undertake those revisions. Additionally, while the EPA has received numerous questions from states concerning demonstrating equivalency between pre-existing state regulations and EG OOOOc in terms emissions reductions, the EPA has not received any draft analyses for such demonstrations for review. Similarly, while the EPA currently expects approximately five states to invoke RULOF to apply less stringent standards to certain designated facilities, and while the EPA has received numerous questions from states concerning RULOF demonstrations, the EPA has yet to receive any draft RULOF demonstrations for review. The EPA outlines this information in table 2 below. This demonstrates that many states are struggling to develop their plans on the schedule that the 2024 final rule requires.

TABLE 2—STATUS OF STATE AND TERRITORY PLANS

| Status | States |
| --- | --- |
| I. EPA-Approved State Plans ......... | None. |
| II. Anticipated Negative Declarations to be Submitted to the EPA. | Hawaii, American Samoa, Guam. |
| III. Negative Declaration Submitted/ EPA Approved. | Vermont (submitted), Puerto Rico (submitted), District of Columbia (submitted). |
| IV. Anticipated State Plans to be Submitted to the EPA. | Maine, New York, Delaware, Maryland, Pennsylvania, Virginia, West Virginia, Georgia, South Carolina, Tennessee, Arkansas, New Mexico, Oklahoma, Texas, Colorado, Montana, North Dakota, Utah, Wyoming, Arizona, California. |
| V. Anticipated State Plans Leveraging Pre-Existing State Programs to be Submitted to the EPA. | New York, Maryland, New Mexico, Colorado, Montana, North Dakota, Utah, Wyoming, California. |
| VI. Anticipated State Plans Invoking RULOF to be Submitted to the EPA. | Tennessee, Arkansas, Oklahoma, Texas, California. |
| VII. Final State Plans Submitted to the EPA. | None. |
| VIII. Draft State Plans Submitted to the EPA. | Pennsylvania (partial), West Virginia (partial), Montana (partial). |
| IX. EPA Has Not Received a Draft or Final State Plan or Negative Declaration. | Maine, New York, Delaware, Maryland, Virginia, Alabama, Florida, Kentucky, Mississippi, North Carolina, Georgia, South Carolina, Tennessee, Illinois, Indiana, Michigan, Minnesota, Ohio, Arkansas, Louisiana, New Mexico, Oklahoma, Texas, Missouri, Colorado, Montana, North Dakota, Utah, Wyoming, Arizona, California, Hawaii, American Samoa, Guam. |
| X. Anticipated Federal Plan Promulgation. | Connecticut, Massachusetts, New Hampshire, Rhode Island, New Jersey, Wisconsin, Iowa, Kansas, Nebraska, South Dakota, Nevada, Alaska, Idaho, Oregon, Washington. |

The EPA acknowledges this delay in meeting expected informal state plan development milestones could be because of various factors, including several that the EPA acknowledged in the 2024 final rule. However, the EPA has determined that the practical reality of states identifying impacted sources and pertinent stakeholders, conducting meaningful engagement, comparing pre-existing state programs to EG OOOOc, and producing RULOF demonstrations has proven to be more time-consuming than we expected because of various challenges faced by states. These challenges stem from both the relatively large and complex nature of the source category, the corresponding complexity associated with applying EG OOOOc to designated facilities, and states' lack of familiarity with the newly revised general implementing regulations.[46]

---

[46] EG OOOOc represents the first time states will be implementing the requirements promulgated in

States are understandably taking more time than the EPA initially expected as they navigate these multiple challenges, including through iterative questions for and discussions with the Agency.

Moreover, implementing some of these requirements in the context of EG OOOOc in particular is proving to be more complex than originally anticipated. For example, the new requirement to submit documentation of meaningful engagement pursuant to 40 CFR 60.23a(i) has proven time consuming due to the large number of geographically dispersed designated facilities in some states, covering multiple industry segments. States have faced challenges determining the appropriate scope, form, and number of engagement activities, as well as identifying pertinent stakeholders and owners and operators. States have also communicated to the EPA that the relatively complicated technical nature of EG OOOOc has presented obstacles to fostering public participation at engagement activities.

Similarly, states are needing more time than anticipated to invoke RULOF to apply less stringent standards (or longer compliance schedules).[47] For example, due to the large number of EG OOOOc designated facilities, some states have undertaken the task of attempting to segment designated facility types into classes for purposes of RULOF. Given the number and diverse circumstances of designated facilities in the source category, collecting enough information on facility operations necessary to determine appropriate classes and associated standards has proven difficult and time-consuming. For similar reasons, states have confronted difficulties with quickly collecting the full complement of relevant data on emissions and costs to demonstrate fundamental differences between the information specific to those facilities (for which the states are invoking RULOF) and the information the EPA considered in determining the presumptive standards in EG OOOOc.

While the EPA provided flexibility to states with pre-existing regulatory programs for the oil and natural gas industry to leverage those programs for the purposes of state plan submission, the scope and stringency of those programs varies considerably, each posing unique issues regarding demonstrating equivalency or harmonizing with EG OOOOc. Analyses to compare the stringency of pre-

existing standards and their associated compliance assurance measures to EG OOOOc have proven to be complicated and time-consuming, especially for those presumptive standards that are expressed in a non-numerical format in EG OOOOc. Administrative complexities have also arisen for several states attempting to concurrently revise associated state rules for Reasonably Available Control Technology in their State Implementation Plans (SIP) for CAA sections 182 and/or 184, in order to maintain a single set of requirements for the oil and natural gas sources in those states.

These challenges have increased the time needed to develop state plans beyond the EPA's expectations. The EPA has worked to provide assistance to states along the way. The EPA has made information publicly available in efforts to helps states including a document summarizing requirements for state plans[48] and answers to frequently asked questions about the 2024 final rule.[49] Additionally, the EPA notes that states have returned multiple times to their Regional offices and the EPA's Office of Air Quality Planning and Standards for numerous meetings to get dozens of complex implementation questions answered, many of which require the coordinated weeks-long effort of multiple EPA staff members to respond to.

Based on the information the EPA currently has, the EPA anticipates the vast majority of states intending to submit state plans will be unable to meet the current state plan submittal deadline of March 9, 2026. If a state does not submit a state plan within the prescribed time, the EPA is obligated to promulgate a Federal plan within twelve months of the submittal deadline.[50] The EPA does not find it appropriate to maintain a state plan submittal deadline that we now have reason to believe is untenable for most states intending to submit state plans. The EPA does not wish to set these states up to fail, especially when they have been diligently working to try to meet the submittal deadline. Extending the submittal deadline will enable states to devote suitable time and resources to developing approvable plans that meet all applicable requirements and achieve

the objectives of the states and their stakeholders. In contrast, pressing forward on the existing deadline could needlessly embroil states and the EPA in disputes over untimely or insufficient submissions, thereby triggering administrative processes and litigation that detract from implementation of the emission guidelines and could be avoided with a targeted extension.

In this action we are extending the deadline for state plan submittal until January 22, 2027 for the reasons discussed in this section. This gives states additional time from their current deadline in March 2026.

### III. Rulemaking Procedures

As noted in section I.C. of this preamble, the EPA's authority for the rulemaking procedures followed in this action is provided by APA section 553(b)(B), which allows an agency to forgo notice-and comment requirements "when the Agency for good cause finds (and incorporates the finding and a brief statement of reasons, therefore, in the rule issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."[51] The EPA finds good cause to forego prior notice and comment because that rulemaking procedure is impracticable and unnecessary under the circumstances.

The EPA finds that prior notice and comment is unnecessary because the EPA is making only targeted changes to certain compliance or implementation dates in response to immediate concerns raised by stakeholders, including owners and operators subject to the rule's requirements. For the reasons described in more detail in section II of this preamble, certain regulatory provisions have created unintended compliance difficulties unrelated to the actual emissions standards and other requirements of the underlying regulations. This targeted action provides subject facilities the additional time needed to resolve these specific compliance and implementation problems without disrupting the sequencing of the compliance deadlines in the final rule or risking interim noncompliance proceedings. The EPA believes the targeted deadline revisions in this action do not interfere with, or unreasonably frustrate, the ultimate emission reduction requirements of the rule. To the extent interested parties

---

the revisions to 40 CFR part 60, subpart Ba (subpart Ba), the implementing regulations for the adoption and submission of state plans. 88 FR 80480.

[47] See 40 CFR 60.24a(e)–(h); 88 FR 80508–80528.

[48] https://www.epa.gov/system/files/documents/2024-08/ooooc-summary-of-requirements-for-state-plans-final-8-23-2024.pdf.

[49] https://www.epa.gov/controlling-air-pollution-oil-and-natural-gas-operations/frequently-asked-questions-about-epas.

[50] 40 CFR 60.27a(c). The EPA's obligation to promulgate a Federal plan is removed if the state submits, and the EPA approves, a state plan before the EPA issues a Federal plan.

[51] Although the procedural requirements of CAA section 307(d) apply to the EPA's promulgation or revision of any standard of performance under CAA section 111, these procedural requirements do not apply "in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of [APA section 553(b)]." 42 U.S.C. 7607(d)(1).

raise concerns about this action or any particular deadline amendment made therein, the EPA will carefully review any comments submitted on this action and consider whether changes are appropriate after close of the comment period.

In addition, the EPA finds that prior notice and comment would be impracticable given the applicable compliance deadlines and the timeline involved in completing such procedures. The EPA has determined through ongoing communications with stakeholders and review of the relevant regulatory language that there are legitimate barriers to compliance and/or questions as to whether the regulatory provisions for which we are extending compliance deadlines are practically and logistically achievable as promulgated in the timeframes allowed by the 2024 final rule. As a result, the EPA is making only targeted changes to certain compliance dates in this action to provide the immediate relief necessary to avoid unnecessary and problematic situations of owners and operators expending time and resources attempting to comply in short amounts of time with untenable regulatory provisions. Prior notice and comment would be impracticable given the purpose of these targeted amendments, which is to provide the immediate extension required to address the problems identified above.

The EPA has determined that this rule may take effect immediately upon publication because, in extending certain deadlines within the 2024 rule it "relieves a restriction." 5 U.S.C. 553(d)(1). Further, for the reasons described above, there exists "good cause" for an immediate effective date. 5 U.S.C. 553(d)(3); 5 U.S.C. 808(2).

## IV. Request for Comment

As explained in section III of this document, the EPA finds good cause to issue this interim final rule without prior notice or opportunity for public comment. However, the EPA is providing an opportunity for the public to comment on the deadlines being extended in the regulatory text changes being made by this action and, thus, requests comment on the revisions described herein. The EPA is not reopening for comment any provisions of the March 2024 final rule other than the specific changes made in this interim final rule. The EPA will review comments received and consider whether this action should be revised, if appropriate, in response to comments received.

## V. Statutory and Executive Order Reviews

Additional information about these statutes and Executive Orders can be found at *https://www.epa.gov/laws-regulations/laws-and-executive-orders.*

### A. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

This action is a significant regulatory action as defined under section 3(f)(1) of Executive Order (E.O.) 12866. Accordingly, it was submitted to the Office of Management and Budget (OMB) for review. Any changes made in response to E.O. 12866 review have been documented in the docket. The EPA prepared an analysis of the potential costs and benefits associated with this action. This analysis, *Economic Impact Analysis for the Extension of Deadlines in the NSPS OOOOb and EG OOOOc,* is available in the docket.

In the analysis, we present the estimated present values (PV) and equivalent annualized values (EAV) of the estimated cost savings of delaying compliance with the EG OOOOc (via extending the state plan submittal deadline) in 2024 dollars over the 2028 to 2039 period, discounted to 2025. Those quantitative results can be found in the next section. We acknowledge, but do not quantify, the cost savings to states resulting from having an additional year to develop state plans to implement the EG OOOOc.

Under the IFR, we anticipate disbenefits associated with additional emissions and lost value of captured natural gas because of delayed compliance with EG OOOOc. Specifically, we estimate climate damages from increasing methane emissions by 1,300,000 short tons, lost value of $PM_{2.5}$ and ozone-related health benefits from increasing VOC emissions by 350,000 short tons, and lost value of benefits from increasing HAP emissions by 13,000 short tons. In addition, we estimate present values of the lost value of natural gas of $170 million using a 3 percent discount rate and $280 million using a 7 percent discount rate.

### B. Executive Order 14192: Unleashing Prosperity Through Deregulation

This action is considered an Executive Order 14192 deregulatory action. Details on the estimated cost savings of this final rule can be found in the EPA's analysis of the potential costs and benefits associated with this action. Table 3 presents the estimates of the compliance cost savings of this action. The analysis horizon over which the present value (PV) and equivalent annualized value (EAV) are estimated is 2028 to 2039. We estimate the PV and EAV under 3 and 7 percent discount rates discounted back to 2025 in 2024 dollars.

TABLE 3—PRESENT VALUE (PV) AND EQUIVALENT ANNUALIZED VALUE (EAV) OF THE COMPLIANCE COST SAVINGS

[Billion 2024$, discounted to 2025]

| 3 Percent discount rate | | 7 Percent discount rate | |
|---|---|---|---|
| PV | EAV | PV | EAV |
| 0.75 | 0.08 | 1.38 | 0.18 |

### C. Paperwork Reduction Act (PRA)

This action does not impose any new information collection burden under the PRA. On June 28, 2024, the information collection activities for NSPS OOOOb and EG OOOOc were approved by OMB under the PRA.[52] The ICR document that the EPA prepared has been assigned OMB Control No. 2060–0721 and EPA ICR number 2523.07. You can find a copy of the previously submitted ICR in EPA–HQ–OAR–2021–0317.

---

[52] *https://www.reginfo.gov/public/do/PRA ViewICR?ref_nbr=202405-2060-001.*

This action does not change the information collection requirements.

### D. Regulatory Flexibility Act (RFA)

This action is not subject to the RFA. The RFA applies only to rules subject to notice and comment rulemaking requirements under the APA, 5 U.S.C. 553, or any other statute. This rule is not

subject to notice and comment requirements because the Agency has invoked the APA "good cause" exemption under 5 U.S.C. 553(b).

*E. Unfunded Mandates Reform Act of 1995 (UMRA)*

This action does not contain an unfunded mandate of $100 million or more as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action imposes no enforceable duty on any state, local or tribal governments or the private sector. This action extends certain deadlines in the March 2024 final rule.

*F. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government. This action extends the deadline for state plan submittals, which will allow additional time for states to develop plans. However, this action does not alter the substantive requirements related to the content of state plans.

*G. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

This action does not have tribal implications as specified in Executive Order 13175. This action will implement extension of certain deadlines in the March 2024 final rule. Thus, Executive Order 13175 does not apply to this action.

*H. Executive Order 13045: Protection of Children From Environmental Health Risks and Safety Risks*

This action is not subject to Executive Order 13045 because the EPA does not believe the environmental health risks or safety risks addressed by this action present a disproportionate risk to children. The EPA contends that the environmental health risks or safety risks addressed by this action do not present a disproportionate risk to children because other regulations are sufficiently protective of children's health. This action does not affect the level of public health and environmental protection already being provided by existing NAAQS and other mechanisms in the CAA. Nor does this action result in any changes to the control of air pollutants. This action does not affect applicable local, state, or Federal permitting or air quality management programs that will

continue to address areas with degraded air quality and maintain the air quality in areas meeting current standards. Areas that need to reduce criteria air pollution to meet the NAAQS will still need to rely on control strategies to reduce emissions. The EPA does not believe this decrease in emission reductions projected from this action will have a disproportionate adverse effect on children's health.

*I. Executive Order 13211: Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

This action is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution or use of energy. In the Regulatory Impact Analysis (RIA) accompanying the 2024 final rule, the EPA used a set of supply and demand price elasticities to estimate the impacts of the rule on the United States energy system (see section 4.1.4 of that document). The EPA estimated maximum production reductions of about 41.4 million barrels of crude oil (1.05 percent of projected baseline production) and 272.5 million Mcf (thousand cubic feet) per year (0.75 percent). This final rule is estimated to result in a decrease in total compliance costs, with the reduction in costs affecting the affected entities under EG subpart OOOOc, which the EPA expects will attenuate the impacts estimated for the 2024 final rule RIA.

*J. National Technology Transfer and Advancement Act (NTTAA) and 1 CFR Part 51*

This action does not involve technical standards; therefore, the NTTAA does not apply.

*K. Congressional Review Act (CRA)*

This action meets the criteria described at 5 U.S.C. 804(2), and the EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. The CRA allows the issuing agency to make a rule effective sooner than otherwise provided by the CRA if the agency makes a good cause finding that notice and comment rulemaking procedures are impracticable, unnecessary, or contrary to the public interest (5 U.S.C. 808(2)). The EPA has made a good cause finding for this action as discussed in section III of this document, including the basis for that finding.

**List of Subjects in 40 CFR Part 60**

Environmental protection, Administrative practices and

procedures, Air pollution control, Intergovernmental relations, Reporting and recordkeeping requirements.

**Lee Zeldin,**
*Administrator.*

For the reasons stated in the preamble, the Environmental Protection Agency amends part 60 of title 40, chapter I, of the Code of Federal Regulations as follows:

**PART 60—STANDARDS OF PERFORMANCE FOR NEW STATIONARY SOURCES**

■ 1. The authority citation for part 60 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

**Subpart OOOO—Standards of Performance for Crude Oil and Natural Gas Facilities for Which Construction, Modification, or Reconstruction Commenced After August 23, 2011, and On or Before September 18, 2015**

■ 2. Amend § 60.5371 by adding two sentences before the first sentence of the introductory text to read as follows:

**§ 60.5371   What standards apply to super-emitter events?**

The provisions of this section will not apply between July 31, 2025, and January 22, 2027. The provisions of this section will apply after January 22, 2027. * * *

*        *        *        *        *

**Subpart OOOOa—Standards of Performance for Crude Oil and Natural Gas Facilities for Which Construction, Modification or Reconstruction Commenced After September 18, 2015 and On or Before December 6, 2022**

■ 3. Amend § 60.5371a by adding two sentences before the first sentence of the introductory text to read as follows:

**§ 60.5371a   What standards apply to super-emitter events?**

The provisions of this section will not apply between July 31, 2025, and January 22, 2027. The provisions of this section will apply after January 22, 2027. * * *

*        *        *        *        *

**Subpart OOOOb—Standards of Performance for Crude Oil and Natural Gas Facilities for Which Construction, Modification or Reconstruction Commenced After December 6, 2022**

■ 4. Amend § 60.5365b by revising paragraph (e)(2)(i) introductory text and paragraphs (e)(2)(ii) and (e)(3)(ii)(C) and (D) to read as follows:

## §60.5365b   Am I subject to this subpart?

\*      \*      \*      \*      \*

(e) \*  \*  \*

(2) \*  \*  \*

(i) Beginning January 22, 2027, or upon startup, whichever is later, for purposes of determining the applicability of a storage vessel tank battery as an affected facility, a legally and practicably enforceable limit must include the elements provided in paragraphs (e)(2)(i)(A) through (F) of this section.

\*      \*      \*      \*      \*

(ii) For each tank battery located at a well site or centralized production facility, you must determine the potential for VOC and methane emissions within 30 days after startup of production, or within 30 days after an action specified in paragraphs (e)(3)(i) and (ii) of this section, except as provided in paragraph (e)(5)(iv) of this section. Beginning January 22, 2027, the potential for VOC and methane emissions must be calculated using a generally accepted model or calculation methodology that accounts for flashing, working, and breathing losses, based on the maximum average daily throughput for a tank battery determined for a 30-day period of production.

\*      \*      \*      \*      \*

(3) \*  \*  \*

(ii) \*  \*  \*

(C) Beginning January 22, 2027, or upon startup, whichever is later, for tank batteries at well sites or centralized production facilities, an existing tank battery receives additional crude oil, condensate, intermediate hydrocarbons, or produced water throughput from actions, including but not limited to, the addition of operations or a production well, or changes to operations or a production well (including hydraulic fracturing or refracturing of the well).

(D) Beginning January 22, 2027, or upon startup, whichever is later, for tank batteries not located at a well site or centralized production facility, including each tank battery at compressor stations or onshore natural gas processing plants, an existing tank battery receives additional fluids which cumulatively exceed the throughput used in the most recent (*i.e.*, prior to an action in paragraph (e)(3)(ii)(A), (B), or (D) of this section) determination of the potential for VOC or methane emissions.

\*      \*      \*      \*      \*

■ 5. Amend § 60.5370b by revising paragraph (a) introductory text and paragraphs (a)(4) and (5) and adding paragraphs (a)(8) and (9) to read as follows:

## §60.5370b   When must I comply with this subpart?

(a) You must be in compliance with the standards of this subpart no later than May 7, 2024, or upon initial startup, whichever date is later, except as specified in paragraph (a)(1) of this section for reciprocating compressor affected facilities, paragraphs (a)(2) and (3) of this section for storage vessel affected facilities, paragraph (a)(4) of this section for process unit equipment affected facilities at onshore natural gas processing plants, paragraph (a)(5) of this section for process controllers, paragraph (a)(6) of this section for pumps, paragraph (a)(7) of this section for centrifugal compressor affected facilities, paragraph (a)(8) of this section for enclosed combustion devices, paragraph (a)(9) of this section for enclosed combustion devices or flares, and paragraphs 60.5377b(b) or (c) for associated gas wells.

\*      \*      \*      \*      \*

(4) Except as specified in paragraph (a)(4)(i) and (ii) of this section, you must comply with the requirements of § 60.5400b or as an alternative, the requirements in § 60.5401b, for all process unit equipment affected facilities at a natural gas processing plant, as soon as practicable but no later than 180 days after the initial startup of the process unit.

(i) If complying with § 60.5400b, beginning January 22, 2027, or 180 days after startup, whichever is later, you must comply with the requirements of § 60.5400b(h)(2)(ii).

(ii) If complying with § 60.5401b, beginning January 22, 2027, or 180 days after startup, whichever is later, you must comply with the requirements of § 60.5401b(l)(2)(ii).

(5) For process controller affected facilities, you must comply with the requirements of paragraph (a)(5)(i) or (ii) of this section, as applicable.

(i) Any process controller affected facilities may comply with § 60.5390b(b)(1) and (2) or (3) as an alternative to compliance with § 60.5390b(a) until January 22, 2027.

(ii) On or after January 22, 2027, process controller affected facilities must comply with § 60.5390b(a) or (b), as specified in those paragraphs.

\*      \*      \*      \*      \*

(8) For an enclosed combustion device, you must comply with the requirements of paragraph (a)(8)(i) of this section, as applicable.

(i) Beginning January 22, 2027, or 180 days after startup, whichever is later, you must comply with the performance testing procedures of § 60.5413b(b).

(ii) [Reserved]

(9) For an enclosed combustion device or for a flare, you must comply with the requirements of paragraph (a)(9)(i), (ii), or (iii) of this section, as applicable.

(i) Beginning November 28, 2025, or 180 days after startup, whichever is later, you must comply with the continuous monitoring systems requirements of § 60.5417b(d)(8)(i) through (iv).

(ii) Beginning May 7, 2024 or 180 days after startup, whichever is later, you must comply with the visible emission observation requirements of § 60.5417b(d)(8)(v).

(iii) Beginning November 28, 2025, or 180 days after startup, whichever is later, you must comply with the continuous monitoring systems requirements of § 60.5417b(d)(8)(vi) for enclosed combustion devices or flares that are air-assisted or steam-assisted.

\*      \*      \*      \*      \*

■ 6. Amend § 60.5371b by adding two sentences before the first sentence of the introductory text to read as follows:

## §60.5371b   What GHG and VOC standards apply to super-emitter events?

The provisions of this section will not apply between July 31, 2025, and January 22, 2027. The provisions of this section will apply after January 22, 2027. \*  \*  \*

\*      \*      \*      \*      \*

■ 7. Amend § 60.5375b by revising paragraphs (a)(2) and (f)(3)(i) and (ii) to read as follows:

## §60.5375b   What GHG and VOC standards apply to well completions at well affected facilities?

(a) \*  \*  \*

(2) If it is technically infeasible to route the recovered gas as required in paragraph (a)(1)(ii) of this section, then you must capture and direct recovered gas to a completion combustion device, except in conditions that may result in a fire hazard or explosion, or where high heat emissions from a completion combustion device may negatively impact tundra, permafrost or waterways. After January 22, 2027, completion combustion devices must be equipped with a reliable continuous pilot flame.

\*      \*      \*      \*      \*

(f) \*  \*  \*

(3) \*  \*  \*

(i) Route all flowback to a completion combustion device, except in conditions that may result in a fire hazard or explosion, or where high heat emissions from a completion combustion device may negatively impact tundra, permafrost or waterways. After January 22, 2027, completion combustion

devices must be equipped with a reliable continuous pilot flame.

(ii) Route all flowback into one or more well completion vessels and commence operation of a separator unless it is technically infeasible for a separator to function. You must have the separator onsite or otherwise available for use at the wildcat well, delineation well, or low pressure well. The separator must be available and ready for use to comply with paragraph (f)(3)(ii) of this section during the entirety of the flowback period. Any gas present in the flowback before the separator can function is not subject to control under this section. Capture and direct recovered gas to a completion combustion device, except in conditions that may result in a fire hazard or explosion, or where high heat emissions from a completion combustion device may negatively impact tundra, permafrost, or waterways. After January 22, 2027, completion combustion devices must be equipped with a reliable continuous pilot flame.

*    *    *    *    *

■ 8. Amend § 60.5390b by revising paragraph (a) introductory text to read as follows:

### § 60.5390b   What GHG and VOC standards apply to process controller affected facilities?

*    *    *    *    *

(a) Beginning January 22, 2027, or upon startup, whichever is later, you must design and operate each process controller affected facility with zero methane and VOC emissions to the atmosphere, except as provided in paragraph (b) of this section.

*    *    *    *    *

■ 9. Amend § 60.5398b by revising paragraph (d)(1)(iii) to read as follows:

### § 60.5398b   What alternative AGHG and VOC standards apply to fugitive emissions components affected facilities and what inspection and monitoring requirements apply to covers and closed vent systems when using an alternative technology?

*    *    *    *    *

(d) *    *    *
(1) *    *    *

(iii) Within 270 days of receipt of an alternative test method request that was determined to be complete, the Administrator will determine whether the requested alternative test method is adequate for indicating compliance with the requirements for monitoring fugitive emissions components affected facilities in § 60.5397b and continuous inspection and monitoring of covers and closed vent systems in § 60.5416b and/or for identifying super-emitter events in § 60.5371b, except that the

Administrator is not required to make determinations on such requests for methods for identifying super emitter events in § 60.5371b before January 22, 2027. The Administrator will issue either an approval or disapproval in writing to the submitter. Approvals may be considered site-specific or more broadly applicable. Broadly applicable alternative test methods and approval letters will be posted at *https:// www.epa.gov/emc/oil-and-gas-approved-alternative-test-methods-approvals*. If the Administrator fails to provide the submitter a decision on approval or disapproval within 270 days, the alternative test method will be given conditional approval status and posted on this same web page, except that conditional approval will not be given for purposes of identifying super-emitter events in § 60.5371b before January 22, 2027. If the Administrator finds any deficiencies in the request and disapproves the request in writing, the owner or operator may choose to revise the information and submit a new request for an alternative test method.

*    *    *    *    *

■ 10. Amend § 60.5411b by revising paragraphs (a)(3) and (b)(4) to read as follows:

### § 60.5411b   What additional requirements must I meet to determine initial compliance for my covers and closed vent systems?

*    *    *    *    *

(a) *    *    *

(3) Beginning January 22, 2027, or upon startup, whichever is later, you must design and operate the closed vent system with no identifiable emissions as demonstrated by § 60.5416b(a) and (b).

*    *    *    *    *

(b) *    *    *

(4) Beginning January 22, 2027 or upon startup, whichever is later, you must design and operate the cover with no identifiable emissions as demonstrated by § 60.5416b(a) and (b), except when operated as provided in paragraphs (b)(2)(i) through (iv) of this section.

*    *    *    *    *

■ 11. Amend § 60.5412b by revising paragraphs (a)(1)(viii), (a)(3)(viii), and (d)(5) to read as follows:

### § 60.5412b   What additional requirements must I meet for determining initial compliance of my control devices?

*    *    *    *    *

(a) *    *    *
(1) *    *    *

(viii) After January 22, 2027, you must install and operate a continuous burning pilot or combustion flame. After January 22, 2027, an alert must be sent to the

nearest control room whenever the pilot or combustion flame is unlit.

*    *    *    *    *

(3) *    *    *

(viii) After January 22, 2027, you must install and operate a continuous burning pilot or combustion flame. After January 22, 2027, an alert must be sent to the nearest control room whenever the pilot or combustion flame is unlit.

*    *    *    *    *

(d) *    *    *

(5) If the alternative test method demonstrates compliance with the metrics specified in paragraphs (d)(1)(i) and (ii) of this section instead of demonstrating continuous compliance with 95.0 percent or greater combustion efficiency, after January 22, 2027, you must still install the pilot or combustion flame monitoring system required by § 60.5417b(d)(8)(i). If the alternative test method demonstrates continuous compliance with a combustion efficiency of 95.0 percent or greater, the requirement in § 60.5417b(d)(8)(i) no longer applies.

■ 12. Amend § 60.5413b by revising paragraph (e)(2) to read as follows:

### § 60.5413b   What are the performance testing procedures for control devices?

*    *    *    *    *

(e) *    *    *

(2) After January 22, 2027, a pilot or combustion flame must be present at all times of operation. After January 22, 2027, an alert must be sent to the nearest control room whenever the pilot or combustion flame is unlit.

*    *    *    *    *

■ 13. Amend § 60.5415b by revising paragraph (f)(1)(vii)(A)(*1*) and paragraph (h)(1) introductory text to read as follows:

### § 60.5415b   How do I demonstrate continuous compliance with the standards for each of my affected facilities?

*    *    *    *    *

(f) *    *    *
(1) *    *    *
(vii) *    *    *
(A) *    *    *

(*1*) After January 22, 2027, a pilot or combustion flame must be present at all times of operation. After January 22, 2027, an alert must be sent to the nearest control room whenever the pilot or combustion flame is unlit.

*    *    *    *    *

(h) *    *    *

(1) Beginning January 22, 2027, or upon startup, whichever is later, you must demonstrate that your process controller affected facility does not emit any VOC or methane to the atmosphere

by meeting the requirements of paragraph (h)(1)(i) or (ii) of this section.

\* \* \* \* \*

■ 14. Amend § 60.5416b by revising paragraphs (a)(1) and (2) and (a)(3)(i) and paragraph (b) introductory text to read as follows:

### § 60.5416b What are the initial and continuous cover and closed vent system inspection and monitoring requirements?

\* \* \* \* \*

(a) \* \* \*

(1) For each closed vent system joint, seam, or other connection that is permanently or semi-permanently sealed (*e.g.*, a welded joint between two sections of hard piping or a bolted and gasketed ducting flange), you must meet the requirements specified in paragraphs (a)(1)(i) through (iii) of this section.

(i) Within the first 30 calendar days after January 22, 2027, or upon startup of the affected facility routing emissions through the closed vent system, whichever is later, conduct an initial inspection according to the test methods and procedures specified in paragraph (b) of this section to demonstrate that the closed vent system operates with no identifiable emissions.

(ii) Conduct annual visual inspections for defects that could result in air emissions. Defects include, but are not limited to, visible cracks, holes, or gaps in piping; loose connections; liquid leaks; or broken or missing caps or other closure devices. Beginning on the first annual inspection after January 22, 2027, and for all annual inspections thereafter, you must monitor a component or connection using the test methods and procedures in paragraph (b) of this section to demonstrate that it operates with no identifiable emissions following any time the component is repaired or replaced or the connection is unsealed.

(iii) Conduct AVO inspections in accordance with at and the same frequency as specified for fugitive emissions components affected facilities located at the same type of site as specified in § 60.5397b(g). Process unit equipment affected facilities must conduct annual AVO inspections concurrent with the inspections required by paragraph (a)(1)(ii) of this section.

(2) For closed vent system components other than those specified in paragraph (a)(1) of this section, you must meet the requirements of paragraphs (a)(2)(i) through (iv) of this section.

(i) Conduct an initial inspection according to the test methods and procedures specified in paragraph (b) of

this section within the first 30 calendars days after startup of the affected facility routing emissions through the closed vent system or January 22, 2027, whichever is later, to demonstrate that the closed vent system operates with no identifiable emissions.

(ii) Beginning January 22, 2027, conduct inspections according to the test methods, procedures, and frequencies specified in paragraph (b) of this section to demonstrate that the components or connections operate with no identifiable emissions.

(iii) Conduct annual visual inspections for defects that could result in air emissions. Defects include, but are not limited to, visible cracks, holes, or gaps in ductwork; loose connections; liquid leaks; or broken or missing caps or other closure devices. Beginning January 22, 2027, you must monitor a component or connection using the test methods and procedures in paragraph (b) of this section to demonstrate that it operates with no identifiable emissions following any time the component is repaired or replaced or the connection is unsealed.

(iv) Conduct AVO inspections in accordance with and at the same frequency as specified for fugitive emissions components affected facilities located at the same type of site, as specified in § 60.5397b(g). Process unit equipment affected facilities must conduct annual AVO inspections concurrent with the inspections required by paragraph (a)(2)(iii) of this section.

(3) \* \* \*

(i) Beginning January 22, 2027, conduct the inspections specified in paragraphs (a)(3)(ii) through (iv) of this section to identify defects that could result in air emissions and to ensure the cover operates with no identifiable emissions. Defects include, but are not limited to, visible cracks, holes, or gaps in the cover, or between the cover and the separator wall; broken, cracked, or otherwise damaged seals or gaskets on closure devices; and broken or missing hatches, access covers, caps, or other closure devices. In the case where the storage vessel is buried partially or entirely underground, you must inspect only those portions of the cover that extend to or above the ground surface, and those connections that are on such portions of the cover (*e.g.*, fill ports, access hatches, gauge wells, etc.) and can be opened to the atmosphere.

\* \* \* \* \*

(b) *No identifiable emissions test methods and procedures.* If you are required to conduct an inspection of a closed vent system and cover as

specified in paragraph (a)(1), (2), or (3) of this section or § 60.5398b(b), you must meet the requirements of paragraphs (b)(1) through (9) of this section after January 22, 2027. You must meet the requirements of paragraphs (b)(1), (2), (4), and (9) of this section for each self-contained process controller at your process controller affected facility as specified in § 60.5390b(a)(2).

\* \* \* \* \*

■ 15. Amend § 60.5417b by revising paragraphs (d)(8)(i) and (i)(6)(v) to read as follows:

### § 60.5417b What are the continuous monitoring requirements for my control devices?

\* \* \* \* \*

(d) \* \* \*

(8) \* \* \*

(i) After January 22, 2027, continuously monitor at least once every five minutes for the presence of a pilot flame or combustion flame using a device (including, but not limited to, a thermocouple, ultraviolet beam sensor, or infrared sensor) capable of detecting that the pilot or combustion flame is present at all times. After January 22, 2027, an alert must be sent to the nearest control room whenever the pilot or combustion flame is unlit. Continuous monitoring systems used for the presence of a pilot flame or combustion flame are not subject to a minimum accuracy requirement beyond being able to detect the presence or absence of a flame and are exempt from the calibration requirements of this section.

\* \* \* \* \*

(i) \* \* \*

(6) \* \* \*

(v) After January 22, 2027, if required by paragraph (i)(5) of this section to install a pilot or combustion flame monitoring system, a deviation occurs when there is no indication of the presence of a pilot or combustion flame for any 5-minute period.

\* \* \* \* \*

## Subpart OOOOc—Emissions Guidelines for Greenhouse Gas Emissions From Existing Crude Oil and Natural Gas Facilities

■ 16. Amend § 60.5362c by revising paragraph (c) to read as follows:

### § 60.5362c Am I affected by this subpart?

\* \* \* \* \*

(c) You must submit the state or Tribal plan or negative declaration letter to EPA by January 22, 2027.

■ 17. Revise § 60.5368c to read as follows:

**§ 60.5368c   What if my state or Tribal plan is not approvable?**

If you do not submit a state or Tribal plan (or a negative declaration letter) by January 22, 2027, or if EPA disapproves your state plan, EPA will develop a Federal plan according to § 60.27a(c) through (f) to implement the emission guidelines contained in this subpart.

■ 18. Amend § 60.5374c by revising paragraph (b) to read as follows:

**§ 60.5374c   Does this subpart directly affect designated facility owners and operators in my state?**

\*   \*   \*   \*   \*

(b) If you do not submit a plan to implement and enforce the guidelines contained in this subpart by the date specified in § 60.5352c, or if EPA disapproves your plan, the EPA will implement and enforce a Federal plan, as provided in § 60.5368c, to ensure that each designated facility within your state that commenced construction, modification or reconstruction on or before December 6, 2022, reaches compliance with all the provisions of this subpart by the dates specified in § 60.5360c.

[FR Doc. 2025–14531 Filed 7–30–25; 8:45 am]

**BILLING CODE 6560–50–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 81**

**[EPA–R02–OAR–2025–0004; FRL–12573–01–R2]**

**Finding of Failure To Attain and Reclassification of Area in New York as Serious for the 2015 Ozone National Ambient Air Quality Standards—Shinnecock Indian Nation**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final determination.

**SUMMARY:** The Environmental Protection Agency (EPA) is determining that Indian country under the jurisdiction of the Shinnecock Indian Nation located within the New York-Northern New Jersey-Long Island nonattainment area (Shinnecock Indian Nation area) failed to attain the 2015 ozone National Ambient Air Quality Standards (NAAQS) by the applicable attainment date. The effect of failing to attain by the applicable attainment date is that the area will be reclassified by operation of law to "Serious" nonattainment for the 2015 ozone NAAQS on September 2, 2025, the effective date of this final rule. This action fulfills the EPA's obligation

under the Clean Air Act (CAA) to determine whether ozone nonattainment areas attained the NAAQS by the attainment date and to publish a document in the **Federal Register** identifying each area that is determined as having failed to attain and identifying the reclassification.

**DATES:** This final rule is effective on September 2, 2025.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID Number EPA–R02–OAR–2025–0004 at *https://www.regulations.gov*. All documents in the docket are listed on the *https://www.regulations.gov* website. Although listed in the index, some information is not publicly available, *e.g.,* Controlled Unclassified Information (CUI) (formally referred to as Confidential Business Information (CBI)) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *https://www.regulations.gov*.

**FOR FURTHER INFORMATION CONTACT:** Fausto Taveras, Environmental Protection Agency, 290 Broadway, New York, New York 10007–1866, at (212) 637–3378, or by email at *Taveras.Fausto@epa.gov*.

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever "we," "us," or "our" is used, we mean EPA.

**Table of Contents**

I. Overview of Action
II. What is the background for this action?
III. What is the statutory authority for this action?
IV. How does EPA determine whether an area has attained the NAAQS?
V. What is EPA's determination for the areas?
VI. What action is EPA taking?
VII. Statutory and Executive Order Reviews

**I. Overview of Action**

The EPA is required to determine whether areas designated nonattainment for an ozone NAAQS attained the standard by the applicable attainment date, and to take certain steps for areas that failed to attain (*see* CAA section 181(b)(2)). The EPA's determination of attainment for the 2015 ozone NAAQS is based on a nonattainment area's design value (DV) as of the attainment date.[1]

The 2015 ozone NAAQS is met at an EPA regulatory monitoring site when the DV does not exceed 0.070 parts per million (ppm). For the Moderate nonattainment area for the 2015 ozone NAAQS addressed in this action, the attainment date was August 3, 2024. Because the DV is based on the three most recent, complete calendar years of data, attainment must occur no later than December 31 of the year prior to the attainment date (*i.e.,* December 31, 2023, in the case of Moderate nonattainment areas for the 2015 ozone NAAQS). As such, the EPA's determinations for each area are based upon the complete, quality-assured, and certified ozone monitoring data from calendar years 2021, 2022, and 2023.

In 2024, New Jersey, New York, and Connecticut each submitted a request that EPA reclassify the New York-Northern New Jersey-Long Island ozone nonattainment area from Moderate to Serious nonattainment for the 2015 ozone NAAQS.[2] EPA finalized the reclassification in a July 25, 2024 **Federal Register** notice, 89 FR 60314, in which we made clear that since the Shinnecock Indian Nation, which is located adjacent to Southampton, New York, had not requested reclassification of the Shinnecock Indian Nation area of the New York-Northern New Jersey-Long Island nonattainment area for the 2015 ozone NAAQS, it would retain the Moderate classification. This action addresses the Shinnecock Indian Nation area in New York that remains classified as Moderate for the 2015 ozone NAAQS. Table 1 provides a summary of the DVs and the EPA's air quality-based determinations for the Shinnecock Indian Nation area addressed in this action.[3]

---

[1] A DV is a statistic used to compare data collected at an ambient air quality monitoring site to the applicable NAAQS to determine compliance

with the standard. The data handling conventions for calculating DVs for the 2015 ozone NAAQS are specified in appendix U to 40 CFR part 50. The DV for the 2015 ozone NAAQS is the 3-year average of the annual fourth highest daily maximum 8-hour average ozone concentration. The DV is calculated for each air quality monitor in an area, and the DV for an area is the highest DV among the individual monitoring sites located in the area.

[2] Connecticut requested reclassification from moderate to Severe or, in the alternative, to Serious if the States of both New York and Connecticut did not both submit requests to reclassify the area to Severe but did submit requests to reclassify the area to Serious. See 89 FR 60314 (July 25, 2024).

[3] Since the Shinnecock Nation is located within the geographic boundaries of the New York-Northern New Jersey-Long Island nonattainment area, that nonattainment area's design value and the EPA's air-quality based determination will be used as a basis to determine if the Shinnecock Indian Nation attained the August 3, 2024, 2015 ozone NAAQS Moderate attainment date.

# Attachment 2

Declaration of Lois Bower-Bjorson, Clean Air Council and Earthworks

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

**DECLARATION OF LOIS BOWER-BJORNSON**
**Submitted In Support of Clean Air Council and**
**Earthworks**

I, Lois Bower-Bjornson, do hereby affirm and state:

1.      I am currently a member of Earthworks. I first became aware of Earthworks fifteen years ago, and I have been involved in and tracking its advocacy ever since.

2.      I am a member and an employee of Clean Air Council ("Council"). I started working at the Council about eleven years ago as a subcontractor, but I was hired onto the staff in 2019.

3.      As the Southwestern Pennsylvania Field Organizer, my job duties at the Council include attending local municipal council meetings, working with communities to establish better oil and gas zoning laws, working with local, state, and federal agencies on their methane and methane emissions policies, educating communities near oil and gas wells, and hosting "Frackland" tours. The "Frackland" tours are educational tours I provide to various elected officials, schools, and other interested organizations.

1

4.     I joined the Council because I am concerned about the impact the oil and gas industry, particularly fracking, has on Pennsylvanians and our environment. As one who is personally impacted everyday by fracking wells, I support the Council's work to protect and improve air quality in Pennsylvania.

5.     Clean Air Council is a 501(c)(3) environmental health non-profit organization. The Council started in 1967, and its mission is to protect everyone's right to clean air and a healthy environment. As part of the Council's mission, we conduct outreach programs that aim to educate and engage the public on environmental issues. These educational efforts tie into the Council's commitment to ensure all residents, including lower income communities and communities of color, have a voice in government policies and actions that impact their health, quality of life, and local ecosystems. The Council supports communities in protecting their health and local ecosystem from proposed or existing industrial infrastructure, and it supports the advancement of environmental justice. The Council also works toward holding government agencies accountable when creating and enforcing environmental policies.

6.     Through my role as an employee of Clean Air Council, I am aware that the organization has about 5,000 members. Most of whom live in the Pennsylvania area.

7.      My job duties consist of coordinating with other nonprofit and community organizations about fracking. I regularly work with nonprofits such as Mountain Watershed Association, MADFACTS, Mothers and Fathers Against Cancer Threat Spikes, and Protect PT.  I also network and collaborate with local coalitions such POPCO (People Over Petro Coalition), BCMAC (Beaver County Marcellus Awareness Coalition), the Breathe Project, and the Ohio River Valley Institute.

8.      My community education role includes organizing events and distributing information about the impacts of oil and gas production. I also connect interested people to participate in Penn State's ground water research, the University of Pittsburgh's and Pennsylvania Department of Health's study on those living close to oil and gas facilities, Yale University's Leukemia study, and to news outlets.

9.      My job was created to address the high emissions of methane and other harmful pollutants from the fracking wells in the area. The Council developed my job role due to the fracking "boom" that took place in the area I live, and it had to find funding to support my role.

10.     Through my work with partner organizations and my work at the Council, I learn and keep up-to-date on the air, water, and land pollution the oil and gas industries cause. Specifically, I know about the pollutants fracking wells

3

emit and the detrimental health impacts these gas wells cause. This knowledge is combined with what I already knew from my personal experience from living in my home that is close to several fracking wells.

11.    My family and I live in Washington County, Pennsylvania, which is the most heavily fracked county in the state. There are currently 11,856 active wells in Washington County.[1] Having experienced the effects of the explosive growth in the oil and gas industry in my community firsthand, I support Earthworks' mission to protect our health and environment from the negative effects of the oil and gas industry, including air pollution, impacts on climate, and direct health impacts.

12.    Likewise, I joined the Council because I am concerned about the impact the oil and gas industry, particularly fracking, has on Pennsylvanians and our environment. As one who is personally impacted everyday by fracking wells, I support the Council's work to protect and improve air quality in Pennsylvania.

13.    I live in Scenery Hill, Washington County, Pennsylvania, with my family. I grew up about 20 minutes away, so my family is still in the area. When my husband and I wanted to grow our family, we moved back to Washington County to buy a home with more indoor and outdoor space for our children to play. We have lived here for twenty years.

---

[1] *See* Mirtich Declaration.

4

14.     Many factors attracted me to Scenery Hill, including the idyllic rolling hills and relatively reasonable housing costs.

15.     When we bought our home in 2004, there were no fracking wells or facilities in the area. However, not long after we moved in, fracking wells, compressor stations, and pipelines started to appear and encroach upon our home. Endless truck traffic came along with the building of each well pad, pipeline, and compressor station—seven days a week, 24 hours a day there is truck traffic.

16.     Today, I live across the street from 4 active well pads and a pipeline traverses my property about 500 feet away from my home. According to the Oil & Gas Threat Map[2] our home is completely surrounded by well pads, with 34 well pads in a three-mile radius. According to an analysis by Laura Mirtich[3], there are 20 active wells within a half mile of my home – 13 of which are considered "existing sources" under EPA's Oil and Gas Methane Rule, and 7 considered "new sources." Other forms of oil and gas infrastructure surround me, including a compressor station 1 mile down the road, well pads visible out of every window in my house, and heavy trucking traffic on my road. Well pads and compressor stations, in particular, are prone to leaks and malfunctions resulting in toxic air pollution.

---

[2] The Oil & Gas Threat Map, Earthworks & FracTracker Alliance, https://oilandgasthreatmap.com/about/ (last visited Feb. 8, 2024).
[3] *See* Mirtich Declaration.

5

17.    Just across the street from my home is a wellpad that contains multiple wellheads, at least five compressors, and at least two storage tanks. I'm aware that these types of sites with such types of equipment also generally operate process controllers. Just over a mile down the road is another wellpad that I am aware has multiple wellheads, at least five storage tanks, and at least six compressors. The emissions from these sites, and the other sites in close proximity to my home, concern me greatly because I know such close and constant exposure to oil and gas emissions puts my health, and the health of my family, at risk everyday.

18.    As an active member of my community and as an organizer, I regularly talk to folks who are experiencing health issues as a result of oil and gas pollution, or who are afraid for their health and safety, and the health and safety of their children, in the face of oil and gas pollution.

19.    Through my work as an active community member and organizer, I am aware of the effects of oil and gas operations on air quality and health, including emissions of particulate matter ("PM") and soot. Additionally, I am aware that oil and gas operations emit carcinogens such as volatile organic compounds ("VOC") that form ozone and hazardous air pollutants ("HAP").

20.    I also know, through my work, experience, and research, that people who live near fracking wells are more likely to have high-risk pregnancies,

6

premature births, asthma, nasal and sinus issues, skin disorders, heart failure, migraines, and fatigue, at least in part due to the air emissions from the wells.[4]

21.    I am also aware of other environmental pollutants produced by oil and gas infrastructure, including benzene. I know multiple people who have been diagnosed with acute myeloid leukemia, which is directly caused by these pollutants. In fact, a friend of mine who lived in my area recently passed from the disease.

22.    I am concerned that prolonged exposure to the toxic environmental hazards of oil and gas infrastructure will cause these serious medical illnesses to manifest in my family's and my health in the future.

23.    My family has also been directly affected by pollution from oil and gas production. All of my children experienced harmful health impacts linked to pollution from oil and gas production and processing that were more than just normal childhood illnesses. My four children have each experienced some combination of allergies, nosebleeds, rashes, intensified Lyme disease symptoms, cellulitis, respiratory symptoms, and more.

24.    In 2019, my entire family participated in a pilot study conducted by Environmental Health News journalist Kristina Marusic, where we wore personal

---

[4] *Fractured: Harmful chemicals and unknowns haunt Pennsylvanians surrounded by fracking*, Kristina Marusic, *Environmental Health News* (March 1, 2021), https://www.ehn.org/fractured-harmful-chemicals-fracking-2650428324.html.

7

air monitors, underwent urine tests, and had our water tested for nine weeks.[5] The 17 urine samples taken from my family over the course of the study showed large amounts of harmful chemicals associated with oil and gas production present in our bodies.

25.    The study tested for 40 of the chemicals most commonly found in emissions from oil and gas wells in Western Pennsylvania. These included 1,2,3-trimethylbenzene, 2-heptanone, naphthalene, ethylbenzene, xylenes, styrene, toluene, and benzene.[6] These chemicals are linked to skin issues, respiratory illness, immune system damage, hormone disruption, and increased cancer risk.

26.    The majority of our urine screen results exceeded the 95th percentile for biomarkers of ethylbenzene and styrene, and 41 percent of our tests exceeded the 95th percentile for biomarkers of toluene and benzene.[7] I know these chemicals are prevelant air emissions from oil and gas operations and are linked to cancer, nervous system damage, liver and kidney damage, and tissue irritation.[8]

---

[5] *Id.*

[6] Chris Holder et al., *Evaluating potential human health risks from modeled inhalation exposures to volatile organic compounds emitted from oil and gas operations*, 69 J. Air & Waste Mgmt. 1503 (2019);

[7] *Fractured: About our data*, Kristina Marusic (March 1, 2021), https://www.ehn.org/fractured-series-fracking-data-2650699245.html.

[8] *Fractured: Harmful chemicals and unknowns haunt Pennsylvanians surrounded by fracking*, *supra* note 2.

8

27.     Additionally, the personal air monitors captured similar results as the urine screens, and they showed our exposure to higher levels of airborne VOCs and HAPs.

28.     Since seeing the results of the study and the articles, I realized there was a correlation between the medical issues my young children suffered and the amount of fracking happening. The study showed high levels of naphthalene (a HAP)[9], 1,2,3-trimethylbenzene (a VOC)[10], and 2-heptanone (a VOC)[11] in our bodies, which I now know can cause the symptoms my children suffered.[12] All my children have lived all of their lives at our current home. And as the fracking wells appeared and operated around our home, my children suffered peculiar rashes, heavy nose bleeds, and lightheadedness.

29.     My oldest son, who is currently 23 years old, developed a rash when he was about 11 years old. The rash did not itch, and we deduced that it was not related to an allergy or to the type of laundry detergent we used. The rash was

---

[9] A classified HAP under EPA's Substance Registry Services. Https://cdxapps.epa.gov/oms-substance-registry-services/substance-details/13326.
[10] A classified VOC under EPA's Substance Registry Services. Https://cdxapps.epa.gov/oms-substance-registry-services/substance-details/50153.
[11] A classified VOC under EPA's Substance Registry Services. Https://cdxapps.epa.gov/oms-substance-registry-services/substance-details/25403.
[12] I know that exposure to naphthalene, 1,2,3-trimethylbenzene, and 2-heptanone is linked to skin, eye, and respiratory issues, gastrointestinal illness, liver problems, neurological issues, immune system and kidney damage, developmental issues, hormone disruption, and increased cancer risk.

9

bumpy and covered his entire body including his face and ears. When we took him to a dermatologist, the doctors were unable to help us.

30.    My second oldest son, who is now 21 years old, developed odd rashes as a child too. Also, when he was between the ages of two and four years old, he would get heavy nose bleeds while in his bed.

31.    My youngest son, who is 18 years old, used to have very severe nosebleeds— for a period of years he would often get two to three nose bleeds a day. The bleeding was so heavy that he would cough up large blood clots from his throat, which was terrifying. He still suffers from lightheadedness and becomes pale whenever he is exposed to the outdoor air too much.

32.    Finally, my daughter, who is currently 15 years old, used to get recurrent nose bleeds as an infant, which is not normal or common for babies. I remember finding her in the crib with heavy nose bleeds, and it scared me so much. As my daughter got older, she developed eczema.

33.    I am very concerned about my own future health and the health of my children given the high exposure to oil and gas pollution we have experienced and will continue experiencing if tighter regulations are not in place.

34.    My children want to remain in their community as they move into adulthood, and I want them to have that opportunity. The area we live in is

10

affordable and their family is here, but the prospect of continued health risks posed by unchecked pollution mean they may not feel safe to remain in their community.

35.     The presence of fracking wells and facilities impact my family's enjoyment of our home and property. When my husband and I purchased the property, we loved that we had a historic home that sat on a large piece of property. Additionally, it was in a rural location that was close to our extended family. The property had all the advantages we wanted to raise a family. But the poor outdoor air quality caused by oil and gas operations inhibited our full enjoyment of our property.

36.     The air quality at my home is always a major concern that limits our ability to enjoy the property. I check the air quality every day to see if it is safe to be outside. I never did this before the fracking wells appeared in the area. When I check the air quality, I adjust a reminder magnet on the refrigerator that lets all my family know if it is safe to be outside. If tighter regulations were in place to control leaks from fracking equipment, perhaps this precaution wouldn't be necessary.

37.     We have to keep all the windows closed at night in order to reduce our exposure to oil and gas pollution. For years, I noticed that if a window is left open, we would suffer from lightheadedness, paleness, or nose bleeds.

38.     I cannot always work at my home due to the fracking wells and the pollutants they emit. With my job, I am able to work remotely. However, on bad

11

air quality days, I leave my house to work somewhere else to avoid inhaling more air pollution.

39.    The wells disrupt our enjoyment of our outdoor property. I have always encouraged my children to play and be outside, but even on good air quality days, I worry about what they are breathing. And if it is a poor air quality day, we stay inside. It is upsetting to me that when the weather is beautiful outside, but the air quality is bad, we must stay inside or leave our neighborhood.

40.    Contrary to our initial intent to have a home in a safe area, I fear for myself and my family when it comes to the high truck traffic coming and going from the fracking wells. Our home is on State Route 40, so fracking trucks use this as a main route to the wells. The constant truck traffic creates a hazard on the road–not to mention additional toxic exposure to diesel fumes. I am very cautious when driving around these trucks and the volatile materials they carry. I practice and teach my children, who are learning how to drive, to never get stuck behind a fracking well truck.

41.    I am also concerned about the impacts fracking operations have on climate change.

42.    I am aware that methane is a major pollutant emitted by oil and gas operations, and that methane is a very powerful greenhouse gas that contributes significantly to global climate change.

12

43.    I have observed and experienced the effects of climate change in my own life and community, and I am concerned about the outsized contribution of oil and gas pollution to these changes. In the past, southwestern Pennsylvania consistently experienced snow, allowing for recreational activities like skiing, snowshoeing, and sledding which my family and I enjoy. Now, snow is an incredibly rare occurrence, and we are almost never able to enjoy those wintertime activities.

44.    I am concerned that my community will only see more climate-related impacts if oil and gas operations do not comply with regulations as soon as possible.

45.    I worry that, without proper, timely regulation and enforcement, oil and gas emissions will continue unchecked and the negative health, aesthetic, and recreational impacts to me and my community will continue to proliferate.

46.    I understand that the U.S. Environmental Protection Agency ("EPA") has recently issued an interim final rule, without first taking public comment, that delays compliance deadlines for national standards for oil and gas facilities that would control methane and VOC emissions from both new and existing infrastructure. Had the EPA provided an opportunity to comment prior to issuing the interim final rule, I would have commented in my capacity as a member of Earthworks and Clean Air Council.

13

47.     I support the EPA's methane standards that were finalized last year for many reasons, but especially because my family, my community, and I will benefit from the pollution reductions that would stem from this rule.

48.     I do not support a delay in compliance dates for the rule. Delaying compliance with these standards will only prolong and exacerbate my own and my family's exposure to harmful pollutants.

49.     I believe that EPA's oil and gas standards should be implemented and enforced as soon as possible because any delay would negatively affect air quality and health in my area. The sooner the better as full implementation of these regulations are overdue. The previous performance standards for oil and gas operation, finalized many years ago, are sorely insufficient. EPA's standards help to reduce pollutants emitted, and hold oil and gas industries more accountable if they fail to comply. I would not receive the benefits from the rule's reductions to pollution if its full implementation were delayed as will happen as a result of this interim final rule.

50.     I understand that the Environmental Protection Agency published its interim final rule establishing an "Extension of Deadlines in standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule ("interim final rule") on July 31, 2025.

14

51.     I also understand that Earthworks and Clean Air Council, along with other environmental groups, seek to challenge the interim final rule. I support Earthworks and Clean Air Council filing this lawsuit. I also understand, as an employee of the Council, that challenging this interim final rule falls within the Council's mission to protect everyone's right to a clean air and a healthy environment.

I declare under penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.

/s/ Lois Bower-Bjornson

Lois Bower-Bjornson

Executed on August 11, 2025

15

# Attachment 3

Declaration of Brian Buma, Environmental Defense Fund

## DECLARATION OF BRIAN BUMA

I, Brian Buma, declare as follows:

1.      I am a Senior Contributing Scientist at the Environmental Defense Fund ("EDF"). I earned a Ph.D. in Ecology from the University of Colorado Boulder, where I studied the impact of climate change and wildfires, windstorms, and other disasters on ecosystems. I have published more than 90 peer-reviewed papers, many on the impacts of climate change on earth system functioning and natural disasters. My curriculum vitae is attached as Exhibit A.

2.      I joined EDF in 2022 after leaving my position as an Associate Professor at the University of Colorado Denver. At EDF, I direct the Climate Innovation Initiative. This effort focuses on new technologies and means to measure greenhouse gas emissions, to mitigate emissions from natural and human systems, and to remove carbon from the atmosphere. I specifically aim to accelerate solutions to climate warming over all timescales, both near- and long-term.

3.      Methane is a considerable driver of near-term climate change, responsible for more than a quarter of the increased global temperatures we are experiencing today.[1] Atmospheric methane concentrations have doubled since

---

[1] Buma B, Ocko I, Walkowiak B, Xu Y, Lackner M, Sartzetakis SS, Alpert A, Dhungel S. 2025. Considering sectoral warming and cooling emissions and their

the Industrial Revolution[2] and emissions are accelerating. The 2020 emission

rate was the highest ever recorded (608 Tg) and 12% higher than prior decades.[3]

Globally, a third of human-emitted methane comes from the oil and gas sector[4].

Current trends suggest that methane from global oil and gas may soon overtake

livestock as the largest source from human activities.[5] Domestically, the EPA

recognizes that the oil and gas sector is the largest industrial source of methane

emissions in the United States, accounting for nearly one-third of U.S. methane

emissions.[6] However, the actual amount of emissions is almost certainly higher,

as studies show the EPA underestimates methane emissions from the oil and

natural gas sector by approximately sixty percent.[7] I have led research teams[8] to

---

lifetimes can improve climate change mitigation policies.  NPJ Climate and
Atmospheric Science. 8:287

[2] NASA 2024. Vital Signs. https://climate.nasa.gov/vital-signs/methane

[3] Saunois, M., et al. 2025. Global Methane Budget 2000–2020, Earth Syst. Sci.
Data, 17, 1873–1958, https://doi.org/10.5194/essd-17-1873-2025.

[4] *Id.*

[5] Calculated from data on emissions from livestock from Food and Agriculture
Organization (FAO), *available at* http://www.fao.org/faostat/en/#home; data on
emissions from oil and gas from International Energy Agency World Energy
Outlook 2018, *available at* https://www.iea.org/reports/world-energy-outlook-2018.

[6] EPA, *Overview of Greenhouse Gases: Methane Emissions,*
https://www.epa.gov/ghgemissions/methane-emissions, last accessed 2025).

[7] Ramon A. Alvarez,, et al, *Assessment of Methane Emissions from the U.S. Oil and
Gas Supply Chain*, 361 Science 186, 186 (2018), *available at* https://
science.sciencemag.org/content/361/6398/186 (last accessed Sept. 14,2020).

[8] Buma B, Ocko I, Walkowiak B, Xu Y, Lackner M, Sartzetakis SS, Alpert A,
Dhungel S. 2025. Considering sectoral warming and cooling emissions and their
lifetimes can improve climate change mitigation policies.  NPJ Climate and
Atmospheric Science. 8:287

quantify the impacts of all major emissions (both warming and cooling species). Overall, methane, through both direct emissions and modifications to its lifespan by other emissions, is currently driving more than a quarter of the increased temperature forcing we are feeling today, about 0.6 degrees C (~1 deg. F). Of all methane sources from human activities, reducing natural gas emissions from oil and gas operations—whether from venting, flaring, or leaking—presents an immediate and important opportunity considering its cost- effectiveness and technological availability. Methane emissions reductions have a powerful and immediate impact on climate because it is both a powerful short-term warmer – much stronger than $CO_2$ – and has a short lifespan, so reductions in emissions are felt quickly.

4.      For the same mass of carbon dioxide ("$CO_2$") and methane emissions, methane can trap 100 times more heat than $CO_2$, both directly from methane as a greenhouse gas and indirectly from the production of further greenhouse gases: tropospheric ozone, stratospheric water vapor, and $CO_2$.[9] Over a twenty-year period, this number drops to ~82 as methane dissipates from the atmosphere more quickly than $CO_2$.[10]

---

[9] Calculations from IPCC AR6.
https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_AR6_WGI_FullReport.pdf. See https://www.edf.org/methane-spotlight-10-scientific-facts-you-should-know
[10] *Id.*

5.      Further, through the creation of tropospheric ozone, methane contributes to ground-level ozone, which is harmful to humans and is linked to short- and long-term negative health effects, including shortness of breath, decreased lung function, and chronic obstructive pulmonary disease ("COPD"). Ozone also aggravates existing cardiovascular and respiratory conditions, such as asthma, emphysema, and bronchitis, with long-term exposure increasing the risk of death from these conditions. As 125 million Americans, around 37% of the population are exposed to harmful levels of ozone,[11] reducing methane emissions would directly enhance human health while improving air quality and mitigating climate change.[12]

6.      Methane, on average, lasts for approximately a decade in the atmosphere (though its effects can last much longer),[13] because it is oxidized on average after 9 years, breaking down and forming other chemical species.[14] Methane's near-term lifespan combined with its potency, *supra* ¶2, mean that

[11] American Lung Association: State of the Air
https://www.lung.org/research/sota/key-findings/ozone-pollution
[12] *Id.*
[13] For example, as discussed below, oceans absorb 90% of the excess heat trapped by greenhouse gases. Therefore, even though the methane is gone and no longer trapping additional heat in the atmosphere, the warming that it had caused is now in the oceans, contributing to sea level rise decades to come. Hu, A., Xu, Y., Tebaldi, C., Washington, W.M. and Ramanathan, V., 2013. Mitigation of short-lived climate pollutants slows sea-level rise. *Nature Climate Change*, *3*(8), pp.730-734.
[14] Myhre et al. 2013 s*upra* note 3.

methane contributes over a quarter of the global temperature increase we are seeing today. Continued emissions therefore have a material detrimental impact on human health. It also means that immediate emission reduction are valuable, since near-term methane reductions can rapidly slow the rate of warming as previously emitted methane has a relatively short lifespan; once we reduce emissions, we will see concentrations of atmospheric methane from anthropogenic sources decline.[15] This is contingent, however, on immediate reductions in emissions. While it is worth nothing that methane forms tropospheric ozone when it oxidizes, another strong greenhouse gas, the ozone does not last long in the atmosphere. There are immediate and needed climate benefits from reduced methane emissions.

7. It is crucial to limit both the rate of near-term warming and long-term warming, in order to reduce warming impacts within this generation and for generations to come. Both near- term and long-term warming are associated with specific sets of damages, and all must be reduced. Near-term warming

---

[15] Shindell, D., Ravishankara, A.R., Kuylenstierna, J.C., Michalopoulou, E., Höglund-Isaksson, L., Zhang, Y., Seltzer, K., Ru, M., Castelino, R., Faluvegi, G. and Naik, V., 2021. *Global methane assessment: Benefits and costs of mitigating methane emissions* (No. Job No: DTI/2352/PA). United Nations Environment Programme.

impacts property and infrastructure,[16] plant and animal species survival rates,[17] extreme events,[18] sea level rise[19], the timing of crossing tipping point thresholds,[20] the economy,[21] and the ability of vulnerable populations to adapt to a changing environment.[22] Long-term warming impacts glacial melt, permafrost melt, shifts in biomes, ocean circulation, and more. Carbon dioxide is the main driver of long- term warming because of its long atmospheric lifetime.[23] Methane emissions are an important driver of near-term warming and a powerful lever to reduce temperatures in the short term, and so taking

---

[16] Tschakert, Petra, et al. "One thousand ways to experience loss: A systematic analysis of climate-related intangible harm from around the world." Global Environmental Change 55 (2019): 58-72; US EPA, Multi-Model Framework for Quantitative Sectoral Impacts Analysis: A Technical Report for the Fourth National Climate Assessment, 120 (2017), available at https://cfpub.epa.gov/si/si_public_record_Report.cfm?dirEntryId=335095

[17] Wiens, J.J. and Zelinka, J., 2024. How many species will Earth lose to climate change?. *Global Change Biology*, *30*(1), p.e17125.

[18] Fischer, E.M., Sippel, S. & Knutti, R. Increasing probability of record-shattering climate extremes. Nat. Clim. Chang. 11, 689–695 (2021). https://doi.org/10.1038/s41558-021-01092-9

[19] Tebaldi, C., Ranasinghe, R., Vousdoukas, M., Rasmussen, D.J., Vega-Westhoff, B., Kirezci, E., Kopp, R.E., Sriver, R. and Mentaschi, L., 2021. Extreme sea levels at different global warming levels. *Nature Climate Change*, *11*(9), pp.746-751.

[20] Armstrong McKay, D.I., Staal, A., Abrams, J.F., Winkelmann, R., Sakschewski, B., Loriani, S., Fetzer, I., Cornell, S.E., Rockström, J. and Lenton, T.M., 2022. Exceeding 1.5 C global warming could trigger multiple climate tipping points. *Science*, *377*(6611), p.eabn7950.

[21] Newman, R. and Noy, I., 2023. The global costs of extreme weather that are attributable to climate change. *Nature Communications*, *14*(1), p.6103.

[22] Hu et al., *supra* note 13.

[23] Myhre et al., *supra* note 3.

immediate steps to reduce methane emissions can help to immediately lower warming rates.[24] Conversely, allowing methane emissions to increase will accelerate this harmful warming.[25]

8.    Warming to date has already negatively impacted every continent and every ocean,[26] and can result in tropical island villages relocation,[27] Arctic buildings and villages relocating,[28] contribute to coral reef dieoffs,[29] mosquito seasons growing weeks longer,[30] and anthropogenic climate change driven extreme heat events yielding 37% (20.5-76.3%) higher death tolls.[31] The year

---

[24] Shindell et al., *supra* note 15.

[25] *Id.*

[26] IPCC, Climate Change 2023: https://www.ipcc.ch/assessment-report/ar6/

[27] Albert, S., Leon, J.X., Grinham, A.R., Church, J.A., Gibbes, B.R. and Woodroffe, C.D., 2016. Interactions between sea-level rise and wave exposure on reef island dynamics in the Solomon Islands. *Environmental Research Letters*, *11*(5), p.054011.

[28] Alaska Dept of Community and Regional Affairs, https://www.commerce.alaska.gov/web/dcra/planninglandmanagement/newtokplan ninggroup.aspx

[29] Donovan, M.K., Burkepile, D.E., Kratochwill, C., Shlesinger, T., Sully, S., Oliver, T.A., Hodgson, G., Freiwald, J. and van Woesik, R., 2021. Local conditions magnify coral loss after marine heatwaves. *Science*, *372*(6545), pp.977-980.

[30] M. Romanello et al., The 2021 report of the *Lancet* Countdown on health and climate change: Code red for a healthy future. *Lancet* 398, 1619–1662 (2021).

[31] Vicedo-Cabrera, A.M., Scovronick, N., Sera, F., Royé, D., Schneider, R., Tobias, A., Astrom, C., Guo, Y., Honda, Y., Hondula, D.M. and Abrutzky, R., 2021. The burden of heat-related mortality attributable to recent human-induced climate change. *Nature climate change*, *11*(6), pp.492-500.

2024 was the warmest year on record.[32] Extreme weather events and disasters—such as climate-driven wildfires—are increasingly being driven by climate change.[33] Increasing methane emissions will result in more pronounced impacts in the future.[34] Positive feedback loops are emerging that only serve to accelerate warming beyond direct emissions, compounding the challenge.[35] Further warming also enhances the risk that the climate surpasses irreversible tipping points that could render long-term climate stabilization difficult or impossible.[36] Immediate methane reductions can therefore also mitigate long- term warming and make it easier to stabilize global warming below 1.5 °C.[37] This is the key threshold for the international Paris Agreement. But inaction can result in

---

[32] NASA 2025. https://www.nasa.gov/news-release/temperatures-rising-nasa-confirms-2024-warmest-year-on-record/

[33] Burton, C, et al. "Global burned area increasingly explained by climate change." *Nature Climate Change* (2024): 1-7.

[34] Canadell, J.G., Monteiro, P.M., Costa, M.H., Da Cunha, L.C., Cox, P.M., Eliseev, A.V., Henson, S., Ishii, M., Jaccard, S., Koven, C. and Lohila, A., 2021. Global carbon and other biogeochemical cycles and feedbacks. *IPCC AR6 WGI, final government distribution*, pp.chapter-5.

[35] Ripple, William J., et al. "Many risky feedback loops amplify the need for climate action." One Earth 6.2 (2023): 86-91.

[36] Wunderling, N., von der Heydt, A.S., Aksenov, Y., Barker, S., Bastiaansen, R., Brovkin, V., Brunetti, M., Couplet, V., Kleinen, T., Lear, C.H. and Lohmann, J., 2024. Climate tipping point interactions and cascades: A review. *Earth System Dynamics*, *15*(1), pp.41-74.

[37] Cain, M., Jenkins, S., Allen, M.R., Lynch, J., Frame, D.J., Macey, A.H. and Peters, G.P., 2022. Methane and the Paris Agreement temperature goals. *Philosophical Transactions of the Royal Society A*, *380*(2215), p.20200456.

changes that are not reversible.[38]

9.    Climate impacts are adversely affecting the physical health of people globally and the mental health of people in assessed regions.[39] For example, extreme heat can lead to deadly organ failure and conditions that can affect the brain, heart, intestines, kidney and liver[40] and climate- related disasters like flooding, wildfires, and other health threats including injuries, infections, diseases, and death.[41]

10.    Reducing emissions of methane will also help to limit sea level

---

[38] Schleussner, C.F., Ganti, G., Lejeune, Q., Zhu, B., Pfleiderer, P., Prütz, R., Ciais, P., Frölicher, T.L., Fuss, S., Gasser, T. and Gidden, M.J., 2024. Overconfidence in climate overshoot. *Nature*, *634*(8033), pp.366-373.

[39] Romanello, Marina, et al. "The 2022 report of the Lancet Countdown on health and climate change: health at the mercy of fossil fuels." The Lancet 400.10363 (2022): 1619-1654; Masson-Delmotte et al., Intergovernmental Panel on Climate Change, Summary for Policymakers in Climate Change 2022: Impacts, Adaptation, and Vulnerability: Contribution of Working Group II to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change at 11, B.1.4.

[40] Ebi, K.L., Capon, A., Berry, P., Broderick, C., de Dear, R., Havenith, G., Honda, Y., Kovats, R.S., Ma, W., Malik, A. and Morris, N.B., 2021. Hot weather and heat extremes: health risks. *The lancet*, *398*(10301), pp.698-708; Mora, C., Counsell, C.W., Bielecki, C.R. and Louis, L.V., 2017. Twenty-seven ways a heat wave can kill you: deadly heat in the era of climate change. *Circulation: Cardiovascular Quality and Outcomes*, *10*(11), p.e004233

[41] Bell, J.E., Brown, C.L., Conlon, K., Herring, S., Kunkel, K.E., Lawrimore, J., Luber, G., Schreck, C., Smith, A. and Uejio, C., 2018. Changes in extreme events and the potential impacts on human health. *Journal of the Air & Waste Management Association*, *68*(4), pp.265-287; USGCRP [U.S. Global Change Research Program], Climate Science Special Report: Fourth National Climate Assessment, Vol. I (Wuebbles, D.J. et al. eds.) (2017) at 44.

rise. Global average sea level has risen more quickly in the 20th century than any prior century in 3000 years.[42] While methane only lasts for about a decade in the atmosphere, a substantial fraction of the atmospheric heating that methane causes during this period is absorbed by the oceans, where the warming signal lasts far longer than in the atmosphere. Accordingly, near-term methane emissions can cause sea level rise for decades to come.[43]

11.      I am aware that in 2024, EPA finalized a rule to strengthen standards to reduce methane emissions from oil and gas facilities. Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024) ("2024 Rule"). I am aware that the Environmental Protection Agency (EPA) has now issued an interim final rule that provides an 18-month extension for standards in the 2024 Rule to reduce

---

[42] Fox-Kemper, B., H.T. Hewitt, C. Xiao, G. Aðalgeirsdóttir, S.S. Drijfhout, T.L. Edwards, N.R. Golledge, M. Hemer, R.E. Kopp, G. Krinner, A. Mix, D. Notz, S. Nowicki, I.S. Nurhati, L. Ruiz, J.-B. Sallée, A.B.A. Slangen, and Y. Yu, 2021: Ocean, Cryosphere and Sea Level Change. In *Climate Change 2021: The Physical Science Basis. Contribution of Working Group I to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change* [Masson-Delmotte, V., P. Zhai, A. Pirani, S.L. Connors, C. Péan, S. Berger, N. Caud, Y. Chen, L. Goldfarb, M.I. Gomis, M. Huang, K. Leitzell, E. Lonnoy, J.B.R. Matthews, T.K. Maycock, T. Waterfield, O. Yelekçi, R. Yu, and B. Zhou (eds.)]. Cambridge University Press, Cambridge, United Kingdom and New York, NY, USA, pp. 1211–1362, doi: 10.1017/9781009157896.011.

[43] Hu et al., *supra* note 13.

methane emissions from new, modified and existing sources in the oil and gas sector and to reduce volatile organic compound (VOC) emissions from new and modified sources in the oil and gas sector. "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule" ("Delay Rule"), 90 Fed. Reg. 35,966 (July 31, 2025). I understand that, according to EPA, the Delay Rule will result in increased methane emissions from both new and existing oil and gas sources.[44] The 2024 standards were estimated to result in 58 million tons of methane emissions reductions between 2024-2038. 89 Fed. Reg. at 16,836. Delaying those emissions reductions will have both short- and long-term impacts on the climate. Methane is currently responsible for over a quarter of the warming we are feeling today. Given its relatively short lifespan in the atmosphere, acting on methane now will meaningfully and materially reduce the warming we feel from methane in the near term.

12.    I am also aware that EPA updated the metrics for the social cost of greenhouse gases—including the social cost of methane—in supplementary material for its Regulatory Impact Analysis, and that this analysis was used to

---

[44] EPA, *Economic Impact Analysis for the Extension of Deadlines in the NSPS OOOOb and EG OOOOc* (July 31, 2025) 6, Doc ID: EPA-HQ-OAR-2025-0162-0025; *see also* Proville-Mirtich Decl.

estimate the climate benefits of the 2024 Rule.[45]  In its 2023 report updating those estimates, EPA used the best available science to monetize social costs caused by greenhouse gases, including many of the key social costs I've outlined in this declaration. As a foundational step in creating the estimates, EPA adopted a newly calibrated climate module called the Finite amplitude Impulse Response (FaIR) climate model on FaIR version 1.6.2 to generate projections of global mean surface temperature (GMST) change. This climate module is based on reduced complexity climate models, which capture the fundamental physics of climate change and mimic the simulation of more complex global climate models, and are used to estimate global warming due to additional increases in greenhouse gases, including methane. The derived global warming effect is then used to estimate (in combination with sea-level rise models) regional warming and sea level rise, which serve as environmental stressor inputs for the damage module. EPA's climate module is based on the latest science, including the most recent IPCC assessment which reflects consensus from the worldwide scientific community and synthesizes hundreds of recently published climate studies. At the core of EPA's climate module is the latest science on the Equilibrium Climate

---

[45] Environmental Protection Agency, Supplementary Material for the Regulatory Impact Analysis for the Final Rulemaking," Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review" (November 2023) ("SC-GHG Report").

Sensitivity ("ECS"), which is the amount of warming that is expected to result from the doubling of atmospheric carbon dioxide concentrations. The most recent estimate from the 2021 IPCC report, with high confidence, an ECS range from 2.5°C to 4°C, with 3°C as a "best estimate" and considers a lower ECS estimate, such as 1.5ºC, to be "very unlikely." EPA's chosen climate module uses a median ECS of 2.95°C,[46] which falls in the middle of the IPCC's range.

13.    I understand that in the Delay Rule EPA declined to monetize climate harms from delaying the standards "due to the uncertainties related to monetization of impacts from changes in GHG emissions."[47] EPA states that there "are significant uncertainties related to the monetization of greenhouse gases that include, but are not limited to: the magnitude of the change in climate due to a change in GHG emissions; the relationship between changes in the climate and the economy and therefore, the resulting economic impacts; future economic and population growth which are important for estimating vulnerability, willingness to pay to avoid impacts, and the ability to adapt to future changes; future technological advancements that would reduce vulnerability and impacts; the share of impacts from GHG emissions that affect

---

[46] SC-GHG Report, Table 2.2.1.

[47] EPA, *Economic Impact Analysis for the Extension of Deadlines in the NSPS OOOOb and EG OOOOc* (July 31, 2025) Doc ID: EPA-HQ-OAR-2025-0162-0025

citizens and residents of the United States; and the appropriate discount rates to use when discounting in an intergenerational context." This runs counter to EPA's aforementioned 2023 peer-reviewed report on the social cost of greenhouse gases and the evidence therein establishing widely-accepted methodologies for quantifying the impacts of climate change. EPA's 2023 report applied rigorous economic techniques to thoroughly account for uncertainty and found that, given the data and modeling limitations, its central estimate that methane causes around $2000 per ton in climate damage is very likely an underestimate. Given the probability distributions for EPA's 2023 estimates of the social cost of greenhouse gases—which point to large, non-zero estimates of climate damages per ton—it is irrational and inconsistent with best scientific practices for EPA to now assign a value of $0 to the climate damages caused by methane emissions

14.     I declare that the foregoing is true and correct.


_____

Brian Buma

Dated August 12, 2025

**Exhibit A**

# B R I A N   B U M A

Environmental Defense Fund | Boulder, Colorado / New York, New York
bbuma@edf.org | www.brianbuma.com

---

## APPOINTMENTS

Senior Climate Scientist, Office of Chief Scientist, Environmental Defense Fund
*2022 - current*
       Director: Climate Innovation Initiative
Associate Professor of Research, University of Colorado, Denver
*2022 - current*
Associate Professor, University of Colorado, Denver
*2021-2022*
Assistant Professor, University of Colorado, Denver
*2018 – 2021*
Assistant Professor, University of Alaska Southeast
*2013 – 2018*

## EDUCATION

*University of Colorado, Boulder- Ph.D. (2013)*         *Dept. of Ecology and Evolutionary Biology*
*Western Washington University- M.A. (2005) Science Education*
*Western Washington University- B.S. (2003)*         *Biology, minor in Chemistry*

## PUBLICATIONS

*Student advisee. **Postdoc advisee.  †Visiting scholar in Buma lab*
*In review & revision publications not shown*

86. Esquivel-Elizondo S, Walkowiak B, Sartzetakis SS, **Buma B**. 2025. Climate Impact of Direct and Indirect $N_2O$ Emissions from the Ammonia Marine Fuel Value Chain. https://doi.org/10.1021/acs.est.4c13135?urlappend=%3Fref%3DPDF&jav=VoR&rel= cite-as

85.  Godziek J*, Pawlik L, **Buma B**. 2025. The mapping and analysis of the infrequent, large-scale blowdown event in the Colorado Front Range. Land Degradation and Development. In press.

84. Carter TA*, Stears AE, Forwalt PJ, Atkins DH, Dwire KA, Fleri JR, Hayes KR*, Mount HE, Twaddell EM*, Wessel SA, **Buma B**, Laughlin DC. 2025. Fine-root Traits Coordinate with Aboveground Strategies but are Poor Predictors of Understory Plant Species Response to Widespread Spruce Mortality. Plant and Soil. https://doi.org/10.1007/s11104-025-07463-x

83. Talucci, A., Loranty, M.M., Holloway, J.E., Rogers, B.M., Alexander, H.D., Baillargeon, N., Baltzer, J.L., Berner, L.T., Breen, A., Brodt, L. **Buma, B**., et al. 2025. Permafrost-wildfire interactions: Active layer thickness estimates for paired burned and unburned sites in northern high-latitudes. *Earth System Science Data Discussions*, *2024*, pp.1-36.

82. Ury E., Hinckley E, Visioni D, **Buma B**. 2024. Managing the global wetland methane-climate feedback: A review of potential options. Global Change Biology. 30 (11), e17585

80.  Hayes K, Hoffman C, Linn R, Ziegler J, **Buma B**. 2024. Fuel constraints, not fire weather conditions, limit fire behavior in reburned boreal forests. Agricultural and Forest Metrology. 358, 110216

79. **Buma B.** 2024. Including non-growing season emissions of N2O in US maize could raise net CO2e emissions 31% annually. Agricultural and Environmental Letters. 9 (2), e20146

78. Pawlik, Ł., Gałązka, A., Gruba, P., Marzec-Grządziel, A., Szopa, K., Kupka, D., **Buma, B**. and Šamonil, P., 2024. High-resolution soil sampling reveals

the pattern of biological weathering and soil formation under trees. *Science of The Total Environment*, p.173725.

77. Carter, T\*, **Buma B.** 2024. Understory Plant Biodiversity is Inversely Related to Carbon Storage in a Carbon Dense Ecosystem. Ecology and Evolution. **https://doi.org/10.1002/ece3.70095**

76. Gough CM, **Buma B,** Jentsch A, Mathes KC, Fahey RT. 2024. Disturbance theory for ecosystem ecologists: A primer. Ecology and Evolution. 14(6): e11403.

75. Carter T\*, **Buma B**. 2024. The Distribution of Tree Biomass Carbon within the Pacific Coastal Temperate Rainforest, a Disproportionally Carbon Dense Forest. Canadian Journal of Forest Research. 54 (9), 956-977.  DOI: 10.1139/cjfr-2024-0015

74. **Buma, B**., Gordon, D.R., Kleisner, K.M. et al. 2024. Expert review of the science underlying nature-based climate solutions. Nature Climate Change https://doi.org/10.1038/s41558-024-01960-0

73.  Vorster, AG, Stevens-Rimann C, Young N, Woodward B, Choi C, Chambers ME, Cheng AS, Caggiano M, Schultz C, Thompson M, Greiner M, Aplet G, Addington RN, Battaglia MA, Bowker D, Bucholz E, **Buma B**, et al. 2024. Metrics and considerations for evaluating how forest treatments alter wildfire behavior and effects. Journal of Forestry. https://doi.org/10.1093/jofore/fvad036

72. Pawlik, Ł., Gruba, P., Gałązka, A., Marzec-Grządziel, A., Kupka, D., Szopa, K., Buma, B. and Šamonil, P., 2023. Weathering and soil production under trees growing on sandstones–The role of tree roots in soil formation. *Science of The Total Environment*, *902*, p.166002.

71.  Weiss SA, Marshall AM, Hayes KR, Nicolsky DJ, **Buma B,** Lucash MS. 2023. Future transitions from a conifer to a deciduous dominated landscape are accelerated by greater wildfire activity and climate change in interior Alaska. Landscape Ecology. https://doi.org/10.1007/s10980-023-01733-8

70. Booth, A.M., **Buma, B**. and Nagorski, S., 2022. Effects of landslides on terrestrial carbon stocks with a coupled geomorphic-biologic model: Southeast Alaska, United States. *Journal of Geophysical Research: Biogeosciences*, p.e2022JG007297.

69. Davis, KT, Robles MD, Kemp KB, Higuera PE, Chapman T, Metlen KL, Peeler JL, Rodman KC, Woolley T, Addington RN, **Buma B**, et al. 2023. Reduced

fire severity offers near term buffer to climate driven declines in conifer resilience across the western United States. PNAS. 120: e2209120120

68. Pawlik L, **Buma B**, Wistuba M, Malik I, Slezak A. 2023. Trees as bioindicators of hillslope degradation by debris flows and dangerous rockfalls along the Lefthand Canyon, Colorado Front Range. Land Degradation and Development. 34 (6), 1869-1884

67. **Buma B.** 2022. Alternate growth forms can protect climate-threatened trees from freezing stressors. Forest Science. 68(5-6): 435-439.

66. LaRue EA, Fahey RT, Alvershere BC, Atkins JW, Bhatt P, **Buma B,** Chen A, Cousins S, Elliot JM, Elmore EJ, Hakkenberg CR, Hardiman BS, Johnson JS, Kashian DM, Koirala A, Papes M, St. HilaireJB, Susasinghe T, Zambrano J, Zhai L, Fei S. 2023. A theoretical framework for the ecological role of structural diversity. Frontiers in Ecology and the Environment. 21(1): 4-13.

65. Shuman JK, Balch JK, Barnes RT, Higuera PE, Roos CI, Schwilk DW, Stavros N, Banjeree T, Bela MM, Bendix J, Bertolino S, Bililgn S, Bladon KD, Brando P, Breidenthal RE, **Buma B**, & 72 more. Reimagine fire science for the Anthropocene. PNAS Nexus. 1(3): pgac115 https://doi.org/10.1093/pnasnexus/pgac115

64. Carter, T*, Hayes K*, **Buma B**. Putting More Fuel on the Fire… Or Maybe Not? A Synthesis of Spruce Beetle and Fire Interactions in North American Subalpine Forests. 2022. Landscape Ecology. https://doi.org/10.1007/s10980-022-01481-1

63. Hayes K*, Carter T*, Cook P, Twaddell E*, **Buma B.** 2022. Supporting Graduate Field Leadership through Community-Sourced Advice, Action, and Policy. Ecosphere. https://doi.org/10.1002/ecs2.4247

62. **Buma B,** Morello F, Rodriguez K, Serrano Fillol A. 2022. The southernmost end point of pre-industrial human expansion found on Isla Hornos (Isla Lököshpi), Chile. Antiquity. *In press.*
    *Featured in Nature: https://www.nature.com/articles/d41586-022-02111-1*

61. **Buma B,** Hayes K, Weiss S, Lucash M. 2022. Short interval fires increasing in the boreal forest as fire self-regulation decays, especially in drier coniferous forest landscapes. Scientific Reports 12:4901

60. Mitchell JC, Kashian DM, Chen X, Cousins S, Flaspohler D, Gruner DG, Johnson KS, Surasinghe T, Zambrano J, **Buma B**. 2023. Forest ecosystem properties

emerge from interactions of structure and disturbance. Frontiers in Ecology and Environment. 21(1): 14-23.

59. Aguirre F, Squeo AF, Lopez D, Crego R, **Buma B**, Casassa G, Rozzi R. 2022. Gradientes climáticos y su influyente rol sobre los ecosistemas terrestres de la Reserva de Biósfera Cabo de Hornos, Chile. Anales del Instituto de la Patagonia. *In press.*

58. Bisbing S, **Buma B**, VanderNaald B, Bisbing AL. 2022. Single-tree salvage logging as a response to Alaska yellow-cedar climate-induced mortality maintains ecological integrity with limited economic returns. Forest Ecology and Management. 503(1): 119815

57. Vascik B, Booth AM, **Buma B**, Berti M. 2021. Estimated Amounts and Rates of Carbon Mobilized by Landsliding in Old-Growth Temperate Forests of SE Alaska. AGU Biogeosciences. 126(11): e2021JG006321.

56. **Buma B.** 2021. Disturbance ecology and the problem of n = 1. Methods in Ecology and Evolution. 12(12): 2276-2286.

55. Bidlack AL, Bisbing S, **Buma B**, Diefenderfer H, Fellman J, Floyd W, Giesbrecht I, Lally A, Lertzman K, Perakis S, Butman D, D'Amore D, Fleming S, Hood E, Hunt B, Kiffney P, McNicol G, Menounos B, Tank S. Climate-Mediated Changes to Linked Terrestrial and Marine Ecosystems across the Northeast Pacific Coastal Temperate Rainforest Margin. 2021. BioScience. 71(6): 581-595.

54. Bisbing S, Urza AK, **Buma B**, Cooper DJ, Matocq M, Angert AL. 2021. Can long-lived species keep pace with climate change? Evidence of local persistence potential in a widespread conifer. Diversity and Distributions. 27 (2), 296-312

53. Pawlik L†, **Buma B**, Samonil P, Kvacek J, Galazka A, Malik I, Kohout P. 2020. Impact of trees and forests on the Devonian landscape and weathering processes with implications to the global Earth's system properties - A critical review. Earth-Science Reviews. 205: 103200

52. Leverkus AB, **Buma B**, Wagenbrenner J, Burton P, Lingua E, Marzano R, Thorn S.  2021. Tamm review: Does salvage logging mitigate subsequent forest disturbances? Forest Ecology and Management. 481, 118721

51. Hayes K*, **Buma B.** 2021, Effects of short-interval disturbances continue to accumulate, overwhelming variability in local resilience. Ecosphere. 12 (3), e03379

50. **Buma B,** Pawlik L†. 2021. Post-landslide soil and vegetation recovery in a dry, montane system is slow and patchy. Ecosphere. 12(1) p.e03346.

49. **Buma B**, Holz A, Diaz I, Rozzi R. 2021. The world's southernmost tree and global southern treeline. Ecography. 44(1):14-24.

48. Rozzi R, Cregro RD, Contador T, Shuttler E, Rosenfeld S, Mackenzie R, Barroso O, Silva-Rodriguez EA, Alvarez-Bustos X, Silva A, Ramirez I, Mella J, Horreros J, Rendoll-Carcamo J, Marambio J, Ojeda J, Mendez F, Moses KP, Kennedy J, Russell S, Goffinet B, Sancho LG, Berchez F, **Buma B**, Aguirre F, Sanchez-Jardon L, Barros E, Vasquez RA, Arroyo MTK, Poulin E, Squeo F, Armesto JJ, Mansilla A, Masarado F. 2020. Un centinela para el monitoreo del cambio climático y su impacto sobre la biodiversidad en la cumbre austral de América: la nueva red de estudios a largo Plazo Cabo de Hornos. Anales de la Instituto de Patagonia. 48(3): 45-81.

47. **Buma B,** Schultz C. 2020. Disturbances as Opportunities: Can we learn from disturbance-response parallels in social and ecological systems to better adapt to climate change? Journal of Applied Ecology. 57:1113–1123.

46. Booth A, Sifford C, Siebert C, **Buma B**. 2020. Large wood inhibits debris flow runout in forested southeast Alaska. Earth Surface Processes and Landforms. 45(7): 1555-1568.

45. **Buma B**, Weiss S, Hayes K*, Lucash M. 2020. Reburning increasing across the US West, with a limited amount of negative feedbacks. Environmental Research Letters. 15:034026

44. Kulakowski D, **Buma B**, Guz J, Hayes K*. 2019. The ecology of forest disturbances. Reference Module in Earth Systems and Environmental Science. https://doi.org/10.1016/B978-0-12-409548-9.11878-0

43. Wiles G, Charlton J, Wilson R, D'Arrigo R, **Buma B**, Krapek J*, Gaglioti B, Wiesenberg N, Oelkers R. 2019. Yellow-cedar blue intensity tree ring chronologies as records of climate and forest-climate response, Juneau, Alaska, USA. Canadian Journal of Forest Research. 49(12): 1483-1492

42. **Buma B,** Bisbing S, Wiles G, Bidlack A. 2019. 100 yr of primary succession highlights stochasticity and competition driving community establishment and stability. Ecology. 100(12): e02885

41. McWethy DB, Schoennagel T, Higuera PE, Krawchuk M, Harvey BJ,

Metcalf EC, Schultz C, Miller C, Metcalf AL, **Buma B**, Virapongse A, Kulig JC, Stedman RC, Ratajczak Z, Nelson CR, Kolden C. 2019. Rethinking resilience to wildfire. Nature Sustainability. 2:797–804

40. Bisbing S, **Buma B**, Oakes L, Krapek J\*, Bidlack A. 2019. From canopy to seed: Loss of snow drives directional changes in forest composition. Ecology and Evolution. 9(14): 8157-8174.

39. **Buma B,** Battelori E, Bisbing S, Holz A, Hennon PE, Mortiz M, Saunders SE, Creutzburg MK, DellaSala DA, Gregovich D, Krapek J\*, Zaret K, Bidlack A. 2019. Emerging freeze and fire dynamics in temperate rainforests. Austral Ecology. 44: 812-826.

38. Johnson A\*, Kruger L, Noel J, Gregovich D, **Buma B**. 2019. Impacts of Submerging and Emerging Shorelines on Various Biota and Indigenous Alaskan Harvesting Patterns. Journal of Coastal Research. 35(4): 765-775.

37. **Buma B**, Thompson T. 2019. Long-term exposure to more frequent disturbances increases baseline carbon in some ecosystems: Mapping and quantifying the disturbance frequency-ecosystem C relationship. PLOS One. https://doi.org/10.1371/journal.pone.0212526

36. Higuera P, Metcalf A, Miller C, **Buma B,** McWethy D, Metcalf E, Ratajczak Z, Nelson C, Chaffin B, Stedman R, McCaffrey S, Schoennagel T, Harvey B, Hood S, Schultz C, Black A, Campbell D, Haggerty J, Keane R, Krawchuk M, Kulig J, Rafferty R, Virapongse A. 2019. Integrating subjective and objective dimensions of resilience in fire-prone landscapes. BioScience. 69(5): 379-388.

35. **Buma B**, Harvey B, Gavin D, Kelly R, Loboda T, McNeil B, Marlon J, Meddens AJH, Morris JL, Raffa K, Shuman B, Smithwick E, McLauchlan K. 2019. The value of linking short and long-term perspectives to understand spatially-explicit ecosystem resilience. Landscape Ecology 34(1): 17-33.

34. McNicol G\*\*, Bulmer C, D'Amore DV, Sanborn P, Saunders S, Giesbrecht I, Gonzalez-Arriola S, Bidlack AL, Butman D, **Buma B**. 2019. Large, climate-sensitive soil carbon stocks mapped with pedology-informed machine learning in the North Pacific coastal temperate rainforest. Environmental Research Letters. 14 014004

33. Sommerfeld A, Senf C, **Buma B**, D'Amato AW, Despres T, Diaz-Hormazabal, Fraver S, Frelich LE, Gutierrez AG, Hart SJ, Harvey BJ, He HS, Hlasny T, Holz A, Kitzberger T, Kulakowski D, Lindenmeyer D, Mori AS, Muller J, Paritsis J, Perry GLW, Stephens S, Svoboda M, Tuner MG, Veblen TT, Seidl R. 2018. Patterns and drivers of recent disturbances across the temperate forest biome. Nature Communications.  9: 4355.

32. **Buma B**.  2018.  Transitional climate mortality: Slower warming may result in increased climate-induced mortality in some systems.  Ecosphere. 9(3): e02170.

31. Krapek J*, **Buma B**.  2018. Persistence following punctuated range extension: limited dispersal of migrating tree despite habitat ahead of its range. Journal of Ecology 106: 911-924.

30.  **Buma B**, Costanza JK, Riitters K. 2017.  Determining the size of a complete disturbance landscape:  Multi-scale, continental analysis of forest change. Environmental Monitoring and Assessment 189: 642. https://doi.org/10.1007/s10661-017-6364-x

29. Krapek J*, Hennon PE, D'Amore DV, **Buma B**.  2017. Despite available habitat, migration of climate-threatened tree appears punctuated with past pulse tied to Little Ice Age climate period.  Diversity and Distributions. 23(12): 1381-1392.
*Cover story

28. Gill N, Kulakowski D, Sangermano F, **Buma B**. 2017. *Populus tremuloides* seedling establishment: An underexplored vector for forest type conversion after multiple disturbances.  Forest Ecology and Management.  404: 156-164.

27. Riitters K, Costanza JK, **Buma B.**  2017. Interpreting multiscale domains of tree cover disturbance patterns in North America. Ecological Indicators.  doi.org/10.1016/j.ecolind.2017.05.022

26. **Buma B.,** Livneh B. 2017. Key landscape and biotic indicators of watersheds sensitivity to forest disturbance. Environmental Research Letters. 12:074028

25. **Buma B,** Bisbing S, Krapek J*, Wright G.  2017. A foundation of

ecology re-discovered:  100 years of succession on the William S Cooper permanent plots shows importance of contingency in community development. Ecology.  98(6): 1513-1523.
    *Cover story

    24. **Buma B,** Hennon PE, Harrington CA, Popkin JR, Krapek J, Lamb M, Oakes LE, Saunders SC, Zeglen S.  2017. Emerging broad-scale mortality driven by climate warming and loss of snowpack.  Global Change Biology.  23(7): 2903-2914.

    23. Bidlack A, Bisbing S, **Buma B**, D'Amore DV, Hennon P, Huette T, Krapek J, Mulvey R, Oakes LE. 2017. Alternative interpretation and scale-based context for *No evidence of recent (1995-2013) decrease in yellow-cedar in Alaska* (Barrett and Pattison 2017).  Canadian Journal of Forest Research.  47(8): 1145-1151.

    22. Fellman JB, **Buma B**, Hood E, Edwards RT, D'Amore DV.  2017.  Linking LiDAR with streamwater biogeochemistry in coastal temperate rainforest watersheds.  Canadian Journal of Fisheries and Aquatic Sciences.  74(6):801-811

    21. **Buma B,** Krapek J*, Edwards RT.  2016. Watershed-scale forest biomass distribution in a perhumid temperate rainforest as driven by topographic, soil, and disturbance variables.  Canadian Journal of Forest Research.  46(6): 844-854.

    20. Mayer AL, **Buma B**, Davis A, Gagne SA, Loudermilk EL, Scheller R, Schmiegelow F, Wiersma Y, Franklin J.  2016. How landscape ecology informs global land change science and policy. BioScience.  66(6): 458-469.

    19. Kranabetter JM, KK McLauchlan, SK Enders, JM Fraterrigo, PE Higuera, JL Morris, EB Rastetter, R Barnes, **B Buma**, DG Gavin, LM Gerhart, L Gillson, P Hietz, MC Mack, B McNeil, S Perakis.  2016.  A framework to assess biogeochemical response to ecosystem disturbance using nutrient partitioning ratios.  Ecosystems.  19: 387-395.

    18. Krapek J*, **Buma B**.  2015.  Yellow-cedar:  Climate change and natural history at odds.  Frontiers in Ecology and Environment.  13: 280-281.

    17. **Buma B**, Livneh B.  2015. Potential effects of forest disturbances and management on water resources in a warmer climate.  Forest Science.  61: 895-903.

16. **Buma B**, Barrett T. 2015. Signs of disturbance disequilibrium and directional change in the world's largest temperate rainforest. Global Change Biology. 21: 3445-3454.

15. **Buma B**. 2015. Disturbance interactions: Characterization, prediction, and the potential for cascading effects. Ecosphere. 6:art70.

14. Livneh B., J.S. Deems, **B. Buma**, J.J. Barsugli, D. Schneider, N.P. Molotch, K. Wolter, and C.A. Wessman, 2015. Catchment response to bark beetle outbreak in the upper Colorado River basin. Journal of Hydrology. 523: 196-210.

13. **Buma B**, Johnson AC*. 2015. The role of windstorm exposure and yellow cedar decline on landslide susceptibility in southeast Alaskan temperate rainforests. Geomorphology. 228, 504-511.

12. **Buma B,** Poore B, Wessman CA. 2014. Disturbances, Their Interactions, and Cumulative Effects on Carbon and Charcoal Stocks in a Forested Ecosystem. Ecosystems. 17(6): 947-959.

11. **Buma B**, Hennon PE, Bidlack AL, Baichtal JF, Ager TA, Streveler G. 2014. Correspondence regarding "The problem of conifer species migration lag in the Pacific Northwest region since the last glaciation" by Elias, S.A., 2013, Quaternary Science Reviews 77, 53-69.

10. McLauchlan, K.K., P.E. Higuera, D.G. Gavin, S.S. Perakis, M.M. Mack, H. Alexander, J. Battles, F. Biondi, **B. Buma**, D. Colombaroli, S.K. Enders, D.R. Engstrom, F.S. Hu, J. Marlon, J. Marshall, M. McGlone, J. Morris, L. Nave, B.N. Shuman, E.A.H. Smithwick, D. Urrego, D. Wardle, C. Williams, and J.J. Williams. 2014. Reconstructing disturbances and their biogeochemical consequences over multiple timescales. BioScience. 64(2): 105-116.

9. **Buma B**. 2014. Nutrient responses to ecosystem disturbances from annual to multi-millennial timescales. New Phytologist. 1: 13-15.

8. **Buma B**, Brown C, Donato D, Fontaine J, Johnstone J. 2013. The impacts of changing disturbance regimes on serotinous plant populations and communities. BioScience 63(11): 866-876.

7. **Buma B**, Wessman CA. 2013. Forest resilience, climate change, and

opportunities for adaptation:  A specific case of a general problem.  Forest Ecology and Management.  306: 216-225.

6. **Buma B,** Pugh ET, Wessman CA.  2013.  Effect of a major insect outbreak on phenological and LAI trends in southern Rocky Mountain forests.  International Journal of Remote Sensing.  34(20): 7249-7274.

5. **Buma B**.  2013.  Don't give up just yet:  Maintaining species, services, and systems in a changing world.  Invited commentary on:   Sandler R.  Climate Change and Ecosystem Management.  Ethics, Policy, and Environment.  16(1): 1-4.

4. **Buma B**, Wessman CA.  2013.  Management, science, and disturbances as opportunities for adaptive transformation of forests.  The International Journal of Climate Change.  4(3): 77-87.

3. **Buma B**, Wessman CA.  2012.  Differential species responses to compounded perturbations and implications for landscape heterogeneity and resilience.  Forest Ecology and Management, 266:25-33.

2. **Buma B**.  2012.  Evaluating the utility and seasonality of NDVI values for assessing post-disturbance recovery in a subalpine forest.  Environmental Monitoring and Assessment.  184(6):3849-3860.

1. **Buma B**, Wessman CA.  2011.  Disturbance interactions can impact resilience mechanisms of forests.  Ecosphere.  2(5):art64.

## OTHER PUBLICATIONS AND PRODUCTS

•**Buma B.** 2023. Practical maps.  Calafia.

•**Buma B.** 2022. The Bear. Sierra Club Magazine

•**Buma B.** 2021-2022. The Edges of (All) Life. Community Science project, ESRI Storymap. Spans 20,000 species on the North American continent.

•**Buma B.** 2021. An Atlas of a Changing Climate. Timber Press. 280 pages.

•Constructive Visions contributor, 2021 National Geographic Explorer effort (50+ explorers) web volume. https://www.constructivevisions.org/

•Hausle-Johnson N, **Buma B**. 2021. Tile art exhibit: Resilience in the Alaskan boreal. Fairbanks, Alaska.

•**Buma B.** 2020. The world's southernmost tree hangs on in one of the windiest places on Earth. The Conversation. https://theconversation.com/the-worlds-southernmost-tree-hangs-on-in-one-of-the-windiest-places-on-earth-but-climate-change-is-shifting-those-winds-146901. See also National Geographic Magazine article, June 2021.

•**Buma B.** 2020. Notes from the Edge of the World. Earth Island Journal. https://www.earthisland.org/journal/index.php/magazine/entry/notes-from-the-edge-of-the-world

•DellaSala D, **Buma B.** 2019. Tongass National Forest roadless areas hold keys to Alaska's climate future. 4 pages.

•DellaSala D, **Buma B.** 2019. Analysis of carbon storage in roadless areas of the Tongass National Forest. Comment on DEIS Roadless Rule Removal, to USFS. 22 pages.

•**Buma B.** 2018. The hidden value of paper records. Science. 11(360): 10.1126

•Yellow-cedar salvage logging market characterization. Bidlack AL, Clark C, **Buma B**, Bisbing B, VanderNaald B. 2018. USFS report. 12 pages.

•**Buma B.** 2018.  Grey on Green: The quiet decline of one tree in Alaska's temperate rainforest. Earth Island Journal. July 23, 2018. https://tinyurl.com/ybe5d6jf

•Bidlack, A, **Buma B**, Butman D. 2017. Quantifying coastal rain forest carbon transport. Eos. 98. https://doi.org/10.1029/2017EO077633.

•**Buma B.**  2015.  Field Methods in Forest Ecology Laboratory Manual.  University of Alaska Southeast.  80 pages.

•**Buma B**.  2013.  "It takes two to fill our forests with lichens."  Juneau Empire

•Hermanson R, Nufio C, Schmidt B, **Buma B**.  2010.  Principles of Ecology Laboratory Manual.  University of Colorado.  Fountain head Press, Texas.  110 pages.

## OTHER APPOINTMENTS (CURRENT)

•Enhanced Weathering: Data Quarry governing board (commercial data to public research): Chair
•CDRAnet official observer
•US GCRP National Nature Assessment (1st annual): Author
•National Geographic Explorer (2016-present)
•Rocky Mountain Hub National Geographic Coordinator
•Explorer's Club: Fellow
•Alaska Climate Adaptation Science Center – Senior Scientist
•Steering Committee, Arctic Migrations Network

## FUNDRAISING AND GRANTS

•NSF: Collaborative Research: The past, present, and future of boreal fires. January 2023 – June 2026. **$1.4 million.** Overall PI. Collaborative proposal with University of Montana and Colorado State University.
•National Geographic: The Future Transect. **$99,215**. January 2022-December 2022
•NSF. Collaborative Research: GCR: Co-defining climate refugia to inform the management of mountain headwater systems. **$3.6 million** (Collaborative proposal with PI Keith Musselman, 5 other institutions; **$444,889** to CU Denver)
•Boulder County, City of Boulder, and Jefferson County. Carbon and fuel treatments – do they work when burned? Investigations into treatments and the Calwood fire. **$30,000**. Jan 2021-December 2021.
•NSF: Spatial patterning and carbon vulnerability: Does the spatial arrangement of forest management increase susceptibility to climate change and ecosystem disturbances? **$476,254** January 2021 – December 2023
•USDA. Does vegetation sprouting buffer against climate change, and what is the minimal size for success? **$27,254**. Sept 2020 – July 2022
•Teaching Enhancement Grant. "Bringing Ecology Lecture Outside." **$2,789**.
•Evaluating Flammability of Reburns in the Boreal Forests of Interior Alaska. Joint Fire Science Program (GRIN award to Katherine Hayes, PhD student). 2020-2021. **$24,717**
•University of Colorado Denver, travel funds: **$1500**
•US Department of Agriculture, US Forest Service. Trees on the edge. June 2019 – May 2020. **$29,916**.
•University of Colorado Denver, Large Grant. Ecosystem succession and the longest

running study in the world: Expanding and building on a globally unique ecological research network. May 2019 – August 2020. **$23,769.**

•NSF Research Experience for Undergraduates. **$17, 525.** January 2019 – May 2020. Supporting two CU Denver undergraduates

•National Geographic Exploration Grant: Documenting and monitoring climate change effects at the edge of the world. **$44,933.** Chile, July 2018 – June 2019

•NSF:  Linking landslide and windstorm exposure to regional carbon stocks and fluxes in the largest US forest carbon reservoir, southeast Alaska.  Collaborative proposal with Adam Booth (Portland State University). **$606,353**. July 2017 – June 2020

•NSF:  Regional impacts of increasing fire frequency and climate change on carbon dynamics and species composition in the boreal forest.  Collaborative proposal with Melissa Lucash (Portland State University), Jason Vogel (University of Florida), Vladimir Romanovsky (University of Alaska Fairbanks). **$1.4 million**.  January 2018 – December 2020

•USDA Regional Climate Hub: Integrating tribal and governmental management into regional conservation planning:  Alaska yellow-cedar decline and silviculture. 2017 to 2019)  **$56,823**

•US Fish & Wildlife:  Yellow-cedar decline and recovery:  climate modeling and data assimilation. 2017 - 2018  **$24,346**

•University of Alaska Southeast Faculty Research Award. 2017. **$1000**.

•Elmer L Andersen Research grant.  2017.  **$1000**.

•USFS/Alaska Dept. of Forestry – Forestry Internship RSA 2017-2020.  **$29,302.**

•USFS/Alaska Dept. of Forestry – Forestry Internship RSA 2016.  **$4,935.**

•NSF Research Coordination Network: Coastal Rainforest Margins Research Network – understanding materials flux in linked terrestrial and marine ecosystems in the face of climate change (2016-2021).  With Allison Bidlack (Alaska Coastal Rainforest Center) & David Butman (University of Washington).  **$498,470**.

•National Geographic Exploration Grant.  2016.  Rediscovery of original 1916 William Cooper vegetation succession plots in Glacier Bay, Alaska.  **$7,765.**

•BLaST travel grant. 2015.  Training for advanced educational/pedagogical techniques.  **$1,954.**

•NASA RID Grant, 2015-2016.  "Improving landslide warning systems for local weather forecasts by linking wind exposure, satellite precipitation data, and local weather forecasts.  **$19,309.**

•University of Alaska Southeast Academic Innovation Funds, 2015.  **$2,419.**

•Alaska Yellow Cedar Decline Impact Assessment and Restoration Baseline, 2015. with Allison Bidlack (Alaska Coastal Rainforest Center) **$30,007**

•Novus professional development grant.  2015. "Fire effects on black carbon and microbial activities." Linked proposal with Rebecca Barnes (Colorado College)

**$1,500**

•NASA EPSCoR RID Grant.  2014 - 2015.  "Linking LIDAR and stream organic carbon export:  Can aboveground biomass and landscape composition be used to predict the export and biogeochemistry of stream organic carbon?" **$29,919**

•Alaska Space Grant Program. With Laurie Sowa and Robin Gilchrist (Engineering). 2014-2015.  "Biomass Energy of Southeast Alaska:  Providing Hands on Technology Projects for STEM Undergraduates." **$27,888**

• Work on forest resilience was recognized in a radio interview with Quirks and Quarks, the Canadian Broadcast Companies weekly science show.

•NSF, with Carol Wessman, 2011-2013,  "Disturbance Interactions, Management, and Implications for Carbon Sequestration,"  Author but not co-PI due to graduate status. DEB 1119819,  **$230,591**

•Western Water Assessment/NOAA.  2011-2013.  "Snowmelt Perturbations and Water Supply Forecast Errors Across the Colorado Headwaters."  Author but not co-PI due to graduate status. With Jeff Deems, Noah Molotch, Carol Wessman, Klaus Wolter, Joe Basugli, and Tom Painter.  **$348,000**.

•NASA MSU Professional Enhancement Award, 2013.  **$600**

•ESA Ecovision Award, **$150**

•Co-Investigator:  CIRES Innovative Research Project Grant, 2011, **$14,719**

•CIRES Graduate Fellowship, 2010, **$14,719**

•USGA travel grant, 2010, **$300**

•SPOT Planet Action Award 2009, ~**$8000** (satellite imagery)

### Undergraduate Specific Grants (as faculty mentor)

•URECA grant with H. Evoy, 2014, **$712**
•URECA grant with K. Elmore, 2014, **$1061**
•URECA grant with A. Stewart, 2016, **$2400**

### PRESENTATIONS:
*:  Postdoctoral Advisee; **: Graduate Student in Buma lab, †: Undergraduate Student in Buma lab

•Musselman KN, Tarasewicz N, Schwebs L, Parsekian A, Bailey K, Parsons C, Kelsey K, **Buma B**, Knowles JF, Hinckley ELS, Parker J, Blanken P. The EcoTram: New measurements permit the study of lateral connectivity of landscapes, energy, and water in the Como Creek watershed, Colorado. AGU 2024.

- Nicolas Tarasewicz, Peter Blanken, Lena Schwebs, Andy Parsekian, Kinzie Bailey, Claire Parsons, Jackson Parker, Connor Greenberg, Katharine Kelsey, **Brian Buma**, John F Knowles, Eve-Lyn S Hinckley, Holly R Barnard, Keith N Musselman. Fine-Scale Observations and LiDAR Raytrace Modeling of Subalpine Canopy Structure on Energy and Water Availability. AGU 2024.
- Wollen B, Schnabel C, Zhang S, Reinhard CT, Suhrhoff TJ, **Buma B**, Planavsky N. Estimating Soil pH on Agricultural Lands as a Constraint on Enhanced Weathering Potential AGU 2024.
- **Buma B**, Moore LA, Sartzetakis S, Walkowiak B, Dilling L. Solar Radiation Modification Impacts Research: Existing research, gaps, and priorities moving forward. AGU 2024.
- Frumhoff PC, **Brian Buma**, Brendan M Rogers, Stavroula Sartzetakis, Carly Phillips, Christina Schaedel, Rachael Treharne, Susan Natali, John P Holdren, Alice Alpert, Josep Gili Canadell, Werner A. Kurz, Kate Dooley, Carlos Afonso Nobre, Emily Ury and Steve Hamburg. Limiting Global Temperature Rise Requires Better Accounting for Rising GHG Emissions from Warming Ecosystems. AGU 2024.
- Riaz, A, **Buma B**, Miller CE, Elena Cady-Pereira K, Sun K, Spurr R, Kort EA. Linear sensitivity analysis of $N_2O$ remote sensing by integrating Near- and mid-infrared nitrous oxide bands. AGU 2024.
- Buma B, Gordon D, Oldfield E, Lavallee J, Chave J. Source of uncertainty in nature-based carbon measurements. Invited talk. BIPM CIPM Sectorial Task Group on Climate Change and Environment, Paris, France.
- Lucash M, Vogel J, Link T, Romanovsky V, Nicolsky D, Weiss S, Hayes K**, Marshall A, Shabaga J, Scheller R, Buma B. 2023. Impacts of increasing fire frequency and climate change on species composition and carbon dynamics in the boreal forests of Alaska. Ecological Society of America.
- Booth A, **Buma B**, De Guzman D, Nagorski S, Seibert C, Sifford C, Turchick K, Vascik B. *Landslide-forest interactions governing the post-glacial landscape evolution of southeast Alaska, United States*. Geological Society of America. 2022.
- Hayes K**, Lucash M, Hoffman C, Ziegler J, **Buma B**. *"Short-interval reburning changes fuel structure, carbon storage and fire behavior of boreal forests"*, Ecological Society of America. Montreal, CA. August 2022.
- Hayes K**, Carter T, Cook P, Twaddell E, **Buma B**. *"Strategies for managing and leading fieldwork successfully as a graduate student"*, Ecological Society of America: Inspire Session. Montreal, CA. August 2022.
- Hayes K, Hoffman C, Ziegler J, **Buma B**. *"Repeat reburning drives changes in fuel structure and fire behavior in black spruce forests"*. Alaska Fire Science Consortium. Webinar. May 2022.

- Hayes K, Lucash M, **Buma B**. *"Repeat short-interval fires put carbon storage in Interior Alaska at risk",* International Association of Landscape Ecology: North America. Remote. April 2022.
- Hayes K, Carter T, Cook P, Twaddell E, **Buma B**. *"Graduate Field Leadership: Challenges, Successes and Strategies",* Front Range Student Ecology Symposium. Fort Collins, CO. Feb. 2022.
- Booth A, Vascik B, **Buma B**, Nagorski S. Effects of landslides on terrestrial carbon stocks with a coupled geomorphic-biologic model: southeast Alaska, United States. Goldschmidt Conferences 2022
- Hayes K**, **Buma B**. 2021. Repeat Short-Interval Fires drive Changes in Biomass and Soil Carbon in Interior Alaska, Regardless of Local Site Conditions or Resilience. AGU.
- **Buma B**, Hayes K, Weiss S, Lucash M. 2021. Short interval fires increasing in the boreal forest over multi-decadal time periods, especially in drier coniferous forests. AGU.
- Loranty MM, Talucci A, Berner LT, Breen AL, **Buma B**, Delcourt C, Dieleman CM, Douglas TA, Frost Jr GV, Gaglioti B, Gibson C, Hewitt RE, Hollingsworth T, Lara MJ, Mack MC, Manies K, Natali S, O'Donnell JA, Olefeldt D, Paulson AK, Roch AV, Rogers BM, Sistla S, Sizov O, Turetsky MR, Veraverbeke S, Walvoord MA. 2021. A Synthesis of Wildfire Impacts on Permafrost Thaw Depth Across Arctic and Boreal Ecosystems. AGU.
- **Buma B**., Bidlack AL, Bisbing S. 2021. At what scale do disturbances matter for terrestrial to marine carbon fluxes? Comparing undisturbed aquatic carbon fluxes to disturbance frequency, extent, and associated carbon export at fine and regional scales. Ecological Society of America.
- Hayes K**, **Buma B**. 2021. Repeat short interval fires drive shifts in biomass and soil carbon in interior Alaska.. North American-International Association for Landscape Ecology (oral presentation)
- **Buma B**, Higuera P, Hayes K**, Weiss S, Lucash M. 2021. Melding very short and very long-term records to determine how much fire is too much fire in boreal forests. North American-International Association for Landscape Ecology (oral presentation)
- **Buma B**. 2021. Fire frequency, feedbacks and forests. University of New Mexico (invited seminar)
- **Buma B**. 2021. Disappearing white: The loss of snow and forest change. University of Victoria (invited seminar)
- **Buma B**. 2021. Arctic threats and landscapes: Fire in the boreal. Arctic Winter College (international NSF RCN sponsored).
- **Buma B**, Romanovsky V. 2020. Continued short-interval fires drives ongoing and new shifts in forest composition. IARPC Terrestrial Ecosystems and Permafrost

Collaboration Team

•**Buma B**, Hayes K**, Weiss S, Lucash M. Looking past reburns – short-interval fires and boreal forests. Bonanza Creek LTER annual symposium.

•Pawlik L, **Buma B**, Samonil P, Kvacek J, Galazka A, Kohout P, Malik I. Biological weathering by the Devonian trees.  EGU General Assembly 2020.

•Hayes K**, **Buma B**. Interacting Effects of Herbivory and Short-Interval Reburns on Successional trajectories in Boreal Interior Alaska. North American-International Association of Landscape Ecology. May 2020.

•**Buma B**, Hayes K**. Evaluating flammability of reburns in the boreal forests of Interior Alaska. Alaska Fire Science Consortium. April 2020.

•Turchick K**, Vascik B, Booth A, **Buma B**. Drivers of fine-scale carbon/biomass distribution in landslide systems - Disturbances, soil, or slope? AGU. December 2019.

•Booth A, Sifford C, de Guzman D, Siebert C, **Buma B**. Coarse wood inhibits debris flow runout in forested southeast Alaska. AGU. December 2019.

•**Buma, B**, K Hayes**, MS Lucash and S Weiss. Rates of short-interval fires increasing across the U.S. West. Oral presentation. Association for Fire Ecology Conference. November 2019.

•Hayes, K** and **B Buma**. Effects of spatial heterogeneity on successional trajectories following repeat disturbances in boreal Interior Alaska. Poster. American Geophysical Union. San Francisco, CA. December 2019

•Olson, K†, **B Buma** and K Hayes**. Fine-scale observations of permafrost after repeat fires in Interior Alaska. Poster. American Geophysical Union. San Francisco, CA. December 2019.

•Kodicherla, V†, JA Shabaga, J Vogel, K Hayes**, and **B Buma**. Soil Respiration in very high frequency boreal wildfires as a function of species. Poster. American Geophysical Union. San Francisco, CA. December 2019.

•Hayes, K**, **B Buma**, MS Lucash and S Weiss. Continued repeat burning in the boreal causes continued ecosystem transformation. Oral presentation. Association for Fire Ecology Conference. November 2019.

•**Buma, B**, K Hayes**, S Weiss and MS Lucash. Overlapping and interacting fires, a double whammy: Short-interval burns are becoming more frequent across the US West but pace suggests negative feedbacks and spatial patterning. Oral presentation. American Geophysical Union. San Francisco, CA. December 2019.

•**Buma B**. 2019. Forests at the Edge of the World. National Geographic Closer Look Series, Washington DC.

•**Buma B**. 2019. When do plants matter? Keynote presentation. European Geosciences Union meeting, Kathmandu, Nepal.

•**Buma B**, Holz A, Rozzi R, Diaz I. 2019. The worlds southernmost treeline: Data from a never surveyed before area indicates complex response to climate change. Ecological Society of America.

•Caviness TE, Rozzi R, Squeo FA, **Buma B**. 2019. Evaluation of invasive species presence at America's southernmost forested island: Horn Island, Cape Horn Biosphere Reserve, Chile. Ecological Society of America.

•**Buma B**, Batllori E, Bisbing S, Holz A (presenter), Saunders S, Bidlack A, Creutzberg M, DellaSala D, Gregovich D, Hennon PE, Krapek J, Mortiz MA, Zarat K. 2019. Emergent freeze and fire disturbance dynamics in temperate rainforests. Ecological Society of America.

•Vascik B, Booth A, **Buma B**. 2019. Estimating Amount and Fate of Aboveground Biomass and Carbon Mobilized by Mass-wasting Events in SE Alaska. AGU.

•Organized international symposium (2019): Disappearing snow and altered ecosystems. Attracted researchers from Asia, Europe, and North and South America. International Association for Landscape Ecology, Milan, Italy.

•Co-Organized international symposium (2019): Forest disturbances as drivers of tree species range shifts. With Juha Honkaniemi (Finland). International Association for Landscape Ecology, Milan, Italy.

•**Buma B,** Bidlack AL, Lader R. 2019. Widespread snow loss driving mass mortality of a forest –
but might it be temporary? International Association for Landscape Ecology, Milan, Italy.

•Vascik B, Booth A, **Buma B**. 2019. Predicting debris flow inundation via semi-empirical modeling in SE Alaska. GSA. (poster)

•**Buma B**. 2019. Snow loss on the North Pacific coast. Invited Seminar, Colorado State University

•**Buma B**, Lucash M, Hayes K**, Weiss S. 2019. The predictable and not so predictable spatial distribution of fires across the US West. US-IALE. (oral)

•Hayes K**, **Buma B**. Landscape Context Mediates the effect of Shortening Fire Intervals in Boreal systems. US-IALE (oral)

•Turchick K**, Buma B. Linking Landslide Disturbance Regimes to Carbon Distribution. US-IALE (poster).

•**Buma B**. 2019. The Emerald Edge: Management and change. Environmental Science and Management seminar, University of Texas A&M.

•**Buma B**. 2018. Mapping and modeling carbon on the remote north Pacific coast. Geography and Environmental Science seminar, University of Colorado Denver.

•**Buma B**. 2018. Emerging drivers of change. Colorado State University, invited seminar.

•**Buma B.** 2018. Climate change and emerging disturbance. University of Denver, invited seminar.

•**Buma B**, Bisbing S, Bidlack A, Wiles G. 2018. Much ado about nothing? The surprising lack of succession on the longest running primary succession plot network in the world at Glacier Bay, Alaska. Guild of Rocky Mountain Ecologists and

Evolutionary Biologists annual meeting, Nederland, Colorado.

•**Buma B**, Hood E.  2018.  Climate change in southeast Alaska.  University of Alaska Southeast Thursday community lecture series.

•**Buma B**, Booth A. 2018.  Landslides, wind, and big carbon.  Sitka Science Community Series lecture, Sitka, AK.

•Bisbing S, **Buma B**, Oakes L, Krapek J**, Bidlack A, Brousil M. 2018.  Multiscale climatic and topographic characteristics of low-snow mortality and regeneration in yellow-cedar suggest directional change in forest composition.  US-International Association for Landscape Ecology, Chicago, IL

•**Buma B**, Bisbing S, Krapek J**, Wiles G, Bidlack A, Wright G.  2018.  Space, stochasticity, succession, and the limits of chronosequence methods.  Why 101 year old history matters to primary succession communities and ecosystems.  US-International Association for Landscape Ecology, Chicago, IL

•McNicol G*, **Buma B**, Giesbrecht I, Arriola SG, Bidlack A. 2018.  Meso-scale drivers and stocks of soil organic carbon in temperate rainforests, and a spatially explicit assessment of carbon across the north Pacific coast.  US-International Association for Landscape Ecology, Chicago, IL

•Girard A, Saunders S, Alaback P, Lertzman K, **Buma B**, Klassen H. 2018. A comparative analysis of structural characteristics in old-growth coastal temperate floodplain forests.  US-International Association for Landscape Ecology, Chicago, IL

•**Buma B**.  2017. The longest running successional study in the world:  The ecology of Glacier Bay, Alaska.  Mendenhall Winter Lecture Series, Juneau, Alaska.

•**Buma B**.  Interactions between disturbances: Describing and anticipating complex regimes.  Invited talk.  IUFRO World Congress 2017, Freiburg, Germany.

•**Buma B**, Krapek J**, Bidlack AL, Hennon PE, Oakes LE, Saunders S, Zeglen S. 2017.  Current range and decline model of a climate threatened species:  Development and current status.  Yellow-cedar climate regional summit, Juneau, Alaska.

•**Buma B**.  2017.  Transitional mortality:  An emerging dynamic in climate-boundary ecosystems.  Yellow-cedar climate regional summit, Juneau, Alaska.

•Charlton J, Cruz AJ, Lummus MM, Loadholt K, Messerich C, Wiles G, **Buma B**, Krapek J**. 2017. Yellow-cedar growth response to decadal climate shifts at Cedar Lake, Juneau, Alaska.  Geological Society of America, Seattle, Washington. (poster)

•**Buma B**, Bisbing S, Krapek J**, Wright G, Bidlack AL, Wiles G. 2017. 101 years of succession in Glacier Bay.  (oral) Ecological Society of America, Portland, Oregon.

•Wolf K, Barnes RT, **Buma B**.  2017. C stocks and fluxes in fire disturbed landscapes of Colorado.  (poster). Ecological Society of America, Portland, Oregon.

•Girard A, Saunders S, Alaback P, **Buma B**, Klassen H, Lertzman K.  2017. A comparative analysis of structural characteristics in old growth North Pacific temperate floodplain forests. (poster) North American Forest Ecology Workshop, annual meeting, Edmonton, AB, Canada.

•**Buma B**.  Long-term successional research, chronosequences, and permanent plots. 2017.  Glacier Bay National Park invited talk.

•**Buma B**.  Emerging disturbances in high latitude forests.  2017. International-US Association for Landscape Ecology (oral).  Baltimore, Maryland.

•Wolf K, Barnes R, **Buma B**, Gilbertson A.  2017.  C Stocks and Fluxes in Fire-Disturbed Landscapes of Colorado.  Gordon Conference (poster).

•Barnes R, Wolf K, Whittinghill K, Gilbertson A, **Buma B**.  2016.  Carbon stocks and fluxes in fire disturbed landscapes of Colorado.  AGU (oral), San Francisco, California.

•**Buma B**, Juday G, Morimoto M.  2016.  Repeat photographs and surveys over 100 years of change.  (oral)  NPS Centennial Science meeting, Fairbanks, Alaska.

•**Buma B.** 2016.  North Pacific coast forests:  Emerging disturbances and overall growth.  (oral) Invited Speaker, Evening at Egan lecture series, Juneau, Alaska.

•**Buma B**, Juday G.  2016.  100 years of succession on the Cooper succession plots in Glacier Bay, Alaska.  (oral)  Glacier Bay National Park, Gustavus, Alaska.

•**Buma B**, Jacobs A.  2016.  Forest landslides in southeast Alaska:  Impacts, prediction, and evaluation. (oral) NASA Goddard Space Flight Center, Greenbelt, Maryland.

•**Buma B,** Riitters K, Costanza JK.  2016.  How big is a complete (disturbance) landscape?  US-International Association for Landscape Ecology (oral).  Asheville, North Carolina.

•Bisbing S, **Buma B**, Krapek J**.  2016.  Microclimate drivers of decline and forest compositional shifts in yellow cedar forests of southeast Alaska. US-International Association for Landscape Ecology (oral).  Asheville, North Carolina.

•Riitters K, Costanza JK, **Buma B**.  2016.  Modeling North America tree cover disturbance at multiple scales.  US-International Association for Landscape Ecology (oral).  Asheville, North Carolina.

•**Buma B**.  2016.  The shifting North Pacific temperate rainforests:  From individual trees to the regional biome.  Invited speaker, Western Washington University. Bellingham, Washington.

•**Buma B,** Bisbing S, Bidlack A, VanderNaald B, Clark C.  2015.  Alaska yellow cedar:  Harvest and restoration baseline.  USFS Regional Meeting (oral), Juneau, Alaska.

•**Buma B**., Livneh B.  2015.  Quantifying the sensitivity of water yield to forest disturbances across a diverse set of unmanaged watersheds throughout the continental United States.  AGU (oral), San Francisco, CA.

•Livneh B., Deems J., **Buma B**., Barsugli J., Schneider D., Molotch N., Wessman C., Wolter K.  2015.  Hydrologic impacts of land cover disturbances in the Upper Colorado River Basin. AGU (oral), San Francisco, CA.

•Barnes B, **Buma B,** Wolf K, Fehsenfeld T, Kehlenbeck M.  2015.  After the Burn:

Forest carbon stocks and fluxes across fire disturbed landscapes in Colorado, USA. AGU (poster), San Francisco, CA.

•Hennon P, Zeglen S, Trubilowisz J, Sunders S, Floyd B, Harrington C, D'Amore D, **Buma B**, Bidlack A.  2015. A range wide climate vulnerability assessment of yellow-cedar along a 20 degree latitudinal span of the Pacific Coast temperate rainforest. International Association for Landscape Ecology World Congress (oral), Portland, Oregon.

•Saunders S, Klassen H, **Buma B**, Hennon P, Alaback P, MacKinnon A.  2015. Implications of projected climate change for relative roles of disturbance, climate, and site drivers on stand level dynamics across a plot network of the perhumid coastal temperate rainforest.  International Association for Landscape Ecology World Congress (oral), Portland, Oregon.

•Krapek J**, **Buma B**, Verbyla D, D'Amore D, Hennon P.  2015.  Establishment patterns of yellow-cedar at a current range edge:  A climate-threatened tree's migration north and east, and implications for conservation planning.  International Association for Landscape Ecology World Congress (oral), Portland, Oregon.

•**Buma B**, Barrett T.  2015.  Regional scale disequilibrium in the perhumid North Pacific temperate rainforest.  International Association for Landscape Ecology World Congress (oral), Portland, Oregon.

•**Buma B**, Fellman J, Edwards RT, Hood E.  2014.  Linking forest and aquatic carbon in Berners Bay, Alaska EPSCoR annual conference (poster).

•Johnson A*, Kruger L, **Buma B,** Schrader B.  2014.  Geomorphology and sustainable indigenous populations.  American Water Resources Association Meeting (oral) Juneau, Alaska.

•**Buma B**.  2014.  Disturbance research in Alaska and Colorado.  Novus network: Linking disturbance ecology across temporal scales (oral). Estes Park, Colorado.

•Johnson A*, Kruger L, **Buma B**, Schrader B.  2014.  Geomorphology and indigenous populations of Southeast Alaska.  AWRA National Meeting (oral), Virginia.

•**Buma B**, Brown CD, Johnstone JF, Fontaine JB, Donato DC.  2014.  Serotiny and resilience to fire:  Who are the winners and losers?  Ecological Society of America (oral), Sacramento, CA.

•Downes Z, Wiles G, Lawson D, Wiesenberg N, Connor CL, **Buma B**, Barclay D, Frank DC, Nelson W.  2014.  Dating glacial history of the first millennium CE in Muir Inlet, Glacier Bay National Park and Preserve, southeast Alaska.  Geological Society of America (oral), Vancouver BC.

•**Buma B**, Johnson AC*.  2014.  Wind and landslide interactions in southeast Alaskan temperate rainforests.  International Association for Landscape Ecology (oral), Anchorage, Alaska.

•**Buma B**, Livneh B.  2014.  Responding to forest disturbances:  Policy Implications. Invited Presentation, International Association for Landscape Ecology (oral),

Anchorage, Alaska.

•**Buma B**, Livneh B, Wessman CA.  2014.  Forest disturbances, management actions, and a changing climates implications for water supplies.  Invited Presentation (oral), Global Land Project Open Science Meeting, Berlin, Germany.

•**Buma B**, Beaudreau A, Bidlack AL, Tallmon D, VanderNaald B, Pyare S.  2013.  A new resource for integrated temperate rainforest ecosystem research:  The Berners Bay glacier-to-estuary research area.  Pacific Northwest Climate Science Conference (poster), Seattle.

•Poore R, Wessman CA, **Buma B**.  2013.  The effects of fire severity on black carbon additions to forest soils – 10 years post fire.  AGU (poster).

•Livneh B, Deems JS, **Buma B**, Barsugli JJ.  2013.  Using quasi-dynamic land cover to investigate hydrologic disturbance from beetle-kill and dust in the Upper Colorado river basin.  AGU (oral).

•**Buma B**, Poore R, Wessman CA.  2013.  Compound disturbances and their impact on post-fire carbon and charcoal pools.  International Association for Landscape Ecology  (oral), Austin TX.

•Livneh, B, Deems JS, and **Buma B**.  2013.  National Centers for Atmospheric Research (NCAR) Seminar, Boulder  (oral), CO. Deciphering the impacts of competing hydrologic disturbance factors in the Upper Colorado River Basin.

•**Buma B**, Wessman CA.  2012.  Fire catalyzed regime shifts, carbon sequestration, and climate change: A case for active management?   5th International Fire Ecology and Management Congress (oral).  Portland, OR.

•Livneh, B., J.S. Deems, **B. Buma**, J.J. Barsugli, D. Schneider, N. Molotch, and C. Wessman. 2012.  Interpreting changes to Upper Colorado River Basin hydrologic response via alternate climatic and land-cover scenarios (oral), AGU

•Livneh, B., J.S. Deems, **B. Buma**, J.J. Barsugli, D. Schneider, and C. Wessman. 2012.  Upper Colorado River Basin Water Conference.  Modeling Hydrologic Impacts of Bark Beetles and Desert Dust on Tributary Catchments of the Upper Colorado River Basin (oral). EGU

•**Buma B**., Wessman CA   2012.  Ecosystem services may outlast their ecosystems: Regional carbon stocks minimally affected by multiple disturbances and coniferous-to-deciduous regime change (oral). Ecological Society of America.

•**Buma B,** Wessman CA.  2012.  Ecosystems and ecosystem services may have differing resilience to increasing disturbance rates and disturbance interactions.  4th International Conference on Climate Change (invited oral). Seattle WA.

•**Buma, B**, Wessman CA.  2012.  Resistance and resilience mediate disturbance interactions:  A review and modeling exercise.  International Association of Landscape Ecology (poster), Newport.

•Wessman, CA, Muller, **B, Buma**, B, Bagher, M, Flohr, T, Heris M. 2012.  Assessing the benefits of green infrastructure.  International Association of Landscape Ecology

(oral), Newport, RI.

•**Buma, B**, Flohr, T, Wessman CA, Muller, B, Bagher, M, Heris M.  2012.  Urban phenology and ecosystem services.  Front Range ecology forum (oral), Ft. Collins, CO.

•**Buma, B**, Wessman CA.  2011.  Compounding disturbances and their impact on regeneration of subalpine tree species. Ecological Society of America (oral).

•**Buma, B**, Wessman CA.  2011.  Multiple disturbances in a subalpine forest, impact on resilience mechanisms, and implications for ecosystem recovery.  International Association of Landscape Ecology (oral).

•**Buma B.**  2011.  Multiple disturbances and subalpine forest regeneration.  CIRES Graduate Student Association (oral).

•**Buma, B**, Pelz, K.  2011.  MPB, fuel loadings, and the loss of forest resilience?  Western Water Assessment Symposium (invited oral), Boulder CO.

• **Buma B.**  Multiple disturbances can reduce coniferous forest resilience.  CIRES Rendezvous (poster), Boulder CO.

•**Buma B**. 2011.  Disturbance interactions and forest resilience mechanisms.  Front Range ecology forum (oral), Ft. Collins, CO.

• **Buma B**.  2010.  Compounding disturbances and their impact on subalpine forest and landscape structure. International Association of Wildland Fire (poster), Spokane, WA.

# Attachment 4

Declaration of Elizabeth DelBueno, Environmental Law & Policy Center

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ENVIRONMENTAL DEFENSE FUND, )
*et al.*,                     )
                             )
     *Petitioners*     )
                             )
    v.                 )     No. 25-1164
                             )
LEE ZELDIN, *et. al.*,        )
                             )
     *Respondents*     )
                             )

## DECLARATION OF ELIZABETH ANN DELBUONO, MD

I, Elizabeth Ann DelBuono, MD, do hereby affirm and state:

1.    I am the Founder and a full-time volunteer operating in the capacity of Interim Executive Director and Board Chair for Michigan Clinicians for Climate Action (MiCCA). I am a current member of the Environmental Law and Policy Center ("ELPC").

2.    MiCCA is a coalition of approximately 450 Michigan health professionals working to reduce the health effects of climate change through education and advocacy.  MiCCA's vision is to cultivate a climate in which the health and wellbeing of all people can thrive.

3.    I founded MiCCA in 2020, served as a full-time volunteer Executive Director for about 3 years, and currently serve as Board Chair and continue to

work as a full-time volunteer overseeing the new Deputy Director as Interim Executive Director.

4.    While we have members from throughout the lower peninsula of Michigan, and one from Houghton, several of our members work and practice, or have practiced, in Grand Traverse County, Michigan which overlies the Antral Shale Formation, known for its natural gas production.

5.    Personally, I am a retired physician (diagnostic pathologist) who trained and practiced medicine for approximately 30 years in Michigan, most of the time (20 years) in Traverse City which serves an area in Northern Michigan that overlies the Antral Shale Formation, known for its natural gas production.

6.    I have lived in Traverse City, Michigan for 25 years.

7.    MiCCA has worked in coalition with other national, state, and local organizations to educate legislators, the general public and our peers about the health risks of fossil fuel combustion including:

> i.    Submitting an amicus brief regarding the use of "exception days" by the U.S. Environmental Protection Agency ("EPA") for ground level ozone. Brief of Amici Curiae Michigan Clinicians for Climate Action and MI Air MI Health in Support of Petitioner in *Sierra Club v. United States Environmental Protection Agency*, 60 F.4th 1008 (6th Cir. 2024) (No. 23-3581); and

2

    ii.  Producing organizational statements, press releases, and member testimony to the EPA on a variety of rules including the EPA's methane rules and greenhouse gas emissions from power plant rules, among others.

8.    I personally have written comments to the EPA regarding the National Ambient Air Quality Standards ("NAAQS") for Particulate Matter pollution. *See* Comment Submitted by Elizabeth DelBuono, Review of the National Ambient Air Quality Standards for Particulate Matter, May 2, 2023, Comment ID: EPA-HQ-OAR-2015-0072-4411, available at https://www.regulations.gov/comment/EPA-HQ-OAR-2015-0072-4411. I also have written comments to the EPA regarding greenhouse gas emissions guidelines for power plants. *See* Comment Submitted by Elizabeth DelBuono, New Source Performance Standards for Greenhouse Gas Emissions from New, Modified, and Reconstructed Fossil Fuel-Fired Electric Generating Units: Emission Guidelines for Greenhouse Gas Emissions from Existing Fossil Fuel-Fired Electric Generating Units; and Repeal of the Affordable Clean Energy Rule, Comment ID: EPA-HQ-OAR-2023-0072-4724, available at https://www.regulations.gov/comment/EPA-HQ-OAR-2023-0072-4724.

9.    I have acted as a declarant on behalf of ELPC in connection with ELPC's motion to intervene as a respondent to defend the EPA's rule entitled "Waste Emissions Charge for Petroleum and Natural Gas Systems: Procedures for

3

Facilitating Compliance, Including Netting and exemptions," 89 Fed. Reg. 91,094 (November 18, 2024) in *Independent Petroleum Association of America, et al.* v. *U.S. Environmental Protection Agency, et al.* in the United States Court of Appeals for the District of Columbia Circuit.  *See* Declaration of Elizabeth Ann DelBuono, MD, Case Docket No. 25-1021, Document No. 2100941.

10.     I also have provided testimony on the adverse health impacts of methane to the Office of Management and Budget ("OMB") to oppose the EPA's extension of compliance deadlines for the final rule entitled "Standards of Performance for New Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources:  Oil and Natural Gas Sector Climate Review," 89 Fed.  Reg.  16,820 (March 8, 2024) (hereafter "2024 Rule"), which posted to the OMB Pending EO 12866 Regulatory Review Page on June 5, 2025, RIN:2060-AW61.  I provided my testimony on July 10, 2025, and a record of such meeting can be found at

https://www.reginfo.gov/public/do/viewEO12866Meeting?viewRule=true&rin=2060-AW61&meetingId=994023&acronym=2060-EPA/OAR.

11.     I understand that ELPC is a petitioner with some other organizations in the above-captioned lawsuit challenging an interim final rule issued by the EPA that will extend the deadlines for oil and gas producers to comply with the 2024 Rule.   This new interim final rule was issued by EPA on July 31, 2025, and is

4

entitled "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review." 90 Fed. Reg. 35,966 (July 31, 2025) (hereafter "Delay Rule"). If the petition by ELPC and the organizations is successful, it will benefit me, as well as MiCCA members and Michiganders, because we will be exposed to less methane emissions and the associated adverse health and climate impacts.

12.    The Medical Society Consortium on Climate and Health ("MSCCH"), a coalition of 100 medical and health associations representing over 1 million physicians and health professionals in the U.S., has provided important public statements quoted below regarding the impacts to public health from methane extraction and production in reference to the EPA's Supplemental Proposal to Reduce Methane and Other Pollutants From the Oil and Gas Industry "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 87 Fed. Reg. 74,702 (December 6, 2022) ("Supplemental Proposal"). MiCCA is one of 29 state network groups under the parent organization of MSCCH. MSCCH's statements are as follows:

      i.    "The science is clear that methane is a potent greenhouse gas and oil and natural gas operations are the nation's largest industrial

5

source of that methane."  MSCCH Statement on the EPA

Supplemental Proposal to Reduce Methane and Other Pollutants

from the Oil and Gas Industry, available at

https://medsocietiesforclimatehealth.org/statements/consortium-

statements/consortium-statement-epa-supplemental-proposal-

reduce-methane-pollutants-oil-gas-industry/.

ii.  "Health impacts of pollutants emitted during the extraction and

production of methane—most notably volatile organic compounds

(VOCs) that increase ground-level ozone (smog)—which worsens

asthma and respiratory disease, causes nervous system and

developmental harms, and causes cancer.  Children are especially

vulnerable to the health impacts of VOCs and smog."  *Id*.

iii.  "Climate change is a health emergency: Our member physicians

are seeing the health impacts of climate change in their patients

and communities every day. These impacts disproportionately

harm our most vulnerable patients, including children, pregnant

individuals, the elderly, people of color, and communities living in

poverty, and these impacts are worsening with every increment of

increased warming.  To avoid catastrophic climate change, we

must reduce methane and other climate pollutant emissions as

6

quickly as possible. Methane is a potent greenhouse gas; oil and natural gas operations are the nation's largest industrial source of methane." *Id.*

13.    The EPA's own Regulatory Impact Analysis for the 2024 Rule found that "[m]ethane is...  a potent greenhouse gas (GHG) that...  contributes to increased global warming and continuing climate change." EPA-452/R-23-013 at pg. 3-4.  That same analysis found that methane contributes to "increased air and ocean temperatures, changes in precipitation patterns...  severe weather events, such as hurricanes of greater intensity, and sea level rise, among other impacts." *Id*. The EPA also recognizes that "extreme weather events" caused by climate change include wildfires. *See Id* at pg. 3-23.  The EPA even recognizes that climate change has increased the frequency, duration, and intensity of wildfires. *See* EPA, *Climate Change Indicators: Wildfires*, Background, available at https://www.epa.gov/climate-indicators/climate-change-indicators-wildfires.

14.    My son was two when we moved to Traverse City, and while no one else in the family has ever suffered from asthma, he experiences intermittent mild exercise-induced asthma, a condition that can be exacerbated by elevated levels of ground level ozone produced from a combination of nitrogen oxides and VOCs.

15.    On several occasions over the last few summers, and occurring at an increasing frequency, we are experiencing wildfire smoke from Canada which

7

worsens air quality to dangerous levels, especially for those like my son with asthma. Already this summer, 2025, there have been several days in which wild fire smoke from Canada has worsened the air quality and altered my son's plans to run outdoors. For example, on July 31, 2025 the air quality was unhealthy even for those not within a sensitive population like my son. *See* EPA, AirNow Interactive Map of Air Quality, July 31, 2025, available at

https://gispub.epa.gov/airnow/index.html?tab=3&showlegend=yes&xmin=-9689390.73455211&xmax=-9397095.538389483&ymin=5544856.058450451&ymax=5670212.784838188&archivedates=07/31/2025. Given this already vulnerable air quality situation, it is imperative that the EPA promptly implement the 2024 Rule to reduce pollutants like VOCs which contribute to asthma in people like my son.

16.     The wildfires and accompanying impaired air quality have negatively impacted my life as well. The smoke and smog have blocked my view across the lake, which is typically clear and beautiful. I am also concerned for my health when walking outside on hazardous air quality days caused by wildfires. This is even more concerning given that these types of days are continuing to grow in frequency and will do so in the future as climate change continues to progress. *See* EPA, *Climate Change Indicators: Wildfires*, Background, available at

https://www.epa.gov/climate-indicators/climate-change-indicators-wildfires (where

8

EPA notes that "climate change threatens to increase the frequency, extent, and severity of fires through increased temperatures and drought.")

17.     One of MiCCA's campaigns initiated in 2023 and still ongoing is to collect first-hand accounts from Michigan health professionals and community members that are consistent with the health impacts described in peer-reviewed literature that can result from, but are not specifically attributed to, the combustion and extraction of fossil fuels, including methane.  Health impacts recounted by Michigan practitioners and/or community members in connection with our MiCCA collection of first-hand accounts include those I describe in Paragraphs 18 to 28 below, which are consistent with the human health impacts that our parent organization, MSCCH, identified in their Statement on the EPA Supplemental Proposal to Reduce Methane and Other Pollutants from the Oil and Gas Industry. I also described these first-hand accounts that MiCCA has gathered during my testimony to OMB, referenced above, on July 10, 2025.  Many of the first-hand accounts shared with me and others at MiCCA that I describe below can be found at https://www.michigancca.com/blank.

18.     Exacerbation of pre-existing conditions by extreme weather conditions, for example:

> i.   Repeated floods in Detroit (e.g., an elderly patient experienced a heart attack while trying to carry furniture up the stairs on a

hot/humid day while basement filled with contaminated water);

 ii. Displacement of large numbers of people in Midland, Michigan when dam broke after extreme rain event during "lockdown", pre-vaccination phase of COVID pandemic; and

 iii. Power outages during extreme cold resulting in a surge of patients to the Emergency Department from carbon monoxide poisoning.

19. A MiCCA hospital emergency department practitioner who lives and works in Detroit recounted a time, during one of the coldest winter days she could remember, the power went out.  Shortly thereafter, the emergency department became so overwhelmed with patients suffering from carbon monoxide poisoning from trying to stay warm by unsafe methods, like grills and generators, that they had to set up a separate hazmat tent outside to handle all the patients.  As she described it, "[t]hat tent became the dedicated area for treating CO poisoning patients, keeping them separate from the rest of the emergency cases to avoid overwhelming the main ER.  The tent was a lifesaving necessity but also a sobering reminder of how quickly emergencies can escalate during extreme weather events." Available at https://www.michigancca.com/blank.

20. Extreme heat exacerbating:

 i. Unsafe conditions for homeless and mentally ill whose medications are often less effective when temperatures rise.  For

10

example, a University of Michigan medical student recounted the time that a veteran with PTSD missed an appointment during extreme heat and ultimately required hospitalization. The combination of extreme heat and his medication becoming less effective in the heat were likely the cause of confusion.

21.     Extreme rain events leading to flooding:

    i.  Often contaminated by industrial chemicals (including carcinogens), agricultural waste, or sewage (frequently leading to increased incidence of gastrointestinal illness in children).

22.     Repeated flood events leading to molds within the home which in turn trigger or exacerbate asthma attacks and chronic pulmonary disease, and lead to localized or systemic infection in immunosuppressed patients.

23.     Exposure to wildfire smoke resulting in over 100 deaths in Michigan the summer of 2023: *See*, https://planetdetroit.org/2024/08/wildfire-smoke-led-to-169-deaths-in-michigan/?utm_source=Planet+Detroit&utm_campaign=37afe32324-Oct-13-2023. These wildfires trigger and exacerbate asthma and other chronic respiratory and cardiovascular conditions, and also contribute to mental health impacts. For example, one Wayne student described how "the combination of hot summer temperatures coupled with the wildfire smoke and need to wear masks, resulted in

11

her feeling trapped." Available at https://www.michigancca.com/blank.  A second Wayne State public health major described the need to change her plans so that she could stay indoors because of the poor air quality associated with wildfire smoke coming down from Canada in the summer of 2023.

24.    Climate change can also extend the length and severity of allergy seasons and increase the incidence of vector borne diseases such as West Nile Virus, La Crosse Encephalitis, and Equine Encephalitis.  *See*, *e.g.*, https://www.bridgemi.com/michigan-environment-watch/warming-great-lakes-region-water-heat-can-be-unhealthy-combination and https://www.bridgemi.com/michigan-health-watch/mosquito-borne-viruses-and-mystery-emerge-michigan-summer-ends.

25.    Climate change also contributes to broader mental health impacts. For example, post-traumatic stress disorder can occur in individuals after extreme weather events, and children are especially vulnerable when families have been displaced by such events.

26.    Furthermore, general "climate anxiety" in all populations, especially young adults is increasing due to climate change.  One mental health practitioner described counseling several teens and young adults who expressed concern about their future on this planet.  There have been times where an entire session or more is dedicated to processing their feelings of distress, anxiety, and anger.  Combined

12

with anxiety is a growing sense of helplessness or powerlessness as is evidenced in questions like, "[h]ow am I supposed to live through this if things don't get better?" and "[w]hy aren't leaders/older generations doing anything?" Available at https://www.michigancca.com/blank.

27. The same practitioner described that one of her adult therapy clients is considering starting a family with their long-term partner and they are feeling increasingly worried about the quality of life their child would have if climate change progresses as it is projected to in the coming years without drastic interventions, and this is weighing heavily in their decision-making process.

28. As discussed above, climate induced wildfire smoke is also causing many health issues. One of MiCCA's active members, a nurse practitioner from the Traverse City area, has developed intractable coughing spells over the summer as the wildfire smoke has worsened air quality. This has forced her indoors when the Air Quality Index is high, which has been most of the summer. She has had to resort to wearing a mask when she ventures outside and is exposed to areas of hazy and smoky air.

29. It is important to note that these sorts of adverse health outcomes are even more likely to happen to children. As I know from my professional experience and training, the lungs and nervous systems in children are still developing, they often play outdoors, and their respiratory rates are higher than

13

those of adults meaning their rate of breathing can bring ground level ozone created from nitrous oxides, VOCs, and other pollutants into their system more quickly.

30.     As a health care practitioner, I have observed real world impacts from the type of pollution the 2024 Rule seeks to prevent.  I truly hope the EPA changes course to ensure these health benefits are realized and adverse health outcomes like asthma attacks and cancer are avoided.

31.     From my association with ELPC, MiCCA is aware and applauds EPA's 2024 Rule which became effective on March 8, 2024.

32.     I have read the newly issued Delay Rule which delays the compliance deadlines for some of the key emissions control provisions and monitoring requirements of the 2024 Rule.  This unnecessary delay of these emission controls and monitoring requirements will forestall health and climate benefits and, therefore, will harm myself, my community, and is antithetical to MiCCA's mission.

33.     According to the EPA, the 2024 Rule is expected to result in significant emissions reductions, including an estimated 130 million metric tons of methane and 1.3 million short tons of VOCs between 2024 and 2029.  *See* EPA-452/R-23-013, pg. 3-4.  I strongly support these emissions reductions.

34.      These emissions reductions from the 2024 Rule, if implemented

14

without the delays set forth in the Delay Rule, will accrue throughout the country and will have especially important impacts in Michigan given the significant presence of the oil and natural gas industry in our state. For example, according to data compiled by the Environmental Defense Fund, in Grand Traverse County alone where I have practiced and spent much of my lifetime, there are 1747 active oil and natural gas wells producing methane emissions. I understand that this data will be described more fully in the Declaration of Jeremy Proville and Laura Mirtich to be filed in the above captioned matter (hereafter "Proville-Mirtich Decl."). One of these wells is even within 5 miles of my home. *See* Proville-Mirtich Decl.

35.     As noted above, ozone pollution associated with methane emissions is of great interest and concern for MiCCA. EPA's 2024 Rule Regulatory Impact Analysis shows that by 2028 ozone pollution would decrease significantly in parts of Michigan and throughout the Midwest, if the deadlines in the 2024 Rule are enforced. *See* EPA-452/R-23-013, pg. 3-30, figure 3-2. This will in turn produce significant health benefits to my family and other Michiganders, including many avoided ozone-related premature respiratory mortalities and illnesses. *See* EPA-452/R-23-013, pg. 3-47, table 3-8.

36.     As an organization comprised of medical professionals who are focused on mitigating the adverse health impacts of pollution and climate change,

15

these health benefits of the 2024 Rule are crucial to advancing MiCCA's mission.

37.    ELPC's participation as a petitioner to challenge the EPA's Delay Rule, which will forestall the compliance deadlines for the technology controls and monitoring requirements in the 2024 Rule are directly relevant to MiCCA's mission to "cultivate a climate in which the health of all people can thrive" as we are committed to ensuring these health benefits are realized and the adverse climate impacts are avoided.  *See* Michigan Clinicians for Climate Action ("MiCCA"), About Page, available at https://www.michigancca.com/about.

38.    MiCCA supports ELPC's efforts to challenge the EPA's new Delay Rule as a petitioner in the above-captioned lawsuit entitled *Environmental Defense Fund et al. v. Lee Zeldin et al.,* Case No. 25-1164.

39.    I, Elizabeth Ann DelBuono, MD, declare under penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.

Elizabeth A. Del Buono MD

Elizabeth Ann DelBuono, MD

Executed on August 12, 2025.

16

# Attachment 5

Declaration of Lisa Deville, Fort Berthold POWER

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

**DECLARATION OF LISA DEVILLE**
**Submitted In Support of Fort Berthold POWER**

I, Lisa Deville, declare as follows:

1.      I am an enrolled member of the Mandan, Hidatsa, Arikara

(MHA) Nation, also known as the Three Affiliated Tribes (TAT). I am also

a co-creator and the Vice President of Fort Berthold Protectors of Water

and Earth Rights (Fort Berthold POWER), which is a member organization

of the Dakota Resource Council, which in turn is a member organization of

the Western Organization of Resource Councils. I am also a former board

member of the Western Organization of Resource Councils. I currently

serve in North Dakota's House of Representatives, where I represent the

people of District 4A on the Fort Berthold Reservation.

2.      I live with my husband, five children and eight grandchildren.

We have lived our whole lives in Mandaree, North Dakota, the most

extracted community on the Fort Berthold Reservation. Mandaree and the

Fort Berthold Reservation are special to me because this is where I was

raised and where I choose to raise my family.

3.      My family and my ancestors are buried here along the shores

1

of Lake Sakakawea. Being Native American/Indigenous, this is the only land that we have left that is our own. We were relocated several times in our history as a people. When my ancestors were intentionally infected with smallpox, we were forced to move from our ancestral lands along the Missouri River. And a second time, we were forced to move when much of Fort Berthold Reservation was flooded to build the Garrison Dam as part of the Pick Sloan project.

4.      We are connected to the Earth. We are taught in the story of our creation that we are created from the Earth. We are taught that the Earth is our Mother, so we must protect it. As Indigenous women, we are taught that Water is Life! The babies females carry are held in water throughout pregnancy. We need clean water to drink. We need clean soil to grow food. We need clean air to breathe.

5.      We have been living with oil and gas for roughly fifteen years now, and we did not know that there would be so much environmental destruction with fracking. There are thousands of oil and gas wells on the Fort Berthold Reservation.

6.      I have Masters Degrees in Management and Business Administration, and I also have a degree in environmental science. I am trained in using Geographic Information System (GIS) technology. I have

2

096

worked with Professor Tanya Driver at the Nueta, Hidatsa, Sahnish College
to create a map of the oil and gas wells on the Fort Berthold Reservation.

7.      For the past 10+ years I have witnessed the increase of oil and
gas industrialization along with the environmental impacts. We are very
much affected by the light and noise pollution from flares. Every direction
you look there are gas flares that sound like a roaring jet plane that rumbles
the ground like a train passing by. I can feel the earth rumble at night time
when everything is quiet. So do other members of my family. At night the
sky is lit up like it is still day. Our land once was lush with natural grasses,
wildlife, June berries and plum trees. Our way of life has been changed
because of the interruption by the oil industry.

8.      Oil and gas operations on Reservation land threatens our
drinking water supply, wetlands, and native plants and animals. There have
been thousands of fracking brine spills throughout our lands, leaving
behind heavy metals that may never biodegrade. Companies have also
illegally destroyed the fragile wetlands along the Little Missouri River to
try and sell water to fracking operations. And the pipelines that now criss-
cross the Reservation, running under Lake Sakakawea and over the
National Grasslands, have destroyed thousands of acres of plant and animal
habitat, threatening species that are already struggling to survive.

3

9.      Several years ago, I helped gather snow samples from around flares on the Fort Berthold Reservation that was used in a scientific study to investigate the composition of flare gases and their potential health risks. Based on the study's results, I am concerned about my exposure and the exposure of members of my family to harmful hydrocarbons.

10.      In August of 2017, both my husband, Walter, and I got ill from respiratory infections. We first went to Indian Health Service where we received medication but did not get any better for several weeks. We then went to the McKenzie County Clinic, where a physician told us that we had the same symptoms as oil field workers who had come to the clinic—this is commonly called the "Bakken Cough." Walter was given a steroid shot, but I took medication again. It took about 8 weeks for Walter and me to fully heal from the infection. Asthma and respiratory infections are on the rise on the Fort Berthold Reservation. I am very concerned about the air pollution from oil and gas near my home, because I worry that it will impact my health and my family's health.

11.      We can constantly smell hydrocarbons in the air, a pungent smell of rotten eggs of sulfur. Every direction you look there is flaring. Air pollution is visible in all directions on the Reservation.

12.      Because of all the impacts that oil and gas production has on

4

our air, our health, our ecosystems and wildlife, members of Fort Berthold POWER, including myself, have worked to secure protections. I helped create Fort Berthold POWER in 2015 to counteract the devastating environmental, social, and cultural impacts of hydraulic fracturing on the federal trust lands of allottees and the tribal government. In order to protect my community, I have participated in activism and litigation (as a declarant) relating to changes in the Council on Environmental Quality's NEPA regulations, which impact so many aspects of our lives, including gravesites, endangered species, water, and air. I have also participated in efforts to oppose the Dakota Access Pipeline, rulemaking regarding the definition of "Waters of the United States" under the Clean Water Act, and have provided comments on hydraulic fracturing, among other topics.

13.     I have fought for better regulations on oil and gas operations in my community. For four years, members of Fort Berthold POWER and I worked to secure the protections of the Bureau of Land Management's (BLM) Waste Prevention Rule, which requires reductions in methane and other harmful emissions by limiting leaking, venting, and flaring of natural gas. In 2015, my husband Walter and I traveled to Washington, D.C., to meet with our delegates and attended public hearings, meetings, and briefings to gain support of the Waste Prevention Rule. I also authored op-

5

ed pieces, testified in front of Congress, and participated in litigation to stop the Trump Administration from rescinding the necessary protections of the Waste Prevention Rule.

14. I and other members of Fort Berthold POWER have also worked to secure the benefits that EPA's newest New Source Performance Standards will provide. In 2016, EPA issued the first ever methane regulations for new and modified emission sources in the oil and gas industry. EPA then tried to eliminate those vital protections with two new rules in 2018. Walter and I testified against those rollbacks at multiple public hearings in 2018 and 2019, and I provided testimony in June of 2020 to the Office of Information and Regulatory Affairs about the dangers associated with methane emissions from the huge amounts of oil and gas development around my community. When EPA nonetheless finalized the rules, I participated in litigation to prevent EPA from eliminating the vital protections contained in the EPA 2016 New Source Performance Standards (2016 NSPS).

15. Now EPA has finalized a new rule that will better protect communities from the harms of oil and gas development. We submitted comments on EPA's first and supplemental proposals for the new NSPS, urging EPA to strengthen its proposals. The final rule, published March 8,

6

2024, and titled Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review (new NSPS), adopted some of our recommendations, including, for example, banning routine flaring at new wells.

16.     The protections in EPA's new NSPS are necessary to protect the health and welfare of my community. In its new NSPS, EPA issued regulations for new and modified emission sources in the oil and gas industry, and emission guidelines for existing sources. The rules restrict oil and gas operators' flaring, require installation of zero-emitting pneumatic devices, and require operators to periodically monitor equipment and repair emission leaks in the leak detection and repair (LDAR) program.

17.     There are numerous oil and gas wells surrounding my home. In fact, according to analysis provided to me by Environmental Defense Fund analyst Laura Mirtich (*see* Proville-Mirtich Declaration), there are currently 17 producing wells within ½ mile of my home. There are also well over 6,000 producing oil and gas wells in McKenzie County alone, including nearly 5,500 that were drilled prior to December 2022 and 623 drilled after December 2022. And drilling is ongoing, there are 9 drill rigs active in the county.

7

18.     EPA's issuing of rules to regulate methane from the thousands of oil and gas wells surrounding my home and community will help address the impacts of climate change and prevent continued emissions of harmful pollutants, like volatile organic compounds (VOCs) and hazardous pollutants (including carcinogens like benzene).

19.     There are also gathering and boosting compressor stations in the area right around my home. The Station 8 compressor station and the TAT-Blue Buttes compressor station are just 8.8 miles and 10 miles from my house, respectively. There is also a transmission compressor station, the Elkhorn Creek compressor station, near Mandaree that is about 30 miles from my home. The station began operating in 2022. EPA's new NSPS rule strengthens the LDAR requirements for compressor stations, which will reduce the methane, VOC, and hazardous pollutants from these sources that plague myself and my family.

20.     I am very concerned about the physical effects of oil and gas development, including flaring and venting. My children and grandchildren breathe in this air. How is this going to affect our health? We need the rules in place NOW to prevent further illness. The impacts from the oil and gas boom has changed our way of life and our quality of life.

21.     Creating and strictly enforcing environmental laws and

8

policies to regulate oil and gas development is very important. Otherwise, we risk the unrepairable consequences of the environmental damage. We need monitoring, research, testing, and studies that show the environmental and human health impacts of exposure. Our health and the health of our children and mother Earth should not continue to be sacrificed.

22.      Through my education in environmental science, I have learned that methane is the second largest contributor to human-caused global warming after carbon dioxide. It has a global warming potential that is 86 times greater than carbon dioxide.

23.      I am very worried about the impacts of global warming on my way of life. We depend on chokeberries, and plums—this is what we live on. And we use juneberries in our traditional ceremonies. But last summer, my husband and I went outside and noticed that all of the juneberries and chokeberries were shriveled up. They were dying from the heat and lack of water. I understand that global warming can cause issues with rain. Without rain, and with the warming, the plants just aren't growing. We rely on the trees and we rely on Mother Earth for everything, and climate change is affecting us. My people have always been people of natural agriculture. We are ceremonial people. We teach our children to sing songs to the garden. It is hard to watch everything about who we are as Native Americans

9

disappear.

24.    In addition to methane, natural gas leaked and vented from oil and gas development also contains VOCs and hazardous air pollutants such as benzene, a known carcinogen. Long term exposure to these emissions result in health impacts, such as: asthma, cancer, neurological damage, pulmonary reduction, coronary problems, endocrine disruption, and headaches. The impact can be devasting if we're breathing in carcinogenic material that is a result of oil and gas production.

25.    Fort Berthold POWER members, including myself, worked with Earthworks to study the flaring and emissions coming off well locations using infrared imaging. Specifically, my husband Walter and I collaborated with Dakota Resource Council and Earthworks to examine the Buffalo wellpad on the Fort Berthold Reservation using an infrared camera (FLIR). In 2016, Walter and I participated in a fly-in to Washington, D.C., where we presented the Buffalo wellpad case study to executive branch staff. During July 2017, Walter and I collaborated again with Dakota Resource Council and Earthworks to examine existing wellpads on the Fort Berthold Reservation using an infrared camera. Some of the results of this

10

investigation are available in YouTube videos.[1] The investigation documented visible and concerning emissions at five sites. Finally, in September 2018, Earthworks and Fort Berthold POWER members, including my husband Walter and I, once again used a FLIR camera to view leaks from wells located on the Fort Berthold Reservation. Some of the results of this investigation are available in YouTube videos, which again show visible and concerning emissions at multiple sites on the Fort Berthold Reservation.[2] Several of the videos document flares failing to burn off all the gases properly.  Other videos show emissions from tank vapors and other sources. The emitted gases include methane, hydrocarbons, and VOCs.

---

[1] HRC Operating Fort Berthold 1H Well Site: https://youtu.be/cY3mfnZEd6o?si=74rNg8j5gZuNWQgX; HRC Operating Fort Berthold 8-12H Well Site: https://youtu.be/UEpah9g2JDc?si=ZvGYrQxzuVf2AnS6; HRC Operating Fort Berthold 13H Well Site: https://www.youtube.com/watch?v=753IojkdVD0; Statoil & Gas LP Lougheed 2-11 XE #1TFH Well Site: https://www.youtube.com/watch?v=o6ayGWltHCo; Zavanna LLC Arrowhead 10-3 Well Site: https://www.youtube.com/watch?v=bLT8CBytwAM
[2] Enerplus Hidasta Hills Well Site: https://www.youtube.com/watch?v=Gfq7J7-BKkw; WPX Energy Skunk Creek 23-14HC Well Site: https://www.youtube.com/watch?v=XDL6uBVnfvI; Rimrock Oil & Gas Two Shields Butte 1-24-12-1H & Skunk Creek 2-24-25-15H Well Site: https://www.youtube.com/watch?v=uXua5mchHK8; XTO Energy Yellowwolf 21X-10 & Ironwoman 21X-10 Well Site: https://www.youtube.com/watch?v=Iq8FbFxKhhY; Enerplus Cactus Well Pad: https://www.youtube.com/watch?v=5kI6cKP5Hb8; XTO Energy FBIR Big & FBIR Stephen Well Pad: https://www.youtube.com/watch?v=rRN87yLs7RM.

11

26.     In August 2017, Fort Berthold POWER members, including myself, worked with Dakota Resource Council to publish a report titled Oil and Gas Pollution's Impacts on North Dakota's Families. The report is available at this link: https://drcinfo.org/wp-content/uploads/2017/08/ND-Methane-Report-DRC.pdf. The report describes the health risks my family and other Fort Berthold Reservation residents face from air pollution from the oil and gas sector. The report also describes the importance of federal oil and gas air quality regulations issued by EPA and BLM.

27.     Federal protections against dangerous emissions that pollute our air, like the new NSPS, are especially important because, in my opinion, the industry has much too much influence with our tribal and state government decisions makers. I do not trust the state of North Dakota in regulating oil and gas. We have seen that the state puts profit before people. We have oil and gas industry propaganda in the school system, so our kids are wrongly learning that fracking and all harmful practices are safe.

28.     I am very familiar with the concept of environmental justice. I served on EPA's National Environmental Justice Advisory Committee (NEJAC) for three years. The NEJAC is a Federal Advisory Committee formed in 1993 to provide advice and recommendations to the EPA Administrator and her or his staff about broad, cross-cutting issues related

12

to environmental justice, from all stakeholders involved in the environmental justice dialogue. The NEJAC also provides a valuable forum for discussions about integrating environmental justice with other EPA priorities and initiatives.

29.     I understand that the impacts of oil and gas development on the Fort Berthold Reservation disproportionately harm indigenous people, many of whom are low-income, which is a classic environmental justice problem. I have reviewed a Clean Air Task Force study that studies the data and reaches this conclusion.[3] The study found that on tribal lands alone, oil and gas companies waste (i.e. emit) 18.4 billion cubic feet of methane each year, which would be worth $100 million if it was captured and sold on the market. The study showed that people living on the Fort Berthold Reservation were twice as likely to live within 0.5 miles of an oil and gas facility compared to the average North Dakota resident. Four percent of Native American people in North Dakota who live on tribal lands live within 0.5 miles of an oil or gas well, compared to two percent of the total state population of North Dakota. This is an environmental justice crisis because, in addition to the people who are disproportionately exposed to

---

[3] https://cdn.catf.us/wp-content/uploads/2018/05/21094517/Tribal_Communities_At_Risk.pdf

pollution from oil and gas being indigenous, Native American people in North Dakota also tend to be low income. The study reported that twenty-eight percent North Dakota's Native American population on tribal land lives below the poverty line, compared to just eleven percent of the state population as a whole.

30.     I am also familiar with another Clean Air Task Force study that shows that North Dakotans, especially people like me who live in the western part of the state, bear much higher health risks from oil and gas pollution than people in other parts of the United States.[4] McKenzie County, where I live, exceeds EPA's cancer risk threshold by the highest possible margin.

31.     I support EPA's attempts to strengthen the NSPS because every year the oil and gas industry releases millions of tons of methane into the air. Between 2009 and 2014, oil and gas producers on public and tribal lands vented, flared, and leaked about 375 billion cubic feet of natural gas. That's enough to supply over 5 million homes for one year. I am aware that EPA's new NSPS rule will reduce methane emissions by 58 million tons over the next 14 years, as well as preventing the release of 16 million tons

---

[4] https://www.catf.us/wp-content/uploads/2017/02/CATF_FactSheet_HealthEffects_ND.pdf

14

of VOCs and 590,000 tons of air toxics. These reductions will improve the air quality on the Reservation and help protect me and my family from the health impacts of oil and gas development, and from the impacts of climate change.

32.    I am aware that the Trump administration has announced that it will reconsider the NSPS rule and that, on July 31, 2025, the EPA issued a final rule that extended many of the compliance deadlines for the rules without even providing an opportunity for public comment from the people most impacted by these changes. According to EPA's own fact sheet for the rule, emission reductions that I was counting on for my community will no longer occur between 2028 and 2038, including 3.8 million tons of methane emission reductions, 960,000 tons of VOC emission reductions, and 36,000 tons of toxic emission reductions. These delays affect the important provisions in the rule like leak detection and pneumatic controller replacements that would have reduced air emissions in my community and improved our quality of life, as well as compliance assurance measures that ensure that air pollution controls are working as they are supposed to work.

33.    By rejecting attempts to undermine and delay EPA's new NSPS rules, the Court can prevent the severe, immediate, and irreversible

15

harms that would fall on me, my family, and my community if these rules were not implemented.

34.     We choose to live on our ancestral lands, but we cannot choose to not breathe polluted air. I worry that without the EPA's new NSPS rules, I will continue to have respiratory problems from the pollution.

35.     I live with oil and gas. I see the health and environmental impacts every day. Mandaree is the biggest producing oil and gas community on Fort Berthold Reservation. I live here, and will continue to live here, so I have no choice but to deal with the impacts of oil and gas development. I do not plan to move, this is the only land we have left.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed August 14, 2025, in Mandaree, North Dakota.

*Lisa Deville*

LISA DEVILLE

16

# Attachment 6

Declaration of Gillian Graber, Sierra Club

**DECLARATION OF GILLIAN GRABER**

I, Gillian Graber, state as follows:

1. I live with my husband and our two teenaged children in Trafford Borough in Westmoreland County, Pennsylvania, which is about seven-and-a-half miles east of Pittsburgh. I have spent most of my life in Pennsylvania and have lived in the Pittsburgh metro area for 23 years. We moved here to Trafford ten years ago with the intention of raising our children in a healthy environment and neighborhood.

2. We chose Trafford because it is still a close drive to Pittsburgh but is more of a residential suburban community with great schools, parks, a quaint ice cream shop on the corner, and a semi-private road where my kids could learn how to ride their bikes safely. This working-class community fits our needs perfectly as it is also close to my in-laws, who are our source of child care. When looking for a home we intentionally steered clear of other locations like Plum Borough in Allegheny County because it was upwind from the Cheswick Power Plant. Having previously lived on a busy road, we were concerned about the air our children breathe and wanted to ensure their access to clean air.

3. I am a Sierra Club member, and first joined the organization in 2021. I support the Sierra Club's mission and goals to encourage the public to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystem and resources; to educate and enlist humanity to protect and restore the quality of the natural environment; and to use all lawful means to carry out these objectives.

4. I also serve as the Executive Director of Protect PT (Penn-Trafford). I founded the organization, along with other Penn-Trafford community members, in December 2014 to fight a fracking well pad that was proposed in the community less than a half-mile from

1

my home. My husband and I were particularly concerned about air quality living near unconventional gas development. The more we learned about fracking, and the health impacts and detriment to our community that it poses, the more we wanted to fight this proposed well pad. Additionally, this well pad was the closest we had ever seen to such a densely populated suburban neighborhood like ours. This means that hundreds of children would be exposed to this pollution in addition to our children. As a mother and homeowner, I worried that this idyllic neighborhood would soon become an industrial zone. While the operator is still attempting to move the project forward, until now we have successfully stopped that well pad from being constructed.

5.   However, there is still a huge number of wells scattered across my community. This includes both actively producing wells and wells that are legally abandoned, but are not plugged. Based on the Pennsylvania Department of Environmental Protection's ("DEP") Oil and Gas Mapping tool, I understand that there are 132 active conventional gas wells within 2.5 miles of my house, as well as 50 wells that DEP has listed as abandoned but not plugged. In addition, I work in Harrison City, a few towns away from Trafford. Within a 2.5-mile radius of my office, I understand that the DEP's Oil and Gas Mapping tool shows 86 active conventional gas wells and at least 14 active unconventional gas wells. According to data compiled by environmental groups, I understand that there are a total of 4,828 active gas or oil wells in Westmoreland County. Of this total, I understand that 4,733 were drilled or modified before December 6, 2022, while 85 were drilled or modified after that date.

6.   In addition to wells themselves, there are also large quantities of other oil and gas infrastructure in our area. For instance, I understand that FracTracker Alliance's PA Shale

2

Viewer tool shows that, as of 2019, there were at least two dozen gas compressor stations in Westmoreland County, including at least seven within 10 miles of my home. I understand that as of 2024, data collected by the Department of Homeland Security's Geospatial Management Office showed that there were at least nine compressor stations located on gas transmission lines within 10 miles of my office in Harrison City. I am aware that, like wells, compressor stations emit large quantities of methane, smog- and soot-forming compounds, and dangerous air toxins.

7. I did not realize the extent to which the oil and gas equipment in my community is impacting the health of my family until we participated in a study with Environmental Health News ("EHN") in 2019. Because we do not live extremely close to any fracked wells, my family was supposed to be part of the control group that did not have contact with toxins associated with fracked wells. EHN analyzed the pollutants we had been exposed to against people who live closer to fracked wells. However, our reports showed an alarming amount of dangerous pollutants in our bodies. My daughter particularly had a very high rate of dangerous pollutants in her body.

8. We were tested three times, and each time every member of my family had levels of mandelic acid (a metabolite of ethylbenzene and styrene) detected in our urine that exceeded the 95th percentile for the general U.S. population. Ethylbenzene and styrene can cause liver, kidney, or circulatory system problems and increase the risk of cancer. We also all had levels of hippuric acid (a metabolite of toluene and cinnamaldehyde), 2-Methylhippuric acid (a metabolite of xylene), phenylglyoxylic acid (a metabolite of ethylbenzene and styrene), and trans, trans-muconic acid (a metabolite of benzene) above the U.S. median. We often far exceeded the U.S. median for these chemicals. In several

3

instances we even exceeded the 95th percentile for these chemicals in at least one family members' urine sample. Every person in my family exceeded the 95th percentile for mandelic acid in all three urine tests. My daughter, who was 9 years old at the time of testing, also exceeded the 95th percentile for phenylglyoxylic acid and trans-muconic acid in all three tests, and in two of the tests she exceeded the 95th percentile for 2-Methylhippuric acid. Her samples showed the highest level of 3-Methylhippuric acid, a metabolite for Xylene, detected in anyone in the study. These chemicals can cause health effects such as nervous system damage, kidney damage, nausea, circulatory system problems, anemia, and an increased risk of cancer.

9. Additionally, as part of this study we wore air sampling monitors for periods of six to eight hours. We wore these monitors on two separate occasions. The air monitor results indicated that we were all exposed to benzene, ethylbenzene, and naphthalene levels that are above the risk limit set by the California Office of Environmental Health Hazard Assessment, indicating an increased cancer risk of at least one in a million. At high enough exposures, these chemicals can also cause conditions such as anemia, liver and kidney problems, neurological damage, and eye damage.

10. I believe a lot of this pollution comes from the conventional wells, both abandoned and actively producing, all around us. Many of these wells are very old and have limited reserves left, so the owners have fracked the wells to stimulate production. It is known that the pollutants that were found in our bodies are carcinogenic and are associated with oil and gas drilling.

11. The operators of these wells also store the condensate from drilling in storage tanks that vent pollutants into the atmosphere, and these tanks are often not properly maintained.

4

For instance, the Pennsylvania Department of Environmental Protection charged an operator near my office with multiple violations because they kept a storage tank on the well pad for years and did not maintain it. As a result, the condensate overflowed and spilled into a nearby stream.

12. Due to the heavy oil and gas infrastructure in our area, my family and I are exposed to large amounts of methane, volatile organic compounds, benzene, toluene, and other pollutants. Methane is a powerful greenhouse gas; volatile organic compounds can turn into ozone and fine particulate matter, which damage the heart and lungs; benzene can cause anemia, increase cancer risk, and can have significant harmful developmental effects in children; and toluene can cause nervous system or liver problems and increase cancer risk.

13. I am incredibly worried about how the pollution my family and I have been exposed to will impact our long-term health. My fear is that I'm going to get cancer and that my kids are going to get cancer. It is shocking how often we hear about kids and adults that have been diagnosed with cancer in our area. It is the same types of cancer too—types of leukemias, Ewing's sarcomas, and osteosarcomas that are usually very rare. For example, one of my friend's grandmothers died several years ago from a very rare form of leukemia. Another friend that knows the kind of work I do has contacted me on two separate occasions to tell me that someone they grew up with in this area was either diagnosed with cancer or that their child was. Several years ago, he even sent me a picture of a fundraising poster for a third grader in Norwin School District that was diagnosed with cancer.

5

14. It is hard to overstate the fear you are forced to live with when you and your family are exposed to these kinds of chemicals every day that you know are incredibly dangerous, and that you see are already sickening your friends and neighbors. It takes an incredible mental toll. No one should have to fear exposing their children to an increased risk of cancer just because of the place they choose to live. No mother should have to go through this, but so many are and no one is doing anything about it.

15. These concerns hinder my family's ability to enjoy the natural environment. For instance, there is a well in a stream next to a nearby park, for example. I cannot walk in the woods near my home without seeing a gas well. I often wonder, "Am I being exposed just by walking along this path?" I get out in nature to avoid pollution, but that's where many of these wells are. Outdoor activities are such an important part of our family's lifestyle, but it is difficult to enjoy our quality time together when I am in constant fear that the air we are breathing is causing irreparable harm to our bodies.

16. In addition to the direct impacts that oil and gas pollution is having on our health, I am also greatly worried about climate change. I understand that oil and gas operation emit huge quantities of methane, which is a very powerful greenhouse gas that warms the planet much more than carbon dioxide.

17. Climate change is having a huge impact on my family's life. For instance, we've been seeing much more erratic weather recently than we'd seen in the past. There has been so little snow in the recent winters that my children haven't been able to build a snowman in years. Droughts have also become a major problem. Beaver Run Reservoir, which provides drinking water for Westmoreland County, has been losing a lot of water; you can see in photos that my husband has taken of Beaver Run that the water level is much lower

6

than it used to be. This worries me a lot, especially since all the hydrofracking operations

Southwestern Pennsylvania already take so much water out of our water table.

18. We've also had more extreme weather events in recent years. Even while droughts have

caused overall water levels to go down, when it does rain, it is often extremely heavy, and

there's a huge risk of floods. We have been seeing more and more of these heavy rains

that cause massive stormwater problems. The storm sewers are just overwhelmed, and

that stormwater gets into the other waterway channels. This has all caused stormwater

management costs to skyrocket: our sewage bill is now about $300 per quarter, compared

to around $100 when we first moved here. This is affecting our entire region, and

everyone is very upset about it.

19. When we first moved into house our house over 10 years ago, we didn't have a many

large rainstorms, but now flooding seems to happen on a yearly basis. There are river

tributaries in this area that, after big rains, have washed out people's driveways. These

sorts of weather-related impacts are causing homeowners' insurance rates to go up. This

affects everyone: even those whose homes are more protected than others will have to

pay more because the overall level of risk has increased due to climate change and

extreme weather. So as homeowners, and people who use insurance, we're offsetting cost

of those folks that have same insurance that are seeing even greater destruction.

20. The heat waves have also been more intense recently. The summers are hotter than they

used to be, and we just don't go outside as much as we used to because of it. I'm worried

about heat stroke during these kinds of episode. My body can't tolerate that kind of heat;

it makes me feel dizzy, and I try to avoid it. This is really unfortunate because my family

loves being outdoors in our yard when the weather allows it: we love swimming in our

backyard pool and we often set up a big outdoor screen and projector to host movie nights with our friends and neighbors. We also like to spend time doing yard work and home maintenance, playing ball with the dog, and gardening. The problem is that lately, the weather and climate won't allow us to enjoy these kinds of outdoor activities nearly as much as we used to.

21. These climate-related impacts—heat, droughts, floods, extreme weather—negatively impact my family's recreational opportunities away from home. My husband and I are really into kayaking, but we haven't been able to do it as much recently; the weather just wouldn't permit it. We also love to fish, particularly at the local reservoirs that allow it, but this has been more difficult as well due to bad weather and droughts. The family also enjoys bike riding. We live less than a quarter a mile from the Westmoreland Heritage Trail, which is great biking, but we haven't been able to do it much recently during the summer mostly because of the heat; we just can't tolerate it.

22. We've also been negatively affected by smoke from the terrible wildfires that have been happening around the country and in Canada. As people in the Pittsburgh area, we've long had to deal with elevated levels of smog and soot. In fact, I understand that Allegheny County is currently out of compliance with EPA's ambient air quality standards for both ozone and fine particulate matter—problems that are made worse by the volatile organic compounds emitted by oil and gas equipment. To add smoke from wildfires to this mix is just terrible for our health.

23. I'm deeply worried about the affect that climate change is having on our entire society and planet. I worry kids that the world my children will live in will have worse air, depleted watersheds, intolerably hot summers, animals going extinct, a greater spread of

8

disease, a lack of natural resources, and feedback loops where ice cover melts and releases even greater quantities of methane trapped below. And when my children are the age I am now, they will have to be worrying about what the future holds for *their* children. It makes me very sad to think about it.

24. I am aware that in 2024, EPA finalized stringent new pollution standards for the oil and gas industry in 2024 that will substantially reduce emissions of climate-disrupting methane, smog-producing compounds, and cancer-causing air toxics. I understand that this rule strengthens requirements for new equipment that were put in place in 2016 and establishes the first-ever requirements for existing equipment. This rule will provide real benefits for my family and me, since it will cut the emissions that are driving climate change while also reducing the smog, soot, and air toxics that harm us.

25. I understand that EPA has now extended the compliance deadlines for this rule so that the companies don't have to meet its emission limits until later. Furthermore, I understand that EPA has not followed the usual mandatory procedures for implementing these delays, which require the agency to issue a proposal, take public comments, consider and respond to those comments, and only then issue a final rule. This means that Sierra Club and its members were given no opportunity to formally register their views on this action before it took effect.

26. I strongly oppose the deadline delay action, since it will allow oil and gas companies to continue avoiding the 2024 rule's badly needed emission limits, which will benefit people like me and my family. I also oppose the fact that EPA has taken this action in a way that avoids the mandatory rulemaking procedures, thereby shutting out Sierra Club, its members, and the public from participating in the process.

9

27. I understand that Sierra Club has filed a lawsuit in court in an effort to stop EPA from delaying the 2024 methane rule's compliance deadlines, and to require the agency to follow the typically required rulemaking procedures. If the lawsuits succeed, it will benefit my family and me, since it will require oil and gas companies to reduce their emissions according to the 2024 rule's original deadlines, and will allow Sierra club, its members, and the public to participate in and influence the rulemaking process by submitting comments that EPA must consider and respond to. Therefore, I strongly support Sierra Club's decision to bring this lawsuit.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Trafford, PA on August 15, 2025.

Gillian Graber

10

# Attachment 7

Declaration of Patrick Grenter, Sierra Club

## DECLARATION OF PATRICK GRENTER

I, Patrick Grenter, declare as follows:

1.      I am the Senior Director for Campaign Strategy for Sierra Club. I have worked with Sierra Club since March 2017, and have been in my current role since April 2024.

2.      The Sierra Club is a non-profit membership organization incorporated under the laws of the State of California, with its principal place of business in Oakland, CA.

3.      The Sierra Club was founded in 1892, and is the nation's oldest grassroots environmental organization.

4.      In my role as Senior Director for Campaign Strategy, I manage teams of campaign directors, analysts, and strategists who are responsible for developing the Sierra Club's climate strategy through the transformation of our energy systems. In this capacity, I oversee the Club's coordinated efforts to use grassroots organizing, legal advocacy, and political strategies to protect our families, communities, and the broader public from the harmful pollution emitted by the oil and gas industry and, ultimately, to reduce and prevent the extraction of oil and gas from our country's wild places.

6.       Sierra Club's members are deeply concerned about the harm caused by air pollution associated with oil and gas extraction, production, processing,

transmission, storage, and distribution. Many members of ours who live near oil and gas infrastructure suffer from adverse health impacts related to emissions caused by this industry, and many members are experiencing ongoing negative impacts from climate change, to which oil and gas methane emissions are a major contributor. Many of these members are regular participants in programs and advocacy efforts that are geared toward reducing these emissions.

7.     In order to protect our members and the broader public, Sierra Club has for many years worked tirelessly to combat pollution stemming from oil and gas development across the United States. Over the course of the past decade, Sierra Club has actively participated in many federal regulatory processes centered on this topic, submitting over a dozen sets of comprehensive technical and legal comments in EPA rulemaking dockets concerning oil and gas emissions. During that time, the Club also initiated or intervened in at least ten separate legal proceedings in federal court regarding these rulemakings, with the ultimate goal of protecting our members and the general public from oil and gas pollution.

7.     When an individual becomes a member of Sierra Club, his/her/their current residential address is recorded in Sierra Club's membership database. This database is regularly updated each business day to add new members, reflect address changes, and change membership status for those who are no longer active members.

8.      According to data updated in July 2025, Sierra Club currently has over 617,000 members in the United States. These include members living in states that have significant oil and gas production activities. For example, Sierra Club currently has 24,631 members in Pennsylvania, 20,037 members in Texas, 7,639 members in New Mexico, 4,096 members in Utah, 3,056 members in Oklahoma, 2,711 members in Louisiana, and 873 members in North Dakota. These members have a strong interest in protecting human health and the environment from air pollution from oil and gas sites, which are at stake in this EPA litigation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.  Executed on August 12, 2025.

_____

Patrick Grenter

3

# Attachment 8

Declaration of Paul Jeffrey, Natural Resources Defense Council

## DECLARATION OF PAUL JEFFREY

I, Paul Jeffrey, declare as follows:

1.     I am a "Friend" and member of the Natural Resources Defense Council (NRDC). I have been a member for over twenty years. I joined NRDC for many reasons—a Superfund site near my home, for one—but the main reason is my love for the outdoors. I come from a family that has always enjoyed the outdoors—my father climbed the Matterhorn—and we have raised our children to be very active in outdoor activities and sports. I believe somebody, if not everybody, needs to do something to preserve our natural resources, which is why I support NRDC.

2.     While I've been concerned about climate change for some time, my concerns have increased based on the latest projections about sea level rise. One publication after another documents the fact sea levels are rising. It concerns me deeply that sea level rise and associated flooding are going to render whole portions of the U.S. east coast unlivable. Perhaps worst of all will be the impact of climate change on the Atlantic coast of New Jersey, where I live.

3.     I live in Ortley Beach, New Jersey, a community on a coastal barrier island, which is part of Toms River Township. My wife and I have

1

owned property here for over twenty years and lived here for over ten. We made Ortley Beach our permanent residence just months before October 29, 2012, when Superstorm Sandy destroyed our town.

4.    Superstorm Sandy damaged over 99 percent of the homes in Ortley Beach. The intensity and devastation from that storm, which climate change likely contributed to, made us recognize that the future survival of our town was likely to depend on our actions to incorporate future storm resilience into how we rebuilt. That is when I decided to get involved in the Ortley Beach Voters and Taxpayers Association. Soon after that, I was elected to serve as President. I'm now the Vice President of this Association, a nonprofit whose mission is to improve the quality of life in Ortley Beach. For example, we obtained a $1 million grant for pedestrian lighting in the business district. We have also done grassroots advocacy for a new dunes barrier system to protect residents and homeowners on the ocean side of the town from another storm like Superstorm Sandy. We were instrumental in negotiating the sale of 2.5 acres of private beachfront property to the state of New Jersey and Toms River Township to be preserved forever as dunes and beach instead of the planned 24

2

condominium development. Our association's number one priority was pleading with the US Army Corps of Engineers to return to replenish our rapidly deteriorating dune system. Thank goodness that project was completed this year and the dunes have been replenished. While the dune system came with a 50-year promise to revisit and replenish the dunes every 5 to 10 years, Congress just failed to provide further funding in the "Big Beautiful Bill". Not so beautiful for southern New Jersey and Delaware where their replenishment projects for this and next year were just cancelled.

5.      Ortley Beach was "ground zero" for Superstorm Sandy due to the level of damage the storm wrought here. The land elevation in Ortley Beach is low, only about two to four feet above sea level, so the ocean storm surge formed more like a tsunami than a hurricane and inundated our community. Ortley Beach sustained more damage than any other municipality in New Jersey. About 25 percent of the homes in Ortley Beach were considered "substantially damaged" under Federal Emergency Management Agency (FEMA) standards, which means that the cost to repair the home was equal to or greater than fifty percent of the home's

3

market value before the flood. Very few people received full payments from their flood insurance carriers. Many community members who had full flood insurance coverage of $250,000, as required by their mortgage banks, received less than $100,000 from their insurance.

6.      Compared to others in our community, my wife and I were very lucky: we were some of the very few who did not get water inside our home. We live on the bay side of the island, which saw the least amount of flooding, and our house is elevated on pilings with breakaway walls. We did, however, lose everything in our garage, our two cars, our deck, pool, and landscaping. There was three feet of water in our garage, sand in the streets, and debris everywhere; for example, a mattress and someone's fireplace mantle crashed through our garage door. In addition, because the storm struck at the end of October, as winter was approaching, it made recovery difficult with no electricity, no natural gas, no water, and no sewer. All utility infrastructure was destroyed. We could not re-enter our community for over a month because roads were either washed away or covered with feet of sand. Downed power lines and natural gas leaks were everywhere. We could not live in our home for about three months until

4

the conditions were safe and utilities were restored. Even then, recovery was slow as there were restrictions on entry, and contractors, plumbers, and electricians were all in very short supply.

7.     I estimate the full cost of repairing our home after Superstorm Sandy was more than $150,000. Flood insurance covered part of this cost, and we received additional aid from FEMA. Nevertheless, we paid more than $75,000 out-of-pocket from our retirement funds to repair our home.

8.     The financial impacts of Sandy go far beyond these initial repair costs and continue to this day. Our flood insurance premiums have increased 18% per year, but only because our house is above the base flood elevation and this is our primary residence. Secondary homeowners in the area have a $250 surcharge on their annual flood insurance premiums and their premiums can rise 25 percent per year under current federal legislation.  All new homes must be built elevated high on pilings which protects them from flooding, but comes with immense increased cost.  In addition, following superstorm Sandy all New Jersey insurance companies added a new "hurricane deductible."  The deductible, which is triggered if a hurricane makes landfall anywhere in the state of New Jersey, is five

5

percent of the amount for which our home is insured. Our insurance company requires us to insure for full replacement cost, or just over $1,300,000, so our "hurricane deductible" is now over $65,000.

9.      Hurricane Sandy also affected the makeup of my community. Unfortunately, some of our barrier island residents have still not returned after evacuating for Superstorm Sandy over eleven years ago. Many of the homes destroyed by Sandy were cottages that had been passed down from generation to generation. Sadly, many of those families are gone now. As an officer of the Voters and Taxpayers Association, I have received letters that said, "I love Ortley Beach, but my home was destroyed by Sandy, and I can never afford to return." Some properties damaged by the storm still sit with damaged, unrepaired homes.  These abandoned houses remain a blight in our neighborhood.

10.      Superstorm Sandy badly damaged many of the Township's streets and roadways. These effects occurred in many coastal towns near Ortley Beach, as reported by the New York Times.[1] Fortunately, a grant

---

[1] Nick Corasaniti, *Jersey Shore Towns Scramble for Revenue as Sandy Aid Dries Up*, NYTimes (July 30, 2017), https://www.nytimes.com/2017/07/30/nyregion/hurricanesandy-jersey-shore-towns.html.

6

from FEMA enabled the Township to repave most of our badly damaged streets.

11.    I believe that superstorm Sandy was such a strong, devastating storm because of climate change. It is obvious that our environment is changing, and I believe that humans are accelerating the change. I was trained as an organic chemist at Carnegie Mellon University and MIT. Although mostly retired, I still read articles from scientific journals including Science, the New England Journal of Medicine, and the MIT Technology Review. I see a clear, negative impact from human-produced greenhouse gas emissions on the climate. I therefore support government efforts to reduce greenhouse gas emissions to slow and ultimately prevent these impacts.

12.    Sandy was an extreme storm; it resulted in the lowest barometric pressure ever recorded in New Jersey. But such extremes are becoming more frequent as climate change progresses, as evidenced by multiple storms over the past decade that have continued to batter and damage our protective sand dune system. As I continue to see frequent

7

storms roll up the New Jersey shore, I'm more convinced than ever that climate change is real and is progressing at an increasingly rapid rate.

13.     I am very concerned about the future effects of climate change. I've said to my kids, partly in jest, "Enjoy our house here, but don't count on it being livable in the future when you are my age." I'm worried that, if the sea level keeps rising, flooding during storms and high tides will eventually make our community uninhabitable.

14.     Low-lying streets in Ortley Beach now more frequently flood during minimal storms or seasonal high tides. This increased flooding isn't associated with powerful storms; it's associated with seasonal high tides that are generating higher water levels than they have in the past. We are seeing more and more "sunny day" high tides. Just this past year we had two minimal winter storms that resulted in our local streets becoming impassable. We could not leave our home because the water in the roadways was a foot deep. The nearby state highway was closed in both directions due to high tide waters. The tide rose to within one foot of my garage doors – the highest it has ever been since superstorm Sandy. More and more frequently I cannot walk my dog to the bay. People who live on

8

the flooded streets have to drive through 3-6 inches of salt water to get to their homes, if they can get there at all. I've seen some projections that say that within the next decade, there will be twenty days per year when you cannot get down the street to your home in my town. We are reminded of the rising sea levels more and more frequently. Frankly it's scary.

15.    I worry that this type of flooding will only get worse if the climate continues to warm and seas continue to rise. In fact, if sea levels rise another foot, many of the local roads will flood so much during high tides that some homes will become simply inaccessible. Our Township continues to obtain state grants that allow the elevation of other nearby roads that continue to frequently flood, but it is immensely expensive. It is unlikely that the funding necessary to fully address anticipated sea-level rise over the next 25 years will be available. And we can't elevate all the roads! If the state and Township did not have to spend so much money on these mitigation efforts, there are many things that the money could go toward that would improve the lives of residents, such as public transportation.

9

16.    I'm familiar with the Environmental Protection Agency's (EPA's) 2024 rule that regulates methane emitted from oil and gas operations. I understand that methane is a powerful greenhouse gas with a climate impact as much as 30 times that of $CO_2$ over 100 years, and that these regulations are anticipated to reduce greenhouse gas emissions by an estimated 1.5 billion metric tons of $CO_2$ equivalent by 2038, thereby slowing climate change.

17.    I am also familiar with EPA's recent rule delaying compliance with these important standards and understand that this will result in an increase of 3.8 million tons of methane. I also understand that NRDC has filed a lawsuit to challenge that delay. I believe EPA should protect our communities from the harmful effects of climate change, including by limiting greenhouse gas emissions. I therefore support NRDC's lawsuit aimed at defending these methane-reduction rules.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 10, 2025, in Ortley Beach, NJ.

_____
Paul Jeffrey

10

# Attachment 9

Declaration of Mitch Jones, Food & Water Watch

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

**DECLARATION OF MITCH JONES**
**Submitted In Support of Food & Water Watch**

I, Mitch Jones, declare and state as follows:

1.      I am the Managing Director of Policy & Litigation at Food & Water
Watch ("FWW"). I have worked for FWW since 2008 and have held several
positions within the Water, Fish, Common Resources, Climate & Energy, and
Policy departments of FWW. I have been a Managing Director since December
2021 and have held my current position since January 2023. Given my past and
present duties, I am intimately familiar with FWW's mission, membership,
activities, and operations.

2.      FWW is a national non-profit membership organization headquartered
in Washington, D.C., with approximately 1.4 million members nationwide. It was
founded in 2005 to ensure access to clean drinking water, safe and sustainable
food, and a livable climate. FWW uses grassroots organizing, policy advocacy,
research, communications, and litigation to further this mission.

3.      FWW advocates extensively on issues related to the fossil fuel
industry and regulation of that industry. FWW's activities include, among other
things, intervening in Federal Energy Regulatory Commission proceedings for
natural gas infrastructure projects and challenging the Commission's decisions

1

where appropriate, opposing fossil fuel leasing and extraction on federal lands, and advocating for strong state and local regulation of fossil fuel extraction, processing, and related activities. FWW's work to influence policy related to the fossil fuel industry includes opposing the allocation of public funding and incentives that prop up and extend fossil fuel use, submitting comments to improve regulatory oversight of the industry, and advocating for legislation necessary to ensure a livable climate for all. Ultimately, FWW recognizes that ending fossil fuel use is necessary due to the industry's impacts on the climate, the environment, public health, and local communities.

4.      FWW's long history of advocacy related to the fossil fuel industry includes opposing hydraulic fracturing ("fracking") for oil and gas. FWW was the first national organization to call for a ban on fracking and has spent more than a decade campaigning to hold the federal government accountable for its failures to adequately protect public health from fracking, mitigate climate change, and regulate fossil fuel interests.

5.      FWW has significant expertise on the climate, environmental, and public health harms of the fossil fuel industry. FWW regularly educates our members, supporters, and the public about the negative impacts of fossil fuels by maintaining informational websites; producing news articles, press releases, fact sheets, issue briefs, and reports; and sending out action alerts notifying our

2

members and supporters about how they can engage with government decisionmakers to address the harmful consequences of fossil fuel use. FWW's publications related to the fossil fuel industry include a 2024 fact sheet "Factory Farms, Fracking, and the Methane Emergency," a 2022 report "Averting Climate Catastrophe: Fossil Fuels Must End While Renewables Take Over," a 2021 fact sheet "Dangerously Deep: Fracking's Threat to Human Health," a 2020 report "Fracking's Bridge to Climate Chaos," and a 2019 report "The Fracking Endgame: Locked Into Plastics, Pollution and Climate Chaos."

6.      On March 8, 2024, the Environmental Protection Agency ("EPA") published a final rule revising the new source performance standards ("NSPS") for new, reconstructed, and modified oil and natural gas sources and setting final emissions guidelines for existing oil and gas sources. Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024) (the "2024 Rule").

7.      The 2024 Rule reduces emissions from oil and gas production through equipment and performance requirements including more frequent monitoring and prompt repair of equipment leaks across all well sites, limiting flaring of natural gas, requiring operators to submit closure plans before wells become orphaned,

3

tightening requirements for pneumatic controllers, tanks, and compressor stations, and increasing monitoring of large release ("super-emitter") events from facilities.

8.    FWW participated in the rulemaking process for the 2024 Rule by joining comments on EPA's proposed rule, Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 86 Fed. Reg. 63,110 (Nov. 15, 2021), and EPA's supplemental proposed rule. Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 87 Fed. Reg. 74702 (Dec. 6, 2022).

9.    On July 31, 2025, EPA finalized a rule ("Delay Rule") that extended many of the 2024's compliance deadlines. EPA did so without providing public notice or taking public comment. If EPA had allowed for prior notice and comment, FWW would have joined comments opposing the delays. FWW is concerned about the effects of the Delay Rule because, according to EPA, the Delay Rule means that an additional 3.8 million tons of methane pollution, 960,000 tons of harmful volatile organic compounds, and 36,000 tons of toxic air pollution will pollute the air between 2028 and 2038.

10.    Advocating for increased regulatory oversight and significant reductions in emissions from the oil and gas sector is central to FWW's mission.

4

FWW believes it is vitally important that the federal government act to protect our climate, the environment, public health, and local communities from the harm of pollution from oil and gas extraction, processing, transmission, and storage.

11.     As a membership organization that also partners with community groups and frontline residents to confront the harms of the oil and gas industry and works to inform the public about fossil fuel pollution, FWW is directly and adversely impacted by the Delay Rule. First, some of the emissions addressed by the 2024 Rule will continue unabated, harming FWW's members and supporters, local communities, public health, the environment, and the climate. Second, FWW will have to divert resources to advocate for policy solutions to address those emissions, rather than dedicating those resources to other work to address the climate crisis. Third, FWW did not have the opportunity to influence EPA's decision to delay implementation of the rule through public comment.

12.     If the Delay Rule remains in effect, FWW's members and supporters, local communities, public health, the environment, and the climate will be less protected from the oil and gas sector's harmful pollution.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed by:    _____

Mitch Jones

Dated:    August 12, 2025

6

# Attachment 10

Declaration of Carol Kuehn, Food & Water Watch

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

**DECLARATION OF CAROL KUEHN**
**Submitted In Support of Food & Water Watch**

I, Carol Kuehn, declare as follows:

1.      I am currently a member of Food & Water Watch. I joined because I consider myself quite active on a whole host of issues, including environmental and climate change issues which are central to the organization's overarching mission. I share Food & Water Watch's goals, particularly its aim to guarantee a livable climate for future generations through the cessation of societal reliance upon fossil fuels and to ensure clean air for our communities.

2.      I reside at 4291 Route 27 in Princeton, New Jersey, 08540, where I have been a resident for 46 years. Construction of a compressor station ("Compressor Station 206") as part of the Northeast Supply Enhancement ("NESE") project, developed by Williams subsidiary Transcontinental Gas Pipe Line Company ("Transco"), has been proposed next to my home. As proposed, the construction of Compressor Station 206 would occur roughly 1,700 feet from my house, on the land directly adjacent to my property, which would connect to the Transcontinental pipeline that already runs through my property.

1

3.    I have personally and publicly opposed Transco's construction of the new NESE Compressor Station 206, as well as other gas infrastructure projects. This includes attending initial NESE project scoping meetings and further informational meetings. Following those meetings, I joined other residents to request local Franklin Township, New Jersey, council members to form a task force on pipeline issues and have been actively involved in this task force ever since. I have also engaged in outreach with concerned residents in the local community by organizing opposition to the NESE project, going door to door, and providing informational meetings for community members. I have attended numerous meetings and hearings about the NESE project at the state and local levels, oftentimes speaking at those engagements. Furthermore, I intervened in the Federal Energy Regulatory Commission ("FERC") proceedings on the NESE project and have provided significant commentary to FERC and the New Jersey Department of Environmental Protection ("NJDEP") concerning the project.

4.    In response to the proposed NESE project, I worked with environmental consultants to determine the environmental appropriateness of this area for barred owl nesting, after having reported barred owl call observances to NJDEP in 2019. Also in 2019, the New Jersey Department of Environmental Protection confirmed the suitability of my property and other

2

adjoining properties for threatened barred owl habitat. Further, the wetlands in this area were reclassified to "exceptional resource value" and vernal pools, which are critical habitat for flora and/or fauna, were also identified in this area.

5.    In addition to proposed Compressor Station 206, I live within twenty miles of five existing compressor stations.

6.    I understand compressor stations to be sources covered by the U.S. Environmental Protection Agency's ("EPA") final rule revising the new source performance standards ("NSPS") for new, reconstructed, and modified oil and natural gas sources and setting final emissions guidelines for existing oil and gas sources. Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024) (the "Final Rule").

7.    I understand that the Final Rule will reduce air emissions from oil and natural gas operations. In particular, I am aware that the Final Rule requires monthly audible, visual and olfactory ("AVO") surveys and quarterly optical gas imaging ("OGI") monitoring, with corresponding timelines for repair, to address fugitive emissions from compressor stations like those near my property.

8.    I am aware that the Trump administration has announced that it will reconsider the Final Rule and, on July 31, 2025, EPA issued an interim rule,

3

effective immediately, extending many of the compliance deadlines. EPA did not provide an opportunity for public comment before extending the deadlines.

9.   According to the fact sheet for the delay rule, emissions reductions that I was counting on will be delayed or no longer occur. Nationally, this includes 3.8 million tons of methane, 960,000 tons of volatile organic compounds (VOCs), and 36,000 tons of toxic air pollution.

10.   I have been impacted and will continue to be impacted by the EPA's failure to adequately regulate methane and other air pollutants from natural gas infrastructure, like the existing and proposed compressor stations near my property, including by the delay of compliance deadlines in the Final Rule. I am concerned that air emissions from the existing and proposed compressor stations near my house that would be addressed under the Final Rule will be worse if it is not implemented on the original timeline, further degrading the air quality surrounding my property. I am also concerned that such emissions could seriously impact the ecological quality of my property and the surrounding area.

11.   Furthermore, if the Final Rule does not go into effect in accordance with the original deadlines, it will exacerbate my growing concern related to climate change impacts resulting from expanded fossil fuel gas infrastructure and the inadequate regulation of that infrastructure's emissions of potent greenhouse gasses, particularly methane. I understand that climate change will

4

bring more insect-borne diseases, drought, flooding, saltwater intrusion, and decreased snowfall to New Jersey, which would deprive me of the enjoyment of my property, prevent me from recreating in local parks, and increase the risk of harm to my home and health.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed by:          _Carol Petryk Kuehn_

                      Carol Kuehn

Dated:                August 13, 2025

5

# Attachment 11

Declaration of Paula Leach, Environmental Law & Policy Center

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

ENVIRONMENTAL DEFENSE FUND,  )
*et al.*,                    )
                            )
    *Petitioners*  )
                            )
  v.               )   No. 25-1164
                            )
LEE ZELDIN, *et. al.*,      )
                            )
    *Respondents*  )
                            )

## DECLARATION OF PAULA LEACH

I, Paula Leach, declare as follows:

  1.  I am currently a member of the Environmental Law and Policy Center ("ELPC"). I am also a landowner in Antrim County, Michigan, where I have owned a lake house on Torch Lake for more than a decade. This property serves as a personal refuge for our family which includes my husband and our adult daughter, her husband, their two-year-old child and their new baby. My second grandchild was just born in July, 2025, and I am growing increasingly concerned about my family's health and well-being, particularly in relation to air pollution from active oil and natural gas wells that pepper the landscape near our property.

  2.  Our family are avid outdoor recreation enthusiasts. During the summer, we swim, bike, kayak, and boat in the Torch Lake watershed, and we

cherish the pristine environment that makes these activities so special. In fact, each summer I train and pride myself on participating in an annual 63-mile bike race around Torch Lake. We also love taking our older grandchild to Providence Farm up the road, so she can pet the animals and pick wildflowers, and, of course, expect to continue to do the same now with both our grandchildren. In the wintertime, our family cross country skis, snowshoes, and we enjoy gazing at the starry night sky around a cozy campfire. This lake is one of the most beautiful in the region, if not the world, and we feel privileged to be stewards of this land. Beyond its sentimental and recreational value, my property is also an investment for my retirement, and I do not want to see it devalued due to toxic emissions in the region.

3.      I understand that in March of 2024, the U.S. Environmental Protection Agency ("EPA") issued a final rule entitled "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (March 8, 2024) ("2024 Rule").

4.      I have read the EPA's newly issued interim final rule entitled "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review." 90 Fed. Reg. 35,966 (July 31, 2025) ("Delay Rule").

2

This Delay Rule postpones the compliance deadlines for emissions control and monitoring provisions contained in the 2024 Rule. Any delay of these crucial emissions control standards and monitoring requirements will negatively impact my health, the health of my family, and the climate.

5.  The EPA itself recognizes these harms. The agency found that this Delay Rule will produce "climate damages from increasing methane emissions by 1,300,000 short tons, lost value of PM2.5 and ozone-related health benefits from increasing VOC emissions by 350,000 short tons, and lost value of benefits from increasing HAP emissions by 13,000 short tons." 90 Fed. Reg. 35,980.

6.  The EPA's Regulatory Impact Analysis ("RIA") found that the 2024 Rule is expected to result in significant emissions reductions, including an estimated 130 million metric tons of methane, 1.3 million short tons of volatile organic compounds ("VOCs"), and 49 thousand short tons of hazardous air pollutants ("HAPs") between 2024 and 2029. *See* EPA-452/R-23-013, pg. 3-4. These emissions reductions would personally benefit me and my family. For example, ozone is a HAP and ozone emissions would decrease significantly in Michigan near our property because of the technology control and monitoring requirements of the 2024 Rule. *See* EPA-452/R-23-013, pg. 3-30, Figure 3-2. Therefore, this Delay Rule would impair the air quality my family and I would

3

have otherwise enjoyed by forestalling these reductions in emissions of methane, VOC and HAPs through a delay in compliance deadlines of the 2024 Rule.

7.    I strongly support these reductions of emissions of methane, VOCs and HAPs because they will lead to improved local air quality in places like Antrim County and will help mitigate climate change impacts that threaten the natural beauty and livability of my community and many other communities across this country and the globe.  For example, the EPA's RIA found that the 2024 Rule would avoid significant climate harm and would result in a quantified benefit of $27 billion.  *See* EPA-452/R-23-013, pg. 3-25.

8.    The protections provided by the 2024 Rule are important to my family because, according to an analysis by the Environmental Defense Fund ("EDF"), there are 2787 active oil and natural gas wells in Antrim County where we own property and reside in our lake house.  I understand that this EDF data will be described more fully in the Declaration of Jeremy Proville and Laura Mirtich to be filed in the above-captioned matter (hereafter "Proville-Mirtich Decl.").  More specifically, I understand that EDF identified that there are 70 new active wells, meaning wells built after December 2022, within 5 miles of my home.  *See* Proville-Mirtich Decl.  But for this Delay Rule postponing the compliance deadlines of the 2024 Rule, those 70 active wells would have had to comply with the technology control and monitoring requirements by the dates set in the 2024

4

Rule.  *See* 2024 Rule at 16,830-16,833, Table-3 (summarizing the applicable requirements that would have been implemented absent the Delay Rule).  This would have in turn decreased methane emissions from those wells and reduced my and my family's exposure to dangerous pollutants, including VOCs.  *See Id, e.g.*, at 16,830, Table 3 (which indicates process controllers would have had a zero emissions rate for VOCs.); *see also* 90 Fed. Reg. at 35, 972-79 (where the Delay Rule delays requirements to ensure combustion devices and flares are functioning, to inspect closed vent systems such that they are operating with "No Identifiable Emissions," to repair gas plant equipment leaks, to determine whether the storage vessel standard applies to their sources, and to install zero-emitting process controllers).

9.    Additionally, I understand that the same EDF analysis found that there are 140 existing active wells, meaning wells constructed before December 2022, located within 5 miles of my home.  *See* Proville-Mirtich Decl.   The Delay Rule postpones the date by which states must submit implementation plans to ensure those 140 wells comply with requirements for existing sources.  *See* 90 Fed. Reg. at 35,977.  These requirements include, for example, "[b]est management practices to minimize or eliminate methane and VOC emissions to the maximum extent possible" and "zero emission process controllers." *See* 2024 Ruyle at 16,830-16,834, Table-4.  Delaying the date by which states must issue a state

5

implementation plan is likely to delay the implementation of these requirements. This will prolong the period wherein dangerous pollutants like VOCs are emitted at elevated rates from existing sources. This will in turn impair my air quality in a manner which would have been avoided had the original compliance deadlines been enforced against states.

10.     These oil and natural gas wells produce significant amounts of air pollution including carbon dioxide, VOCs, and HAPs including benzene, toluene, ethylbenzene, and xylene, according to the EPA.  *See* EPA-452/R-23-013, pg. 2-24.  These gases are often vented directly to the atmosphere or flared.  *See Id*. Additionally, these gases can leak from equipment at oil and gas wells via fugitive emissions.  *See Id*. at 2-18.  For example, this can occur when connection points are not strong enough or mechanical stress places too much pressure on the equipment.  *See Id*.  The 2024 Rule provides protection from such pollutants by imposing monitoring and technology control requirements on this equipment to reduce emissions.  *See Id*. at pg. 2-25, Table 2-1.  Given the high concentration of oil and natural gas wells near me and my family, I have a significant interest in seeing that the requirements in the 2024 Rule are implemented promptly and that the deadlines set forth in the 2024 Rule are not extended.  Not doing so, as the EPA's new Delay Rule effectuates, will impair the air quality we breathe.

6

11.      In addition to these direct adverse health impacts, the oil and natural gas industry contributes significantly to climate change which is producing myriad other impacts that affect my life negatively.  For example, the recent wildfires in Canada have significantly impaired the air quality I breathe.  The EPA's own analysis found that "[m]ethane is...  a potent greenhouse gas (GHG) that... contributes to increased global warming and continuing climate change."  *Id*. at pg. 3-4.  That same analysis found that methane contributes to "increased air and ocean temperatures, changes in precipitation patterns...  severe weather events, such as hurricanes of greater intensity, and sea level rise, among other impacts." *Id*.  While the EPA did not quantify the harms of wildfires, the agency did recognize that these "extreme weather events" caused by climate change include wildfires.  *See Id*. at pg. 3-23.  As recently as July 30, 2025, these climate-induced wildfires have reduced the air quality around me to unhealthy levels.  *See* https://gispub.epa.gov/airnow/index.html?tab=3&archivedates=07%2F30%2F2025 &showlegend=yes&xmin=-9689390.73455211&xmax=- 9397095.538389483&ymin=5544856.058450451&ymax=5670212.784838188. This air quality is unequivocally caused by the Canadian wildfires and the National Weather Service has issued significant warnings for the area I live in.  *See* https://www.newsweek.com/canadian-wildfires-map-shows-three-us-states- warned-about-air-quality-2106726.

7

12.     Simply being outside on July 30, 2025 gave me a sore throat.  I have included some pictures I took from that day showing the poor visibility, as well as a picture I took on August 1, 2025, which was a relatively clear day, for comparison.

Poor Air Quality Day (July 30, 2025):



Poor Air Quality Day (July 30, 2025):



8

Clear Day (August 1, 2025):



13.     I am becoming increasingly worried about my young grandchildren visiting me considering the deteriorating air quality.  They visit me in my home on Torch Lake for most major holidays and various other weekends and will continue to do so in the future.

9

14.     Without proper emissions controls, the oil and gas industry has continued to release excessive methane and other harmful pollutants into the air.  I support the timely implementation of the 2024 Rule, including enforcement of the deadlines it contains, to ensure that emissions reductions are realized sooner and the health risks to me and my family can be minimized now and in the future.

15.     I have spent considerable personal resources and time in engaging on these issues personally – from travelling to Washington, D.C. for the People's Climate March, to calling my congressional representatives and state lawmakers to ensure that this polluting industry is held to account.  I participated as a declarant on behalf of ELPC in its motion to intervene to a challenge made by the oil and gas industry to the Waste Emissions Charge Rule in *Independent Petroleum Association of America, et al. v. U.S.  Environmental Protection Agency*, Case No. 25-1021, Appendix to the Motion to Intervene, Doc. No. 2100941, pgs. A008-A0012.   I engage civically through petitions, attend climate summits, and volunteer for and offer financial support to many partner organizations including ELPC, the Michigan Sierra Club, Groundwork Center for Resilient Communities, the Oil and Water Don't Mix Coalition, the National Wildlife Federation, Earthjustice and many more.  I believe that the climate crisis is the most pressing issue of our time and I am personally committed to doing all I can to mitigate the damage for my child's future and those of my grandchildren.

10

16.    The EPA's Delay Rule also bypasses important public participation opportunities.  ELPC was unable to provide comments on this Delay Rule before it was issued and became effective immediately.  As a member of ELPC, I would have strongly supported the opportunity for ELPC to provide public comment to inform the EPA of the health and environmental consequences of its Delay Rule before EPA issued that interim final rule.  By issuing the Delay Rule without first allowing for public comment, the EPA deprived ELPC and myself the procedural right to public participation.

17.    I am disappointed by the EPA's decision to issue its Delay Rule which forestalls the compliance deadlines for crucial emissions control and monitoring provisions of the 2024 Rule.  I believe the compliance deadlines as set forth in the 2024 Rule are critical for protecting my family, my property value, this incredibly special place, and the tourist community that exists because of this world class resource.  The EPA's 2024 Rule is a crucial step toward reducing harmful pollution and safeguarding the environment for future generations.  This EPA Delay Rule is a big step backwards to achieving these goals.

18.    My family's investment in our property starting in 2012 is not just financial—it is deeply personal.  I have built a lifetime of memories at Torch Lake and in Antrim County, and I want my grandchildren to be able to do the same without fear of exposure to harmful air pollution.

11

19.     I support ELPC's effort to challenge the EPA's new Delay Rule as a petitioner in the above-captioned lawsuit entitled *Environmental Defense Fund et al. v. Lee Zeldin et al.,* Case No.  25-1164.

20.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Paula Leach

Executed on August 12, 2025.

12

# Attachment 12

Declaration of John MacFarlane, Sierra Club

# DECLARATION OF JOHN MACFARLANE

I, John MacFarlane, declare as follows:

1.    My name is John MacFarlane, and I am of legal age and competent to give this declaration. All information provided herein is based on my own personal knowledge unless otherwise indicated.

2.    I am 54 years old and live in Fort Worth, Texas with my wife and two children, ages 12 and 16. I was born and raised here in Fort Worth, and have lived in my current home for 13 years.

3.    I have a bachelor's degree in environmental science from Stephen F. Austin State University, and currently work as an environmental protection specialist for the Federal Aviation Administration.

4.    I am a dues-paying member of Sierra Club. I initially joined the Club in 2011 because I am a long-time environmental advocate and naturalist, and it felt like the natural thing to do. I am very active with the Club's Lone Star Chapter; I now serve as the Conservation chair of the Chapter's Greater Fort Worth Group. In that capacity, I help direct the Group's activities, provide advocacy information to members, organize volunteers, draft and distribute public communications on behalf of the Group, comment on new rules by the Texas Commission on Environmental Quality, and deliver public testimony on environmental issues and proposals.

1

5.      I am very concerned about climate change and the problems it poses for our world and society. I actively study climate change and regularly educate myself about the science behind it and the various effects it is having on society.

6.      Climate change is negatively affecting my life in numerous ways. For instance, coastal erosion due to climate change is one of the impacts in Texas.  I regularly visit areas along Texas' Gulf Coast, including Corpus Christi, Galveston, and North and South Padre Islands. I have joined a group of volunteers at Padre Island National Seashore to release critically endangered Kemp's ridley sea turtles on the beach, where they nest and lay eggs. In recent years, it has become startling clear that Padre Island and nearby areas are rapidly losing sand dunes and beach area due to sea-level rise. I am very worried that this loss of habitat will make it impossible for the Kemp's ridleys to survive. In addition, the sex of the turtle is determined by the ambient temperature while the eggs are buried in the sand. In general, if the temperature is greater than 87.8 degrees Fahrenheit, the entire clutch will be female. Thus, as temperatures rise as a result of climate change, all turtles will be female, leading to the eventual extinction of the species, along with all sea turtle species.

2

7.  Coastal erosion and sea level rise have diminished other recreational opportunities for me in these areas. In the past, for instance, there were several hundred yards of beach and dune area at high tide. Now, there are only five yards or so at high tide. Furthermore, there are a number of restaurants near the shore at Corpus Christi and North Padre that I enjoy visiting. In past years, these restaurants have been some ways out from the water at high tide, and offer a very nice view of the Gulf. Now, the water comes almost up to the restaurants themselves at high tide, and I worry that they might not be able to survive much longer.

8.  Closer to home, my family and I have enjoyed participating in outdoor activities. We regularly go hiking at local parks, such as Fort Worth Nature Center and Refuge, which is located in the northwest corner of the city, and Tandy Hills Natural Area, which is located in central Fort Worth. We also enjoy hiking along the trail system that follows the Trinity River, which runs through Fort Worth. However, in recent years, we've had to reduce our outdoor activities from June through about mid-September due to extreme heat and extreme air pollution. Both my daughter and I suffer from allergies. We are now experiencing longer summers, hotter weather, more droughts, and less precipitation than we did in previous years.

3

9.    My family also enjoys camping at various locations near Fort Worth. These areas include Cleburne State Park, Dinosaur Valley State Park, and Mineral Wells State Park, all of which are part of the Dallas-Fort Worth Metroplex. We used to be able to camp from May through September or October, but we now can't do much camping at all anymore during the summer months; it's just too hot.

10.   The increasingly hot climate is also contributing to another environmental problem in our area: poor air quality. Hotter weather leads to additional formation of ozone, an air pollutant that causes serious lung and heart problems when inhaled. Tarrant County, which includes most of Fort Worth, has unlawfully high levels of ozone, as do the neighboring counties of Parker, Wise, Denton, Ellis, Johnson, and Dallas. Each of these counties is in "severe" nonattainment of EPA's 2008 national ambient air quality standard for ozone standard, and is in "serious" nonattainment of the agency's 2015 ozone standard.

11.   I would like to take my family hiking and camping more often during the summer. As a naturalist, I would also like to take my children outdoors in the summer to study ecology and biodiversity, and to learn how to identify plants and animals. Unfortunately, I often avoid these activities because of both excessive heat and air pollution, specifically on high ozone days. In

4

addition, I suffer from chronic sinus infections. My daughter also experiences very bad allergies. She has been on children's Allegra for most of her life, and often coughs at night. I worry that taking her outdoors, especially on high ozone days, will harm both her and my respiratory health.

12. There is a tremendous amount of oil and gas development in the Dallas-Fort Worth area. Oil and gas equipment, including wells, emit large amounts of pollution in the atmosphere. These pollutants include methane—a very powerful greenhouse gas—volatile organic compounds, which form ozone. All the oil and gas development in our area is therefore contributing both to climate change and to the local air pollution problems we are experiencing; this is a major concern. I also understand that oil and gas wells emit significant amounts of air toxins like formaldehyde and benzene, known human carcinogens.

13. I understand that the Texas Railroad Commission's Public GIS tool shows that there over 40 active gas surface wells at over a dozen different well sites located within 2.5 miles of my home. In addition, there are over 60 surface gas wells within that same 2.5 mile-radius of my house that have been permitted but not yet drilled.

14. Drilling continues to expand in and around our area. In recent years, the French energy conglomerate Total sought and received approval to drill

5

dozens of new wells in Fort Worth, the neighboring city of Arlington, and two adjacent suburbs. And despite fierce opposition from the local community, the City Council of Arlington recently approved the creation of a new zone for drilling and fracking, which is located just 600 feet from the nearest home and 2,000 feet from the nearest school.

15.  In 2022, I helped organize Fort Worth Environmental Coalition of Communities, which unifies local environmental and racial justice groups in an effort to oppose the industrialization of east and north Fort Worth, preserve and improve the area's air quality and to oppose the increasing prevalence of gas drilling in east Fort Worth, Arlington, and the surrounding areas. This coalition is particular focused on fighting for underserved neighborhoods and communities of color, where much of the gas drilling in our area occurs.

16.  As a father of two children that attended a school just 700 feet from an active gas pad site, I am very concerned about their health and safety and the health and safety of the 500 other neighborhood children that attend the school. These children attend classes and play outside in the playground area that is so close to an active gas well site, and they are exposed to methane, volatile organic compounds, and air toxins emitted by these wells. I know that children are more vulnerable to air pollution because of their

6

physiology, and these airborne contaminants could lead to chronic health issues, such as cardiovascular, respiratory, neurological, and oncological issues, including leukemia.

17. I understand that in 2024, EPA finalized a rule that included more protective Clean Air Act requirements for newly constructed or modified oil and gas equipment compared to the regulations that were already in place. I understand that, among other things, the rule includes strengthened leak detection and repair requirements for well sites, requires certain non-emitting equipment and practices to replace emitting ones, ensures that storage tank batteries are properly controlled, and include standards for previously unregulated operations like liquids unloading events.

18. I also understand that in the 2024 rule, EPA finalized the first-ever federal emission guidelines for existing oil and gas equipment. I understand that, according to data compiled by environmental groups, there are 3,610 active oil and gas wells across Tarrant County. Of these, I understand that 3,552 were drilled or modified before December 6, 2022, while 58 were drilled or modified after that date.

19. I believe that EPA's final rule provides significant benefits to me, my family, and my community by reducing both climate-disrupting methane emissions from oil and gas operations and conventional pollution like

7

volatile organic compounds and air toxins. Unlike a number of other states, Texas has no state-level emission standards for oil and gas operations, so EPA's federal standards are particularly important here.

20.    I understand that EPA recently issued a rule that delays the implementation deadlines for the 2024 rule, and that this rule bypassed the typically required rulemaking procedures that include the opportunity for comments and input by the public, which EPA must consider and respond to before issuing a final rule. These delays will harm my family and me, since they will require us to wait longer before the rule's full set of emission reduction benefits are achieved. EPA's failure to provide notice and comment also means that Sierra Club, its members, and the broader public were given no opportunity to participate in the rulemaking process and hopefully dissuade EPA from delaying the rule's compliance deadlines.

21.    I understand that Sierra Club has initiated a lawsuit challenging EPA's action delaying the 2024 rule's compliance deadlines. If this lawsuit is successful, it will benefit me, since it will mean that the 2024 rule's emission reductions will be achieved sooner than they would be if the deadline delays go through, and it will mean that Sierra Club, its members, and other interested parties will have the opportunity to participate in the rulemaking

8

process and register their comments. For these reasons, I support Sierra

Club's participation in this lawsuit.


I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct. Executed in Fort Worth, Texas, on

August 11, 2025.

John MacFarlane

9

# Attachment 13

Declaration of Mark Magaña, GreenLatinos

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

**DECLARATION OF MARK MAGAÑA Submitted in Support of
GreenLatinos**

I, Mark Magaña, declare as follows:

1.     I am the Founding President & Chief Executive Officer of
GreenLatinos. I have served in this capacity since the organization's
inception and have 30 years of experience working in Washington, D.C.,
including in senior positions in both the White House and Congressional
leadership. I was the first Latino to serve as senior staff at both, as a special
assistant to President Clinton for White House Legislative Affairs and as
Senior Policy Advisor to the House Democratic Caucus.

2.     GreenLatinos is an active comunidad of Latino/a/e leaders,
emboldened by the power and wisdom of our culture, united to demand
equity and dismantle racism. In my role at GreenLatinos, I am familiar with
the organization's vision, which is a healthy and equitable society where
communities of color are liberated from disproportionate environmental
burdens, free to breathe fresh air, drink pure water, access clean
transportation, and enjoy our majestic public lands, oceans, and waters.

1

3.    GreenLatinos is a membership organization incorporated under the laws of the District of Columbia. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. GreenLatinos' network consists of approximately 12 thousand members residing in 39 states, Puerto Rico, and the District of Columbia.

4.    One of GreenLatinos' core priorities is Climate Justice and Clean Air. The climate crisis is already impacting Latino communities across the country. GreenLatinos supports the Intergovernmental Panel on Climate Change's recommended goal of deep carbon cuts by 2030 and net zero emissions by 2050 in order to prevent global average temperatures from rising by 1.5 degrees Celsius.

5.    I am aware that an overwhelming majority of Latinos—78 percent—say they have personally experienced the effects of climate change. The majority of Latinos in the U.S. live in four states and territories that have already been devastated by natural disasters that were made more extreme because of climate change: from wildfires in California, to hurricanes in Texas and Puerto Rico, and flooding in Florida. GreenLatinos members also live in these states and territories.

6.    I also know that methane is an especially potent greenhouse gas that contributes significantly to global warming, and that oil and gas

2

production is a major source of methane emissions.

7.    Latino communities often bear disproportionate impacts of air pollution from fossil fuel sources, including oil and gas production facilities. As a result of my work at GreenLatinos, I am aware that 1.8 million Latinos in the U.S. live within a half-mile of an oil and gas facility. I also know that this proximity increases the odds of a host of health problems including respiratory illnesses, cardiovascular disease, anxiety, depression, preterm birth, and impaired fetal growth. In addition, Latino children in the U.S. are twice as likely as non-Latino whites to die from asthma attacks. Latinos are more likely to lack access to health insurance and are therefore less able to treat health ailments exacerbated by exposure to poor air quality.

8.    As a result of my work at GreenLatinos, I am aware that some of our members live, work, or recreate in areas where oil and gas production occurs. According to data updated in January 2024, GreenLatinos currently has 11,974 members in the United States. These include members living in states that have significant oil and gas production activities. For example, GreenLatinos currently has 2,348 members in California, 790 members in Texas, and 1,054 members in Colorado. These members have a strong interest in protecting human health and the environment from air pollution

3

from oil and natural gas sites, which are at stake in this EPA litigation. GreenLatinos' Climate Justice and Clean Air Collective has over 450 active members that engage in regular communications and opportunities for advocacy on topics related to oil and gas production. The Collective holds quarterly webinars on topics related to oil and gas and communicates with membership via quarterly newsletters.

9.    I am aware that on March 8, 2024, the Environmental Proctection Agency ("EPA") promulgated new source performance standards for methane and volatile organic compound ("VOC") emissions from the oil and natural gas sector ("the 2024 Rule"). I understand that the Rule also reduces emissions of hazardous air pollutants ("HAPs").

10.    GreenLatinos has a strong organizational interest, and a strong interest that is based in its members recreational, aesthetic, public health, environmental, and economic interests, in ensuring that the Rule's standards are fully realized and not weakened or rescinded.

11.    GreenLatinos is a leading member of the Methane Partners Campaign, which works to protect communities by ensuring that the EPA passes strong methane rules that address climate and health. GreenLatinos participated as a stakeholder during the public comment period for the

4

177

Rule, filing comments on the proposed rule.[1] GreenLatinos also provided comments and public testimony during the original draft of the methane rule, released in 2021.[2] In addition, via the state work performed in Colorado, GreenLatinos engages on oil and gas work for upstream, downstream and midstream emissions, focusing on community advocacy to minimize pollution experienced within frontline communities.

12.   I am aware that the Trump administration has announced that it will reconsider the 2024 Rule. And, on July 31, 2025, EPA issued an interim final rule, effective immediately, extending many of the compliance deadlines ("Delay Rule"). According to EPA's fact sheet for the Delay Rule, this will result in 3.8 million tons of additional methane pollution, 960,000 tons of volatile organic compounds that contribute to ozone pollution, and 36,000 tons of toxic air pollution between 2028 and 2038. Had EPA provided an opportunity to comment prior to taking this action, GreenLatinos would have submitted comments opposing this move.

---

[1] Supplemental Comments of Joint Environmental Justice Commenters on Standards of Performance for New, Reconstructed, and Modified Sources and Emission Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review (Feb. 13, 2023), EPA Docket No. EPA-HQ-OAR-2021-0317-2392.

[2] *See, e.g.*, Comment submitted by Astrid Najarro on Standards of Performance for New, Reconstructed, and Modified Sources and Emission Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review (Sept 21, 2022), EPA Docket No. EPA-HQ-OAR-2021-0317-1453.

5

13.  It is my understanding and concern that as a result of the Delay Rule, GreenLatinos' members will be subjected to unnecessary and harmful levels of air pollution that they otherwise would not be subject to.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed August 13, 2025.


MARK MAGAÑA

6

# Attachment 14

Declaration of Ryan Maher, Center for Biological Diversity

## DECLARATION OF RYAN MAHER

I, Ryan Maher, declare as follows:

1.      The facts set forth in this declaration are based on my personal knowledge. If called as a witness in these proceedings, I could and would testify competently to these facts.

2.      I currently reside in Portland, Maine.

3.      I am an employee of the Center for Biological Diversity ("Center") and have been since February 2022. I am also a member of the Center and have been since March of 2022.

4.      The Center is a non-profit, membership organization founded in 1989 with more than 93,000 members in total, with thousands of members in the western and southwestern United States, including more than eight thousand members in Texas, Colorado, Wyoming, and New Mexico. The Center has offices across the nation.

5.      The mission of the Center is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and environmental law. Based on an understanding that the health and welfare of human societies are closely linked to the condition of the natural environment, the Center works to protect natural resources like air, water, and land and to secure a future for animals and plants hovering on the brink of extinction. It works to protect the ecosystems imperiled species need to survive, and for the people that interact with, depend on, and cherish these natural resources.

6.      As a Staff Attorney at the Center, I work in the Center's Environmental Health program to protect biodiversity and human health from toxic substances, reduce air pollution (including methane and other volatile organic compounds, as well as ground-level ozone, sulfur dioxide, and hazardous air pollutants), protect clean air, safeguard communities, and enforce pollution prevention laws. In this role I am involved in strategic litigation and setting policy

1

priorities for the work that the Center does to reduce the threats to the environment, ecosystems, and public health from air pollution, including greenhouse gases like methane. I primarily do so by engaging in Clean Air Act advocacy and litigation, with a particular focus on reducing air pollution, including methane, volatile organic compounds, ozone, and sulfur dioxide, from oil and gas production operations all over the country, both on- and off-shore, including in Colorado, New Mexico, Texas, Utah, California, Wyoming, North Dakota, Pennsylvania, and Alaska.

7.      The Center has longstanding programs and campaigns to address climate change and greenhouse gas emissions through the Center's Climate Law Institute, public lands program, oceans program, environmental health program, and endangered species program. One of the Center's top priorities is the full implementation of existing environmental laws to reduce climate change impacts to communities, endangered species, and fragile ecosystems. The Center has long advocated for the rapid phase out of fossil fuel use, as well as the abatement of greenhouse gas emissions from new, modified, and existing sources, including emissions of methane and other volatile organic compounds, ozone, and sulfur dioxide from upstream and midstream oil and gas infrastructure.

8.      The Center has regularly commented on the EPA's prior rulemaking proposals seeking to limit methane and other air pollutant emissions from the oil and gas sector under the Clean Air Act. The Center has also resorted to litigation to challenge EPA actions that harm air quality by allowing illegal excess pollution from the upstream and midstream oil and gas industry, as well as to protect EPA's beneficial actions from industry challenge. *See, e.g.*, *Center for Biological Diversity v. EPA, et al.*, 22-9546 (10th Cir.); *Center for Biological Diversity v. EPA, et al.,* 23-9503 (10th Cir.); *Center for Biological Diversity, et al. v. EPA , et al.*, 23-9565 (10th Cir.); *State of Colorado v. EPA, et al.*, 23-9566 (10th Cir.); *Board of County Commissioners*

2

*of Weld County, Colorado v. EPA, et al.*, 21-1263 (D.C. Cir.); *Sierra Club, et al. v. Zinke*, 3:18-cv-5984 (N.D. Cal); *Center for Biological Diversity, et al., v. EPA*, 4:25-cv-6568 (N.D. Cal.); *Texas, et al., v. EPA, et al.*, 24-1054 (D.C. Cir.); *Am. Free Enterprise Chamber of Commerce, et al. c. Zeldin, et al.*, 1:25-cv-67 (W.D. Mich.).

9.      The Center's Environmental Health program has long worked to reduce emissions of methane and other volatile organic compounds, ozone, and sulfur dioxide from upstream and midstream oil and gas (i.e., production and transmission), both of which are required to reduce emissions of methane, other volatile organic compounds, and sulfur dioxide under EPA's 2024 Final Rule, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16820 (March 8, 2024) (hereinafter "2024 Final Rule").

10.     For example, we have worked to improve flare efficiency at oil and gas well pads, compressor stations, and gas processing plants, to ensure that flares are working as they are required to destroy, via combustion, methane that would otherwise be emitted into the atmosphere. We have worked on this in state rulemakings, state permit comments proceedings, state litigation, and through Title V petitions to object submitted to EPA. We have worked on improving permits for off-shore oil and gas platforms off the coast of California to, at a minimum, prevent illegal emissions, including methane and other volatile organic compound emissions.

11.     Our program has also focused on ensuring that emissions from drilling and hydraulic fracturing ("fracking") at well pads is included in permitting, which would reduce emissions of several pollutants including methane and other volatile organic compounds. *See, e.g.*, *Center for Biological Diversity v. EPA*, 22-9546 (10th Cir.); *Center for Biological Diversity*

3

*v. EPA, et al.*, 23-9503 (10th Cir.). We have an Administrative Procedure Act petition for rulemaking pending before EPA, in which we are advocating for the removal of EPA's exception of methane from volatile organic compounds, which would result in methane properly being treated as the ozone precursor it is under the framework of the Clean Air Act.

12.     We also work on enforcement actions to ensure that oil and gas facilities are complying with permit and Clean Air Act requirements. As part of that enforcement work, we have begun evaluating which oil and gas facilities would be subject to the requirements of the 2024 Final Rule, to ensure that the Clean Air Act and EPA's implementing regulations are fully enforced to the benefit of public health, species, their habitats, and ecosystems.

13.     The Center and its members are harmed by continued emissions of methane and other volatile organic compounds, as well as sulfur dioxide, from the oil and gas sector and are further injured by the EPA's delay of implementation of certain aspects of the Final 2024 Rule reducing these emissions from the oil and gas sector, as set forth in the 2025 Interim Final Rule entitled "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule," 90 Fed. Reg. 35,966 (July 31, 2025) (hereinafter "2025 Interim Final Rule"). Delaying implementation of the 2024 Final Rule will also result in delays that harm the Center and its members by postponing many of the emissions reductions the rule is meant to achieve, with the potential for irreversible consequences because of the harm done by climate change (i.e., heat waves), volatile organic compounds, including hazardous air pollutants, sulfur dioxide, and ozone, which can cause premature death.

14.     For example, postponing compliance deadlines for implementation of the 2024 Final Rule's OOOOb standards for equipment leak repair requirements, zero-emissions process

4

controllers, and 95% emissions reductions for methane and VOCs for storage vessels will result in marked and measurable additional emissions that would not have otherwise occurred under the 2024 Final Rule's compliance deadlines. The EPA itself estimates that the 2025 Interim Final Rule is projected to:

    a.  result in 1,300,000 short tons of "total additional emissions" methane emissions as compared to the 2024 Final Rule;[1]

    b.  "increase emissions of volatile organic compounds (VOC), which are a precursor to ozone, by 350,000 short tons relative to the 2024 Final Rule over the 2028–2039 analysis horizon";[2]

    c.  "result in increases of emissions of VOC, which are a precursor to PM2.5, relative to the 2024 Final Rule, thus increasing human exposure to PM2.5 and the incidence of PM2.5-related health effects"; [3] and

    d.  "increase HAP [hazardous air pollutant] emissions by 13,000 tons" through 2039.[4]

15.    The increased methane and accompanying PM2.5, VOC and hazardous air pollutant emissions from the 2025 Interim Final Rule harm the Center's and its members' interests by contributing to climate change, harming public health, and damaging the environment, including by precipitating the creation of ground-level ozone, which in turn adversely affects public health, species and their habitats, and ecosystems.

---

[1] U.S. Envt'l Protection Agency, *Economic Impact Analysis for the Extension of Deadlines in the NSPS OOOOb and EG OOOOc* at 6 (July 23, 2025), https://www.epa.gov/system/files/documents/2025-07/oil_and_gas_eia_extension_of_deadlines_07-2025.pdf.

[2] *Id.*

[3] *Id.* at 7.

[4] *Id.*

5

16.     By imposing requirements to eliminate, limit or significantly reduce such methane, VOC, sulfur dioxide, PM2.5 and HAP emissions, EPA's 2024 Final Rule significantly limited emissions in oil and gas extraction and production processes, thereby alleviating harms to the Center's organizational interests. However, by extending the compliance deadlines in the 2025 Interim Final Rule, the Center's members and its organizational interests are significantly adversely affected by the additional and increased emissions that would not have occurred under the 2024 Final Rule.

17.     Further, the Center and its members are harmed by the EPA's failure to follow proper Administrative Procedure Act and Clean Air Act procedures requiring public notice and comment on rulemakings. Here, the 2025 Interim Final Rule took effect on the day it was published, giving the public no time to weigh in on the significant air pollution harms that would flow from the rule before being subject to those harms. In fact, the Center has a long history of providing substantive feedback on EPA proposals concerning the regulation of methane, VOCs, hazardous air pollutants, PM2.5 and other air pollution from oil and gas operations, including commenting multiple times on the 2024 Final Rule.

18.     Effective implementation and enforcement of our administrative and environmental laws, such as the Administrative Procedure Act and Clean Air Act, is essential to protecting the public and ecosystems from the detrimental air quality impacts of super pollutants like methane, and to the Center's organizational interest in the full implementation of our environmental laws to protect health, wildlife, ecosystems, and the environment.

19.     A ruling finding the EPA acted unlawfully in issuing the 2025 Interim Final Rule would redress the harms that the Center and its members would otherwise experience from the deprivation of their procedural right to comment on the agency's activities and rulemakings *prior*

6

to them taking effect, as well as the significant increase in methane and other pollution acknowledged by EPA that would occur because of delays to compliance deadlines for the air pollution regulations, and therefore the harms to the Center's interest in protecting the environment, communities, species, and ecosystems from the detrimental effects of air pollutants and climate change.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

August 8, 2025

*/s/ Ryan Maher*

Ryan Maher

7

# Attachment 15

Declaration of Shirley (Sug) J. McNall, Sierra Club

## DECLARATION OF SHIRLEY (SUG) J. MCNALL

I, Sug J. McNall, declare as follows:

1. My name is Sug J. McNall, and I am 80 years old and competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated.

2. My address is 840 Navajo Dam Road, Aztec, New Mexico, 87410. Aztec is in San Juan County, and my first husband and I moved here in 1976. I was born and raised in 1944 in Farmington, New Mexico, also in San Juan County. I am currently retired.

3. I am a dues-paying member of Sierra Club. I first joined in 1996 because I love the great outdoors, and the Club is interested in protecting the environment and the beauty of the land in the U.S.A.

4. I live with my husband in Aztec. My daughter lives within six miles of us, and my granddaughter and two great-grandchildren live within two miles of us. My husband and I enjoy taking walks out in the desert and birding and looking for wildlife. Unfortunately, we have an ozone problem in the San Juan Basin. When you drive or fly into our area, there is a big brown cloud of smog over our basin. We have to be careful about being outside when it is hot and the ozone levels are really high. In 2001, the Environmental Protection Agency (EPA) came in and told us how bad our ozone problems

1

here are. We have three ozone monitoring stations sponsored by the state of New Mexico and EPA, and I look at the reports.

5.    Our entire population here is impacted by the fossil fuel industry. I understand that there are over 120 active gas wells within the city limits. According to data compiled by environmental groups, San Juan County currently has 11,667 active and producing gas and oil wells. I understand that, of these totals, 11,595 were drilled or modified before December 6, 2022, while 77 were drilled or modified after December 6, 2022.

6.    I understand that the mapping tools on the New Mexico Oil Conservation Division's website show that there are approximately 200 active gas wells within two and a half miles of our house. One old, leaky well—which is still producing gas—is located on our property, within about 600 feet of our house, and another six within about 2,000 feet. There are also two active gas wells within about 1,000 feet of McCoy Elementary School, where my grandchildren attended.

7.    There are also many gas compressor stations in our area. I understand that, according to the New Mexico Environment Department's website, there are close to 90 compressor stations in San Juan County and in the neighboring Rio Arriba County. These stations leak pollutants into the atmosphere that

2

worsen our air quality, harm our communities, and cause climate change. One compressor station, North Crandell, is just 1.3 miles from my home.

8.  I understand that oil and gas wells and gas compressor stations emit harmful air pollutants, including methane—a powerful greenhouse gas—smog- and soot-forming volatile organic compounds, and hazardous air pollutants like benzene and hydrogen sulfide.

9.  I am aware that methane is a major driver of climate change. We are under the Four Corners methane hot spot that was discovered by NASA and NOAA. They came in and did a lot of testing. I live in the high desert and have serious concerns about climate change.

10. In our area, temperatures are rising, and we depend on the local river and snowpack for water. The temperature this time of year is usually in the mid-90s Fahrenheit, but has recently been running in the low-100s Fahrenheit. We are have also experienced severe droughts in recent years, which may have been part of a one-thousand-year drought. The droughts mean that we have been in constant danger of wildfires. We have had several wildfires in our area, including one a few years back in our neighborhood. Forty miles away in the desert, there was a huge wildfire started by lightning around that time. It went from ten acres to over 100 in one afternoon, and some of my family members were first responders.

3

11.    We have also had to deal with wildfire smoke coming in from Colorado and California, which has made our air quality unhealthy and has caused my daughters and others to have difficulty breathing. This has led to extreme restrictions on open fires in San Juan County. In the past, we used to make campfires and burn brush outside, but we really haven't been able to do in several years.

12.    As an avid birder and viewer of wildlife, I also see the impact that climate change is having on species and my outdoor recreational activities. Bird counts are down in our area, and I have personally seen fewer birds in recent years. Nearby forests are dying from the combination of drought and invasive bark beetles. There has been a rise in bark beetle populations as temperatures have continued to increase. The bark beetles target pinyon juniper trees, which are foundational to our Four Corners forest ecosystems and are already dying because of the drought. We must protect future generations and the planet by combating climate change, not contributing to it. Otherwise, we are going to be in deep, deep trouble.

13.    I am also very concerned about the negative impacts of smog, which is mostly composed of ozone. I have been a part of the Four Corners Ozone Task Force, which has done extensive studies on ozone and the effects that it has on asthmatics, the elderly, and children. According to the New Mexico

4

Department of Health, the three hospitals in the area have noted that high ozone has resulted in a direct increase in visits by asthmatics, children, and the elderly with respiratory distress. Our Four Corners area has high asthma and respiratory distress rates. My daughter is 57 years old, and in the last decade or so has had severe asthma; I worry very much for her health.

14. In addition, to human health concerns, I know that members of the Navajo Tribe have reported that ozone is killing the vegetation in their reservations, which make up almost two-thirds of the land in San Juan County.

15. I am also concerned about hazardous air pollutants from oil and gas development in our area. We did a project in 2010 called the Bucket Brigade, where a group came in and trained us to take air samples. One well, BP Storey BLS #004 (API No. 3004509624), which is close to our house, was emitting high levels of benzene. This really worried me because benzene is a known human carcinogen. This well is still active and producing gas, too.

16. Hydrogen sulfide is another hazardous air pollutant that leaks from wells. We received a document from the Bureau of Land Management in the past informing us that wells in our area leak high levels of hydrogen sulfide. In 2005, I had a strong negative reaction to the hydrogen sulfide levels near my home, and I was worried that it would kill me.

5

17.   I was also involved in a program with Earthworks where we did a Toxic Tour of Hell that showed how we have to survive around gas facilities. We did Forward Looking Infrared (FLIR) camera work, which detects emissions. We took film footage near the top of the tank at the well near my grandchildren's former school. The pollution comes out of the well and drifts over the playground at the school. It was clear from the footage how much these wells pollute our communities.

18.   I am aware that in 2024, EPA finalized a rule that requires greater emission reductions from new oil and gas equipment, and that will include the first-ever emission reduction requirements for existing equipment. I understand that this rule provides considerable climate and health benefits to me, my family, and my community through a number of ways, including strengthened leak detection requirements for wells and compressor stations, the installation of zero-emitting technology, restrictions on flaring at oil wells, and emission standards for storage tanks. I understand that these technologies and practices will reduce emissions of methane, smog-forming volatile organic compounds, and toxic air pollutants like benzene and hydrogen sulfide. My family and I will benefit from that outcome, because it means fewer emissions of pollutants that drive climate change, worsen our air quality, and harm our health and the health of others in our community.

6

19.     I understand that EPA has now delayed the deadlines that oil and gas companies must meet to achieve the 2024 rule's emission reductions. These delays will harm me, my family, and my community, since it will postpone the emission reductions that will result from the 2024 rule. I also understand that EPA has taken this action without holding an opportunity for public comment, which is part of the typically required rulemaking process. This means that groups like Sierra Club and other stakeholders were not given an opportunity to weigh in and persuade EPA not to implement these delays.

20.     I understand that Sierra Club has filed a lawsuit challenging EPA's delays of the 2024 rule's compliance deadlines. If this lawsuit is successful, it will ensure that the rule's original schedule will remain in place, and that there will be no delays in the air pollution reductions it will provide. I will also benefit if the court decides that EPA was wrong not to follow the typical rulemaking procedures, since it will give groups like Sierra Club and members of the community an an opportunity to provide comments, which EPA must consider and respond to those comments before taking final action. For these reasons, I support Sierra Club in this lawsuit.

7

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 11, 2025.

Sug J. McNall

8

# Attachment 16

Declaration of Robert Michaels, Environmental Law & Policy Center

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| ENVIRONMENTAL DEFENSE FUND, *et al.*, | ) ) ) | |
| *Petitioners* | ) ) | |
| v. | ) ) | No. 25-1164 |
| LEE ZELDIN et.al., | ) ) | |
| *Respondents* | ) ) | |

**DECLARATION OF ROBERT MICHAELS
MANAGING ATTORNEY, ENVIRONMENTAL LAW & POLICY
CENTER**

I, Robert Michaels, declare as follows:

1.      I am employed as a Managing Attorney at the Environmental Law & Policy Center ("ELPC"), which is headquartered in Chicago and where I reside.   I am also a member of ELPC.

2.      ELPC is a public interest legal and policy advocacy organization focused on environmental issues in the Midwest with a long history of working to protect air quality and the climate.  ELPC advocates for healthy clean air, safe clean water, and protections for vital natural resources and wild and natural places, all within the Great Lakes and the Midwest region.  ELPC also works to advance climate change solutions in the Midwest through clean renewable

energy and clean transportation.  ELPC is a not-for-profit organization under section 501(c)(3) of the United States Internal Revenue Code and is incorporated in the State of Illinois.

3.    ELPC has offices and staff located in Illinois, Iowa, Michigan, Ohio, Wisconsin, and Washington, D.C.  ELPC dues-paying members reside in rural, urban, and suburban areas throughout the Midwest, including in the Great Lakes states, as well as in Iowa, Nebraska, North Dakota, and South Dakota.

4.    As a Managing Attorney at ELPC, I am responsible for leading the Clean Air and Clean Water Program Areas.  As part of my job responsibilities, I keep current on rulemaking by the U.S. Environmental Protection Agency ("EPA") regarding proposed rules that are promulgated pursuant to the Clean Air Act, Clean Water Act and related federal statutes.  I am involved in our decision-making at ELPC regarding ELPC's advocacy with respect to such EPA rulemaking, and ELPC has a long history of advocating for clean air and, specifically, for reductions in methane emissions.

5.    ELPC has been a party to, and involved with, rulemaking and litigation on the issue of air quality generally and methane emissions specifically, including before federal and state courts and regulatory agencies.  For example, ELPC was a petitioner and presented oral argument before the D.C. Circuit in

2

*Clean Wisconsin* v. *U.S. EPA,* 964 F.3d 1145 (D.C. Cir. 2020), a matter involving the EPA's National Ambient Air Quality Standards in ozone non-attainment areas in Illinois and Indiana.

6.      Additionally, ELPC has been, and continues to be, engaged in litigation regarding the Bureau of Land Management ("BLM") Waste Prevention Rule.  BLM promulgated this final rule in 2016 to reduce the waste of natural gas in the form of venting, flaring and leaking of methane from oil and gas operations on federal and tribal land.  The BLM's original Waste Prevention Rule was challenged in the United States District Court for Wyoming in *Wyoming v. U.S. Dep't of the Interior*, No. 2:16-CV-00285.  *See* Order Granting Motion to Intervene as Respondents, Dec. 8, 2016, ECF No. 56.  That litigation concluded in August 2024 when the Tenth Circuit granted a motion to vacate filed by the EPA and by ELPC and other environmental groups.  *See Wyoming v. U.S. Dep't of the Interior*, Order and Judgment, Aug. 13, 2024, App. Case 20:8072, Doc. No. 010111093851.  Litigation regarding a subsequent version of the Waste Prevention Rule continues in the Ninth Circuit in which ELPC is an intervenor.  *See California v. U.S. Bureau of Land Mgmt.*, No. 17-1745, and *California Air Res. Bd. v. Wyoming*, No. 20-16794; *see also* Defs. Notice of Appeal, Dec. 4, 207, *California v. U.S. Bureau of Land Mgmt.*, No. 3:17-cv-03804-EDL (N.D. Cal.), Doc. 98.

3

7.      ELPC also filed a motion to intervene in the United States Court of Appeals for the D.C. Circuit to defend the EPA's final rule entitled: "*Waste Emissions Charge for Petroleum and Natural Gas Systems: Procedures for Facilitating Compliance, Including Netting and Exemptions,*" 89 Fed. Reg. 91,094 (Nov.  18, 2024).  *See*, *e.g*., Motion of Environmental Law and Policy Center to Intervene in Support of Respondents, February 14, 2025. Doc. No. 2100941, *Indep. Petroleum Ass'n of Am. v. EPA*, No. 25-1021 and consolidated cases.  That matter was dismissed on mootness grounds on May 23, 2025.  *See* Order Granting Voluntarily Dismissal, Doc No. 2117259.

8.      Furthermore, ELPC is an intervenor in litigation relating to the EPA rule on New Source Performance Standards (NSPS), originally promulgated in 2016 to limit methane emissions from the oil and gas industry.  ELPC intervened in the United States Court of Appeals for the D.C. Circuit to support the EPA's newest iteration of that rule which is entitled, "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16,820 (March 8, 2024) ("2024 Rule").  *See*, *e.g.*, Order Granting Motions to Intervene, April 19, 2024, Order, Doc. No. 2050337, *Texas v. EPA*, No. 24-1054.  This matter remains pending and is in abeyance.  *See Id*., Order Granting Motion to Govern Further Proceedings, June, 24, 2025, Doc No. 2122177.  ELPC is committed to

4

defending the climate and health benefits of the 2024 Rule.

9.    I am aware of the EPA's interim final rule entitled: "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review." 90 Fed. Reg. 35,966 (July 31, 2025) ("Delay Rule"). This Delay Rule extends the compliance deadlines for the technology control and monitoring provisions of the 2024 Rule, which, in turn, will forestall the myriad climate and health benefits associated with the 2024 Rule to the detriment of ELPC and its members.

10.    According to the EPA's own Regulatory Impact Analysis ("RIA"), the 2024 Rule is expected to result in significant emissions reductions, including an estimated 130 million metric tons of methane, 1.3 million short tons of Volatile Organic Compounds ("VOCs"), and 49 thousand short tons of Hazardous Air Pollutants ("HAPs") between 2024 and 2029. *See* EPA-452/R-23-013, pg. 3-4.

11.    Foregoing these emissions reductions will have significant adverse health impacts, including on ELPC members in the Midwest.

12.    The EPA's RIA recognized that oil and natural gas operations produce ozone, a byproduct of VOCs and nitrogen oxides. *See* EPA-452/R-23-013, pg. 3-26. It also recognized that ozone is associated with many adverse health effects. including respiratory morbidity and premature respiratory mortality. *See*

5

*Id*. at pg. 3-25.  In addition, the RIA concluded that: (a) short term exposure to ozone is causally related to respiratory effects and is likely to be causal for metabolic effects; and (b) long-term exposure to ozone pollution is likely to be causal for respiratory effects including respiratory mortality.  *Id*. at 3-31.

13.    The EPA geographically mapped the reductions in ozone that would accrue as a result of the 2024 Rule.  *Id* at 3-30, Figure 3-2.  The mapping showed significant reductions in ozone concentrations across the Midwest by 2028 in states where ELPC members reside. These states include Illinois, Iowa, Michigan, Minnesota, Ohio, Wisconsin, Indiana, Iowa, Minnesota, Nebraska, North Dakota, and South Dakota.  *Id*.

14.    The EPA's Delay Rule will adversely impact the health of ELPC members because the projected reductions in VOCs, and by extension reductions in ozone pollution, attained through implementation of the 2024 Rule would be unnecessarily forestalled.  Those adverse health impacts will not be avoided and instead endured by ELPC members throughout the Midwest.

15.    The EPA's RIA also found that the 2024 Rule is expected to reduce Particulate Matter 2.5 ("PM2.5") emissions, which would in turn decrease human exposure to PM2.5 and PM2.5-related adverse health effects, including respiratory morbidity and mortality.  *Id*. at 3-54-55.  The RIA also found that PM2.5 pollution is associated with "asthma development and aggravation, decreased lung function,

6

and increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing." *Id*. at 3-55. The EPA's Delay Rule will forestall reduction of PM2.5 pollution and will therefore ensure the adverse health impacts mentioned above will be endured throughout the country, including the states in which ELPC has members.

16.     Lastly, the EPA's RIA found "that several different [hazardous air pollutants ("HAPs")] are emitted from oil and natural gas operations." *Id*. at 3-56. Eight of these HAPs are especially prevalent in emissions from oil and natural gas operations. *Id*. at 3-57. These include toluene, hexane, benzene, xylenes (mixed), ethylene glycol, methanol, ethyl benzene, and 2,2,4- trimethylpentane. *Id*. The health impacts associated with these HAPs are extensive. For example, benzene, the highest volume pollutant, is a known carcinogen; the EPA has concluded there is "a causal relationship between benzene exposure and acute lymphocytic leukemia." *Id*. at 3-58. Benzene is also associated with "arrested development of blood cells, anemia, leukopenia, thrombocytopenia, and aplastic anemia." *Id*.

17.     The 2024 Rule would avoid 49 thousand short tons of HAPs between 2024 and 2029. *Id*. at 3-4. The EPA's Delay Rule will forestall those reductions; therefore, the adverse health impacts from HAPs will not be avoided but instead

7

endured by Americans throughout the country, including the states in which ELPC has members.

18.    ELPC has members throughout the Midwest who live or recreate near oil and gas operations impacted by the Delay Rule. Three of those ELPC members have submitted declarations in this case.  These declarants are Joseph A. Satrom, Paula Leach, and Elizabeth Ann DelBuono, MD.

19.    Furthermore, the EPA's Delay Rule bypasses important public participation opportunities.  The EPA did not invite public comment before issuing the Delay Rule and made the rule effective immediately.  By issuing the Delay Rule without first allowing for public comment, the EPA has deprived ELPC of its procedural right to comment guaranteed by the Administrative Procedure Act. *See* 42 U.S.C. § 7607(d)(5), (6)(B).

20.    ELPC's purpose and goal to defend environmental well-being and protect public health within the Midwest is threatened by the EPA's Delay Rule because it will forestall much needed reductions in pollutants that adversely impact the health of ELPC members by delaying the compliance deadlines for the technology control and monitoring provisions of the 2024 Rule.

21.    The interests of ELPC and its members are threatened by the Delay Rule.

I declare that the foregoing is true and correct to the best of my knowledge.

8

Robert Michaels

Executed on August 12, 2025.

9

# Attachment 17

Declaration of Jeremy Nichols, Center for Biological Diversity

## <u>DECLARATION OF JEREMY NICHOLS</u>

I, Jeremy Nichols, declare as follows:

1.      The facts set forth in this declaration are based on my personal knowledge. If called as a witness in these proceedings, I could and would testify competently to these facts.

2.      I currently reside in Lakewood, Colorado.

3.      I am an employee of the Center for Biological Diversity ("Center") and have been since November 2023. I am also a member of the Center and have been since 2011.

4.      The Center is a non-profit, membership organization with more than 93,000 members in total and offices across the nation, with thousands of members in western and southwestern United States, including more than eight thousand members in Texas, Colorado, Wyoming and New Mexico.

5.      The mission of the Center is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and environmental law. Based on an understanding that the health and welfare of human societies are closely linked to the condition of the natural environment, the Center works to protect natural resources like air, water, and land and to secure a future for animals and plants hovering on the brink of extinction. It works to protect the ecosystems imperiled species need to survive, and for the people that interact with, depend on, and cherish these natural resources.

6.      In my role at the Center as a Senior Advocate, I work in the Center's Environmental Health, Southwest, and Southern Rockies programs to protect clean air, safeguard communities, and enforce pollution prevention laws. In this role I work to reduce the threats to the environment and public health from air pollution, including greenhouse gases like methane.

1

7.      As a member of the Center, I rely on the Center to represent my interests in conserving native species and their habitats, protecting our air quality and our environment by gathering and disseminating information about air pollution, advocating for the remediation of that pollution, and enforcing our environmental laws in the courts. I support its efforts to secure a future for all species, great or small, and to prevent development, pollution, and climate change from driving species extinct. Many of the species we work to protect rely on a stable climate to survive and ultimately achieve recovery.

8.      To that end, the Center has longstanding programs and campaigns to address climate change and greenhouse gas emissions through the Center's Climate Law Institute, public lands program, oceans program, environmental health program, and endangered species program. One of the Center's top priorities is the full implementation of existing environmental laws to reduce climate change impacts to communities, endangered species and fragile ecosystems. We also aim to address climate change and help spur the transition from a fossil fuel dependent society to a clean energy future.

9.      The Center has a longstanding campaign advocating for the rapid phase out of fossil fuel use as well as the abatement of greenhouse gas emissions from existing sources, including methane emissions. The Center's Climate Law Institute seeks to protect wildlife, ecosystems and communities from the catastrophic dangers and damages of climate disruption by using existing environmental laws (like the Clean Air Act) to slash greenhouse pollution and promote the just transition from a fossil fuel economy to 100 percent clean, renewable energy.

10.      The Center has engaged in EPA's prior rulemaking proceedings to limit methane and other air pollutant emissions from the oil and gas sector under the Clean Air Act, providing multiple rounds of comments on the agency's proposals. The Center has also resorted to

2

litigation to prevent the recission of methane regulations requiring oil and gas companies operating on public lands to take reasonable measures to prevent the waste of publicly owned natural gas, measures which significantly reduce pollution from methane. *See Sierra Club, et al. v. Zinke*, 3:18-cv-5984 (N.D. Cal). Additionally, the Center intervened in support of EPA's regulations implementing Clean Air Act Section 111 to control methane pollution from the oil and natural gas sectors in the face of attack by industry. *See Texas, et al., v. EPA, et al.*, 24-1054 (D.C. Circuit).

11.     Furthermore, the Center petitioned EPA in 2021 to remove methane from its "negligibly reactive" volatile organic compounds ("VOC") list, whereby it has been exempted from regulation in state implementation plans under the Clean Air Act, as a significant precursor to ground-level ozone.[1] Ozone pollution significantly adversely affects public health, causing asthma attacks and even death.

12.     The science is overwhelmingly clear that climate change represents a stark threat to the future of biodiversity both within the United States and around the world. Species extinction risk will accelerate with continued greenhouse gas pollution. One million animal and plant species are now threatened with extinction, with climate change as a primary driver. The recent United Nations Global Methane Assessment demonstrates that slashing emissions from methane, including from the fossil fuel industry, is far more critical than previously thought to avoid the worst effects of climate change.

13.     The impacts of methane emissions on our climate are particularly alarming. Immediate, deep reductions in methane emissions are critical for lowering the rate of global warming in the near-term, preventing the crossing of irreversible planetary tipping points, and

---

[1] *See* https://www.biologicaldiversity.org/programs/environmental_health/pdfs/Methane-Ethane-Petition.pdf.

3

avoiding harms to species and ecosystems from methane's intensive near-term heating effects and ground-level ozone production. Methane is a super-pollutant 87 times more powerful than $CO_2$ at warming the atmosphere over a 20-year period, and is second only to $CO_2$ in driving climate change during the industrial era.

14.     Because methane is so climate-damaging but also comparatively short-lived (with an atmospheric lifetime of roughly a decade), cutting methane has a relatively immediate effect in slowing the rate of temperature rise in the near-term. Critically, deep cuts in methane emissions of ~45% by 2030 would avoid 0.3°C of warming by 2040 and are considered necessary to achieve the Paris Agreement's 1.5°C climate limit and prevent the worst damages from the climate crisis. Deep cuts in methane emissions that reduce near-term temperature rise are also critical for avoiding the crossing of planetary tipping points—abrupt and irreversible changes in Earth systems to states wholly outside human experience, resulting in severe physical, ecological and socioeconomic harms.

15.     Methane also leads to the formation of ground-level ozone, a dangerous air pollutant, that harms ecosystems and species by suppressing plant growth and reducing plant productivity and carbon uptake. Methane emissions also directly affect public health in communities polluted by ground-level ozone, triggering a variety of health problems including bronchitis, emphysema, and asthma. Ozone also can reduce lung function and repeated exposure may permanently scar lung tissue.

16.     The Center and its members are harmed by the relative increase in methane emissions from the oil and gas sector which will occur because of the EPA's 2025 Interim Final Rule entitled "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector

4

211

Climate Review Final Rule," 90 Fed. Reg. 35,966 (July 31, 2025) ("2025 Interim Final Rule"), which delays compliance deadlines for some of EPA's 2024 Final Rule regulations reducing methane emissions from the oil and gas sector entitled "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review," 89 Fed. Reg. 16820 (March 8, 2024) ("2024 Final Rule").

17.    Methane emissions harm the Center's members' interests by contributing to climate change and precipitating the creation of ground-level ozone, which in turn adversely affect species and their habitats, public health, and ecosystems. EPA acknowledges that its 2025 Interim Final Rule will result in *more* emissions than would've otherwise occurred under the 2024 Final Rule—total additional emissions of 1,300,000 short tons of methane, 350,000 short tons of volatile organic compounds (VOCs), and 13,000 short tons of hazardous air pollutants through 2039.[2]

18.    If not for the 2025 Interim Final Rule delaying some compliance deadline requirements, EPA's 2024 Final Rule would significantly limit methane emissions in oil and gas extraction and production processes, thereby alleviating some of the harms to the Center's organizational interest and members. By extending compliance deadlines for 18 months in most cases in for certain OOOOb emissions guidelines and for OOOOc state plan submittal deadlines, EPA's 2025 Interim Final Rule will result in additional significant methane pollution that harms me, the Center's members, and the Center's organizational interests in reducing such pollution.

19.    I understand the 2025 Interim Final Rule will delay deadlines for states like Colorado (where I live and recreate) to submit state implementation plans. I understand that

---

[2] U.S. Envt'l Protection Agency, *Economic Impact Analysis for the Extension of Deadlines in the NSPS OOOOb and EG OOOOc* at 6 (July 23, 2025), https://www.epa.gov/system/files/documents/2025-07/oil_and_gas_eia_extension_of_deadlines_07-2025.pdf.

5

Colorado has already adopted OOOOc-compliant process controller regulations.[3] And I understand that Colorado's environmental agency has released draft rule language to align with OOOOc requirements, with plans to adopt a final rule by January, 2026.[4] I am concerned that the 2025 Interim Final Rule's extension for state plan deadlines will delay the progress Colorado is making.

20.     I am a long-time avid outdoor recreationist and regularly enjoy traveling throughout the western and southwestern United States to explore the region's public lands (primarily federally managed public lands) through hiking, biking, and camping, to view wildlife (in particular, birds), to float rivers with my raft, and enjoy iconic scenery. In my travels outdoors in the western and southwestern United States, I frequently happen upon areas of public lands that have experienced intensive oil and gas extraction. These areas include the Upper Green River Basin of western Wyoming, the Red Desert of southern Wyoming, the Thunder Basin National Grassland of northeast Wyoming, the Pawnee National Grassland in northeastern Colorado, the Powder River Basin of southeastern Montana, the Uinta Basin of northeast Utah, and the Greater Chaco region of northwest New Mexico, southwest Colorado, and southeast Utah.

21.     I also regularly recreate in Barr Lake State Park northeast of Denver and the Pawnee National Grassland northeast of Greeley, CO. Also, in July of this year, I was out in

---

[3] 5 Colo. Code Regs § 1001-9:B.III; *see* Colo. Dep't Health & Env't, Colorado takes action to further reduce methane emissions from oil and gas operations (Feb. 21, 2025) ("This timeline requires operators to complete the phase out [of process controllers] sooner than the March 9, 2029 deadline under new federal requirements.") https://cdphe.colorado.gov/press-release/colorado-takes-action-to-further-reduce-methane-emissions-from-oil-and-gas-operations.
[4] https://oitco.hylandcloud.com/cdphermpop/docpop/docpop.aspx?docid=47493274 (draft rule language); https://oitco.hylandcloud.com/cdphermpop/docpop/docpop.aspx?docid=47402380 (explanation of draft rule language); https://drive.google.com/file/d/177DKpD432tymFlTJS8TEKMRC3seTWahu/view (rulemaking scheduled for January 14-16, 2026, to address OOOOc requirements).

western Colorado, including the Garfield Creek State Wildlife Area and lands on the White River National Forest south of Rifle, Colorado.

22.     When I am enjoying the outdoors and public lands in the western and southwestern United States and come across oil and gas extraction activity, this activity has detracted from my enjoyment of the outdoors. In many parts of the Rocky Mountain region of the United States, it is almost impossible to recreate without coming across oil and gas extraction activity, including wells, tanks, pipelines, trucks, and processing facilities. Visually, the sight of oil and gas development is deeply offensive to me and detracts significantly from my enjoyment of the natural beauty of the outdoors and public lands. This development doesn't just include oil and gas well sites, but also includes tanks, pipelines, processing facilities, heavy trucks and equipment, and drilling rigs that are drilling new wells or working over existing wells. When near oil and gas activity, I have smelled gases emanating from wells, tanks, and pipelines. These smells always have a solvent-like or diesel-like smell indicating they are VOC emissions, but also include methane. I've also heard the sound of gas leaking from equipment. These leaks are of methane and VOCs.

23.     I recently recreated on the Pawnee National Grassland north of Denver in October 2024. During this visit, I visited an iconic scenic area called the Pawnee Buttes, I hiked, birdwatched, and searched for other wildlife.  I enjoyed my visit, but the presence of oil and gas development was very prevalent, with drilling rigs on the landscape, wells, tanks, trucks, and other equipment. In a visit to a portion of the Pawnee National Grassland, there was a drilling rig in operation and I could smell the solvent-like fumes coming from the site even though I was at least a quarter mile away.

24.     During a visit in early mid-August 2024 to public lands that are part of the Thunder Basin National Grassland in northeast Wyoming, I hiked and watched for birds on a portion of the Grassland between Douglas, Wyoming and Gillette, Wyoming. During my visit, I observed several oil and gas wells that were being drilled and several wells that were already "in production." I also observed flaring occurring at several well pads.

25.     I routinely visit public lands that are part of the Thunder Basin to hike, camp, and view wildlife around once a year and have since 2010. Before my visit in mid-August 2024, I last visited the Thunder Basin in May 2023, mid-February 2023 and in early November 2021. I intend to visit again in June of 2025, and I intend to continue to regularly visit the Thunder Basin National Grassland throughout the foreseeable future.

26.     In my visits to the Thunder Basin National Grassland, I have heard, smelled, and seen air pollution from wells pads, tanks, drilling rigs, and other oil and gas extraction activities. These sounds, smells, and sights have detracted from my recreational enjoyment of public lands in the region. Much of this harm stems from the failure of companies to utilize effective controls to limit methane emissions. When companies are required to utilize better controls to limit methane emissions and reduce other pollutant emissions, as required under the 2024 Final Rule, this would reduce the harms I would otherwise experience related to the sounds, smells, and sights of air pollution from oil and gas extraction activities on the Thunder Basin National Grassland.

27.     In addition to the Thunder Basin National Grassland, I regularly recreate on public lands that are located on the Pawnee National Grassland, which is located north of Denver in northeastern Colorado. I most recently recreated on public lands that are part of the Pawnee National Grassland in mid-October 2024. During that visit, I hiked and watched for birds on the

8

eastern unit of the Grassland located northwest of the small town of Raymer. During my visit, I observed many oil and gas wells that were being drilled and several wells that were already "in production." I also observed flaring occurring at several well pads, heard gas venting, and smelled fumes from a drilling rig site.

28.    I visit public lands that are part of the Pawnee to hike, camp, and view wildlife around once a year and have since 2010. Before my last visit in October 2024, I last visited the Pawnee in May 2024, September 2022, March 2021 and June of 2020. I intend to visit again in fall of 2025, and I intend to continue to regularly visit the Pawnee National Grassland throughout the foreseeable future.

29.    In my visits to the Pawnee National Grassland, I have heard, smelled, and seen air pollution from wells pads, tanks, drilling rigs, and other oil and gas extraction activities. These sounds, smells, and sights have detracted from my recreational enjoyment of public lands in the region. Much of this harm stems from the failure of companies to utilize effective controls to limit methane emissions, which is required by the 2024 Final Rule—but some of which are delayed by the 2025 Interim Final Rule. If companies utilized better controls to limit methane emissions because of the imposition of fees by EPA for such methane emissions, it would reduce the harms I would otherwise experience related to the sounds, smells, and sights of air pollution from oil and gas extraction activities on the Pawnee National Grassland.

30.    In my recent July 2025 visit to western Colorado, I went hiking in areas with many oil and gas wells, including the Garfield Creek State Wildlife Area and lands on the White River National Forest south of Rifle, Colorado.  There are numerous oil and gas wells in these areas, as well as associated infrastructure including pipelines, tanks, and other equipment.

9

31.    I regularly recreate in Adams and Jefferson Counties in Colorado. Adams County has a total of 5,085 active oil and gas wells, with at least one drilling rig/well currently under construction and Jefferson County has 91 total active oil and gas wells. *See* Proville-Mirtich Decl.

32.    The compliance delays authorized in the 2025 Interim Final Rule directly affect the compliance deadlines for these wells, resulting in increased emissions (as compared to the 2024 Final Rule) in the areas where I recreate. For example, postponing compliance deadlines for implementation of the 2024 Final Rule's OOOOb standards for equipment leak repair requirements, zero-emissions process controllers, and 95% emissions reductions for methane and VOCs for storage vessels will result in marked and measurable additional emissions that would not have otherwise occurred under the 2024 Final Rule's compliance deadlines.

33.    In Barr Lake State Park, where I recently hiked in June of this year, there are 49 active permits for new wells since December of 2022 within 1.5 miles of the midpoint of the park, *see* Proville-Mirtich Decl.—all of which are now subject to the extension of compliance deadlines for part OOOOb under the 2025 Interim Final Rule. This means that the wells I see and smell while recreating in Barr State Park will pollute the air with more methane and other pollutants and harm my enjoyment of the area because of the EPA's actions in the 2025 Interim Final Rule than would have otherwise occurred under the 2024 Final Rule.

34.    Similarly, there are 33 active well permits for existing wells (prior to December of 2022) within 1.5 miles of the midpoint of the Barr State Park which are subject to the 2025 Interim Final Rule's extension of state plan submittal deadlines for under subpart OOOOc. *See* Proville-Mirtich Decl. So too will these wells, that I see and smell while recreating in Barr State Park, pollute the air with more methane and other pollutants and harm my enjoyment of the area

10

because of the EPA's actions in the 2025 Interim Final Rule than would have otherwise occurred under the 2024 Final Rule.

35.    I have visited many other parts of the western United States and experienced diminished enjoyment of my outdoor recreation as a result of the sights, sounds, and smells of oil and gas extraction activities, and their excess methane emissions venting and flaring. I intend to continue visiting, exploring, and attempting to enjoy public lands in the western United States, particularly in the Rocky Mountain region, for the foreseeable future. While oil and gas extraction activities may diminish my enjoyment, my enjoyment would not be as diminished if companies limited their emissions of methane, as required by EPA's 2024 Final Rule. However, the EPA's 2025 Interim Final Rule delaying compliance deadlines for such requirements prevent many of the emissions reductions that would reduce the harms I feel from oil and gas operations. By delaying compliance deadlines, the 2025 Interim Final Rule harms me and diminishes my enjoyment by allowing emissions that would otherwise not occur under the 2024 Final Rule.

36.    In addition to recreating outdoors, where I live in Colorado, in Lakewood outside of Denver, I experience unhealthy levels of ozone pollution every summer. Ozone is a poisonous gas that even at low concentrations, can cause respiratory irritation, trigger asthma attacks, worsen lung disease, and even cause premature death. On high ozone days, I avoid outdoor recreation. The region's ozone is tied to unchecked oil and gas extraction (and concomitant methane flaring and venting) occurring north and east of Denver. Oil and gas extraction releases large amounts of VOCs, which react with sunlight to form ozone. VOCs are released along with methane. If the oil and gas industry better controlled its methane emissions, as is required under EPA's 2024 Final Rule, it would help to reduce VOCs in the Denver Metro area and help to curtail the region's summertime ozone pollution problems. This would enable me to be able to

11

recreate outdoors more often. I intend to continue living in Lakewood for the foreseeable future. Less methane pollution from the oil and gas industry means less VOCs, which means less ozone, which means my life where I live will be happier and healthier.

37.    I am further injured by the EPA's failure to follow proper Administrative Procedure Act and Clean Air Act procedures requiring public notice and comment on rulemakings when issuing its 2025 Interim Final Rule. When the 2025 Interim Final Rule took effect on the day it was published, the Center and the broader public were given no time to weigh in on the significant air pollution harms that would flow from the 2025 Interim Final Rule before it took effect and they were immediately subject to those harms. Center has a long history of providing substantive feedback on EPA proposals concerning the regulation of methane, VOCs, hazardous air pollutants, PM2.5 and other air pollution from oil and gas operations, including commenting multiple times on the 2024 Final Rule. I and other Center members, as well as members of the public, rely on the procedural right to comment on such regulatory rulemakings to ensure the government takes into account and responds to our comments highlighting the significant air quality and pollution impacts.

38.    Effective implementation and enforcement of our administrative and environmental laws, such as the Administrative Procedure Act and Clean Air Act, is essential to protecting the public, Center members (including me) and ecosystems from the detrimental air quality impacts of super pollutants like methane, and to the Center's organizational interest in the full implementation of our environmental laws to protect health, wildlife, ecosystems, and the environment.

39.    I believe that effective implementation and enforcement of our environmental and administrative laws, such as the Clean Air Act and Administrative Procedure Act, is essential to

12

protecting the public and ecosystems against the detrimental air quality impacts of super

pollutants like methane. A Court order finding EPA acted unlawfully in issuing the 2025 Interim

Final Rule and reinstating the compliance deadlines in the 2024 Final Rule would alleviate some

of the impacts of methane emissions felt by me, communities, wildlife, and ecosystems. Such a

ruling would redress the harms that I and the Center's members will experience from the 2025

Interim Final Rule and therefore the harms to the Center's interest in protecting the environment,

communities, species and ecosystems from the detrimental effects of climate change.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and

correct.

August 13, 2025

*/s/ Jeremy Nichols*

Jeremy Nichols

13

# Attachment 18

Declaration of Lauren Pagel, Earthworks

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

**DECLARATION OF LAUREN PAGEL**
**Submitted In Support of Earthworks**

I, Lauren Pagel, do hereby affirm and state:

1.     I am the Policy Director for Earthworks. I have worked for Earthworks for 22 years.

2.     Earthworks is a nonprofit organization that, since 1988, has helped communities secure protections of their health, land, water, and air from extractive industries. Earthworks is the only national organization in the United States to focus exclusively on preventing the destructive impacts of the extraction of oil, gas, and minerals. Earthworks stands with frontline communities opposing dirty fossil fuels and dirty mining while advocating for a clean energy transition. Earthworks aims to reduce the immediate harms of oil, gas, and mining upon communities, including reducing methane emissions from fossil fuel operations to slow climate change.

3.     In my capacity as a staff member of Earthworks, I am familiar with the nonprofit organization's mission.

1

4.      Earthworks is comprised of members who are on the organization's email list and have taken at least one action in the past year. Earthworks currently has over 90,000 members, and Earthworks has members in all fifty states.

5.      As policy director, I am Earthworks's lead staff person on all policy issues, and I lead a policy team whose remit includes approving reports, blogs, and other Earthworks publications that provide information and education on oil and gas issued, among others.

6.      I am also Earthworks's lead staff person on methane emissions. A key part of my role in that capacity is to work on reducing methane emissions at the federal and state policy levels.

7.      On behalf of Earthworks, I have worked on EPA rulemakings on methane emissions since 2014.

8.      I also work in coalition with other national, state, and local groups about reducing air pollution, including from methane. In addition to advocating for strong methane regulations from EPA, we work with members of Congress on instituting methane emissions limits, including by bringing community members directly impacted by oil and gas to D.C. to bring their voices to elected officials.

9.      As a result of my work at Earthworks, I am aware of the harms of methane emissions. I have heard directly from community members on the ground who have a lot of the same stories about the impacts to their health from living

2

next to oil and gas, including persistent headaches and nosebleeds. The science is clear that living near oil and gas emissions increases cancer risk.

10.     As a result of my work at Earthworks, I am aware that methane is an ozone precursor. I am also aware that oil and gas emissions are associated with toxics, such as benzene and toluene, that are known carcinogens.

11.     As a result of my work at Earthworks, I am aware that methane emissions impact everyone because methane is a climate forcing pollutant. Methane is a climate forcer because of its twelve-year atmospheric lifespan.

12.     I am concerned about the health and climate impacts of methane and other pollutants emitted by the oil and gas sector.

13.     I understand that in March 2024, U.S. EPA finalized a rule titled "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review." 89 Fed. Reg. 16,820 (Mar. 8, 2024). Earthworks supports the full and timely implementation of this March 2024 rule because it will reduce emissions of methane and other harmful pollutants.

14.     Due to my work with Earthworks, I understand that the U.S. Environmental Protection Agency ("EPA") has recently issued an interim final rule, without first taking public comment, that delays compliance deadlines for national standards for oil and gas facilities that would control methane and VOC

3

224

emissions from both new and existing infrastructure. Had the EPA provided an opportunity to comment prior to issuing the interim final rule, Earthworks would have provided comment outlining the substantive and legal deficiencies with such an approach.

15.    I understand that the Environmental Protection Agency published its interim final rule establishing an "Extension of Deadlines in standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule ("interim final rule") on July 31, 2025.

16.    If this interim final rule stands, it will negatively impact Earthworks' members who live, work, and recreate in and around oil and gas infrastructure.

17.    I understand that Earthworks seeks to challenge the interim final rul

18.    I support Earthworks' efforts to challenge this rule. Earthworks' efforts to challenge this rule are directly relevant to Earthworks's mission and consistent with the organization's policy work on methane.


I declare under penalty of perjury that the foregoing is true to the best of my knowledge, information, and belief.

August 12, 2025                           /s/    _Lauren Pagel_

                                              Lauren Pagel

4

# Attachment 19

Declaration of Virginia Palacios, Environmental Defense Fund

**DECLARATION OF VIRGINIA PALACIOS**

I, Virginia Palacios, declare as follows:

1.  I am currently a member of the Environmental Defense Fund ("EDF"). I am a landowner in Webb County, four miles south of Encinal, Texas. I own Atalaya Ranch ("Ranch") on 146.22 deeded acres in Webb County. My family has lived in Webb County for nine generations and we are descendants of Bartolome Garcia, the great-great grandchild of Don Tomas Sanchez, the founder of Laredo, Texas. The Ranch has been in my family for four generations. I named the ranch "Atalaya" after the name of the one-room schoolhouse my grandmother taught at on the Ranch from 1927 to 1943.

2.  My ranch is located in the Eagle Ford Shale in the southwestern part of Texas, one of the most active areas in the country for oil and gas production, and in Webb County, which was the highest natural gas producing county in Texas in August 2023. There are currently approximately 9 active or permitted gas wells on or within a one-mile radius of the Ranch. Additionally, my house is approximately 2.5 miles south of the Enterprise Products Partners Gas Gathering plant on the Martineña Road near Encinal.

3.  From 1922 - 2011, my family used the ranch to raise and

slaughter cattle, to then sell it on the market. Before my father inherited the

Ranch in 1995, the Ranch belonged to my great uncle, Juan L. Salinas

("Tío Juan"), who had inherited it from his father, Antonio Salinas. Cattle

ranching was Tío Juan's primary source of income until he passed away in

1995 at the age of 94. Tío Juan was a rodeo athlete who competed in the

national rodeo circuit and made it to the Championship Rodeo in Madison

Square Garden for ten consecutive years from 1936 to 1946.[1] In 1991 he

was inducted into the Rodeo Hall of Fame of the National Cowboy and

Western Heritage Museum. From the time I was a child, my father helped

manage Tío Juan's cattle, and he inherited full responsibility for the cattle

in 1995 after Tío Juan passed away. Cattle ranching was not my father's

primary source of income, but the cattle provided a helpful service in

maintaining grasslands on the ranch and the revenue from their sale also

helped to pay for ranch maintenance. In 2011, my family stopped ranching

cattle when a historic drought in Texas made ranching uneconomic. During

the drought, temperatures of 115 degrees Fahrenheit multiple days in a row

were not uncommon and the grass became crunchy, brown, and dead –

insufficient to sustain the herd. Without grass, my father had to purchase

---

[1] Palacios, Ricardo D. 2007. *Tio Cowboy: Juan Salinas, Rodeo Roper & Horseman*. Texas A&M University Press College Station.

hay, which was more expensive during a drought. Because my father could no longer afford to feed the cattle as a result of these changes, he decided to sell all of our cattle. My father passed away in 2018.

4.    In the years that followed my father's death my brothers and I thought about getting back into cattle ranching. Ranching is an important part of our heritage. I grew up watching my father and brothers work cattle on our land. Ranching on this land is not only a part of our family history, but also our regional culture. Further, maintaining a ranch is expensive, even without cattle, and my brothers and I were interested in making use of the land's resources to help offset the cost of ranch maintenance. However, after talking to neighbors and relatives carrying on this tradition, we learned that cattle ranching is no longer profitable. Raising cattle isn't a reliable business option on our land anymore because it doesn't rain consistently like it used to. Several ranchers in the area have remarked that while our area used to get rain throughout the year, which kept the grass growing year-round for the cattle, there are now just a few torrential downpours throughout the year without the consistency needed to keep plants growing. Because of these changes in rainfall and the economic uncertainty, my brothers and I decided to forgo cattle ranching. We are the first generation in our family to do so.

5.      The impacts of climate change caused by greenhouse gases such as methane are evident on the Ranch. Aside from drought impacting plant growth and the ability to use our land to raise cattle, the temperatures on the ranch are so extreme they impede my ability to safely work on the ranch many days out of the year. The past couple of summers have been some of the worst. There have been strings of days – adding up to about three months straight of 110- degree or higher days. At the same time as the drought, we have also experienced extreme winds several times this year. The Ranch is about 130 miles from the Gulf Coast, as the crow flies, and southeasterly Gulf winds are common and stronger during hurricane season. Both the drought and the extreme freezes we had in 2021 and 2022 weakened the trees, and every time we experienced high winds this year, many trees would shed large branches. Because of this, I had to spend a considerable amount of time trimming trees and clearing branches around the property. Moving branches to and from the truck bed is a relatively easy to moderate physical task for a physically able person in her thirties but became more challenging for me in triple-digit weather. The period of day when working is unsafe has become longer. Traditionally, the hours between 3 pm – 5 pm are the hottest parts of the day and are not recommended for outdoor work. Now I often find that I can only do activities like this for a few hours in the

morning or the evening, and I needed to take a break from about 1 pm to 5 pm, when the heat made me the slowest. Sometimes, after a few hours of work, I have noticed my heart racing after doing an easy activity like cutting grass with a weed eater. This is a sign of heat stress that can lead to heat stroke. At one point in the summer, I started paying a friend to help me on the Ranch. After one of our first days working together, he told me he had been feeling dizzy just before we stopped working at 1 pm. Later in the season, he decided it would be safer to come help me in the evenings from about 5 pm to 9 pm, once the sun started to set.

6.     Since 2021 I have only seen one bluebonnet (the state flower of Texas) on our ranch, when we used to see fields of them blooming every year from about February to April. As a child, one of my hobbies was flower pressing, and bluebonnets were so plentiful, beautiful, and iconic that they were one of my favorite flowers to press. They are dying off. Bluebonnets are important for the soil as they fix nitrogen, which is essential to plant growth, turning it into a nitrogen compound that plants can use.

7.     Since cattle ranching seems to no longer be a viable profit-making venture, I have been hoping to establish an ecotourism business on the Ranch which is located on a major migratory corridor for birds. The

Ranch is also at the northernmost range for some tropical bird species such as the Green Jay and the Black-bellied Whistling Duck, which cannot be seen in most other parts of the United States outside of South Texas. But climate change is threatening bird life in South Texas and potentially my ability to establish a birding business on the Ranch. This past summer, I noticed numerous birds on our property panting with their mouths open because of extreme heat, some dead birds, and occasionally bees falling to the ground right out of the air. These observations are not typical. While it is common to have 110-degree days during a Webb County summer, I never have experienced so many 110-degree days in a row.

8.      I have personally been exposed to air emissions associated with venting, flaring, and leaking wells near the Ranch. There have been several flares surrounding my property that have been improperly operating. I know that when flares are orange and slightly marbled with smoke, the flare is working, but that when the flare has too much oxygen assistance the emissions are clear and translucent, without a flame. This can indicate that pollutants like methane, volatile organic compounds ("VOCs"), and hazardous air pollutants ("HAPs") are escaping uncombusted and directly into the atmosphere. Alternatively, if the flare is smoking too much, then it isn't getting enough oxygen and is also not fully

combusting pollutants but may also be forming additional pollutants like black carbon. I have periodically seen flares surrounding my property to be in some form of poor operation, whether smoking too much or too little.

9.      I periodically see flared gas coming from the Enterprise Products Partners Gas Gathering plant. When the facility appears to me to be smoking too much or if the flare is flickering out, I call the Texas Commission on Environmental Quality (TCEQ) to report it, and they often don't respond or arrive at the scene for 3 - 4 weeks.[2] Winds from the facility sometimes blow in the direction of the Ranch. Although the prevailing wind tends to be from the southeast, sometimes when I've noticed the flares smoking there has been a northern wind blowing toward the Ranch. I have reported emissions from the gathering facility to TCEQ on several occasions. After one complaint, a TCEQ investigator visited the Ranch and brought out several measurement instruments including an optical gas imaging (OGI) camera, but because the investigator arrived at a much later date than when I had initially reported the smoking flare at the gathering facility, they were not able to detect emissions at the facility from the vantage point of my Ranch the day they conducted the

[2] *See* TCEQ Investigation numbers 1553408 (Jan 30, 2019), 1699829 (Jan. 28, 2021), and 1775185 (Jan 12, 2022).

inspection.[3]

10.     There is an active gas well on the surface of my Ranch. A TCEQ inspector has observed some emissions (presumably VOCs) using the OGI camera coming from the condensate tank at the well pad on my Ranch, but the inspector told me that these appeared to be unreportable or not in violation.

11.     There is a gathering line on the properties next to mine (my brothers' properties). The gathering line goes through the back of their ranches and was built between 2011-2012. There are also condensate and produced water tanks on my property and on my neighbor's property.

12.     I see at least 4 drilling rigs on my way to work every day (between Encinal and Laredo) and see several flares from gas wells next to my property. I have seen big flares on another one of my neighbor's property, about 2,500 feet from our fence line.

13.      I am concerned that we are breathing harmful hydrocarbons, such as benzene, toluene, ethylbenzene, and xylenes (BTEX). I also worry about the aggregate effect of oil and gas operations in our region on the total

---

[3] Investigation No.: 1699829. Incident No.: 348445. Investigation Report dated January 28, 2021.

level of these toxics (also referred to as HAPs) in the ambient air we breathe.

14.     I am aware that oil and natural gas facilities emit significant amounts of harmful air pollution, both through designed releases and unintentionally leaking equipment. I understand that these pollutants include methane, VOCs, carcinogenic air toxics (HAPs) such as benzene and toluene, and other harmful air pollutants. I understand that methane is a highly potent greenhouse gas, capable of warming the climate at a rate over 80 times that of carbon dioxide over a 20-year period. I also understand that VOCs contribute to the formation of ground-level ozone, or smog, which is hazardous to human health and can cause respiratory disease and premature death. NOx and VOC emissions from oil and gas operations in the Eagle Ford Shale contribute to elevated smog levels in San Antonio Texas.[4] There is one ozone monitor in Laredo, Texas, which is positioned to capture urban ozone formation associated with traffic on an international bridge between Mexico and the United States.[5] There are no air quality monitors within 35 miles of Encinal, Texas, but EPA's 2017 National Emissions Inventory

---

[4] Alamo Area Council of Governments. 2014. Oil and Gas Emission Inventory, Eagle Ford Shale, https://library.ctr.utexas.edu/Presto/content/Detail.aspx?ctID=UHVibGljYXRpb25f MTE2MTA%3D&rID=MjQ1MTY%3D&ssid=c2NyZWVuSURfMjEzMjI%3D&b mdc=MQ%3D%3D.

[5] EPA Site Number: 484790016. Laredo College.

Models have estimated that over 70% of NOx emissions in Webb County come from the oil and gas sector.[6] I am aware that the best practices that reduce methane and VOC emissions also help mitigate other harmful air pollutants from oil and gas development.

15.     I am aware that studies show that close proximity to oil and gas development can cause negative health impacts. Southerland-Weisner Decl. I am concerned that living on the Ranch for many years will negatively impact my health. I suffer from increased allergies whenever I am on the Ranch as compared to times when I'm away from the Ranch. Aside from a runny nose, this gives me headaches, makes me feel lethargic, and sometimes clouds my focus. There have been times since living on the Ranch the past five years that I considered having children. A study published in 2020 found that Hispanic women who live next to high rates of flaring in the Eagle Ford Shale region faced 50% higher odds of preterm birth.[7] This awareness caused me stress as I considered whether to pursue

---

[6] US EPA. (2020, April). 2017 National Emissions Inventory (NEI) Data. Retrieved May 3, 2020, from https://www.epa.gov/. air-emissions-inventories/2017-national-emissions-inventory-nei-data cited in Palacios and Mireles. (Sep. 2020). Money-wise Trucking Guide. Rio Grande International Study Center. https://rgisc.org/wp-content/uploads/2020/10/Money-wise-Trucking-Guide.pdf.

[7] Cushing, L. J., Vavra-Musser, K., Chau, K., Franklin, M., & Johnston, J. E. (2020). Flaring from Unconventional Oil and Gas Development and Birth Outcomes in the Eagle Ford Shale in South Texas. Environmental Health

starting a family, which I have not. In 2018, my father died from a heart attack. For as long as I can remember, my dad always had hypertension and high blood pressure. I am aware that exposure to air pollutants associated with oil and gas development, including flaring, results in increased risk of cardiopulmonary disease. Southerland-Weisner Decl. I was always worried about him living and working on the Ranch and oil and gas emissions making his condition worse. In September of 2018, he suffered a heart attack while visiting Austin, shortly after giving a lecture at the Bob Bullock Texas State History Museum. That first heart attack did not kill him, but caused him to significantly lose cognitive function, among other ailments. The doctors who treated him said he would never give a lecture like that again. After two and a half months of recovery in Austin, my brothers and I chose to bring him back home to the Ranch. At the time, I worried that the air pollution caused by oil and gas development would make his condition worse. A couple of weeks later he had heart surgery in Laredo, but suffered another heart attack while in recovery and passed away. I am concerned I could at some point in my life suffer from similar illnesses as my father if I continue to breathe the air in this region.

16.     In 2011, when I returned home from graduate school, I became

---

Perspectives, 128(7), 77003. https://doi.org/10.1289/EHP6394.

aware of the oil and gas development that was booming in the Eagle Ford Shale. I witnessed spills from open-top dump trucks and heard concerns from landowners that had no warning that pits full of chemicals would be dug into their soil. As a result of this increasing awareness, I began helping to plan town halls and presentations to educate the public about potential groundwater contamination and air pollution from oil and gas development.

17.    After graduate school I also became a research analyst at Environmental Defense Fund, on its oil and gas team. There I created a program to educate people in rural and predominantly Spanish-speaking counties of the Eagle Ford Shale region about which agencies to call in the event of an oil and gas incident.

18.    In 2021, I started the non-profit organization Commission Shift and have been serving as its Executive Director since. Commission Shift is building public support to hold the Railroad Commission of Texas - our state oil and gas agency- accountable to its mission in a shifting energy landscape. We do this by educating the public about what the Commission does, advocating for improvements to the Commission's structure, recommending policy changes that will ensure operators maintain a clean environment, and ensuring that Texans understand the role the Railroad Commission plays in setting gas and electric utility rates.

19.    Because there are oil and gas operations on and near my property, and because of my state oil and gas work at Commission Shift and the impact federal regulations can have at the state level, I closely follow regulatory developments concerning federal oil and gas regulations, including through communications that I receive from EDF.

20.    I am aware that EPA updated and strengthened new source performance standards for new, reconstructed, and modified oil and natural gas sources and created emissions guidelines for existing oil and gas sources to address methane and volatile organic compound ("VOC") emissions ("the 2024 Rule"). *Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review*, 89 Fed. Reg. 16,820 (March 8, 2024). These standards will ensure reductions in emissions from oil and gas production through equipment and performance requirements including more periodic monitoring and prompt repair of equipment leaks across all well sites, the installation of zero-emitting process controllers, limitations on flaring of natural gas, controls on storage tanks and compressor stations, and increasing monitoring of super-emitter events from facilities. I am aware that the Rule will reduce methane and VOC emissions by 58 million and 16 million short tons, respectively, 89 Fed. Reg at 16,836, and

that it will reduce 572,000 tons per year of VOC emissions in my home state of Texas by 2028. EPA, Regulatory Impact Analysis of the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector (2023) ("EPA RIA") at 3-28. I am aware that the Rule will improve the air that my family and I breathe and mitigate climate change in the near-term by reducing short-lived methane emissions.

21.    I am aware that Texas' regulations on the oil and gas industry are far weaker than those finalized by EPA's standards and which oil and gas operators in Texas would be required to implement. For example, while EPA's regulation would require Texas operators on and near my property to generally stop flaring at new sites and improve control technologies when operators do flare under temporary circumstances, Texas' regulations do not. The Railroad Commission also generously grants flaring and venting rule exception requests. Thus, without EPA's standards I would continue to experience flaring and venting from gas wells and gas gathering facilities near my property. I am aware that EPA estimates that by 2028, the Rule will eliminate 572,000 tons per year of VOCs in the state of Texas, the greatest amount of VOC reductions for a state from the Rule.[8]

---

[8] EPA RIA at 3-28.

22.      I am aware that on July 31, EPA issued an interim final rule (effective immediately) that provides an 18-month extension for standards in the 2024 Rule to reduce methane emissions from new, modified and existing sources in the oil and gas sector and to reduce volatile organic compound (VOC) emissions from new and modified sources in the oil and gas sector. "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule" ("Delay Rule"), 90 Fed. Reg. 35,966 (July 31, 2025). In particular, it extends the compliance deadlines for storage tanks, process controllers, the super-emitter program (which aims to reduce leaks), combustion devices, flares, and closed vent systems.

23.      I am aware that Environmental Defense Fund analyst Laura Mirtich conducted an evaluation of new and existing wells in my county and within a half-mile of my home. There are a total of 12,288 wells in Webb County drilled prior to December 2022 ("existing sources" under the 2024 rule) and a total of 10,728 wells drilled after December 2022 ("new source" wells under the 2024 rule). There are also 9 drilling rigs currently being constructed in Webb County, indicating those wells will soon be active and producing and would be subject to the 2024 rule had the Delay Rule not taken effect. Additionally, the Enverus database shows there is at least one new well (built post December 2022) and one existing well (built prior to December 2022) within a half-mile of my home, see Proville-Mirtich Decl.

24.     I am concerned that an 18-month delay of the 2024 Rule would prevent me from seeing the benefits of the 2024 rule in the near-term and cause ongoing harmful air pollution near my home and in the county where my family and I live, work, and recreate. I am concerned that affected sources in the oil and gas sector near my property – including the storage tanks on my Ranch and those on my neighbors' land, emissions from oil wells and flares on my ranch, neighbors property, and the surrounding area, as well as the Enterprise Products gathering facility nearby– will increase harmful pollution and that the resulting emissions from the oil and gas operations near my home will threaten my health and well-being and that of my family, as well as worsen climate change impacts on my property for years to come.

I declare that the foregoing is true and correct.

Dated August 12, 2025

# Attachment 20

Declaration of Jeremy Proville and Laura Mirtich, Environmental Defense Fund

## DECLARATION OF JEREMY PROVILLE & LAURA MIRTICH

I, Jeremy Proville, declare as follows:

1.    I am a Senior Director in the Economics department at the Environmental
Defense Fund (EDF). I have worked as an economic and geospatial analyst
for EDF for over 13 years. I hold a Master of Science and a Bachelor of
Commerce from McGill University.

2.    My duties at EDF include performing demographic and spatial analyses,
including assessing how EDF's membership and broader populations are
impacted by pollution and affected by environmental policies. My work
requires me to be familiar with EDF's policy positions, analytical methods,
scientific research, and membership database. I have published works on
the impacts of air pollution and other environmental externalities on people
and vulnerable communities.[1]

---

[1] Proville et al., *The demographic characteristics of populations living near oil and gas wells in the USA*, 44 Population & Env't 1 (2022), https://link.springer.com/article/10.1007/s11111-022-00403-2; Spiller et al., *Mortality Risk from PM 2.5: A Comparison of Modeling Approaches to Identify Disparities across Racial/Ethnic Groups in Policy Outcomes*, 129 Envtl. Health Perspectives 127004 (2021), https://ehp.niehs.nih.gov/doi/full/10.1289/EHP9001; Environmental Defense Fund, *Federal Methane Map* (2021), https://www.edf.org/federalmethanemap/; EDF, *New Mexico Oil & Gas Data* (2021), https://www.edf.org/nm-oil-gas/map/; Kritee et al., *High nitrous oxide fluxes from rice indicate the need to manage water for both long-and short-term climate impacts*, 115 Proceedings of the Nat'l Acad. of Sci. 9720 (2018), https://www.pnas.org/doi/10.1073/pnas.1809276115; Proville et al., *Night-time lights: A global, long term look at links to socio-economic trends, 12 PLoS ONE. e0174610 (2017)*, https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0174610.

1

I, Laura Mirtich, declare as follows:

3.    I am a Senior Analyst at EDF, where I have worked since March 2024. I
      hold a Master of Public Policy and Bachelor of Science from Arizona State
      University.

4.    My work at EDF involves generating state, regional, and national methane
      emissions estimates, focused on the oil and gas sector, as well as
      quantifying the impacts of methane reduction strategies at the state,
      county, and company levels. To do this, I use various modeling
      approaches, including those described later in this declaration.

We declare as follows:

5.    EDF is a membership organization incorporated under the laws of the State
      of New York. It is recognized as a not-for-profit corporation under section
      501(c)(3) of the United States Internal Revenue Code.

6.    EDF is one of the world's leading environmental organizations. EDF's
      mission is to secure a vital earth for everyone. For more than 50 years we've
      been pioneers in working to make the environment safer and healthier for us
      all. Guided by science and economics, EDF finds practical and lasting
      solutions to the most serious environmental problems. EDF employs
      hundreds of scientists, economists, engineers, business school graduates,

2

lawyers, and other professionals to help solve environmental problems in a
scientifically sound, cost-effective, and pragmatic way.

7.    EDF's work covers climate, air pollution, and energy, as well as ecosystems,
public health, and resilience. Since these topics are intertwined, we take a
multidisciplinary, solutions-based approach, working alongside other
organizations—as well as with businesses, governments, and communities.

8.    EDF's energy and climate teams seek to bend the curve on global
greenhouse gas emissions from fossil fuel production and use by 2030,
cleanly and equitably. We do this through a defined set of strategies
targeted at 1) reducing emissions from fossil fuel production, delivery,
and use, and 2) decarbonizing power generation, transportation,
buildings, and industry. EDF's clean air and health teams focus on
protecting both people and the environment from pollution and toxic
chemicals. We do this through cutting-edge research and advocacy,
wide-ranging partnerships, and a focus on strengthening laws and
policies that protect health, air, water, and make food and household
products safer.

9.    Reducing methane from the oil and gas sector is one of EDF's top
organizational priorities. EDF seeks to achieve this by leveraging
scientific data and economic analysis to support policy actions that

3

reduce methane pollution. EDF scientists have studied methane emissions from oil and gas for over a decade, publishing more than sixteen peer-reviewed scientific papers on the topic. In 2023, EDF scientists measured total oil and gas methane emissions across the United States, creating new data that EDF leverages in policy advocacy.

10. We are aware that on March 8, 2024, EPA adopted a final rule that strengthened new source performance standards for the oil and gas source category and established emission guidelines for state plans to limit emissions from existing sources. 89 Fed. Reg. 16,820, 16,826-27 (March 8, 2024) ("2024 Rule"). We are further aware that EPA recently published a final action entitled *Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule*, 90 Fed. Reg. 35,966 (July 31, 2025) ("Delay Rule") which extends many of the compliance dates under the 2024 Rule.

11. EDF has a strong organizational interest, and a strong interest that is based in its members' recreational, aesthetic, professional, educational, public, health, environmental, consumer, and economic

4

interests, in policies that help to reduce harmful pollution from oil and gas operations, including the 2024 Rule.

12.    EDF participated as a stakeholder throughout the rulemaking process for the 2024 Rule and in earlier litigation involving the 2024 Rule. EDF has also extensively advocated for EPA standards to reduce methane from the oil and gas sector throughout multiple past rulemakings, dating back more than a decade.[2]

**Impacts of Oil and Gas Air Pollution**

13.    We are aware that oil and gas facilities emit harmful air pollution, including methane, a potent greenhouse gas with over eighty times the near-term global warming power of carbon dioxide. We are likewise aware that atmospheric methane concentrations are at an all-time high and have been steadily rising since about 2007, coinciding with an increase in U.S. oil and

---

[2] *See* Comments of Environmental and Public Health Organizations in response to EPA's Proposed Revisions to New Source Performance Standards for the Oil and Gas Sector (Nov. 30, 2011), Docket ID Nos. EPA-HQ-OAR-2010-0505-4189, EPA-HQ-OAR-2010-0505-4240, & EPA-HQ-OAR-2010-0505-4275; *See* Comments of Environmental and Public Health Organizations in response to EPA's Proposed Emission Standards for New and Modified Oil and Natural Gas Sources (Dec. 4, 2015), Docket ID Nos. EPA-HQ-OAR-2010-0505-6934, EPA-HQ-OAR-2010-0505-6984, & EPA-HQ-OAR-2010-0505-6994; S*ee* Comments of Environmental and Public Health Organizations on Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources for Review (Dec. 4, 2019), EPA Docket No. EPA-HQ-OAR-2017-0757-2134; Comments of Environmental and Public Health Organizations on Oil and Natural Gas Sector: Emission Standards for New, Reconstructed, and Modified Sources Reconsideration (Dec. 13, 2019), EPA Docket No. EPA-HQ-OAR-2017-0483-2041.

5

gas production. At least 25% of today's warming is driven by methane from human actions, with the oil and gas sector as one of the largest sources. These emissions primarily result from leakage along the supply chain, including from oil and gas wells, production sites, and compressor stations. Reducing oil and gas methane emissions is critical for avoiding the worst effects of climate change.[3] Leaks and operational processes at oil and gas facilities release significant volumes of methane, and standards to address those emissions will mitigate harmful climate change. Moreover, many mitigation measures result in cost and energy supply savings from capturing gas that would otherwise be wasted.

14.    We know that climate change, which is made worse by methane emissions, is a serious and existential threat that affects both the environment and human health and wellbeing. The negative impacts of climate change are projected to  become greater, more frequent, and more intense with every additional increment of global warming. Because climate change is an incremental problem, every additional ton of greenhouse gases emitted into the atmosphere is important; each one contributes to greater warming, making the impacts that much worse. These impacts include longer and

---

[3] Ocko et al., *Acting rapidly to deploy readily available methane mitigation measures by sector can immediately slow global warming*, 16 Env. Research Letters 054042 (2021), https://iopscience.iop.org/article/10.1088/1748- 9326/abf9c8.

6

more intense hurricane seasons, prolonged drought, larger and more intense wildfires, rising sea-levels, increased flooding, and widespread extreme weather events. Climate change is also a serious threat to human health. For example, climate change is projected to increase ozone pollution across broad swaths of the U.S., cause worsening and deadly heat waves, and driving increases in vector-borne diseases.

15.   We are also aware of the significant direct health impacts of volatile organic compounds (VOCs) and hazardous air pollutants (HAPs) that are released alongside methane in emissions from oil and gas production. We are aware that living in close proximity to oil and gas sites exposes people to negative impacts from the air pollution caused by these leaks and intentional emissions. The threat radius for HAPs is generally considered to be a half mile—meaning that those within a half mile of an oil and gas site are at high risk of exposure to these toxic pollutants. Exposure to VOCs and HAPs can lead to a wide range of negative health impacts, including respiratory and skin irritation, neurological problems, dizziness, and headaches. VOCs also contribute to the formation of ground-level ozone or smog which negatively impacts human health and can lead to decreases in lung function, respiratory-related emergency room visits, and premature death. Ozone pollution is particularly harmful for vulnerable populations, such as children,

7

people with respiratory diseases or asthma, older adults, and people who are active outdoors, especially outdoor workers. Those living near oil and gas sites are exposed to increased risk of these negative health impacts.

**EDF Members Are Affected by Oil and Gas Operations and Would Be Harmed by the Delay Rule**

16.    As of August 2025, EDF has more than 315,000 members in the United States, and we have members in all 50 states and the District of Columbia. These members have a strong interest in protecting human health and the environment from air pollution, as well as combatting the negative impacts of climate change.

17.    EDF members are among those directly affected by pollution caused by oil and gas production and associated operations. EDF has conducted an analysis of where our members live across the U.S. to determine how many reside within a half mile, one mile, and ten miles of an oil and gas facility. The half-mile radius is a conservative estimate of the area within which elevated levels of harmful and hazardous pollution are seen, and the distance within which health impacts have most clearly been correlated with the presence of oil and gas facilities. But we anticipate that this estimate understates the full impact of oil and gas pollution on our members. That is because independent research and analysis indicates oil and gas operations

8

have been linked to air pollution at distances much greater than a half mile.[4] Therefore, we also analyzed members within one mile and ten miles of an active oil and gas facility.

18.    We understand from our membership department that when an individual becomes a member of EDF, their current residential address is recorded in our membership database. The database entry reflecting the member's residential address is verified or updated as needed. The database is maintained in the regular course of business, and each entry reflecting a member's residential address and membership status is promptly updated to reflect changes. We obtained the information about our membership discussed below from our membership database.

19.    We performed our analysis using this EDF membership data and geographic information systems (GIS) to assess the proximity of the geographic coordinates of members' addresses to oil and gas production sites and compressor stations. The dataset for oil and gas facilities was obtained from the Enverus Prism database, which is an established database relied on by industry and other oil and gas stakeholders. We selected all onshore wells in

---

[4] Tavella et al., *A Review of Air Pollution from Petroleum Refining and Petrochemical Industrial Complexes: Sources, Key Pollutants, Health Impacts, and Challenges*, 9 (1) *ChemEngineering* 13 (2025).

the U.S., filtering to include only wells with active production in order to exclude abandoned and shut-in wells. We also obtained data for compressor stations from Enverus Prism, filtering to U.S. "In Service" compressor stations to determine the operational sites.

20.    Our analysis determined that EDF has over 4,000 members who live within a half mile of an oil and gas production site or compressor station. It also showed that 9,000 members live within one mile of an active oil or gas production site or compressor station, and 93,000 live within 10 miles. This analysis is relevant to understanding the benefits of the 2024 Rule and harms of the Delay Rule.[10] As a result of the Delay Rule, up to 93,000 of our members living within 10 miles of an active facility would be subject to elevated levels of pollution. EPA's Delay Rule will harm our members.

**Declarant Proximity Analysis Methodology**

21.    We also analyzed on a more granular level the oil and gas facilities and sources subject to the 2024 Rule that exist in counties where EDF member declarants live, as well as members from other environmental and health organizations joining EDF in litigation over the Delay Rule. To do this, we obtained well and rig counts from Enverus datasets during July 21-31, 2025.[5]

---

[5] Enverus Prism, Wells Dataset and Active Rigs Dataset, https://www.enverus.com (EDF subscribes to and uses Enverus' proprietary data explorer).

10

For total well counts, the most recent drilling/modification date was determined using the "Completion Date" field in the Enverus dataset. Well counts are provided for all wells with currently active permits and separately for all wells with currently active permits *and* a "completed" or "producing" status in Enverus (this excludes wells with statuses that indicate inactivity, abandonment, etc.). For total rig counts, only *active* rigs were counted.

22.  According to EPA's Technical Support Document (TSD) for the 2024 Rule, a typical production well has four storage tanks and two super emitter events.[6] Pollution control devices are the required mitigation method for well completions (a process that occurs at all wells) and they are the regulatory standard for controlling storage tank emissions (which wells have an average of four of). Closed vent systems must also be used whenever a control device is used. Additionally, EPA estimates wells have anywhere from 112 to 620 fugitive equipment components that would be repaired under the 2024 Rule and EPA estimates that at least 50% of wells have 1 to 3 pneumatic controllers.[7]

23.  Based on these assumptions, we were able to generate granular estimates of different types of oil and gas wells that would be impacted by the Delay

---

[6] EPA, Background Technical Support Document (TSD) for the Final New Source Performance Standards (NSPS) and Emissions Guidelines (EG), at B-14 (Nov. 2023).
[7] *See id.*

11

Rule on a county basis and within a certain distance of declarants' residences. The categories of wells we analyzed are defined below. Except where otherwise noted, wells and rigs near a declarant's address were totaled within a half-mile radius of that address.

24.   **Categories of Wells – County Counts**

- *County Total (all active permits)*: All active permits for wells in the specified county (wells were included regardless of status).

- *County wells drilled/modified prior to December 2022 (all active permits)*: Same as above but for wells which have a completion date before December 6, 2022.

- *County wells drilled/modified post December 2022 (all active permits)*: Same as above but for wells which have a completion date after December 6, 2022.

- *County Total Active Wells (completed, producing)*: All active permits for wells in the specified county, only including wells which are listed with a "completed" or "producing" status in Enverus (this excludes wells with statuses that indicate inactivity, abandonment, etc.).

- *County Wells Drilled/Modified prior to December 2022 (completed, producing)*: Same as above but for wells which have a completion date before December 6, 2022.

12

- *County Wells Drilled post December 2022 (completed, producing)*: Same as above but for wells which have a completion date after December 6, 2022.

- *Drilling Rigs/Wells being constructed*: All active drilling rigs within the county. This serves as a proxy for wells that will be producing in the near future because the primary use of rigs is the creation of new wells.

25. **Categories of Wells – Within Specific Distance**

- *Existing Wells (prior to December 2022) within a certain distance of member's provided address (all active permits)*: All active permits for wells in the specified area with a completion date before December 6, 2022 (wells are included regardless of status).

- *New wells (post December 2022) within a certain distance of member's provided address (all active permits)*: All active permits for wells in the specified area with a completion date after December 6, 2022 (wells are included regardless of status).

- *Existing Wells (prior to December 2022) within a certain distance of member's provided address (completed, producing)*: All active permits for wells in the specified area with a completion date before December 6, 2022, only including wells which are listed with a "completed" or "producing" status in Enverus (this excludes wells with statuses that

13

indicate inactivity, abandonment, etc.).

- *New wells (post December 2022) within a certain distance of member's provided address (completed, producing)*: All active permits for wells in the specified area with a completion date after December 6, 2022, only including wells which are listed with a "completed" or "producing" status in Enverus (this excludes wells with statuses that indicate inactivity, abandonment, etc.).

- *Rigs being constructed*: indicates a well will produce imminently.

26.    The specific results of the analyses based on the above-described methodology are presented in the individual member declarations for which they were conducted and we attest to the results described therein.

**EDF Members in Areas with Elevated Ozone Pollution**

27.    We further analyzed the number of EDF members living in areas that are not meeting EPA ozone standards (nonattainment areas) with oil and gas facilities. These 130,000 members are already breathing unsafe levels of ozone, which VOCs from oil and gas operations are a major contributor to. The 2024 Rule is projected to greatly reduce VOCs, benefiting our members by helping to reduce harmful ground-level ozone. The Delay Rule would cause EDF members to be harmed by higher levels of VOCs from oil and gas operations that contribute to dangerous levels of ozone pollution.

14

28.  EPA estimates that the Delay Rule will result in additional emissions of 1,300,000 tons of methane (equivalent to the annual climate pollution of 28 coal-fired power plants or 25 million passenger vehicles), 350,000 tons of VOCs, and 13,000 tons of HAPs between 2038-2039.[8] However, these estimates appear to only include delaying standards for existing sources starting in 2028 (when the existing source standards kick in). Nonetheless, EPA's action to delay requirements and standards for new sources will also result in increased pollution. EPA previously estimated that the new source standards would have reduced 490,000 tons of methane, 150,000 tons of VOCs, and 5,600 tons of HAPs in 2025 alone.[9] In 2026, EPA estimated the new source standards would reduce 700,000 tons of methane, 210,000 tons of VOCs, and 5,600 tons of HAPs. While the Delay Rule does not impact all of the new source standards, it does weaken or delay certain standards, which will result in additional pollution. For example, the Delay Rule weakens the standards for process controllers, eliminating the zero-pollution requirement for 18 months. We estimate this change will result in 60,000

---

[8] EPA, Economic Impact Analysis for the Extension of Deadlines in the NSPS OOOOb and EG OOOOc, Page 6, Table 3 (July 23, 2025), https://www.epa.gov/system/files/documents/2025-07/oil_and_gas_eia_extension_of_deadlines_07-2025.pdf.

[9] EPA, Regulatory Impact Analysis of the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 2-57, Table 2-9 (Dec. 2023).

15

tons of additional methane pollution.[10] Similarly, the Delay Rule pauses the Super-Emitter Program, designed to support timely mitigation of the largest emission events—this will lead to unaddressed and significant pollution. EPA's extension of other requirements, such as the requirement to maintain a continuous pilot light to ensure a flare is combusting methane, mean that emission reductions from other standards cannot be verified and may not occur.

29.    The Delay Rule extends deadlines to comply with these standards and will result in increased pollution from these sources. These additional emissions put our members at increased risk of the pollution impacts of the oil and gas sites, including smog-forming VOCs and toxic air pollution. The Delay Rule also puts our members at increased risk from the dangers of climate change—including more severe wildfires, increased risk of flooding, sea-level rise, heat waves, and drought—which would be mitigated by reduced emissions of methane.

30.    EDF's members, and EDF as an organization, have a strong interest in ensuring the Delay Rule is vacated and the 2024 Rule remains in full effect

---

[10] Based on a scenario in which the zero-emission standard is replaced with a low-bleed standard for the production, gathering and boosting, transmission, and storage segments. We calculated the difference in emissions between this scenario and the baseline scenario for 5 months of 2025, all of 2026, and 1 month of 2027.

16

and is timely implemented so that the pollution reductions are realized.

We declare that the foregoing is true and correct.

_____

Jeremy Proville

_____

Laura Mirtich

Executed on August 14, 2025.

17

# Attachment 21

Declaration of Maricruz Ramirez, GreenLatinos

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

**DECLARATION OF MARICRUZ RAMIREZ**
**Submitted In Support of GreenLatinos**

I, Maricruz Ramirez, declare as follows:

1.      I was born and raised in Bakersfield, which is in Kern County, California. I joined GreenLatinos in 2022 to contribute to organizing and advocacy work to improve air quality and end oil and gas drilling in Kern County.

2.      As a lifelong resident of Bakersfield, I have been surrounded by oil and gas infrastructure for as long as I can remember. Oil and gas wells are so ubiquitous in the region that when I was growing up, their presence seemed normal—it was part of everyday life. The Bakersfield High School mascot is even the "Drillers." It also seemed normal that so many people I knew growing up had breathing problems, like asthma, or nosebleeds. It was only later that I learned about the harms of pollution from oil and gas drilling and how the breathing problems and nosebleeds are connected to the oil and gas drilling.

3.      I am aware that Kern County produces roughly 70% of California's oil and more than 75% of California's natural gas. I am also

aware that more than 75% of California's active wells are located in Kern County.

4.      I have witnessed detrimental health impacts associated with oil and gas development throughout my lifetime. So many people that I know have suffered from respiratory issues. My father and all three of my siblings have variations of asthma or bronchitis. My father and my sister use an inhaler to help them breathe. I remember that when I was young, every winter my father would get a frightening cough. My brothers also had terrible coughs and have been prone to bronchitis and other upper respiratory infections. Seeing my family members struggle with something as simple as breathing has been very scary and disheartening. My sister would also frequently suffer from nosebleeds. I am aware that these health impacts are associated with breathing in pollutants emitted at oil and gas well sites.

5.      I attended Sequoia Middle School as a child and remember seeing oil and gas wells within walking distance of my classrooms. I remember that kids at school were frequently sick with symptoms associated with proximity to oil and gas infrastructure, including asthma, bronchitis, and bloody noses.

6.      I am worried that children that attend Sequoia Middle School

2

today will experience the same health impacts that I witnessed due to the continued presence of the oil and gas industry in the immediate vicinity of the campus. I am aware that currently, according to the California Department of Conservation Well Finder, within 2,100 feet of Sequoia Middle School there are: 11 plugged, 3 active, 2 new, and 3 idle oil and gas wells. The nearest well is less than 500 feet away.

7.      I earned my Bachelor's Degree in Sociology from California State University. After I graduated from college, I became involved in organizing and advocacy for environmental justice. In 2020 I joined a local chapter of the Sunrise Movement where I contributed to efforts to end the drilling of new oil and gas wells in Kern County. This experience opened my eyes to how bad things are in Bakersfield with respect to oil and gas production. I realized that the air quality and health issues that we experience in Bakersfield are not normal, and that people in other places don't have to deal with the health impacts associated with this industry. I realized that poor air quality is not something that my community has to accept, and that we can fight to improve it.

8.      I currently work as a Community Organizer with the Center on Race, Poverty, and the Environment in Bakersfield. In this position I support advocacy to end oil and gas drilling in Kern County. I help educate

the community about the issues that Kern County faces, and help empower people to give public comment and share their voices. Part of my job is being here to support the community members who are suffering the most from pollution from oil and gas production. I have met many people across Kern County that experience the same health impacts associated with oil and gas development that I have experienced and witnessed. I have met individuals who have been faced with cancer, cardiovascular disease, and who have lost loved ones. I think that some of these health impacts could have been avoided if we had stronger regulations on oil and gas operations. These experiences and relationships motivate me to continue working to improve the air quality in my community and the health of my neighbors.

9.      I understand that wells leak methane as well as other pollutants, including hazardous air pollutants (HAPs) and volatile organic compounds (VOCs). VOCs have been shown to cause birth defects and contribute to ozone formation, which is also harmful to health. I personally know one woman in Bakersfield who lived near an oil well that was found to be leaking methane, and who eventually gave birth to a child with a birth defect.

10.      I like to visit Panorama Park, in northern Bakersfield. The park is located on a hill overlooking the valley below. Looking north from

4

266

Panorama Park a large field with oil and gas wells is visible, and there is often a pungent odor that I associate with oil and gas wells. This is very disheartening because Panorama Park should be a beautiful location, but all you see is the wells and then you smell the odor. I know that breathing in the toxins that I can smell is harmful to my health, so I avoid going to this park. If the air quality were better, I would visit the park more.

11.      Oil and gas wells are so common in Bakersfield that they are difficult to avoid. When I was a child, these wells simply were a part of the background. Now that I am aware of the detrimental health impacts associated with oil and gas wells, I frequently notice them around town. For example, there is a well near a health clinic that my community visits. I also know of one walking path that crosses through Bakersfield with wells mere feet away from the path. You can walk from the park at River Walk all the way to Yokuts Park along that path. I would like to use that path more, but I worry about pollution when I walk there.

12.      The American Lung Association has assigned Kern County with a "F" grade for air quality when considering both ozone overall and the number of high ozone days. The San Joaquin Valley, which includes Bakersfield where I live, is in extreme nonattainment with the federal ozone standards from both 2008 and 2015. And the eastern portion of Kern

5

County, just east of Bakersfield, is also in nonattainment with the ozone standards. I understand that this means that ozone levels where I live are regularly above the levels that the Environmental Protection Agency has deemed safe. I also understand that newer studies have concluded that even lower levels of ozone are still unsafe and unhealthy. I understand that VOCs emitted by oil and gas wells contribute to the formation of ozone, so I am concerned that this problem is exacerbated by pollutants emitted at oil and gas wells in and around Bakersfield and across the county.

13.     I know that breathing in ozone can harm people by causing coughing, asthma, wheezing or shortness of breath, and higher rates of illness. I understand that air polluted with ozone can also cause heart attacks and even premature death. Because of this, on days with poor air quality I feel especially vulnerable. I often stay inside and cancel plans to go out. You have to ask yourself, is it worth the risk of getting sick? This is very heavy to live with. I want to be able to not have to look at the weather app on my phone to check air quality before deciding whether I should go outside. I want to not have to hear stories from my family members and community members about the health effects they're experiencing. I want to live a more relaxed life with clean air where I can walk down the path in Bakersfield without worrying about the pollution that I'm breathing in. For

6

my own health and for our future generations, I want clean air for
Bakersfield.

14.     Through my profession and personal experience I have
developed a thorough understanding of the adverse health impacts
associated with proximity to oil and gas infrastructure. I understand that,
due to the extensive oil and gas operations in the area, residents of Kern
County are at a heightened risk of experiencing these health impacts. For
this reason I am worried about my own health, the health of my middle
school aged stepson, my infant niece, and the rest of my family and
community. I do not want the next generation to live with the same air
quality issues that I grew up with.

15.     I understand that the Biden Administration's publication on
March 8, 2024, of the Standards for Performance for New, Reconstructed,
and Modified Sources and Emissions Guidelines for Existing Sources: Oil
and Natural Gas Sector Climate Review (NSPS rules), if fully
implemented, will protect the health of my community. The NSPS rules
will improve air quality in Bakersfield by requiring companies to replace
their old, polluting pneumatic controllers with non-emitting technology.
The rule will also limit flaring, which is a polluting practice. I know that
the rule also has comprehensive leak monitoring requirements that subject

7

all sites to regular inspections. The rule will also allow for the use of advanced methane detection technologies onsite, and empower certified third parties to monitor, identify, and report large emissions directly to the Environmental Protection Agency. This is important to me because I'm concerned about the monitoring that oil and gas operators do themselves, and want to have more monitoring by external groups to make sure that leaks are fixed.

16.     I understand that this rule was supposed to result in the reduction of approximately 58 million tons of methane, 16 million tons of VOCs, and 590,000 tons of HAPs. I believe that the NSPS rule, if fully implemented, will have a tangible and lasting positive impact on the health and wellbeing of myself, my family, and my community.

17.     I am aware that the Trump administration has announced that it will reconsider the NSPS rule. As a first step, on July 31, 2025, EPA issued an interim final rule, effective immediately, extending many of the compliance deadlines. According to the fact sheet for the rule, emissions reductions that I was counting on for my community will no longer occur. Nationally, this includes 3.8 million tons of methane, 960,000 tons of volatile organic compounds (VOCs), and 36,000 tons of toxic air pollution.

18.     According to analysis provided to me by Environmental

8

Defense Fund analyst Laura Mirtich (*see* Proville-Mirtich Declaration), there are currently more than 36,000 producing oil and gas wells in Kern County where I live. More than 35,000 of these wells were completed prior to December 2022 and would be subject to the existing source standards once adopted by California, and 222 of these wells were drilled after December 2022 and would be subject to the new source standards, many of which have been delayed. There are currently 2 active drill rigs operating in the county.

19.     According to the Mirtich analysis, there are also at least 2 new wells and 1,924 existing wells that would be subject to the 2024 Rules within 2 miles of the area I visit in Panorama Park.

20.     By delaying compliance with the rules, the Trump administration has delayed important protections for me and my community. The fact that these rules will delay emission reductions in VOCs is particularly concerning to me because I live in an extreme ozone nonattainment area and I was counting on this rule to help with our ozone pollution. I also worry about toxic air pollution from wells near the areas where I recreate.

21.     I am concerned that if the NSPS rule does not go into effect as originally adopted by the Biden Administration, the continuing high levels

9

of pollution from oil and gas production will harm the health of myself, my family, my community, and future generations. The Court can prevent this impact by striking down the deadline extensions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Signed August 11, 2025, in Bakersfield, California.

MARICRUZ RAMIREZ

10

# Attachment 22

Declaration of Todd Richardson, Sierra Club

## DECLARATION OF TODD RICHARDSON

I, Todd Richardson, declare as follows:

1. My name is Todd Richardson. I am 57 years old and competent to give this declaration. All information herein is based on my own personal knowledge unless otherwise indicated.

2. My address is 11 Hialeah Circle, Odessa, Texas, 79761. My home is in Ector County, and I am located about two miles east of the border with Midland County. I have lived in Odessa since 2003. I am an English professor at the University of Texas Permian Basin (UTPB).

3. I am a dues-paying member of Sierra Club. I first joined the Club in 2003 because it is one of the best-known environmental groups and has its roots in getting people into nature, which has always appealed to me.

4. Additionally, one of the main missions of Sierra Club is to reacquaint people with the wild, which is an idea that has its roots in 19th Century transcendental literature and culture. As an English professor, much of my teaching and research focuses on American Transcendentalist writers from the 19th century. Emerson, Thoreau, and others, through inspiring the likes of John Muir and Teddy Roosevelt, helped make wilderness preservation an important American value and one that I hold personally.

1

5.    About 16 years ago, I started a Permian Basin committee with Sierra Club's Lone Star Chapter to resist a proposed nuclear waste site and proposed nuclear power facility. In recent years, I have worked with the chapter to fight pollution related to oil and gas development in my area.

6.    In addition to Sierra Club, I have also been a dues-paying member of Natural Resources Defense Council (NRDC) since 2016 and of Environmental Defense Fund since 2020. I appreciate that each of these environmental organizations is on the cutting edge of keeping the Earth safe and clean.

7.    Around 2008-2009, a huge hydrofracking boom began in this part of the country, as oil and gas operators starting drilling more and more wells. Since that time, flaring, methane leaks, and emissions of other nasty pollutants have been serious issues impacting my area. All of this pollution needs to stop, and I am happy to work with Sierra Club, NRDC, and EDF to make that happen.

8.    There are a tremendous number of oil and gas wells in my area. Based on data compiled by environmental groups, I understand that, together, Ector and Midland Counties have 15,089 active wells currently producing oil, gas, or both. Of these, I understand that 13,286 were drilled or modified before December 6, 2022, while 1,803 were drilled or modified after December 6,

2

2022. I also understand that, according to Texas's oil and gas mapping software, there are at least three actively producing well heads within 2.5 miles of my house and over a dozen more that have been permitted for drilling.

9.     In addition to wells, there is a huge amount of other oil and gas equipment near where I live. For instance, I understand that there are dozens of gas compressor stations in Midland and Ector counties, including at least 20 located within approximately 20 miles of my house. I know that wells, compressor stations, and other oil and gas infrastructure emit large quantities of climate-disrupting methane, smog- and soot-forming volatile organic compounds, and air toxins like benzene and hydrogen sulfide into the atmosphere.

In addition to oil and gas production equipment, that there is substantial quantity of gas transmission equipment in my area as well. For instance, I understand that as of 2024, data collected by the Department of Homeland Security's Geospatial Management Office showed that there were several large transmission compressor stations located along pipelines in the counties immediately surrounding Ector, including one just a few miles south of Guadalupe Mountains National Park, a place I enjoy visiting and hiking in.

3

10.    The combination of air pollution from compressor stations, oil and gas wells, gas flaring, and other oil and gas operations in my area is awful. The sky is often hazy, much more so than it was when I first moved here in 2003. There is a lot of hydrogen sulfide pollution, which I can smell almost all the time, even at night in my home. I and other community members have noticed that the air quality in our area has gotten drastically worse in recent years. The pastor of my church has complained of headaches that she believes are related to environmental pollutants related to fossil fuel extraction.  I experience some lung congestion, I can't breathe as freely as I once did, and I cough more often and harder than in the past. I am absolutely concerned that excess emissions from the oil and gas industry are harming our air and endangering my health.

11.    I am an avid runner and hiker. I hike and enjoy viewing wildlife in the Guadalupe Mountains, the Davis Mountains, the Midland I-20 Wildlife Preserve, and the Sibley Nature Center in the nearby city of Midland. Yet the air pollution and haze that we have in this part of Texas is aesthetically displeasing and diminishes my experience of being out in nature. Every time it gets dark while I'm hiking in the Guadalupe Mountains, the scenery looks like something out of a *Lord of the Rings* movie because of the abundance of haze, flaring, and fossil fuel infrastructure. Perry Como's song "Deep in the

4

Heart of Texas" says that "The stars at night are big and bright, deep in the heart of Texas." However, the haze and pollution that tarnish the air in my slice of Texas prevents me from enjoying the stars and the general aesthetic beauty of this region.

12. I am aware that methane is a major driver of climate change. I can say with no doubt in my mind that climate change is the biggest threat to humanity, and it's having a major impact on West Texas. This area has always been a hot and dry place, but it has been undeniably hotter and drier here in recent years. The summer of 2025 was incredibly dry, until we got hit with rainstorms in July that led to devastating floods in other parts of Texas (which were themselves almost certainly related to climate change). The small playa lake at the I-20 Wildlife Preserve has been completely dry for most of 2025. I have been learning about birding, so I visit the I-20 Wildlife Preserve often—it's usually a birders' paradise. On my most recent trip to the preserve, there were no birds at all.

13. I am seriously concerned about the impact of climate change on my and my family's wellbeing. I like to run, and I now have to run as late as 10 p.m. to avoid the extreme heat, and even then it can be above 90 degrees outside. This past summer, it was difficult to run at all. I also worry about increase in extreme storms and the negative impacts they could have on my mother,

5

who is in her 80s and lives in Newark, Delaware. Similarly, my sister lives in Virginia Beach. I worry that the increased frequency and severity of hurricanes hitting the Virginia coast will harm her and her family.

14. I am also concerned about climate change and the world that future generations, including my students, are inheriting. It is completely unjust and utterly unfair that the younger generation—who are good people that just want to get started in life and have a decent environment to live in— have to worry about climate change dropping on their heads. I work with my students to awaken them to these issues and guide them to adjust to living in a world with climate change.

15. I am aware that EPA finalized a rule in 2024 that will greatly reduce emissions of methane, volatile organic compounds, and hazardous air pollutants from the oil and gas industry. I understand that this rule not only strengthens standards that were in place since 2016 for new and modified oil and gas equipment, but includes the first-ever emission reduction obligations for existing equipment. I understand that, among other things, this rule requires increased leak detection and repair inspections at wells and compressor stations, reduces flaring, requires zero-emitting technology for certain sources, and establishes emission limitations for certain operations that were never previously regulated, such as liquids unloading events. By

6

including these and other requirements, EPA's rule substantially benefits me and my community by reducing climate-harming emission and improving the quality of our air

16.     I understand that EPA recently issued a rule delaying the deadlines by which owners and operators of oil and gas equipment must meet the emission limitations established by the 2024 rule. This will harm me and my community, since it means we will have to wait longer before we can benefit from the emission reductions that the rule will achieve. I also understand that EPA has delayed these deadlines without soliciting, considering, and responding to public comments, which is the typical rulemaking procedure. This means that groups like Sierra Club, EDF, and NRDC, as well as their members, supporters, and the broader public, were not given an opportunity to participate in this process and persuade EPA not to delay the rule's implementation.

17.     I understand that Sierra Club, EDF, and NRDC have filed a lawsuit to challenge EPA's action delaying the 2024 rule's deadlines and its decision not to follow the legally required rulemaking procedures. If this lawsuit is successful, it will be beneficial to me and my community, since it means we will have access to emission reductions sooner, and will benefit from the

7

opportunity for environmental groups, other stakeholders, and the broader public to participate in and influence the rulemaking process. I therefore support Sierra Club, EDF, and NRDC in this litigation.

18. At heart of it, I was drawn to teach about the Transcendentalists because they offer a valuable message to my students. These writers wanted to challenge their readers, and I similarly want to challenge my students to see the truth about what's happening in world around them. However, I want them to know that there is a basis for hope and optimism. If you dig deeply enough, you will find a solution, no matter how bleak and how bad a problem appears to be. I want them to not only have the strength to confront the truth, but also the strength to find those latent resources deep within themselves to squarely address climate change and overcome it. We have to find the courage to hope.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Odessa, TX, on August 12, 2025.

Todd Richardson

8

# Attachment 23

Declaration of Don Schreiber, Environmental Defense Fund

IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF
COLUMBIA CIRCUIT

**DECLARATION OF FRANCIS DON SCHREIBER**
**Submitted In Support of Environmental Defense**
**Fund**

I, Francis Don Schreiber, declare as follows:

1.      I am currently a member of the Environmental Defense Fund
("EDF"). I am a rancher and landowner in Gobernador, New Mexico. My
wife, Jane, and I own the Devil's Spring Ranch ("Ranch") on 480 deeded
acres in Rio Arriba County, and have a permit to graze cattle, sheep and
horses for approximately 2,800 additional acres of land adjacent to the
Ranch. We graze our own horses and raise chickens on the Ranch. We
previously ran cattle but stopped in 2015 to focus our resources on
mitigating oil and gas impacts on our property. We currently lease some of
our grazing rights to other ranchers, who run cattle on the land.

2.      My ranch is located in the San Juan Basin in northwestern
New Mexico. The San Juan Basin is at times one of the most active areas
in the country for oil and gas production with 20,000 active oil and gas
wells. The Ranch is subject to a split estate—I own the surface rights to my
land, and the mineral rights are owned by the federal government. There
are currently about 122 oil and gas wells on and immediately adjacent to
the Ranch emitting harmful pollution. Because there are oil and gas

1

operations on and near my property, I closely follow regulatory

developments concerning federal oil and gas regulations, including through

communications that I receive from EDF. I have advocated for the adoption

of measures in New Mexico and federally that would reduce waste and

limit emissions from oil and gas development.

3.    Jane and I bought our land in 1999, with the goal of developing a

model for sustainable agriculture with cattle and passing the Ranch down

to our children and grandchildren. At that time there were about 75 wells

operating or in construction on the land. We have since curtailed our

ranching activities. Though we continually work on rangeland

improvements, including developing and improving water supply, wildlife-

friendly fencing, invasive and noxious plant control, and erosion control,

these activities are primarily done to mitigate the impacts of oil and gas

activity. While we used to run cattle, we stopped in 2015 because

ConocoPhillips, which had paid for the use of our cattle to restore lands

---

[2] https://www.justice.gov/opa/pr/natural-gas-producer-agrees-settlement-reduce-emissions-new-mexico

2

damaged by the company, withdrew financial support, and because we needed to devote more time to defending the Ranch against oil and gas impacts. This left Jane with increasing responsibility for ranch work. Eventually, we could not do both and decided that working to hold the oil and gas industry accountable for the damage they were causing to our land, water, and air was more important.

4.    Since 2018, we have been aware of recompletion activities (which bring existing wells back into production and which are a "modification" that triggers EPA's new source performance standards) on and around our Ranch as an important part of the business plan of the largest gas producer in New Mexico. In 2018, and again in 2019, we protested recompletions here on the Ranch for failure to capture methane during the recompletion process. In February 2020, we were notified by the operator that it planned to undertake 22 recompletions in our area. The operator owns thousands of wells in the San Juan Basin that are eligible for recompletion. I saw a well undergo recompletion in July 2021 within a mile from my home.

5.    The impacts to the physical properties of our land and resources from oil and gas development have been significant. I see and hear semi-trucks passing by my property, hauling pipe for construction of another

3

well. Roads and pipeline construction have interrupted natural water, soil, and vegetation patterns on our land. This has not only changed what we can grow but has also impacted the natural barriers that we use for grazing permits in and around the Ranch.

6.      I am aware that oil and natural gas facilities emit significant amounts of harmful air pollution, both through designed releases and unintentionally leaking equipment. I understand that these pollutants include methane, VOCs, carcinogenic HAPs such as benzene and toluene, and other dangerous air pollutants. I understand that methane is a highly potent greenhouse gas, capable of warming the climate at a rate over 80 times that of carbon dioxide over a 20-year period. I also understand that VOCs contribute to the formation of ground-level ozone, or smog, which is hazardous to human health and can cause respiratory disease and premature death. I am aware that the best practices that reduce methane and VOC emissions also help mitigate other harmful air pollutants.

7.      I have personally experienced air emissions associated with venting, flaring, process controllers, and leaking wells on the Ranch. I've seen flaring and venting hundreds of times since 1999 and within 1-5 miles of the Ranch. Well construction or maintenance, which can cause flaring and venting, happens every 2-3 months near my property. In June 2023, I

4

caught a recompletion flare occurring about 5 miles from my home on camera (see Exhibit A) and I witnessed a separator fire on October 25, 2022 (see Exhibit B). So many people called in about the flare that the fire department responded. We hear venting daily from wells close by. We know that sound represents harmful and potentially toxic emissions escaping directly into the atmosphere, and into the air we breathe as we live and work here at the Ranch. These emissions endanger not only us, but our livestock and wildlife that we have pledged to protect. Often, we cannot identify exactly where the venting is coming from, but in these canyon lands, the sound can travel for miles.

8.     As I ride, walk and drive around the Ranch, I can often see vapors escaping from leaking wells distorting the air and creating shadows. There is a group of several wells on the Ranch located less than a third of a mile from our house. On five separate occasions over the last several years, we have visited these wells with Optical Gas Imaging ("OGI") cameras. On all five occasions, we observed and recorded leaks at these wells.[3] When we observe leaking wells we report them to the well operator. For

---

[3] OGI video from one of these observations is available at https://www.youtube.com/watch?v=SYE6K58sY1w&feature=youtu.be.

5

example, when using an OGI camera several years ago on a well that we can see from our home, we discovered a large methane leak. An OGI image of that leak is below. I also recorded a valve box leak on May 11, 2023, a screenshot of which is below. There are two low-producing wells within a quarter mile of our home producing less than 60 thousand cubic feet per day, and we witness leaks from those wells all of the time. This happens repeatedly, but we do not have the resources or ability to monitor all of the wells on the Ranch.




6

9.    Most noticeable is the near-constant smell from leaking wells, which can be extremely strong when we are driving, riding, and walking around areas with oil and gas development. These odors make breathing uncomfortable and often cause us to leave affected areas as quickly as possible, as I am concerned that we are breathing harmful hydrocarbons, such as benzene, toluene, ethylbenzene, and xylenes (these toxic components of natural gas are sometimes referred to as BTEX). I also worry about the aggregate effect of oil and gas operations in our region on the total level of these toxins in the ambient air we breathe.

10.    Jane and I have devoted considerable resources – including time and retirement money – to defend our land from the impacts of oil and gas activity. We have travelled to Santa Fe and Washington, D.C., for example, to tell our story and advocate for more stringent regulations on the industry. Recently, my wife and I created the Open Space Pilot Project (OSPP), which brings federal agencies, energy companies, and landowners in the region together to reduce oil and gas impacts on the land, water, and soil. We also conduct regular air and water testing and pay an analyst to understand oil and gas impacts to our Ranch that we can then bring to regulators. The resources going into these projects would have gone into developing a sustainable agricultural farm on our Ranch, familial support,

7

or retirement.

11.   VOC emissions from oil and gas operations in the San Juan

Basin contribute to elevated smog levels in the Four Corners region,

including in our part of northwestern New Mexico. While the Four

Corners is a sparsely populated rural region, we have similar ozone levels

to urban areas, like Washington, D.C. I am aware that people with

cardiovascular disease are at higher risk from breathing ozone. In 2014, I

had open heart surgery for congestive heart failure, and have post-

operative residual congestive heart failure. I am constantly concerned

about the impact of the air quality on my heart condition. I worry that

ozone levels in my county will cause respiratory or cardiovascular

problems for myself and my family.

12.   Jane and I have five grown children, and ten grandchildren.

Although we had hoped the Ranch would be a place we would share with

our grandkids, the oil and gas operations in our area limit our ability to

enjoy it with them. We worry about their exposure to air pollutants from oil

and gas development in the region, and always are careful to keep them

away from wells and above-ground pipeline equipment. I am aware that

scientific studies have found that proximity to oil and gas operations has

8

negative impacts on health, particularly for children and pregnant women.[4]

Protecting our grandchildren from the negative health effects of oil and gas

emissions is a constant concern when they come to visit us.

13.    The impacts of climate change caused by greenhouse gases such

as methane are evident on the Ranch. We have experienced monsoons and

an increase in torrential downpours that have resulted in unprecedented

runoff. At the same time, our property has experienced extreme drought.

Our land is getting drier and dustier each year. I have noticed tree death,

including the death of pinions and junipers, which I did not witness when

we first moved to the Ranch. Weeds flourish in the warmer weather and

inhibit the growth of essential native grasses. Changes in temperature and

weather patterns, including drought, increased wind, severity of

rainstorms, and increased erosion, have required a shift in the

---

[4] *See* Stacy, et al., *Perinatal Outcomes and Unconventional Natural Gas Operations in Southwest Pennsylvania*, PLoS ONE (June 3, 2015) *available at* https://doi.org/10.1371/journal.pone.0126425; Casey et al., *Unconventional Natural Gas Development and Birth Outcomes in Pennsylvania, USA,* Epidemiology (March 2016) *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4738074/; McKenzie et. al., *Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado,* Envtl. Health Perspectives (Jan. 28, 2014) *available at* https://ehp.niehs.nih.gov/1306722/; Currie, Janet, et al., *Hydraulic Fracturing and Infant Health: New Evidence from Pennsylvania*, Science Advances, American Association for the Advancement of Science (Dec. 1, 2017) *available at* advances.sciencemag.org/content/3/12/e1603021.

9

timing of ranch operations, such as when cows should be bred. Other conventional wisdom that has informed practices for generations is no longer applicable. For example, when I first started ranching in 1999, my neighbor, whose family has been ranching in Rio Arriba County for nearly a century, taught me that on September 28th of each year, I would need to begin checking for ice on our cows' water sources in the mornings. Otherwise, the water would freeze deeply and the cows would not be able to drink. However, this date, passed down for decades, has become obsolete—in recent years, we have not had to break ice until much later in the season. These past several years, we did not have to begin to break ice until mid-December. This past January, much water remained open.

14.   I am aware that in 2024, EPA finalized a rule to strengthen standards to reduce methane emissions from oil and gas facilities. Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16,820 (Mar. 8, 2024) ("2024 Rule"). During my time on the Ranch, I've seen both leaking and intentionally emitting equipment, venting and flaring, and emissions from recompletions, storage tanks and process controllers. The 2024 Rule's standards will reduce harmful pollution from these sources.

15.   I am aware that on July 31, EPA issued an interim final rule

10

(effective immediately) that provides an 18-month extension for standards subject to the 2024 rule to reduce methane emissions from new, modified and existing sources in the oil and gas sector and to reduce volatile organic compound (VOC) emissions from new and modified sources in the oil and gas sector. "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule" ("Delay Rule"), 90 Fed. Reg. 35,966 (July 31, 2025). In particular, it extends the compliance deadlines for storage tanks, process controllers, the super-emitter program (which aims to reduce leaks), combustion devices, flares, and closed vent systems.

16.   While living on and working on my ranch, I have been subject to pollution sources that the Delay Rule applies to. Since February, 2025, my wife and I have been working at the southern end of our ranch in Encierro Canyon, which is part of our BLM grazing permit land, and which we access through our private land. We started running cattle there on August 1st and have been there daily for months to prepare. The route there, approximately 7 miles, is covered with active well sites, and the canyon, which is over 2 miles long, has numerous active wells, some of which we must drive through on our way back and forth to get to Encierro Canyon, or work near for 5 or 6 hours per day. Along the route and right by where

11

we work in the canyon, there are wells that were built prior to December, 2022, and which would be subject to the 2024 Rule's existing source standards, as well as new wells built after December, 2022 that would be subject to the new source standards. In July, there was a tremendous release of methane and fracking waste at a well that was drilled very recently about a mile and half from our home; it was so loud that we heard it from our inside our house. On July 20, at 7:30 AM there was a recompletion of a well that occurred resulting in major venting and leaks. See Exhibit C. On July 30th when working in the Canyon, I saw two wells that bi-sect the road emitting methane that caused me nausea. See Exhibit D.

17.   I am aware that an analyst at Environmental Defense Fund evaluated the number of wells near my ranch and in my county. Rio Arriba County currently has 14,669 active wells. The county has 8,087 wells that were drilled prior to December, 2022 and that would be subject to the 2024 Rule's existing source standards. There are also 33 wells in my county that were drilled after December, 2022 and would thus be subject to the 2024 Rule's new source standards. And there is at least 1 rig being constructed in my county which indicates that infrastructure is being built to begin well production shortly. Additionally, EDF analyzed the number and type of wells that are in close proximity to my ranch and found the

12

following number of wells at various distances from my ranch:

| Buffer around ranch boundary | Number of wells identified | Number of new source wells identified |
|---:|---:|---:|
| 4 miles | 1,030 | 2 |
| 4.5 miles | 1,204 | 2 |
| 5 miles | 1,377 | 2 |

18.   I am aware that the 2024 Rule's standards for process controllers, storage tanks, combustion devices, closed vent systems, leaks, and the super emitter program, would apply to both new and existing wells near my ranch and in my county, and that the Delay Rule's extension for compliance deadlines for these sources is allowing them to forgo pollution mitigation the 2024 rule would have provided.

19.  Because of the Delay Rule, I am concerned that nearby fossil fuel emissions will continue to threaten my health and well-being and that of my family, our workers, and the livestock and wildlife on the Ranch.

I declare the foregoing is true and correct.

Francis Don Schreiber

*[signature]*

Dated August 12, 2025

13

**Exhibit A**



14

**Exhibit B**



15

**Exhibit C**



16

**Exhibit D**





17

# Attachment 24

Declaration of Veronica Southerland and Meagan Weisner, Environmental Defense Fund

## DECLARATION OF DR. VERONICA SOUTHERLAND AND
## DR. MEAGAN WEISNER

We, Dr. Veronica Southerland and Dr. Meagan Weisner, declare:

1.      I, Dr. Southerland, am a Scientist at Environmental Defense Fund (EDF), a non-profit organization focused on protecting human health and the environment from airborne contaminants by using sound science. I received a Ph.D. in Environmental Health from the Milken Institute School of Public Health at George Washington University, where I also received my Master of Public Health in Environmental Health Science and Policy. At EDF, I conduct risk assessments aimed to estimate the health impacts of air pollution. Prior to joining EDF, I contributed to proposed regulations to prevent the release of hazardous substances under the Clean Air Act and the Clean Water Act in the U.S. Environmental Protection Agency's Office of Land and Emergency Management. I have also worked in environmental and chemical policy at the U.S. Chemical Safety Board, the U.S. Department of Homeland Security and U.S. Department of Defense. My research and scholarship concerning air pollution health risks have been published in several journals, including *Lancet Planetary Health, GeoHealth, Environmental Research Letters, Nature Communications*, and *Environmental Health Perspectives*. My curriculum vitae is attached as Exhibit A.

2.    I, Dr. Meagan L. Weisner, am a Senior Health Scientist at EDF. I completed my Ph.D. in Geosciences from Florida Atlantic University, as well as an Advanced GIS certificate and Master's degree in Anthropology from the same university, and hold a Bachelor's degree in Anthropology from Oregon State University. In 2021, I received a special appointment as an assistant professor in the School of Public Health at the University of Colorado, where I advise graduate students and serve on theses and dissertation committees related to oil and gas and health impacts research. Additionally in 2024, I was selected by the Colorado Department of Public Health and Environment to serve on the scientific community technical working group for Colorado House Bill 22-1244, Public Protections from Toxic Air Contaminants. I have testified as an expert witness in numerous Colorado state rulemakings and provided technical and scientific expertise related to air pollution from oil and gas development, health impacts, and air monitoring systems. I have published scholarly works in peer-reviewed journals including *Environmental Health Perspectives, International Journal of Environmental Research and Public Health, Sustainable Production and Consumption,* and others.

### VOCs Form Ground-Level Ozone that Harms Human Health

3.    Ozone forms when VOCs and oxides of nitrogen (NOx) react in the presence of sunlight. This process becomes more pronounced in the summertime.

4.       A longstanding body of scientific research, including numerous EPA assessments, demonstrates that exposure to ground-level ozone harms human health. In its 2013 Integrated Science Assessment for Ozone (2013 ISA), EPA concluded that "a very large amount of evidence spanning several decades supports a relationship between exposure to [ozone] and a broad range of respiratory effects."[1] These effects range from decreases in lung function among healthy adults to increases in respiratory-related hospital admissions and emergency room visits, to premature death.[2]

5.       Multiple studies across various states (California, Georgia, North Carolina), counties (Maricopa County, AZ; Erie County, NY) and cities (Seattle, New York, Newark, Atlanta,  Houston, Dallas, San Antonio, Austin, Indianapolis, St. Louis) have found that changes in ozone concentrations were associated with higher asthma emergency room visits, most at concentrations below the current standard.[3] In studies with average daily maximum ozone concentrations between 31 and 54 parts per billion (ppb)—well below EPA's current ozone standard of 70 ppb—these effects were strongest among children between 5 and 18 years old.[4] It

---

[1] U.S. EPA, EPA/600/R-10/076F, *Integrated Science Assessment (ISA) of Ozone and Related Photochemical Oxidants*, at 1-6 (2013), *available at* https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=247492 ("2013 *ISA*").
[2] *Id.* at 6-131 to 6-158, 6-162 to -163.
[3] Stephanie Holm, John Balmes, Ananya Roy, *Human Health Effects of Ozone: The State of Evidence Since EPA's Last Integrated Science Assessment*, EDF 2018.
[4] US EPA, EPA/600/R-20/012, *Integrated Science Assessment (ISA) for Ozone and*

is estimated that up to 11% of all asthma emergency room visits in the United States are attributed to ozone.[5] According to the Centers for Disease Control and Prevention (CDC), 24 million Americans currently have asthma.[6] Of these, 5.5 million are children and over half have uncontrolled asthma.[7] Asthma results in 1. 6 million emergency room visits, 9.8 million visits to the physician,[8] and 188 thousand hospitalizations.[9] Asthma costs the U.S. economy more than $80 billion annually in medical expenses, missed work and school says, and deaths.[10]

6.    Ozone pollution is particularly harmful for vulnerable populations, such as school-aged children, people with respiratory diseases or asthma, older adults, and people who are active outdoors, especially outdoor

---

*Related Photochemical Oxidants*, at IS-26 tbl.IS-4 (2020), *available at* https://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=348522 ("2020 *ISA*") (summarizing evidence from epidemiologic, controlled human exposure, and animal toxicological studies on the respiratory effects of short-term exposure to ozone).

[5] Susan C. Anenberg et al., *Estimates of the Global Burden of Ambient PM2.5, Ozone, and NO2 on Asthma Incidence and Emergency Room Visits*, Environmental Health Perspectives, 2018; 126 (10): 107004.

[6] CDC, *Fast Stats: Asthma*, https://www.cdc.gov/nchs/fastats/asthma.htm (last visited Sept. 8, 2020).

[7] *Id.*

[8] *Id.*

[9] CDC, *Most Recent National Asthma Data*, https://www.cdc.gov/asthma/most_recent_data.htm (last visited Aug. 26, 2020).

[10] Tursynbek Nurmagambetov, Robin Kuwahara, Paul Garbe, *The Economic Burden of Asthma in the United States, 2008 -2013*, Annals of the American Thoracic Society, 2018.

workers.[11] Children with asthma also face heightened risks from ozone exposure. Many studies have demonstrated that children with asthma experience decrements in lung function and increases in respiratory symptoms when exposed to ozone pollution.[12]

7.    EPA has concluded that there is a causal relationship or likely causal relationship between both short- and long-term ozone exposure and a broad range of harmful respiratory effects in humans.[13] Short-term exposure is defined as hours, days, or weeks, and long-term exposure is measured in months to years.[14]

8.    Short-term exposure to ozone can have critical health implications.[15] For instance, short durations of exposure (e.g. up to three hours in duration and also at the daily level) have been associated with an increased risk of out-of-hospital cardiac arrest, with the highest risk estimates for those that are aged >65 years, male, or Black.[16] Other studies indicate higher rates of stroke in populations following higher exposures to ozone. A study in Allegheny County, Pennsylvania found that exposures to ozone on the current day increased the risk

---

[11] 2013 *ISA* at 1-8.
[12] K. Mortimer et al., *The Effect of Air Pollution on Inner-City Children with Asthma*, 19 EUR. RESPIRATORY J. 699 (2002), 2013 *ISA*, 6-120-21, 6-160.
[13] 2013 *ISA* at 1-5 to 1-8 & tbl. 1-1.
[14] *Id.* at 1-4.
[15] Katherine B. Ensor et al., *A Case-Crossover Analysis of Out-of-Hospital Cardiac Arrest and Air Pollution*, 127 CIRCULATION 1192 (2013), https://pubmed.ncbi.nlm.nih.gov/23406673/.
[16] *Id.*

of total stroke hospitalization.[17] Another study in Nueces County, Texas found

elevated risk of having a first stroke with higher ozone concentrations in the

preceding 2 days.[18] Additional analyses support these conclusions.[19]

9.    This evidence augments the long-standing body of literature

demonstrating the serious impacts from short-term exposure to ozone pollution,

including the increased risk of premature death.[20] EPA has recognized that

positive associations have been reported between "short-term [ozone] exposures

and respiratory mortality, particularly during the summer months."[21]

10.    Long-term exposure likewise has critical health implications. EPA

has concluded that there is "likely to be a causal relationship between long-term

exposure to [ozone] and respiratory effects."[22] A recent study of 5,780 adults

followed for a decade across six U.S. metropolitan regions found that long-term

---

[17] Xu X, Sun Y, Ha S, Talbott EO, Lissaker CT, *Association between ozone exposure and onset of stroke in Allegheny County, Pennsylvania, USA, 1994-2000*, Neuroepidemiology, 2013, 41(1):2-6.

[18] Wing JJ, Adar SD, Sánchez BN, Morgenstern LB, Smith MA, Lisabeth LD, *Short-term exposures to ambient air pollution and risk of recurrent ischemic stroke,* Environmental Research, Jan. 2017, 152:304-7.

[19] Shah, Anoop SV, et al., *Short term exposure to air pollution and stroke: systematic review and meta•analysis*, BMJ 350 (2015): h1295; Yang, Wan-Shui, et al., *An evidence-based appraisal of global association between air pollution and risk of stroke*, International Journal of Cardiology 175.2 (2014): 307-313.

[20] 2013 *ISA* at 1-14 (concluding that there is "likely to be a causal relationship between short-term exposures to [ozone] and total mortality").

[21] EPA, *National Ambient Air Quality Standards for Ozone,* 80 Fed. Reg. 65,292, 65,307 (Oct. 26, 2015); *see also* 2013 *ISA* 6-220 to 6-221.

[22] 2013 *ISA* at 1-8.

ozone exposure was significantly associated with development of emphysema. This was equal to that of 29 pack-years of smoking or 3 years of aging.[23] Additionally, in a study of 11 million Medicare enrollees in the southeastern United States, long-term ozone exposure was associated with increased risk of first hospital admission for stroke, chronic obstructive pulmonary disease, myocardial infraction, lung cancer, and heart failure.[24]

11.    Similarly, EPA notes that "recent evidence is suggestive of a causal relationship between long-term [ozone] exposures and total mortality."[25] Some longitudinal studies have further demonstrated that "long-term [ozone] exposure influences the risk of asthma development in children."[26]

12.    A recent study of almost 61 million Medicare patients conducted nationwide indicates a significant association between short- and long-term ozone exposure and all-cause mortality, with effects strongest in minorities and those of low socio-economic status. These effects were seen at ozone concentrations well below the current standard of 70 ppb.[27] In fact, the majority of deaths occurred

---

[23] Wang, Meng, et al., *Association between long-term exposure to ambient air pollution and change in quantitatively assessed emphysema and lung function*, JAMA 322.6 (2019): 546-556.

[24] Yazdi, Mahdieh Danesh, et al., *Long-term exposure to PM2. 5 and ozone and hospital admissions of Medicare participants in the Southeast USA*, Environment International 130 (2019): 104879.

[25] 2013 *ISA* at 1-8.

[26] 2013 *ISA* at 7-2.

[27] Di et al., *Air Pollution and Mortality in the Medicare Population*, NEW

when ozone levels were below 60 ppb, and throughout the whole study period, mean ozone levels were 38 ppb.[28]

13.     Health effects other than cardiovascular or respiratory effects are also likely. A 2017 study suggests that ozone exposure may be linked to approximately 8,000 stillbirths per year.[29] Studies carried out in California and Florida of over 4,000 births each found that elevated exposure to ozone during pregnancy was associated with higher risk of pre-term birth.[30] Prolonged exposure to ozone may also accelerate cognitive decline in the early stages of dementia.[31] There is now accumulating evidence that suggests that ozone exposure during pregnancy can result in Autism Spectrum Disorders among children.[32]A review of epidemiological research found age has the strongest

---

ENGLAND J. OF MEDICINE (June 29, 2017); Di et al., *Association of short-term exposure to air pollution with mortality in older adults*, JAMA (Dec. 26, 2017) 318(24):2446-56.

[28] *Id.*

[29] Mendola et al., *Chronic and Acute Ozone Exposure in the Week Prior to Delivery is Associated with the Risk of Stillbirth*, 14 INT'L J. ENVT'L RESEARCH AND PUB. HEALTH 731 (2017).

[30] Laurent O, Hu J, Li L, et al., *A statewide nested case-control study of preterm birth and air pollution by source and composition: California, 2001-2008*, Environ Health Perspect. 2016;124(9):1479-1486; Ha S, Hu H, Roussos-Ross D, Haidong K, Roth J, Xu X, *The effects of air pollution on adverse birth outcomes*, Environ Res. 2014;134:198-204.

[31] Galkina Cleary et al., *Association of Low-Level Ozone with Cognitive Decline in Older Adults*, 61 J. ALZHEIMERS DISEASE 1, 67-78 (2018).

[32] Becerra, Tracy Ann et al., *Ambient air pollution and autism in Los Angeles County, California*, Environmental Health Perspectives 121.3 (2012) 380- 386; Volk HE, Lurmann F, Penfold B, Hertz-Picciotto I, McConnell R, *Traffic- related*

influence on ozone sensitivity, with risks increasing as individuals get older.[33]
Short-term exposure to ozone has been associated with adverse neural effects in
the elderly, even at lower than recommended concentrations.[34]

14.    In 2015, EPA strengthened the national health-based standard for
ground-level ozone, lowering the standard from 75 ppb to 70 ppb.[35] The record
for that rulemaking, however, along with subsequent scientific studies,
demonstrates that health effects can occur at much lower levels, especially in
sensitive populations. For that reason, EPA's independent scientific advisors
recommended that the agency establish the standard in the range of 60–70 ppb.
Many health and medical associations suggested that lower standards may be
appropriate.[36]

15.    EPA has issued designations for counties that are not meeting the
2015 ozone standards, referred to as "ozone non-attainment areas."[37] According

---

*air pollution, particulate matter, and autism*, JAMA Psychiatry (Jan. 1, 2013)
70(1):71-7.

[33] Bell, Michelle L, Antonella Zanobetti, and Francesca Dominici. "Who Is More
Affected by Ozone Pollution? A Systematic Review and Meta-
Analysis." American journal of epidemiology 180.1 (2014): 15–28. Web.

[34] Qu, Rongrong et al. "Short-Term Ozone Exposure and Serum Neural Damage
Biomarkers in Healthy Elderly Adults: Evidence from a Panel Study." The Science
of the total environment 905 (2023): 167209–167209. Web.

[35] EPA, *National Ambient Air Quality Standards for Ozone*, 80 Fed. Reg. 65,292
(Oct. 26, 2015).

[36] *Id.* at 65,321–23, 65,355.

[37] EPA, *Air Quality Designations for the 2015 Ozone National Ambient Air Quality
Standards,* 82 Fed. Reg. 54,232 (Nov. 16, 2017); EPA, *Additional Air Quality*

to EPA calculations, there are over 120 million people living in ozone non-attainment areas in the United States.[38] These individuals are at risk of acute respiratory illness and other damaging health outcomes due to unhealthy levels of ozone air quality. Additionally, given the evidence of adverse health effects even at levels below EPA's standard for ground-level ozone, the millions of Americans living outside of ozone nonattainment areas may also be at risk of experiencing the negative health effects of ozone exposure.

### The Oil and Natural Gas Sector Is a Substantial Source of Smog-Forming Emissions

16.    The oil and natural gas sector is a substantial source of smog-forming emissions. According to EPA's most recent National Emissions Inventory (NEI), "Oil and Gas Production" is the largest source of human-caused VOCs nationally and a major contributor to NOx emissions.[39] Regional analyses likewise underscore the significant ozone-forming emissions from these

---

*Designations for the 2015 Ozone National Ambient Air Quality Standards*, 83 Fed. Reg. 25,776 (June 4, 2018); EPA, *Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards-San Antonio, Texas Area*, 83 Fed. Reg. 35, 136 (July 25, 2018).

[38] EPA, *Summary Nonattainment Area Population Exposure Report*, https://www3.epa.gov/airquality/greenbook/popexp.html (last updated July 31, 2020).

[39] Calculation based on EPA, *National Emissions Inventory (NEI) Sector Data*, *available at* https://www.epa.gov/air-emissions-inventories/2017-national-emissions-inventory-nei-data.

sources, including work in the Uinta Basin in Utah,[40] the Barnett Shale in

Texas,[41] the Upper Green River Basin in Wyoming,[42] and in Colorado.[43] Another

recent study published in California assessed data from the U.S. EPA Air Quality

System from 2006 to 2019 and documented higher concentrations of air

pollutants including $PM_{2.5}$, nitrogen dioxide ($NO_2$), VOCs, and ozone ($O_3$) as far

away as 4 kilometers (13,123 feet) from oil and gas well sites, including in the

---

[40] Warneke, C. et al., *Volatile organic compound emissions from the oil and natural gas industry in the Uintah Basin, Utah: oil and gas well pad emissions compared to ambient air composition*, 14 Atmos. Chem. Phys., 10977-10988 (2014), *available at* www.atmos-chem-phys.net/14/10977/2014/; ENVIRON, *Final Report: 2013 Uinta Basin Winter Ozone Study* (Mar. 2014), *available at* https://deq.utah.gov/locations/U/uintahbasin/ozone/docs/2014/06Jun/UBOS2013FinalReport/Title_Contents_UBOS_2013.pdf.

[41] David T. Allen, *Atmospheric Emissions and Air Quality Impacts from Natural Gas Production and Use*, Annu. Rev. Chem. Biomol. Eng. 5:55-75 (2014), *available at* https://www.annualreviews.org/doi/abs/10.1146/annurev-chembioeng-060713-035938.

[42] *See* B. Rappengliick et al., *Strong wintertime ozone events in the Upper Green River basin*, Wyoming, Atmos. Chem. Phys. (2014), *available at* https://doi.org/10.5194/acp-14-4909-2014.

[43] Helmig, D., *Air quality impacts from oil and natural gas development in Colorado*, 8,4 Elem Sci. Anth. (2020), *available at* https://doi.org/10.1525/elementa.398; Brantley et al., *Assessment of volatile organic compound and hazardous air pollutant emissions from oil and natural gas well pads using mobile remote and onsite direct measurements*, Journal of the Air & Waste Management Association 1096-2247 (Print) 2162- 2906 (Online) (2015); Petron, G. et al., *A new look at methane and non-methane hydrocarbon emissions from oil and natural gas operations in the Colorado Denver-Julesburg Basin*, 119 J. Geophys. Res. Atmos., 6836-6852 (2014), *available at* http://onlinelibrary.wiley.com/doi/10.1002/2013JD021272/full

San Joaquin Valley.[44] Bakersfield, CA in particular attributes 22 percent of all anthropogenic emissions during the spring and summer months to petroleum operations, and 8 percent of all total potential ozone precursors.[45]

17.    Studies and analyses have linked ozone formation to emissions from oil and gas development. For example, a recent study by NOAA scientists at the Cooperative Institute for Research in Environmental Sciences (CIRES) found that, on high ozone days on Colorado's Northern Front Range, oil and gas operations contribute roughly 50% to regional VOC reactivity and that these activities are responsible for approximately 20% of ozone produced locally in the nonattainment area.[46] This CIRES study was one of many that was included in a

---

[44] D.J. Gonzalez et al. (2022). *Upstream Oil and Gas Production and Ambient Air Pollution in California*, Science of The Total Environment, 806, 150298, available at: https://doi.org/10.1016/j.scitotenv.2021.150298.

[45] Gentner et al. (2014). Emissions of Organic Carbon and Methane from Petroleum and Dairy Operations in California's San Joaquin Valley. *Atmos. Chem. Phys.*, 14, 4955–4978, at 4971, available at: https://doi.org/10.5194/acp-14-4955-2014.

[46] McDuffie, E. E., et al. (2016), *Influence of oil and gas emissions on summertime ozone in the Colorado Northern Front Range*, J. Geophys. Res. Atmos., 121, 8712-8729, doi:10.1002/2016JD025265, *available at* http://onlinelibrary.wiley.com/doi/10.1002/2016JD025265/abstract; *see also* Gilman, J. B., B. M. Lerner, W. C. Kuster, and J. A. de Gouw (2013), *Source signature of volatile organic compounds from oil and natural gas operations in northeastern Colorado*, Environ. Sci. Technol., 47(3), 1297-1305, *available at* http://pubs.acs.org/doi/abs/10.1021/es304119a (finding 55% of VOC reactivity in the metro-Denver area is due to nearby oil and natural gas operations and calling these emissions a "significant source of ozone precursors"); Cheadle, LC et al., *Surface ozone in the Colorado northern Front Range and the influence of oil and gas development during FRAPPE/DISCOVER-AQ in summer 2014*, Elementa

review published this year documenting over a decade's worth of research demonstrating multiple lines of evidence that link regional production of ozone with emissions from oil and gas operations in the Colorado Front Range. Another study analyzing ozone impacts associated with unconventional natural gas development in Pennsylvania concluded that "natural gas emissions may affect compliance with federal ozone standards."[47]

18.      Recent studies have documented high levels of wintertime ozone in locations with oil and gas production such as the Upper Green River Basin in Wyoming and the Uinta Basin in Utah.[48] VOC emissions from oil and natural gas operations are a critical factor driving wintertime ozone formation in these regions.[49] When combined with specific meteorological conditions, including

---

(2017), *available at* http://doi.org/10.1525/elementa.254 (finding on "individual days, oil and gas O3 precursors can contribute in excess of 30 ppb to O3 growth and can lead to exceedances" of the EPA ozone standards).

[47] Swarthout, R. F. et al., *Impact of Marcellus Shale natural gas development in southwest Pennsylvania on volatile organic compound emissions and regional air quality*, Environ. Sci. Technol., 49(5), 3175-3184 (2015), doi:10.1021/es504315f, *available at* https://www.ncbi.nlm.nih.gov/pubmed/25594231.

[48] *See* S.J. Oltmans et al., *O3, CH4, CO2, CO, NO2 and NMHC aircraft measurements in the Uinta Basin oil and gas region under low and high ozone conditions in winter 2012 and 2013*, Elementa (2016), *available at* http://doi.org/10.12952/journal.elementa.000132; B. Rappenglück et al., *Strong wintertime ozone events in the Upper Green River basin, Wyoming*, Atmos. Chem. Phys. (2014), *available at* https://doi.org/10.5194/acp-14-4909-2014.

[49] R. Ahmadov et al., *Understanding high wintertime ozone pollution events in an oil-natural gas-producing region of the western US*, Atmos. Chem. Phys. (2015), *available at* https://doi.org/10.5194/acp-15-411-2015.

snow cover and temperature inversions, VOC emissions can produce winter ozone concentrations of nearly twice the EPA ozone standard.[50] The contribution of unconventional oil and natural gas development on ozone formation has been quantified in North Texas, where mean values of all meteorologically adjusted ozone was 8% higher at monitoring sites located within the shale gas region than in the non-shale gas region.[51] Directional analysis found that when winds were from areas with high shale gas activities, higher ozone downwind occurred.

### Oil and Natural Gas Operations Emit Hazardous Air Pollutants like Benzene, a Known Human Carcinogen

19.     Oil and natural gas operations also emit several different hazardous air pollutants (HAPs) from equipment leaks, processing, compressing, transmission and distribution, and storage tanks. HAPs emitted from oil and gas operations include benzene, a known carcinogen. When issuing the 2024 Rule, EPA recognized the negative health and welfare consequences of HAPs emitted from oil and gas extraction and the health benefits the New Source Rule would provide by reducing HAP emissions in addition to methane and VOC

---

[50] ENVIRON, *Final Report: 2013 Uinta Basin Winter Ozone Study* (Mar. 2014), *available at* https://deq.utah.gov/air-quality/2013-uinta-basin-winter- ozone- study-final-report.

[51] Ahmadi, M., and K. John. 2015. Statistical evaluation of the impact of shale gas activities on ozone pollution in North Texas. Sci. Total Environ. 536:457–67. doi:10.1016/j.scito tenv.2015.06.114.

emissions.[52]

20.    HAP emissions from oil and gas extraction sites often occur as short-term, yet significant releases, especially during the pre-production phase.[53] Short-term exposure to benzene (typically 14 days or less) through inhalation may cause acute health impacts such as drowsiness, dizziness, headaches, as well as eye, skin, and respiratory tract irritation, and, at high levels, unconsciousness.[54] Studies have linked increases in air pollution from oil and gas sites with increased acute health risks[55] and epidemiological research finds significant increases in reporting of acute health symptoms from populations living near oil and gas development sites.[56]

---

[52] EPA, Regulatory Impact Analysis of the Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review (Dec. 2023)

[53] Ku et al., *Atmospheric Environment, Air quality impacts from the development of unconventional oil and gas well pads: Air toxics and other volatile organic compounds*, 317 (Jan 2024), 120187, https://doi.org/10.1016/j.atmosenv.2023.120187.

[54] United States Environmental Protection Agency, *Benzene* (1992), https://www.epa.gov/sites/default/files/2016-09/documents/benzene.pdf.

[55] McKenzie et al., *Ambient Nonmethane Hydrocarbon Levels Along Colorado's Northern Front Range: Acute and Chronic Health Risks*, Environ. Sci. Technol. 2018, 52, 8, 4514–4525 (March 2018), https://doi.org/10.1021/acs.est.7b05983; Holder et al., *Evaluating potential human health risks from modeled inhalation exposures to volatile organic compounds emitted from oil and gas operations*, J Air Waste Manag Assoc. 2019 Dec;69(12):1503-1524, https://pubmed.ncbi.nlm.nih.gov/31621516/.

[56] Weisner et al*., Health Symptoms and Proximity to Active Multi-Well Unconventional Oil and Gas Development Sites in the City and County of Broomfield, Colorado*, Int J Environ Res Public Health. 2023 Feb 1;20(3):2634,

21.     There is no safe level of human exposure to many of the toxic pollutants released as a result of oil and gas extraction. Exposure to HAPs can cause cancer and seriously impair the human neurological system. For example, benzene, found naturally in oil and gas, is linked with various forms of leukemia[57] and is a known human carcinogen.[58] Exposure to benzene is associated with chronic non-cancer health effects, including immunotoxicity and hematotoxicity.[59] Additionally, maternal exposure to benzene has been associated with birth defects like spina bifida,[60] decreased fetal weight, and other

---

https://pubmed.ncbi.nlm.nih.gov/36767999/.

[57] ATSDR (Agency for Toxic Substances and Disease Registry). 2024. *ToxFAQs™ for Benzene*, https://wwwn.cdc.gov/TSP/ToxFAQs/ToxFAQsDetails.aspx?faqid=38&toxid=14; Glass DC, Gray CN, Jolley DJ, Gibbons C, Sim MR, Fritschi L, et al. 2003*, Leukemia risk associated with low-level benzene exposure*, Epidemiology 14(5):569–577, PMID: 14501272, 10.1097/01.ede.0000082001.05563.e0. [DOI] [PubMed] [Google Scholar]; Snyder R. 2012*, Leukemia and benzene*, Int J Environ Res Public Health 9(8):2875–2893, PMID: 23066403, 10.3390/ijerph9082875. [/10.3390/ijerph9082875"DOI] [PMC free article] [PubMed] [Google Scholar]

[58] IARC, Benzene: IARC Monographs on the Evaluation of Carcinogenic Risks to Humans (2018), https://publications.iarc.who.int/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Benzene-2018

[59] US EPA. 2002. Toxicological review of benzene, non cancer. IRIS: Benzene CASRN 71-43-2. https://iris.epa.gov/ChemicalLanding/&substance_nmbr=276

[60] Lupo PJ, Symanski E, Waller DK, Chan W, Langlois PH, Canfield MA, Mitchell LE. Maternal exposure to ambient levels of benzene and neural tube defects among offspring: Texas, 1999-2004. Environ Health Perspect. 2011 Mar;119(3):397-402. doi: 10.1289/ehp.1002212. Epub 2010 Oct 5. PMID: 20923742; PMCID: PMC3060005.

neurodevelopmental effects.[61]

22.    EPA has recognized the harmful effects of other specific air toxics emitted from oil and gas operations, including ethylbenzene, n-hexane, and other air toxics.[62] Each of these hazardous pollutants is harmful to human health and may cause cancer or other serious health effects. For example, the effects of toluene range from impacts to the brain and nervous system, as well as harmful effects to the liver, kidneys, lungs, and impaired immune function.[63]

**Recent Studies Suggest Proximity to Oil and Gas Development Is Associated with Adverse Health Outcomes**

23.    Recent studies document associations between proximity to nonconventional oil and gas development and human health effects. While some of these studies do not evaluate concentrations of specific air pollutants, they document health effects that are consistent with exposure to smog and HAPs.

24.    There is an extensive body of scientific research that has identified health impacts associated with living in proximity to oil and gas wells at various distances. For example, a study in Colorado estimated health risks from exposures to oil and gas air emissions and found cumulative cancer

---

[61] *Supra* note 55.

[62] https://www.epa.gov/controlling-air-pollution-oil-and-natural-gas-operations/basic-information-about-oil-and-natural

[63] *Supra* note 55.

risks were 10 in a million and 6 in a million for residents living ≤½ mile and

>½ mile from wells, respectively, with benzene as the major contributor to the

risk.[64] Additional human health risk assessments of benzene and other toxic

air contaminants from oil and gas have been measured at levels that exceed

lifetime cancer risks of 1 in a million for nearby communities.[65] Weisner et al.

(2025)[66] analyzed concentrations of pollutants emitted from oil and gas

operations and found that communities 1,000 ft from an unconventional oil

and gas pad in Colorado were exposed to concentrations of air toxics at levels

that may pose risks to health. Specifically, this risk assessment found that EPA

acute thresholds for respiratory, immunological, and developmental health

endpoints during the production phase were surpassed.

---

[64] McKenzie, Lisa M. et al., Human Health Risk Assessment of Air Emissions from Development of Unconventional Natural Gas Resources, *The Science of the Total Environment*, Vol. 424 (2012): 79-87, doi:10.1016/j.scitotenv.2012.02.018.

[65] McKenzie, Lisa M. et al., Ambient Nonmethane Hydrocarbon Levels Along Colorado's Northern Front Range: Acute and Chronic Health Risks, *Environmental Science & Technology*, Vol. 52,8 (2018): 4514-4525. doi:10.1021/acs.est.7b05983; Weisner, Meagan L. et al., Cumulative Human Health Risk Assessment of Regional Ozone and Volatile Organic Compounds from Unconventional Oil and Gas Sites in Colorado's Front Range, *Environmental Health Perspectives*, Vol. 133,5 (2025): 57025. doi:10.1289/EHP16272.

[66] Weisner, Meagan L. et al., Cumulative Human Health Risk Assessment of Regional Ozone and Volatile Organic Compounds from Unconventional Oil and Gas Sites in Colorado's Front Range, *Environmental Health Perspectives*, Vol. 133,5 (2025): 57025. doi:10.1289/EHP16272.

25.    A scoping review of epidemiological research found that 25 out of 29 studies reported at least one statistically significant link between unconventional oil and gas development exposure and adverse health outcomes, such as hospitalizations, negative birth outcomes, cancer, and asthma exacerbations.[67] A recent study found that children ages 2-9 who live within 13 km (8 miles) of oil and gas sites are at increased risk for acute lymphoblastic leukemia, and children within 5 km are at greatest risk (McKenzie et al., 2025).[68] Furthermore, individuals living within 1 kilometer of an oil and gas site in Pennsylvania have reported higher rates of skin problems and upper respiratory symptoms compared to those living farther away.[69] Another study in Colorado finds that respiratory and acute health symptoms (e.g. nosebleeds, nausea, cough, throat irritation) were reported at

---

[67] Deziel N.C., Brokovich E., Grotto I., Clark C., Barnett-Itzhaki Z., Broday D., Agay-Shay K. Unconventional oil and gas development and health outcomes: A scoping review of the epidemiological research. Environ. Res. 2020;182:109124. doi: 10.1016/j.envres.2020.109124. [DOI] [PubMed]

[68] Exposures from Oil and Gas Development and Childhood Leukemia Risk in Colorado: A Population-Based Case–Control Study | Cancer Epidemiology, Biomarkers & Prevention | American Association for Cancer Research, https://aacrjournals.org/cebp/article/34/5/658/762044/Exposures-from-Oil-and-Gas-Development-and?searchresult=1

[69] Rabinowitz P.M., Slizovskiy I.B., Lamers V., Trufan S.J., Holford T.R., Dziura J.D., Peduzzi P.N., Kane M.J., Reif J.S., Weiss T.R., et al. Proximity to Natural Gas Wells and Reported Health Status: Results of a Household Survey in Washington County, Pennsylvania. Environ. Health Perspect. 2015;123:21–26. doi: 10.1289/ehp.1307732

greater frequencies in adults living within 1 mile of an oil and gas site, compared to adults living at further distances. Symptoms in children were also reported in greater frequencies within 2 miles of the same oil and gas sites, when compared with children living at further distances (Weisner et al., 2023).[70] Since children breathe faster, are more physically active than adults, and often breathe out of their mouths, they expose their lungs to more air pollution (citation).[71] Their organs and immune systems have not been fully developed and higher ventilation rates and mouth-breathing may expose children to different mixtures of chemicals that are pulled deeper into the lungs, making clearance slower and more difficult, playing a significant role in asthma and diminished lung function.[72]

26.    The health burden associated with air pollution from the oil and gas sector is substantial. A 2023 study from the Boston University's School of Public Health, The University of North Carolina and EDF analyzed the impacts of onshore oil and gas, as well as specific process within the upstream

---

[70] Health Symptoms and Proximity to Active Multi-Well Unconventional Oil and Gas Development Sites in the City and County of Broomfield, Colorado - PubMed, https://pubmed.ncbi.nlm.nih.gov/36767999/.

[71] Bateson TF, Schwartz J. Children's response to air pollutants. J Toxicol Environ Health A. 2008;71(3):238-43. doi: 10.1080/15287390701598234. PMID: 18097949.

[72] Id.

sector, including venting and flaring.[73] Prior studies have indicated that oil and gas activity is associated with increased risk of adverse health events, but there was limited quantification of the health impacts that resulted from air pollution from flaring and venting activities. This study sought to fill this gap by quantifying ozone, fine particulate matter (PM2.5) and nitrogen dioxide (NO2) emissions from the oil and gas sector and attributing those emissions to health outcomes. Using a hybrid VIIRS and National Emissions Inventory (NEI) and applying an EPA atmospheric model (CMAQ) and EPA health impact assessment tool (BenMAP), the study assessed air quality impacts attributable to the oil and gas sector, finding 7,500 excess deaths, 410,000 asthma exacerbations, 2,200 new cases of childhood asthma and $77 billion in health impacts. Of these impacts, EDF estimated that 710 premature deaths, 73,000 asthma exacerbations, 210 instances of ozone NAAQS exceedances and $7.4 billion in health damages can be attributed to venting and flaring activities.[74]

27.     Children miss 500,000 days of school each year due to poor health

---

[73] Buonocore, J. J., Reka, S., Yang, D., Chang, C., Roy, A., Thompson, T., ... & Arunachalam, S. (2023). Air pollution and health impacts of oil & gas production in the United States. *Environmental Research: Health*, *1*(2), 021006.
[74] Tran, et al. (2023). A refined Satellite-based emissions estimate from onshore oil and gas flaring and venting activities in the United States and their impacts on air quality and health, ESS Open Archive, https://essopenarchive.org/doi/full/10.22541/essoar.169447349.95079599/v1.

associated with smog pollution.[75] A study of children in Pennsylvania found that exposure to unconventional natural gas development was associated with increased odds of pediatric asthma-related hospitalization.[76]

28.     Air pollutants associated with oil and gas operations are known to cause serious health impacts in sensitive populations such as pregnant women, babies, and children. Studies have documented that living near natural gas wells is associated with lower birth weight babies[77] and preterm birth.[78] An epidemiological study found adult residents living within one mile of an oil and gas site in Colorado reported greater frequencies of upper respiratory, lower respiratory, gastrointestinal and acute symptoms than residents living greater than two miles from an oil and gas site.[79] Increased symptoms in children were reported two miles out from oil and gas sites. The findings from this study were corroborated with additional research that found concentrations of individual, oil

---

[75] Clean Air Task Force, *Gasping for Breath: An analysis of the health effects from ozone pollution from the oil and gas industry* (2016).

[76] Mary D. Willis, et al., *Unconventional natural gas development and pediatric asthma hospitalizations in Pennsylvania*, Environ Res. 166:402–408 (Oct. 2018), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6110967/.

[77] *See* Stacy, et al., *Perinatal Outcomes and Unconventional Natural Gas Operations in Southwest Pennsylvania*, PLoS ONE (June 3, 2015), *available at* https://doi.org/10.1371/journal.pone.0126425.

[78] Casey et al., *Unconventional Natural Gas Development and Birth Outcomes in Pennsylvania, USA*, Epidemiology (Mar. 2016), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4738074/.

[79] Weisner et al. 2023.

and gas-related volatile organic compounds from oil and gas sites in the same study area were often several orders of magnitude higher than background air and could be traced back to specific oil and gas activities.[80] Other studies have found an association between oil and gas proximity and congenital heart defects in infants.[81] Congenital heart defects are the leading cause of death due to birth defects.[82]

      29.     A recent case-controlled study in Colorado found that children diagnosed with acute lymphoblastic leukemia between 2002 and 2019 were significantly more likely to live near an oil and natural gas well site than children without a cancer diagnosis.[83] A 2014 Colorado study found that babies whose mothers had large numbers of natural gas wells within a 10-mile radius of their home had an increased risk of birth defects of the heart, compared to babies

---

[80] Ku et al. 2024.

[81] McKenzie et. al., *Birth Outcomes and Maternal Residential Proximity to Natural Gas Development in Rural Colorado*, Envtl. Health Perspectives (Jan. 28, 2014) ("McKenzie 2014"), *available at* https://ehp.niehs.nih.gov/1306722/; McKenzie et al., *Congenital Heart Defects and Intensity of Oil and Gas Well Site Activities in Early Pregnancy*, Environment International (July 28, 2019) ("McKenzie 2019"), *available at* https://www.sciencedirect.com/science/article/pii/S0160412019315429.

[82] McKenzie 2019.

[83] McKenzie et al., *Exposure from Oil and Gas Development and Childhood Leukemia Risk in Colorado: A Population-Based Case-Control Study*, Cancer Epidemiol Biomarkers Prev OF1-OF11, https://doi.org/10.1158/1055-9965.EPI-24-1583 (March 2025).

whose mothers had no wells within 10 miles of their home.[84] A 2019 follow-up study by the same research team fortified these results.[85] Perhaps most notably, a study of over 1.1 million births in Pennsylvania demonstrated evidence of negative health effects (including low birth weight) from in utero exposure to fracking sites within 3 kilometers of a mother's residence, with the largest health impacts seen from in utero exposure within 1 kilometer of oil and gas sites.[86] Another recent study of 2.9 million births in California also found that among rural populations living in proximity to higher oil and gas production, oil and gas development was associated with increased odds of having a low birth weight baby.[87] A 2020 study of births in the Eagle Ford Shale play in south Texas found that living within 5 kilometers of oil and gas wells was associated with adverse birth outcomes, and that women living within 5 kilometers of natural gas flaring events had higher odds of having a baby preterm.[88]

---

[84] McKenzie 2014.

[85] McKenzie 2019.

[86] Currie, Janet, et al., *Hydraulic Fracturing and Infant Health: New Evidence from Pennsylvania*, Science Advances, American Association for the Advancement of Science (Dec. 1, 2017), *available at* https://advances.sciencemag.org/content/3/12/e1603021.

[87] Tran, Kathy V., et al., *Residential Proximity to Oil and Gas Development and Birth Outcomes in California: A Retrospective Cohort Study of 2006– 2015 Births*, Environmental Health Perspectives 128.6 (2020): 067001.

[88] Laura J. Cushing et al., *Flaring from Unconventional Oil and Gas Development and Birth Outcomes in the Eagle Ford Shale in South Texas*, Environmental Health Perspectives 128(7) (July 2020), *available at* https://ehp.niehs.nih.gov/doi/pdf/10.1289/EHP6394.

30.     Other studies also document correlations between proximity to oil and gas drilling and human health effects in otherwise healthy populations. This emerging body of scientific literature includes several new studies documenting negative human health impacts based on proximity to oil and gas wells. For example, a study from 2016 demonstrated that oil and gas well proximity was correlated with an increase in the likelihood of asthma exacerbations, including mild, moderate, and severe asthma attacks.[89] A 2018 study observed evidence supporting an association between the intensity of oil and gas activity and several indicators of cardiovascular disease.[90] A 2015 study documented increased hospitalization rates in counties with a high density of oil and gas wells.[91] Similarly, other studies, including a 2017 study, have demonstrated an increase in the reporting of nasal, sinus, and migraine headaches, and fatigue symptoms in areas with high volumes of oil and gas drilling.[92]

---

[89] Rasmussen et al, *Association between Unconventional Natural Gas Development in the Marcellus Shale and Asthma Exacerbations*, 176 J. Am. Med. Assn. Internal Med. 1334-43 (Sept. 2016), *available at* https://www.ncbi.nlm.nih.gov/pubmed/27428612.

[90] Lisa M. McKenzie et al., *Relationships between Indicators of Cardiovascular Disease and Intensity of Oil and Natural Gas Activity in Northeastern Colorado*, Environ. Res. 170: 56–64 (Mar. 2019), *available at* https://pubmed.ncbi.nlm.nih.gov/30557692/.

[91] Jemielita et al., *Unconventional Gas and Oil Drilling Is Associated with Increased Hospital Utilization Rates*, PLoS ONE (July 15, 2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4503720/.

[92] *See* Tustin et al., *Associations between Unconventional Natural Gas Development and Nasal and Sinus, Migraine Headache, and Fatigue Symptoms in*

31.    A 2018 study in Colorado found that communities living in close proximity to oil and gas activity had higher measured exposures to HAPs and face increased risks to their health, including a heightened risk of cancer.[93] The study found that the lifetime cancer risk was 8.3 per 10,000 people for populations living within approximately 500 feet of oil and gas activity, above EPA's allowable risk. The study also found elevated levels of acute and chronic blood system and developmental risks, and acute nervous system risks for the same population. Benzene exposures contributed to 80-95% of risks across the different health effects.

32.    An important 2019 study, funded by the Colorado Department of Public Health and Environment, used weather and emissions data measured in Colorado with state-of-the-science dispersion modeling tools to map concentrations of air toxics from 3 sizes of oil and gas fields, finding both an elevated lifetime cancer risk and non-cancer health risks for the population living in close proximity to oil and gas fields.[94]

---

*Pennsylvania*, 125 ENV. HEALTH PERSPECTIVES 189 (Feb. 2017), *available at* https://ehp.niehs.nih.gov/EHP281/.

[93] Lisa McKenzie et al., *Ambient Non-Methane Hydrocarbon Levels Along Colorado's Northern Front Range: Acute and Chronic Health Risks*, Envt'l Sci. & Tech. (Mar. 27, 2018), *available at* https://pubs.acs.org/doi/10.1021/acs.est.7b05983.

[94] *See* ICF, *Final Report: Human Health Risk Assessment for Oil & Gas Operations in Colorado* (Oct. 17, 2019), *available at* https://drive.google.com/file/d/1pO41DJMXw9sD1NjR_OKyBJP

33.    Benzene exposures from production emissions (from existing wells), and all activities combined (drilling, fracking, flow back and production), were associated with an increased lifetime risk (above one in a million) of leukemia for the average individual at 500 feet. Risks in the most exposed populations (people who live downwind and spend more time outdoors) only dropped below the one- in-a-million risk threshold after a distance of 2000 feet from the well.

34.    The study also found elevated non cancer risks due to VOC exposures. Benzene and 2-ethyltoluene emissions from oil and gas in Colorado resulted in maximal acute exposures higher than considered safe for most populations 500 feet away. Exposures of benzene were more than 10 times higher than considered safe for acute exposure and should be considered a risk for blood disorders. Blood disorders could result in anemia, disturbances in clotting or the ability to fight infections, and could manifest as fatigue, nose bleeds or infections. The study also found the potential for neurotoxic effects, such as headaches, blurred vision, and dizziness, from combined acute exposures of benzene and 2- ethyltoluene.

35.    The study only assessed pollution dispersion from single wells. This

---

5NCb- AO0I/view (submitted to the Colorado Department of
Public Health and Environment).

potentially underestimates the risks faced by almost two-thirds of the roughly 240,000 Coloradoans living within 2000 ft. of two or more well pads.

36.   A new study in Colorado assessed the cumulative risk from exposure to ozone and ozone precursors, such as volatile organic compounds, emitted from the oil and gas industry. Results found that for communities located near unconventional oil and natural gas during pre-production in an ozone non-attainment area, respiratory risks surpassed EPA thresholds due to the combined risk from not only ozone, but ozone precursors.[95]

37.   The health impacts we describe may disproportionately affect minority communities living in the vicinity of oil and gas activity. For example, in Texas, there are over 800,000 Latinos living within half a mile of an oil or gas well, in Colorado nearly 3 out of 10 people living near a well are Latino, and in California 2 out of 5 people living in close proximity to a well are Latino.[96] The 2020 study of birth outcomes in south Texas found that Hispanic women in the study were particularly vulnerable to the effects of flaring on preterm birth, noting that those findings were consistent with prior studies that found African American and residents of socioeconomically disadvantaged neighborhoods

---

[95] https://ehp.niehs.nih.gov/doi/10.1289/EHP16272.

[96] *Latino Communities at Risk: The Impact of Air Pollution from the Oil and Gas Industry*, Clean Air Task Force (CATF), League of United Latin American Citizens (LULAC), National Hispanic Medical Association (NHMA) 2016.

more vulnerable to the impacts of air pollution.[97]

### Delaying EPA's 2024 Rule Will Increase
### Substantial Ozone Forming and Other Harmful Air Pollution

38.  We are aware that the Environmental Protection Agency (EPA) has

issued an interim final rule that provides an 18-month extension for standards to

reduce methane emissions from new, modified and existing sources in the oil and

gas sector and to reduce volatile organic compound (VOC) emissions from new

and modified sources in the oil and gas sector. "Extension of Deadlines in

Standards of Performance for New, Reconstructed, and Modified Sources and

Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate

Review Final Rule" ("Delay Rule"), 90 Fed. Reg. 35,966 (July 31, 2025). We

understand the Delay Rule will result in increased emissions from both new and

existing oil and gas sources, *see* Proville-Mirtich Decl., and that EPA projects it

will result in negative health outcomes.[98]

39.  By delaying compliance deadlines for methane and VOC standards,

many Americans will be adversely affected by ozone-forming VOC emissions

---

[97] Laura J. Cushing et al., *Flaring from Unconventional Oil and Gas Development and Birth Outcomes in the Eagle Ford Shale in South Texas*, Environmental Health Perspectives 128(7) (July 2020), *available at* https://ehp.niehs.nih.gov/doi/10.1289/EHP6394.

[98] EPA, *Economic Impact Analysis for the Extension of Deadlines in the NSPS OOOOb and EG OOOOc* (July 31, 2025) Doc ID: EPA-HQ-OAR-2025-0162-0025, 6-8; *See also* Proville-Mirtich Decl.

and HAP emissions. Even small amounts of VOC, ozone and HAP pollution can cause severe damage. Nationwide, it is estimated that almost 18 million people live within 1 mile of at least one active oil and/or gas site.[99] Sensitive populations including children, older adults, those suffering from respiratory diseases such as asthma, low-income populations including minority low-income communities, outdoor workers, and others recreating outdoors are likely to be disproportionately affected. This is particularly true for Americans living in areas that already experience unhealthy levels of ozone pollution.

### Conclusion

40.     The Delay Rule will lead to increases in harmful VOC and HAP pollution that would otherwise be abated. Individuals exposed to these emissions and the secondary pollutants that form from them, even for a short period, face a higher risk of adverse health effects, including acute and immediate respiratory ailments like asthma and enhanced risk of longer term, deleterious health effects associated with toxic pollution exposures, such as neurotoxicity, cancer, or blood disorders.

---

[99] Eliza D. Czolowsk et al*., Toward Consistent Methodology to Quantify Populations in Proximity to Oil and Gas Development: A National Spatial Analysis and Review*, 125 Envtl. Health Perspectives 6 (2017), *available at* https://doi.org/10.1289/EHP1535.

I declare that the foregoing is true and correct.


Veronica Southerland


Dated: August 12, 2025


Meagan Weisner


Dated: August 12, 2025

# Exhibit A

## VERONICA SOUTHERLAND, PhD, MPH

(+1) 434-235-1977 | vsoutherland@edf.org

### EDUCATION

**Doctor of Philosophy, Environmental Health,** 2022
George Washington University, Milken Institute School of Public Health, Washington, D.C.
<u>Dissertation title</u>: Assessing inequitable distribution of environmental health burdens using high resolution satellite-derived exposure data.
<u>Advisor</u>: Dr. Susan Anenberg

**Master of Public Health, Environmental Health Science and Policy**, 2013
George Washington University, Milken Institute School of Public Health, Washington, D.C.

**Bachelor of Arts, International Affairs,** 2008
Florida State University, Tallahassee, FL

### PROFESSIONAL & RESEARCH EXPERIENCE

| Role | Institution | |
|---|---|---|
| **Scientist**<br>Global Clean Air | Environmental Defense Fund<br>Washington, D.C. | 2023-Current |
| **Practicum Director**<br>**Professorial Lecturer**<br>Department of Environmental and Occupational Health | George Washington University<br>Milken Institute School of Public Health<br>Washington, D.C. | 2023-Current |
| **Environmental Protection Specialist**<br>Office of Land and Emergency Management | US Environmental Protection Agency<br>Washington, D.C. | 2020-2022 |
| **Senior Research Associate**<br>Department of Environmental and Occupational Health | George Washington University<br>Milken Institute School of Public Health<br>Washington, D.C. | 2019-2020 |
| **Analyst** | ICF International, Inc.<br>Fairfax, VA | 2018-2019 |
| **Research Associate** | Uniformed Services University of the Health Sciences<br>Bethesda, MD | 2017-2018 |
| **Research Contractor** | Environmental Health Analytics, LLC<br>Washington, D.C. | 2017 |
| **Recommendations Specialist** | U.S. Chemical Safety and Hazard Investigation Board<br>Washington, D.C | 2015-2017 |
| **Project Coordinator** | Children's National Health System | 2013-2015 |

### PUBLICATIONS

**Peer-reviewed journal articles**

[11] Naess B, Buonocore J, **Southerland V**, Khemani M, Seppanen C, Roy A, et al. (2025). Distribution of air quality health benefits of medium and heavy-duty electrification policies in New York City. Environmental Research: Health, 3(1), 011001.

[10] Gohlke JM, Harris MH, Roy A, Thompson TM, DePaola M, Alvarez RA, Anenberg SC, Apte JS, Demetillo MG, Dressel IM,6 Kerr GH, Marshall JD, Nowlan AE, Patterson RF, Pusede SE, **Southerland VA**, & Vogel SA (2023). State-of-the-Science Data and Methods Need to Guide Place-Based Efforts to Reduce Air Pollution Inequity. Environmental Health Perspectives 131.12: 125003.

[9] **Southerland V**, Zota A, Parasram V, Alvarez C, Clement M, Anenberg S. (2023). Temporal trends in sociodemographic composition and land development within U.S. fenceline communities surrounding hazardous industrial facilities: 2001–2019. Environmental Research Letters 18. 14042 DOI 10.1088/1748-9326/ad0136

[8] Li C, van Donkelaar A, Hammer MS, McDuffie EE, Burnett RT, Spadero JV, Chatterjee D, Cohen AJ, Apte JS, **Southerland, VA**, Anenberg SC, Brauer M, Martin RV. Reversal of trends in global fine particulate matter air pollution. Nature Communications 14, 5349 (2023). https://doi.org/10.1038/s41467-023-41086-z

[7] **Southerland VA**, Brauer M, Mohegh A, Apte J, Hammer M, Martin RV, van Donkelaar A, Anenberg SC. Global urban temporal trends in fine particulate matter ($PM_{2.5}$) and attributable health burdens: estimates from global datasets. Lancet Planetary Health. https://doi.org/10.1016/S2542-5196(21)00350-8

[6] Apte J, Seraj S, Chambliss S, Hammer MS, **Southerland, VA**, Anenberg SC, et al. (2021). Air Inequality: Global Divergence in Urban Fine Particulate Matter Trends. ChemRxiv. Preprint. https://doi.org/10.26434/chemrxiv.14671908.v1

[5] Castillo MD, Kinney PL, **Southerland V**, Arno CA, Crawford K, van Donkelaar A, Hammer M, Martin RV, Anenberg SC. Estimating Intra-Urban Inequities in $PM_{2.5}$-Attributable Health Impacts: A Case Study for Washington, DC. Geohealth. 2021 Nov 1;5(11):e2021GH000431. doi: 10.1029/2021GH000431.

[4] **Southerland VA**, Anenberg SC, Harris M, Apte J, Hystad P, van Donkelaar A, et al. (2021). Assessing the Distribution of Air Pollution Health Risks within Cities: A Neighborhood-Scale Analysis Leveraging High-Resolution Data Sets in the Bay Area, California. Environmental Health Perspectives, 129(3), 037006.

[3] Anenberg SC, Henze DK, **Tinney V**, Kinney PL, Raich W, Fann N, et al. Estimates of the Global Burden of Ambient $PM_{2.5}$, Ozone, and $NO_2$ on Asthma Incidence and Emergency Room Visits. Environmental Health Perspectives. 2018;126(10):107004-1-14.

[2] **Tinney VA**, Anenberg SC, Kasczniak M, Robinson B. Eighteen years of recommendations to prevent industrial chemical incidents: results and lessons learned of the US Chemical Safety Board. Public Health. 2016 Oct;139:183-188. doi: 10.1016/j.puhe.2016.04.011. Epub 2016 May 17.

[1] **Tinney V**. Children's health and the environment. Pa Nurse. 2014;69(1):4-13

**Commentaries**

[2] **Tinney V**, Denton J, Tyler L, Paulson J. School siting near industrial chemical facilities: Findings from the U.S. Chemical Safety Board's investigation of the West Fertilizer explosion. Environmental Health Perspectives. 2016;124(10):1493-1496.

[1] **Tinney VA**, Paulson JA, Larsen JW, Bathgate SL. Medical education for obstetricians and gynecologists should incorporate environmental health. American Journal of Obstetrics and Gynecology. 2015;212(2):163-6.e1.

**EPA Regulatory Documents**

[3] U.S. EPA, 2022 (contributing author). Accidental Release Prevention Requirements: Risk Management Program Under the Clean Air Act; Safer Communities through Chemical Accident Prevention. Proposed rule. Office of Emergency Management, Washington, DC. Available at: https://www.federalregister.gov/documents/2022/08/31/2022-18249/accidental-release-prevention-requirements-risk-management-programs-under-the-clean-air-act-safer

[2] U.S. EPA, 2022 (contributing author). Clean Water Act Hazardous Substance Worst Case Discharge Planning. Proposed rule. Office of Emergency Management, Washington, DC. Available at: https://www.regulations.gov/document/EPA-HQ-OLEM-2021-0585-0001

[1] U.S. EPA, 2021 (contributing author). <u>Safety Alert: Public Safety at Oil and Gas Upstream Facilities</u>. Office of Emergency Management, Washington, DC. Available at: https://www.epa.gov/rmp/oil-and-gas-safety-alert-public-safety-oil-and-gas-upstream-facilities.

**Other publications**

[2] Health Effects Institute (contributor). 2022. Air Quality and Health In Cities: A State of Global Air Report 2022. Boston, MA:Health Effects Institute. Available at: https://www.stateofglobalair.org/resources/health-in-cities.

[1] Paulson J, **Tinney V**. Potential and Known Health Impacts Associated with Unconventional Natural Gas Extraction. In M Finkel, ed. The Human and Environmental Impact of Fracking: How Fracturing Shale for Gas Affects Us and Our World. Santa Monica, CA: Praeger; 2015:1-22.

**PRESENTATIONS**

[8] **Southerland V**, Stainforth T. Attainment of the European Union's Green Deal Zero Pollution Action Plan goals for fine particulate matter attributable mortality in urban areas. 2023. American Geophysical Union, San Francisco, CA.

[7] **Southerland V**. Methane Matters: Exploring the health impacts of methane mitigation. George Washington University Environmental and Occupational Health Department Fall Research Seminar Series. October 25th, 2023.

[6] **Southerland V**. The impact of air quality on the health of DC residents. George Washington University Hospital Health Policy Grand Rounds. May 24, 2023.

[5] **Southerland V**, Anenberg SC, Roy A, Harris M. 2020. Assessing the distribution of air pollution health risks within cities: a neighborhood-scale analysis leveraging high resolution datasets in the Bay Area, California. International Society for Environmental Epidemiology, virtual.

[4] **Southerland V**, Roy A. 2019. Google Street View and the health burden of air pollution. American Geophysical Union Annual Meeting, San Francisco, CA.

[3] **Southerland V**. 2019. Health Impacts of Air Pollution using Satellites and Mobile Monitoring. American Geophysical Union Annual Meeting, San Francisco, CA.

[2] **Tinney, V**. 2016. Outside the Facility Fenceline: The Proximity of Chemical Facilities to Communities and Potential Public Consequences of Catastrophic Accidents. American Public Health Association Meeting, Denver, CO.

[1] **Tinney, V**. 2016. U.S. Chemical Safety Board Recommendations to the National Fire Protection Association. National Fire Protection Association Annual Conference, Las Vegas, NV.

**Poster presentations**

[3] **Southerland V**, Sanchez S, Weisner, M, Pusch J. Building a health research alliance to drive community-centered climate action in Mexico. American Geophysical Union Fall Meeting, Washington, DC.

[2] **Southerland V**, Parasram V, Anenberg SC. 2021. Temporal trends in land use and environmental justice near hazardous industrial facilities across the US. American Geophysical Union Fall Meeting, virtual.

[1] **Southerland V**, Anenberg SC, Harris M, Roy A, Apte J, Hystad P, Vodonos A, Schwartz J. 2019. Assessing the distribution of air pollution health risks within cities: a neighborhood-scale analysis leveraging high resolution datasets in the Bay area, California. American Geophysical Union, San Francisco, CA.

**TEACHING EXPERIENCE**

| Role | Responsibilities | Dates | Course Name | Institution |
|---|---|---|---|---|
| Teaching assistant | Provided feedback to graduate students on draft assignments, Graded homework assignments, answered student questions, | Spring 2025, 2024, 2023, 2022 | Protecting Public Health and the Environment: Policies, Politics, and Programs (Pubh 6122) | Milken Institute of Public Health, George |

| | | | | |
|---|---|---|---|---|
| | maintained Blackboard materials for ~20 graduate students. | | | Washington University |
| Graduate teaching assistant | Held weekly office hours, graded weekly homework assignments, conducted in-class, SAS-based data-analysis laboratory, assisted with code troubleshooting for ~20 graduate students. | Spring 2020 | Quantitative Methods in Environmental and Occupational Health (Pubh 6131) | Milken Institute of Public Health, George Washington University |
| Graduate teaching assistant | Taught a 120-minute lecture on chemical safety and occupational health, graded exams, and answered student questions for ~40 graduate students | Fall 2019 | Assessment and Controls of Environmental and Occupational Hazards (Pubh 6126) | Milken Institute of Public Health, George Washington University |
| Graduate teaching assistant | Updated lecture materials to include R and STATA coding examples, office hours, conducted exam review sessions for ~60 graduate students | Fall 2017 | Biostatistics I (PMO503) | Uniformed Services University of the Health Sciences |

**AWARDS**
- Individual Excellence Award, Office of Land and Emergency Management, US Environmental Protection Agency, 2022
- Analyst of the Year, Office of Land and Emergency Management, US Environmental Protection Agency, 2021
- Grand Prize Winner ($5,000), Data Visualization and Storytelling Competition, American Geophysical Union (AGU) and the National Aeronautics and Space Administration (NASA), 2019
- Full doctoral tuition, Milken Institute School of Public Health Institutional Scholarship, 2018

**PROGRAMMING SKILLS**
- **R/RStudio:** Advanced level
- **ArcGIS/ArcPro**: Advanced level
- **SAS:** Intermediate level
- **STATA:** Intermediate level
- Comprehensive Air quality Model with extensions (**CAMx**): Intermediate level
- Sparse Matrix Operator Kernel Emissions (**SMOKE**): Beginner level
- **GDAL:** Beginner level

**LANGUAGES:** Spanish (Intermediate Working Proficiency)

**PROFESSIONAL ACTIVITIES & SERVICE**

Professional Development
- **GeoCAFE Scholar, 2024-2025**
  *GeoCAFE is a National Science Foundation Research Coordination Network that brings together university faculty from non-medical related geoscience departments and medical and public health professionals.*
- **Reach the Decision Makers Fellowship, 2014-2015**
  *Program on Reproductive Health and the Environment, University of California, San Francisco fellowship designed to develop professional capacity for public policy making among health professionals.*

Peer-review of submitted manuscripts (editorial requests):
- Nature Communications
- Atmospheric Environment
- Environmental Research Letters
- American Journal of Obstetrics and Gynecology

<u>Memberships</u>
- American Geophysical Union, 2019-Current
- American Public Health Association, 2013-Current
- Delta Omega Honor Society in Public Health, Omega Chapter, *Inductee Represents Top 10% of Graduating Student Body*, 2014
- Lead Poisoning Prevention and Healthy Homes Advisory Committee, District of Columbia Department of the Environment, 2013-2015

<u>Grant review panels</u>
- Data Visualization and Storytelling Competition, American Geophysical Union (AGU) and the National Aeronautics and Space Administration (NASA), 2020-Current
- Grants & Awards, National Environmental Education Foundation, 2017

<u>Other service activities</u>
- Junior League of Charlottesville, Diversity Equity and Inclusion Committee (2024-2025)

**Exhibit B**

# Meagan L. Weisner, PhD

E: mweisner@edf.org

**Education**

|      |      |
|------|------|
| 2019 | **Ph.D.** Geosciences, Florida Atlantic University |
| 2018 | **Advanced GIS Certificate,** Florida Atlantic University |
| 2015 | **M.A.** Anthropology, Florida Atlantic University |
| 2013 | **B.A.** Anthropology, Oregon State University |
| 2011 | **A.A.** Anthropology, Broward College |

**Relevant Employment**

Dec 2023 – present, **Senior Health Scientist**, Global Clean Air, Environmental Defense Fund. Full-time employment. Working on multiple projects with a team of scientists to investigate health impacts related to methane co-pollutants from oil and gas operations both nationally and internationally.

August 2021 – Nov 2023, **Senior Environmental Epidemiologist**, City and County of Broomfield, Department of Public Health, CO. Full time, 40 hours/week. Responsibilities included advising City Council on local environmental topics related to oil and gas development, air quality monitoring, and air toxics exposure. Additional responsibilities included organizing and conducting health research in collaboration with University of Colorado School of Public Health.

Feb 2020 – August 2021, **Environmental Epidemiologist**, City and County of Broomfield, Department of Public Health, CO. Full time, 40 hours per week. Managed and analyzed air quality data for the County's oil and gas monitoring program. Collaborated with various departments, the community, and external stakeholders on a variety of environmental issues including health impacts associated with living near multi-well oil and gas sites.

June 2016 – Dec 2019, **Adjunct Professor**, Courses: World Geography, Water Resources, Culture and Society. Department of Geosciences and Department of Anthropology, Florida Atlantic University and at Broward College. Part time, 20 hours/week. Duties included lecturing 25 - 250 students per class either in-person or online, developing curriculum, lectures, quizzes, and directing a team of teaching assistants.

May 2019 – Sept 2019, **Postdoctoral Research Associate**, Center for Environmental Studies, Florida Atlantic University. Full time, 40 hours/week. My key responsibilities were to query and analyze data, oversee graduate students with IRB applications, as well as survey design and research implementation for statewide climate change projects, mitigation strategies, and local community vulnerability assessments.

August 2015 – May 2019, **Research Investigator**, Florida Atlantic University. Part time 20 hours/week. Over the course of 4 years, I managed grant funding for my dissertation research and hired and trained three research assistants to assist in field work and data collection.

January 2016 – May 2016, **GIS Lab Technician**, Department of Geosciences, Florida Atlantic University. Part time, 20 hours/week.

January 2014 – Dec. 2015, **Graduate Teaching Assistant** for a variety of classes including Environment and Society, Introduction to Philosophy, Environment and Disease (Environmental Epidemiology course), and World Geography. Part time, 20 hours/week.

December 2008 – April 2009 **Volunteer English Teacher**, Traveler Not Tourist Organization, Arequipa, Peru. I volunteered to teach children in the village of Chachani, Peru. This program was designed to give educational access to over 100 children. Part time 20 hours/week.

## Professional Leadership and Service

- 2024 - present, selected by the State of Colorado to serve on the Scientific Community Technical Working Group for House Bill 122-1244, Public Protections from Toxic Air Contaminants, Colorado Department of Public Health and Environment.
- 2022- 2023, selected to serve on the External Advisory Committee, Department of Environmental and Occupational Health, University of Colorado School of Public Health.
- 2021- present, Special Appointment, Adjunct Assistant Professor, University of Colorado School of Public Health.
- American Association of Geographers, 2018-current, member.
- American Geophysical Union, 2024-current, member.
- Colorado Public Health Association, 2023-present, member.

## Research Experience

- Cumulative health risks from air toxics near unconventional oil and gas sites
- Unconventional oil and gas development, air quality, and health impacts
- Design, implementation, data organization and analysis for air quality monitoring near oil and gas sites in Colorado
- Health Equity frameworks and research
- Florida Climate Change mitigation survey design and implementation (postdoctoral research)
- Examining the Relationships between Neighborhood Socioeconomic Status and Drinking Water Quality: Identifying Inequities in Palm Beach County, FL (dissertation research)
- South Florida: Peace, Justice and Human Rights Index (research assistant)

## Awards and Grants

2021 City and County of Broomfield, funding for epidemiological research on the health impacts of residents living near unconventional oil and gas development, Principal Investigator, award amount $61,847

2018 Research Award, Water Resources Specialty Group, American Association of Geographers, $200

2017 Florida Atlantic University Center for Environmental Studies, Walter and Lalita Janke Innovations in Sustainability Science Research Grant, $5,000

2016 Florida Atlantic University, Graduate and Professional Student Association, 1st place award for poster presentation

2016 Florida Atlantic University, Department of Geosciences, $1000 Scholarship award

2015 Florida Atlantic University, Graduate and Professional Student Association, 1st place award for poster presentation, $100

2014 Florida Atlantic University, Anthropology Department, Morrow Thesis Award, $1000

2013 Oregon State University, $500 Travel Award

## Select Presentations and Posters

Sutherland, V., **Weisner, M.** December 2024. Co-convener for poster session, Health Impacts of Methane Emissions and Copollutants from Oil and Gas Operations Poster. American Geophysical Union annual meeting.

**Weisner, M.L.,** Varner, P.M., Ku, I., Collett, J., Mckenzie, L.M. December 2024, paper presentation. Assessing the Cumulative Health Risks from Volatile Organic Compounds and Regional Ozone at Colorado's Unconventional Oil and Gas Sites. American Geophysical Union annual meeting.

Southerland, V., Sanchez, S., **Weisner, M.,** Pusch, J. December 2024, poster presentation. Building a health research alliance to drive community-centered climate action in Mexico. American Geophysical Union annual meeting.

**Weisner, M.L.** April 2024, paper presentation, American Association of Geographers' annual meeting. Oil and Gas Cumulative Impacts Policy in Colorado: Evaluation of Volatile Organic Compounds and Health Impacts.

Copeland, C. Turner, J., Frank, D., **Weisner, M.L.** on behalf of Colorado Communities for Climate Action. October 2023, presentation to the Legislative Interim Committee on Ozone Air Quality. Front Range Local Government Air Quality Studies.

**Weisner, M.L.** October 2023, invited speaker, Department of Political Science, Colorado State University. Ozone Pollution from a Health and Policy Perspective.

**Weisner, M.L.** September 2023, paper presentation, Public Health in the Rockies conference.

Oil and Gas Air Monitoring in the City and County of Broomfield.

**Weisner, M.L.** March 2023, paper presentation, American Association of Geographers' annual meeting. Unconventional Oil and Gas Development Near your Neighborhood: the challenges and science needed for opposition.

**Weisner, M.L.** February 2022, session organizer and paper presentation, American Association of Geographers' annual meeting. Weisner, M.L. At the Intersection of Oil and Gas Development and Human Health: What have we learned? Where do we go from here?

**Weisner, M.L.**, Root, T.L. and Harris, M.S. April 2019, paper presentation, American Association of Geographers' annual meeting. Examining the Relationship between Metals in Tap Water and Socioeconomic Inequality: A Spatial Analysis of Water Quality Disparities in Palm Beach County, FL.

**Weisner, M.L.**, Root, T.L. and Harris, M.S. November 2018, paper presentation, Southeastern Division of the American Association of Geographers' annual meeting. The Socioeconomics of Tap Water Quality: Public Perceptions and Consumption Patterns in Palm Beach County, FL.

**Weisner, M.L.**, Root, T.L. and Harris, M.S. April 2018, paper presentation, American Association of Geographers' annual meeting. "I don't want to know what's in my drinking water because I'm too poor to do anything about it": resident reactions to tap water testing in a South Florida county.

**Weisner, M.L.** November 2016, Poster Presentation, Southeastern Division of the American Association of Geographers' annual meeting. Examining the Relationship between Socioeconomic Factors and Drinking Water Quality: Mapping Areas of Concern in Eastern Palm Beach County, FL.

**Weisner, M.L.** April 2016, Poster Presentation, Florida Atlantic University 3rd Annual Sea-Level Rise Summit. Sea-Level Rise in South Florida: Impacts to Drinking Water and Human Health.

**Weisner, M.L.** March 2016, Poster Presentation, Graduate and Professional Student Association, Florida Atlantic University. Drinking Water Quality and Socioeconomics: Testing for Heavy Metals throughout South Florida Communities.

## Publications (Peer-reviewed)

**Weisner, M.L.,** Varner, P.M., Ku, I., Collett, J., Buck, B., Mckenzie, L.M. 2025. Cumulative Human Health Risk Assessment of Regional Ozone and Volatile Organic Compounds from Unconventional Oil and Gas Sites in Colorado's Front Range. *Environmental Health Perspectives*. https://doi.org/10.1289/EHP16272

**Weisner, M.L.,** Harris, M.S., Mitsova, D.M., and Liu, W. 2023. Drinking Water Disparities and Aluminum Concentrations: assessing socio-spatial dimensions across an urban landscape.

*Social Sciences and Humanities Open.*  https://doi.org/10.1016/j.ssaho.2023.100536

**Weisner, M.L.**, Allshouse, W.B., Erjavac, B., Valdez, A.P., Vahling, J., McKenzie, L.M. 2023. Health Symptoms and Proximity to Active Multi-Well Unconventional Oil and Gas Development Sites in the City and County of Broomfield, Colorado. *International Journal of Environmental Research and Public Health.* https://www.mdpi.com/1660-4601/20/3/2634

**Weisner, M.L.**, Root, T.L., Harris, M.S., Mitsova, D.M. and Liu, W. 2020. The Complexities of Trust between Urban Water Utilities and the Public, *Sustainable Water Resources Management.* https://doi.org/10.1007/s40899-020-00407-6

**Weisner, M.L.**, and Cameron, M. 2020. Does Yoga Enhance Sustainability? Yoga, Meditation, Sensory Awareness, and Environmental Behavior, *Worldviews: Global religions, culture and ecology.* https://doi.org/10.1163/15685357-02401101

**Weisner, M.L.**, Root, T.L., Harris, M.S., Mitsova, D.M. and Liu, W. 2019. Tap Water Perceptions and Socioeconomics: Assessing the Dissatisfaction of the Poor, *Journal of Sustainable Production and Consumption*. https://doi.org/10.1016/j.spc.2019.08.008

**Weisner, M.L.** Levels of Resistance to Rate Collection [map]. 2019. In: Kanter, D. and Walsh, P. eds., *Taxation, Politics, and Protest in Ireland, 1662-2016*. Cham: Palgrave Macmillan, page 179.

**Weisner, M.L.** Petitions for Tax Relief. Weisner [map]. 2019. In: Kanter, D. and Walsh, P. eds., *Taxation, Politics, and Protest in Ireland, 1662-2016*. Cham: Palgrave Macmillan, page 239.

**Weisner, M.L.** 2018. Flooding - The City of Boston case study. In: Mitsova, D. and Esnard, A.-M. *Geospatial applications in climate adaptation planning.* CRC Press - Routledge.

## Government Reports

**Weisner, M.L.** 2022. Q2 2022 City and County of Broomfield Health Report April 1, 2022 - June 30, 2022. Department of Public Health and Environment. Available at: https://drive.google.com/drive/folders/1SVnG-xGYpe6a7gRKZmnRbmLto_uMatys

**Weisner, M.L.** 2022. Q1 2022 City and County of Broomfield Health Report
January 1, 2021 - March 31, 2021. Department of Public Health and Environment. Available at: https://docs.google.com/document/d/1sZD3NKSxFNXBd0UhIsU8Gp78MLBajRmaMpjLq-p6SN4/edit

**Weisner, M.L.** 2021. Q4 2021 City and County of Broomfield Health Report October 1, 2021 - December 31, 2021. Department of Public Health and Environment. Available at: https://docs.google.com/document/d/16A6CW1e4tqSeCkSERuccyK-15kOvWWo2Uf7oQDQzPl8/edit

**Weisner, M.L.** 2021. Q3 2021 City and County of Broomfield Health Report July 1, 2021 - September 30, 2021**.** Department of Public Health and Environment. Available at: https://docs.google.com/document/d/1QjaJSnGISIfi9jH-dEBo-OAgMxLMKfjRZjxoGZnahw0/edit

**Weisner, M.L.** 2021. Q2 2021 City and County of Broomfield Health Report April 1, 2021 - June 30, 2021. Department of Public Health and Environment. Available at: https://docs.google.com/document/d/1OxPY9Xw1nOL4df3Ks6Ou2vOur24ltzjKN0brqhUDBW0/edit

**Weisner, M.L.** 2021. Q1 2021 City and County of Broomfield Health Report January 1, 2021 - March 31, 2021. Department of Public Health and Environment. Available at: https://docs.google.com/document/d/1FgNKXd5e4jZYwcIYkGgFwtYRoOmrdvyJ-N3jZp-6GiM/edit

**Weisner, M.L.** 2020. Q4 2020 City and County of Broomfield Health Report October 1, 2020 - December 31, 2020. Department of Public Health and Environment. Available at: https://docs.google.com/document/d/1vvEnblhoNJKSyYxEqc-Wv3H1jWG3WibWNko7-fnJUmI/edit

**Weisner, M.L.** 2020. Overview of Symptom Data Reported by Broomfield Residents1 for Q3 2020 Period. Department of Public Health and Environment. Available at: https://docs.google.com/document/d/14RBthheL5xCzur2k0L7FgRD4lmoGGGLbeebDQXkiruY/edit

**Weisner, M.L.** 2020. Q2 2020 City and County of Broomfield Health Report April 1, 2020 - June 30, 2020. Department of Public Health and Environment. Available at: https://docs.google.com/document/d/1mgeB8CWk75MImQkdicRzN4YN3Gn-ECoFGxKNlqKq8vI/edit

**Peer-reviewer for the following journals:**

American Geophysical Union, Community Science
Sustainable Water Resources Management

**Mentoring and Advising**

**(University of Colorado, School of Public Health, Anschutz Medical Campus)**

| Student | Degree | Role | Year |
| --- | --- | --- | --- |
| Clare Burchenal | MD | Fellowship Advisor | 2024-present |
| Hannah Walters | PhD | Committee Member | 2023-present |
| Ben Erjavac | MPH | Capstone Preceptor | 2022-2023 |
| Ben Erjavac | MPH | Practicum Preceptor | 2022 |
| Maizie Humm | MPH | Practicum Co-Preceptor | 2022 |
| Maizie Humm | MPH | Capstone Preceptor | 2022 |

| Jillian Murphy | MPH | Capstone Preceptor | 2021-2022 |
| **(George Washington University)** | | | |
| **Student** | **Degree** | **Role** | **Year** |
| Vana Brookings | MPH | Practicum Preceptor | 2024 |

## Select Testimonies and Public Comment

Colorado Air Quality Control Commission. February 2025. Regulation number 7 rulemaking, Control of Emissions from Oil and Gas Emissions Operations. Served as expert witness on behalf of EDF.

Colorado Air Quality Control Commission. February 2025. Informational Hearing on HB-22 1244, Public Protections from Toxic Air Contaminants. Served as expert to provide information to the commission.

Colorado Energy and Carbon Management Commission. August 2024. Cumulative Impacts and Enhanced Systems and Practices Hearing. Public comment written on behalf of the Environmental Defense Fund.

Colorado Energy and Carbon Management Commission. October 2023. Cumulative Impacts Hearing. Public Commenter on behalf of the City and County of Broomfield.

Colorado Energy and Carbon Management Commission. September 2023. Hearing for Lizzie B Oil and Gas Development Pad. Public commenter on behalf of the City and County of Broomfield.

Colorado Air Quality Control Commission. May 2023. Regulation number 3 hearing, enhancing modeling, monitoring and permitting in disproportionately impacted communities. Served as expert witness and presenter on behalf of the Local Government Coalition.

Colorado Oil and Gas Conservation Commission. October 2022. Hearing for the Cosslett East Oil and Gas Development Pad. Served as expert witness and presenter for the City and County of Broomfield.


## Select Media Interviews and Engagements

Broomfield Enterprise, 2020, Broomfield Hires Environmental Epidemiologist.
https://www.broomfieldenterprise.com/2020/03/03/broomfield-hires-environmental-epidemiologist/

Broomfield Enterprise, 2021, Broomfield City Council Oks 2,000-foot reverse setbacks from pre-production oil and gas sites.
https://www.broomfieldenterprise.com/2021/07/28/broomfield-city-council-oks-2000-foot-reverse-setbacks-from-pre-production-oil-and-gas-sites/

The Colorado Sun, 2022, Colorado oil and gas regulators approve new wells in Weld County over Broomfield's objections. https://coloradosun.com/2022/10/26/colorado-oil-and-gas-regulators-approve-new-wells-in-weld-county/

Boulder Daily Camera, 2022, Broomfield officials review oil and gas health survey results. https://www.dailycamera.com/2022/05/27/broomfield-officials-review-oil-and-gas-health-survey-results/

The Sum and Substance, 2023, Companies within disproportionately impacted communities to come under new regulations. **https://tsscolorado.com/companies-within-disproportionately-impacted-communities-to-come-under-new-regulations/**

EDF Vital Signs, 2025, Colorado scores a win for communities and cleaner air. https://vitalsigns.edf.org/story/colorado-scores-win-communities-and-cleaner-air

# Attachment 25

Declaration of Joseph A. Satrom, Environmental Law & Policy Center

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| ENVIRONMENTAL DEFENSE FUND, *et al*., ) ) ) | |
| *Petitioners* ) ) | |
| v. ) ) | No. 25-1164 |
| LEE ZELDIN, *et. al*., ) ) | |
| *Respondents* ) ) | |

**DECLARATION OF JOSEPH A. SATROM**

I, Joseph A. Satrom, do hereby affirm and state:

1.      I am a lifelong resident of North Dakota.  I am currently a member of the Environmental Law and Policy Center ("ELPC").

2.      I reside in Bismarck, North Dakota.  I grew up on my family's farm in the Red River Valley in North Dakota near the Minnesota border.  I attended North Dakota State University and received a Bachelor of Science degree in agricultural education.

3.      I am retired now.  Prior to retiring, during my career, I worked in a number of leadership and management positions in state government and business, including cofounding a forty-year-old tour and travel company.   For ten years I was elected and served in the North Dakota State Senate where I represented my

community and state on a wide diversity of issues.  For much of my career I also worked as an administrator and manager in habitat conservation for Ducks Unlimited and the Nature Conservancy, where I managed land conservation programs and the responsible management and stewardship of North Dakota's natural resources.

4.      I have long been interested in environmental issues in my community, state and nation.  My family and I know the local environment here in North Dakota very well.   We enjoy virtually all aspects of the outdoors.  Whenever I have time, I enjoy fishing on Lake Sakakawea, and hiking and birding outings in the Bakken region which includes the Little Missouri National Grasslands and western areas around Lake Sakakawea in the western part of the State.

5.       As an ELPC member, I previously prepared a declaration that is included in the Appendix to the Motion of Environmental and Public Health Organizations to Intervene in Support of Respondents filed by ELPC and other organizations to intervene in the lawsuit *State of Texas v. U.S. Environmental Protection Agency*, *et al.*, No. 24-1054, filed on March 12, 2024, at pgs. 176 to 181 of the Appendix, Doc. No. 2044639.  In that matter, ELPC intervened to support a final rule issued by the U.S.  Environmental Protection Agency ("EPA") entitled "Standards of Performance for New Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources:  Oil and Natural Gas Sector Climate

2

Review," 89 Fed. Reg. 16,820 (March 8, 2024) ("2024 Rule"), which revised the New Source Performance Standards for methane and volatile organic compounds ("VOCs") in the crude oil and natural gas source category. I wanted to get involved as part of ELPC's effort to support the 2024 Rule because I believe it will significantly reduce methane, VOCs, and hazardous air pollutant ("HAP") emissions.

6. I understand that on July 31, 2025 the EPA issued an interim final rule entitled: "Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review." 90 Fed. Reg. 35,966 (July 31, 2025) ("Delay Rule"). This Delay Rule will postpone compliance deadlines for technology control and monitoring requirements of the previously mentioned 2024 Rule. A delay of these emissions controls would forestall climate and health benefits which in turn would adversely impact my local environment, my health and the health and enjoyment of my guests who I have taken and will continue to regularly take on hiking and birding outings in these extraordinary natural areas of North Dakota.

7. The EPA itself recognizes these harms. The agency found that its Delay Rule will produce "climate damages from increasing methane emissions by 1,300,000 short tons, lost value of PM2.5 and ozone-related health benefits from

3

increasing VOC emissions by 350,000 short tons, and lost value of benefits from increasing HAP emissions by 13,000 short tons." 90 Fed. Reg. 35,980.

8.     According to the EPA's Regulatory Impact Analysis ("RIA"), the 2024 Rule was expected to result in significant emissions reductions, including an estimated 130 million metric tons of methane, 1.3 million short tons of VOCs, and 49 thousand short tons of HAPs between 2024 and 2029.  *See* EPA-452/R-23-013, pg. 3-4.  I strongly support these emissions reductions, but the Delay Rule unnecessarily forestalls them.

9.     The RIA identifies the Bakken region of North Dakota as an "Oil and Natural Gas Intensive Community," meaning the region is in the top 20% of all Public Use Microdata Areas ("PUMAs") for oil and natural gas workers.  *See* EPA-452/R-23-013, pg. 4-58.  North Dakota's Bakken region also is identified by the EPA as having increased cancer risks associated with HAP pollution from the oil and gas sector.  *See* EPA-452/R-23-013, pg. 4-55, figure 4-6.  Significant reductions in ozone pollution would also accrue because of the requirements of the 2024 Rule.  EPA's RIA found that by 2028 ozone pollution would decrease significantly in North Dakota, especially in the Bakken region, if the compliance deadlines in the 2024 Rule are enforced.  *See* EPA-452/R-23-013, pg. 3-30, figure 3-2.

10.     The Bakken region is especially important to me because I often

4

recreate there, and spend time there with my family, friends and out-of-state and international guests who ask me to introduce them to western North Dakota. These requests from friends and guests to visit the Bakken region with me are the result of my prior involvement and recent retirement from a 40-year old ecotourism business. For many years I used my conservation experiences to guide tourists to the Bakken region's tremendous natural areas and birding spots. In my retirement years, I continue to take several trips each year into the Bakken oil and gas development region of North Dakota for birding and outdoor recreation, and I plan to continue to do so. My next trip to the Bakken region is set for September 3-7, 2025, with guests from Iowa, Massachusetts and Utah. During this trip, on September 4, 2025, I will visit Dickinson, South Heart, and Belfield. On September 5, I will travel to Medora and Theodore Roosevelt National Park (South Unit), as well as to the North Dakota Badlands and Little Missouri National Grasslands in Billings County. On September 6, I will travel to Theodore Roosevelt National Park (Elkhorn Ranch site), Fairfield, Grassy Butte, Killdeer, and Medora.

11.    Over the years, and especially recently, I have been able to witness how oil and gas operations have boomed in the intensively productive Bakken region. These days, while out birding and hiking in the Bakken, I regularly see the continued operation of oil and gas wells. I know that these operations emit

5

pollutants into the air that are harmful to those exposed, and these pollutant emissions diminish the local ecosystems that I enjoy personally. An analysis conducted by the Environmental Defense Fund ("EDF") has confirmed my observations. I understand that this EDF data analysis will be described more fully in the Declaration of Jeremy Proville and Laura Mirtich to be filed in the above-captioned matter (hereafter "Proville-Mirtich Decl."). I understand that EDF's analysis has found that there are 828 active wells in Stark County, where I will be visiting Dickinson, South Heart, and Belfield on September 4, 2025; 1,985 active wells in Billings County, where I will be visiting Medora, the North Dakota Badlands and Little Missouri National Grasslands on September 5, 2025; 10,768 active wells in McKenzie County, where I will be visiting on September 6, 2025; and 5,107 active wells in Dunn County, where I will be visiting Killdeer on September 6, 2025. *See* Proville-Mirtich Decl.

12.    I have extensive experience planning and leading ecotourism trips in North and South Dakota, including birding in the areas of the Little Missouri River Valley, Lostwood, Des Lacs, Audubon National Wildlife Refuges, and Theodore Roosevelt National Park in North Dakota. While hiking around Theodore Roosevelt National Park, I have encountered oil and natural gas drilling and transport in close proximity to the Little Missouri River and its delicate tributaries. These are fragile ecological areas and scenic areas that I regularly enjoy visiting,

6

but the oil and natural gas operations impair my aesthetic enjoyment of the landscape and pose a threat to my health.  These outdoor activities have been an important part of my entire life, and they remain important to me in my retirement.

13.     The timely enforcement of compliance deadlines in the 2024 Rule is crucial in realizing improvements in air quality and avoiding adverse health impacts throughout North Dakota and the Bakken region.  *See* EPA-452/R-23-013, pg.  3-47, table 3-8.  This concrete data showing avoidance of adverse health impacts from adherence to the deadlines in the 2024 Rule makes me far less worried for my health and the health of my friends when traveling to the Bakken Region; however, the EPA's Delay Rule will unnecessarily forestall those benefits and harm the health of myself, my family and my friends.

14.     When I worked for the Nature Conservancy, I built relationships with people all across both North and South Dakota, including landowners, people in local government and a diverse group of conservationists and birders that helped me lead various conservation efforts and later to create my own nature-based tourism business.  The Dakotas provide critical habitat for many species of migratory waterfowl and grassland nesting birds and are wonderful spots for observing birds and ducks in their primary habitats.  The EPA's RIA notes that a form of HAP known as polycyclic aromatic hydrocarbons ("PAHs"), which are released as a result of oil and natural gas operations, can accumulate in the food

7

chain and pose a threat to many species including migratory birds.  *See* EPA-452/R-23-013, pg. 3-56.  The timely implementation of the technology control and monitoring requirements in the 2024 Rule will decrease these types of pollutants.  *See* EPA-452/R-23-013, pg. 3-4, Table 3-2.  EPA's Delay Rule will forestall these reductions and therefore negatively impact the health of these species I care deeply about and which form the basis of my recreational enjoyment.

15.     As a former North Dakota State Senator, I remember attending public hearings where local citizens and taxpayers complained of health concerns and property damage to their farms and ranches from well pollution they did not anticipate when oil and natural gas development first came to their agricultural land and their communities.

16.     The EPA's Delay Rule also bypasses important public participation opportunities.  ELPC was not able to provide comments on the Delay Rule before it was issued by EPA and became effective immediately.  As a member of ELPC, I would have strongly supported having ELPC participating in a public comment period to inform the EPA of the health and environmental consequences of the Delay Rule before EPA issued it.  By issuing the Delay Rule without first allowing for public comment, the EPA has deprived ELPC and myself the procedural right to public participation.

17.     More pollution control is needed to protect these places and the health

8

of myself and my family.  The 2024 Rule is instrumental to achieving this goal and I believe EPA's decision to forestall the compliance deadlines in the 2024 Rule for the crucial technology control and monitoring requirements is a huge step in the wrong direction.

18.     I wonder if we cannot do better when it comes to managing environmentally damaging air pollution from these operations.  Knowing that environmentally harmful air pollution from these operations was better regulated would certainly increase my enjoyment of these places, improve my visits, better secure the health of the ecosystems I rely on for fishing, hiking and birding, and lessen the health risks associated with my regular trips.

19.     I believe myself, my family, my friends and guests who join us on trips to the Bakken region all would benefit from the associated climate and health benefits of the originally promulgated implementation timeline of the 2024 Rule. Any delay of such emissions control provisions would cause unnecessary adverse climate and health impacts to myself, my community, and the natural places that I recreate and that I take my family, friends and guests to visit and enjoy.

20.     I fully support ELPC's efforts to challenge the EPA's new Delay Rule as a petitioner in the above-captioned lawsuit entitled *Environmental Defense Fund et al. v. Lee Zeldin et al.,* Case No. 25-1164.

21.     I declare under penalty of perjury that the foregoing is true and

9

correct.

*/s/ Joseph A. Satrom*
Joseph A. Satrom

Executed on August 12, 2025.

10

# Attachment 26

Declaration of Linda Weiss, Dakota Resource Council

IN THE UNITED STATES COURT OF APPEALS
DISTRICT OF COLUMBIA CIRCUIT

**DECLARATION OF LINDA WEISS**
**Submitted In Support of Dakota Resource**
**Council**

I, Linda Weiss, declare as follows:

1.      My siblings and I, along with another relative, own and

operate a family farm, renting crop and pastureland near Belfield, North

Dakota. The farmstead was bought by my paternal grandparents and has

been in my family for nearly a century. I have lived here since 1985, for the

past 39 years. The farm is located six miles east of the Theodore Roosevelt

National Park, a Class One airshed, and approximately one mile outside of

Belfield, North Dakota.

2.      I am a dues-paying member of the Dakota Resource Council

("DRC") since 2000 and have served on the board of the organization since

2005. From 2013 to 2015, I served as chair of DRC's board. DRC was

formed in 1978 to protect North Dakota's land, air, water, rural

communities and agricultural economy. DRC's mission is to promote

sustainable use of North Dakota's natural resources and family-owned and

operated agriculture by building member-led local groups that empower

people to influence the decision-making processes that affect their lives and

1

communities. In my role as a member and board member of DRC, I actively participate in DRC's campaigns on agriculture and oil and gas issues. DRC has participated in the federal oil and gas leasing process, including, for example, by commenting on the Oil and Gas Leasing Draft Supplemental Environmental Impact Statement (DEIS) Northern Great Plains Revision in 2018.

3.    Through DRC, I am also a member and board member of the Western Organization of Resource Councils ("WORC"). I am on WORC's Oil and Gas Task Force, in which capacity I work on behalf of WORC and its member groups, including DRC, to give communities a voice in how oil and gas development affects them. The task force works to address methane waste and orphaned and abandoned oil and gas wells and infrastructure, among other aspects of the oil and gas industry that threaten clean water and farmland. I am aware that active, orphaned, and abandoned wells can emit hazardous and carcinogenic air pollutants, and that proximity to these wells positively correlates with an increase in the occurrence of adverse health impacts, including cardiovascular disease, respiratory diseases, and certain types of cancer.

4.    In the early 2000's, I co-chaired, and then chaired the Badlands Area Resource Council ("BARC"), an affiliate of DRC. BARC is

2

comprised of members from Killdeer, Dickinson, Richardton, Beach, Belfield and Medora and was formed in 1998 in response to efforts to privatize the Dickinson Landfill. Later campaigns have included protecting the Heart River, opposing genetically modified wheat, and opposing the South Heart Mine. Currently, BARC has been working to relocate the proposed Davis oil refinery from its proposed location less than three miles southeast of the Theodore Roosevelt National Park and three miles southwest of my family's farm.

5.     I am a member of DRC and WORC because I support their mission to promote responsible use of North Dakota's natural resources and support family owned and operated agriculture, and because I believe in protecting our air, water, land, and wildlife resources from the negative impacts of fossil fuel development.

6.     When DRC organized in 1978, one founding member stated "that it protects the integrity of food producing land, air and water." Early issues dealt with energy issues, reclamation of coal mines, preserving water, protecting airsheds, fighting acid rain, protecting people from mercury-laden fish, and improving air quality. Along with two other member groups in Montana and Wyoming, DRC launched the Western Organization of Resource Councils in 1979. We were facing the same

3

issues impacting members in different ways. Members, with help from organizers, empowered themselves to face local, state, federal and sometimes global entities and agencies on issues that affected us directly and extensively. We have dealt with many livestock issues such as Country of Origin Labeling (COOL), livestock concentration, beef checkoff, confined animal feeding operations, and huge hog operations. In the past couple of decades issues around local foods, soil health, food hubs, renewables, and community have grown. Members have gone on to serve in different government councils, offices and legislatures.

7.      Our family farm—my home—has been negatively impacted by federal oil and gas development in many ways. The extraction industry has impacted the land for many decades; first coal mines in early 1900s leaving tunnels in nearby land, then seismic testing in the 1980's, affecting groundwater quality and aquifers, oil and gas drilling affecting the land surface, and a produced water spill on pastureland in 1990s. Oil and gas exploration adjacent to and in some cases on our property has affected the zoning of our land and has resulted in us having to sell some parts of it in order to keep others.

8.      I am aware of 18 active and abandoned wells within approximately one mile of my home/family farm. From my front yard I can

4

see 12 flares on the horizon, one of which in the northeast seems to run continuously. On overcast days I can see the reflection of the flares in the clouds, which also makes it looks as if the trees underneath are on fire. When there's a cold snap, the flares burn even more. I can also hear a loud noise emanating from the northeast, in the direction of the flares.

9.      Because of all these impacts, I have been working for more than 20 years, advocating for clean air, water and land. Issues I have worked on include air quality near coal-fired power plants, GMO wheat affecting farmers' crops and export customers, a mine and coal-fired power plant near South Heart and a national park, opposing the resumption of uranium mining in our area (which first occurred in the early 1960s), coalbed methane development, special waste landfills taking radioactive waste from oil and gas production, trade agreements detrimental to farmers and ranchers, development of a rail loop every five or 10 miles, and the proposed development of an oil refinery within three miles of a national park. I found a quote by Ted Nace, a founding member of DRC, and he said "just as lusting is not our sin but calling it love is, so exploiting the earth is not our sin but calling it development is."

10.     My biggest concerns about oil and gas development include impacts to air quality/airshed issues, abandoned/orphan wells, volatile

5

organic compounds (VOCs), particulates, water quality and quantity, reclamation bonding, and wildlife and wildlife habitat impacts. I am concerned that these air quality impacts may make it more difficult for me to breathe and to take a deep breath. Because I do not know what is in the air that I breathe, I regularly check an air quality monitoring application on my phone. It often says that the air quality is unhealthy and suggests limiting your time outdoors. I also receive air quality alerts from an air monitoring station at Fort Berthold. On days with dangerous air quality I try to limit the amount of time that I spend outside, or even stay inside entirely.

11.     I am very concerned about the recovery costs from this type of development falling on the backs of people—ND residents, their agricultural land and soil health, and ultimately healthy food and healthy people.

12.     I support the Biden Administration's effort to better protect communities from the harms of oil and gas development through the new final rules for New Source Performance Standards and Emission Guidelines for the oil and gas industry, published on March 8, 2024 ("2024 Rule"). These rules are necessary to protect the health and wellbeing of myself, my family, and my community. In these rules, EPA regulates new

6

and modified emission sources in the oil and gas industry. In particular, I understand that the rule's comprehensive leak monitoring requirements will help to mitigate the emission of harmful air pollutants. I am aware that the super emitter program, which enables third parties to notify EPA of large leaks, will streamline identification and repair of leaks that could harm myself and my community. I am also aware that the rules will restrict flaring and include other measures to reduce air pollution, which will help reduce the health impacts that I worry about. I understand that when implemented, this rule is estimated to reduce emissions of VOCs by 16 million tons, and hazardous air pollutants by 590,000 tons.

13.     Moreover, I am aware that the final rule ensures significant benefits to the climate by reducing methane emissions by covered sources by 80%, totaling 58 million tons. Preventing the emission of this potent greenhouse gas is key to maintaining a stable climate system upon which I rely for my health and well-being.

14.     I have learned that the Trump administration plans to reconsider the 2024 Rule. And on July 31, 2025, EPA issued a rule that immediately extended many of the compliance dates in the 2024 Rule, without taking any public comment before doing so.  According to the fact sheet for the rule, emissions reductions that I was counting on to protect me

7

and my community will no longer occur in the near term, including 3.8 million tons of methane, 960,000 tons of VOCs, and 36,000 tons of toxic air pollution.

15.     According to analysis provided to me by Environmental Defense Fund analyst Laura Mirtich (*see* Mirtich Declaration), there are currently more than 268 producing oil and gas wells in Stark County, ND where I live.  Five of these wells were drilled after December 2022 and would be subject to the new source standards in the 2024 Rules, and 263 of these wells were completed prior to December 2022 and would be subject to the existing source standards of the 2024 Rule once adopted by North Dakota.  Six of these existing wells are within ½ mile of my home.

16.     By delaying compliance with the 2024 Rules, the Trump administration has delayed important protections for me and my community. I worry about the effect of delays, and possibly eventual rescission, of standards that were adopted to restrict flaring and reduce air pollution and how that will affect the health of me and my neighbors.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

8

Signed this 15th day of August, 2025, in Belfield, North

Dakota.

_Linda K Weiss_

Linda Weiss

# Attachment 27

Declaration of Joyce Yeung, Natural Resources Defense Council

# DECLARATION OF JOYCE YEUNG

I, Joyce Yeung, declare as follows:

1.      I am the Associate Director of Membership at the Natural Resources Defense Council (NRDC).  I have served as the Associate Director of Membership since 2022, and I have worked in NRDC's Membership department for more than 20 years.

2.      My duties include supervising the preparation of materials that NRDC distributes to members and prospective members.  Those materials describe NRDC and identify its mission.

3.      NRDC is a membership organization incorporated under the laws of the State of New York. It is recognized as a not-for-profit corporation under section 501(c)(3) of the United States Internal Revenue Code. NRDC's headquarters are located at 40 West 20th Street, 11th floor, New York, NY 10011.

4.      NRDC's mission statement declares that "The Natural Resources Defense Council's purpose is to safeguard the Earth: its people, its plants and animals, and the natural systems on which all life depends." The mission statement goes on to declare that NRDC works "to restore the integrity of the elements that sustain life – air, land, and water – and to defend endangered natural places." NRDC's mission includes the prevention and mitigation of global warming to

1

protect and maintain NRDC's members' use and enjoyment of natural resources threatened by climate change, as well as members' own health and safety.

5.      Through its Climate and Energy Program, NRDC pursues federal and state policies to curb air pollution, particularly the pollutants that are causing climate change. NRDC seeks to reduce emissions of methane from the oil and gas sector, which is responsible for over a third of the nation's methane pollution.

6.      As a part of these efforts to protect our climate, communities, wildlife and ecosystems, NRDC joined our colleagues in submitting comments on the Environmental Protection Agency's ("EPA") November 2021 proposal and November 2022 supplemental proposal, both titled "Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review." NRDC is also part of the group of organizations that sued EPA over its prior attempts to delay and rescind methane regulations for the oil and natural gas sector, and intervened to defend EPA's 2024 standards for methane emissions from new and existing oil and gas operations.

7.      When an individual becomes a member of NRDC, his or her current residential address is recorded in NRDC's membership database. When a member renews his or her membership or otherwise makes a contribution to NRDC, the database entry reflecting the member's residential address is verified or updated.

2

8.     NRDC has hundreds of thousands of members nationwide. There are NRDC members residing in each of the fifty United States and in the District of Columbia and Puerto Rico.

9.     When an individual becomes a member of NRDC, he or she authorizes NRDC to take legal action on his or her behalf to protect the environment and public health.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Signed on August 8, 2025

_____
Joyce Yeung

3