NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 25-1164, 25-1168

———————————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

ENVIRONMENTAL DEFENSE FUND, et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Respondents*.

———————————————

Petition for Review of Action of the U.S. Environmental Protection Agency

———————————————

**EPA'S OPPOSITION TO SECOND MOTION
FOR SUMMARY VACATUR**

———————————————

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

Of Counsel:

DEREK MILLS
*Attorney*
U.S. Environmental Protection Agency

LAURA J. GLICKMAN
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 598-3056
laura.glickman@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

BACKGROUND ...................................................................................2

STANDARD OF REVIEW ..................................................................11

ARGUMENT .......................................................................................11

I.     EPA Reasonably Extended Deadlines............................................11

II.    Clean Air Act Section 111 Does Not Require That EPA Do More to
       Consider Health and Environmental Impacts in Extending the 2024
       Rule's Deadlines...........................................................................14

III.   Precedent Does Not Require That EPA Do More to Consider Health
       and Environmental Impacts.........................................................18

IV.    The Court Should Retain the Standard Merits Briefing Schedule ...............22

CONCLUSION.....................................................................................23

CERTIFICATE OF COMPLIANCE....................................................25

CERTIFICATE OF SERVICE…………………………………………26

# TABLE OF AUTHORITIES

## Cases

*Air All. Hou. v. EPA*
  906 F.3d 1049 (D.C. Cir. 2018) ..................................................... 19, 20

*Air Transp. Ass'n of Am. v. FAA*,
  169 F.3d 1 (D.C. Cir. 1999) ................................................................22

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
  3 F.4th 373 (D.C. Cir. 2021) ...............................................................12

*Am. Lung Ass'n v. EPA.*, 985 F.3d 914 (D.C. Cir. 2021),
  *rev'd and remanded sub nom. West Virginia v. EPA*, 597 U.S. 697 (2022) ... 18, 19

*Badgerow v. Walters*,
  596 U.S. 1 (2022) ...............................................................................20

*Cascade Broad. Grp. v. FCC*,
  822 F.2d  (D.C. Cir. 1987) ..................................................................11

*Clean Air Council v. Pruitt*
  862 F.3d 1 (D.C. Cir. 2017).................................................................21

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*
  538 F.3d 1172 (9th Cir. 2008) ............................................................21

*FDA v. Wages & White Lion Invs., L.L.C.*,
  604 U.S. 542 (2025) ............................................................................11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020) ............................................................................15

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ............................................................................16

*Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..............................................................................12

*Michigan v. EPA*,
  576 U.S. 743 (2015) ...........................................................................13

*Portland Cement Ass'n v. Train*,
  513 F.2d 506 (D.C. Cir. 1975) ..........................................................13

*Sierra Club v. Costle*
  657 F.2d 298 (D.C. Cir. 1981)...........................................................21

*Watt v. Energy Action Ed. Found.*,
  454 U.S. 151 (1981) ...........................................................................15

*West Virginia v. EPA*,
  597 U.S. 697 (2022) ....................................................................... 6, 18

**Statutes**

42 U.S.C. § 7411 ......................................................................... 14, 15, 20

42 U.S.C. § 7411(a)(1) ................................................................ 3, 16, 17

42 U.S.C. § 7411(b) ...............................................................................19

42 U.S.C. § 7411(b)(1)(A) ......................................................................3

42 U.S.C. § 7411(b)(1)(B) ........................................................... 3, 15, 16

42 U.S.C. § 7411(d) ......................................................................... 3, 19

42 U.S.C. § 7411(d)(1) ...........................................................................3

42 U.S.C. § 7411(d)(2) ...........................................................................3

42 U.S.C. § 7412(i)(3)(A) .....................................................................20

42 U.S.C. § 7412(j)(5) ...........................................................................20

42 U.S.C. § 7412(r)(7) ...........................................................................20

iv

42 U.S.C. § 7607(d)(7)(B) ........................................................................19

Clean Air Act Amendments of 1990, 104 Stat. 2631 (Nov. 15, 1990) ...................21

**Code of Federal Regulations**

40 C.F.R. part 60, subpart Ba ...................................................................3

40 C.F.R. § 60.20a(a)(1) ..........................................................................4

**Federal Registers**

89 Fed. Reg. 16820 (Mar. 8, 2024) ..................................... 4, 6, 9, 16, 17

90 Fed. Reg. 3734 (Jan. 15, 2025) ..............................................................4

90 Fed. Reg. 35966 (July 31, 2025) ............... 5, 6, 7, 8, 9, 10, 11, 12, 14, 17, 19, 22

90 Fed. Reg. 55671 (Dec. 3, 2025) ...........................................................5

**Rules**

D.C. Cir. Handbook of Practice & Internal Procedures ...............................11, 22, 23

**Executive Order**

Executive Order 12866  (Sept. 30, 1993) ...............................................22

# GLOSSARY

| | |
|---|---|
| 2024 Rule | Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources; Oil and Natural Gas Sector Climate Review, 89 Fed. Reg. 16820 (Mar. 8, 2024) |
| BSER | Best System of Emission Reduction |
| EPA | Environmental Protection Agency |
| Interim Rule | *Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources: Oil and Natural Gas Sector Climate Review Final Rule*, 90 Fed. Reg. 35966 (July 31, 2025) |
| Final Rule | *Oil and Natural Gas Sector Climate Review: Extension of Deadlines in Standards of Performance for New, Reconstructed, and Modified Sources and Emissions Guidelines for Existing Sources*, 90 Fed. Reg. 55671 (Dec. 3, 2025) |

# INTRODUCTION

A petitioner seeking summary vacatur carries the heavy burden to demonstrate that the merits of the case are "so clear" that briefing and argument are unnecessary to ensure a just result. Petitioners cannot and have not carried that burden in this complex case involving important issues for a critical industry.

At dispute are an Interim and associated Final Rule that extended several deadlines under a 2024 Rule regulating certain air emissions from oil and gas sources. After promulgation of the 2024 Rule, oil and gas operators and states raised unexpected challenges in meeting certain deadlines. Based on its review of information from these stakeholders, in the Interim Rule, EPA reasonably exercised its judgment and discretion under Section 111 of the Clean Air Act by extending upcoming deadlines for states to submit plans for emission guidelines to the Agency and for oil and gas facilities to meet certain new-source deadlines primarily aimed at different ways that sources can show compliance with the standards. EPA affirmed those extensions in the Final Rule after considering comments and holding a public hearing. In the meantime, new oil and gas facilities still must comply with the underlying standards in the 2024 Rule.

Rather than seek judicial review in the ordinary course as provided for under the Clean Air Act, Petitioners again take the extraordinary step of invoking this Court's limited practice of allowing for summary disposition when the merits are

1

so clear that briefing, argument, and traditional collegiality would not impact the Court's ultimate decision. Such a result is entirely inappropriate where, as here, the relevant matter involves federal regulatory action with important consequences for regulated parties and the merits favor the agency or, at a minimum, are bound up in record questions that require development in the ordinary course. This Court should not reward Petitioners' attempt to transform a docket-management tool into a tempting means to avoid the settled standards for preliminary relief.

Petitioners do not dispute in their Second Motion for Summary Vacatur that states and oil and gas operators cannot meet the 2024 Rule's deadlines. Instead, Petitioners argue that EPA did not reasonably weigh health and environmental impacts when exercising its discretion on compliance dates. That is wrong. And that type of record-based review is particularly unsuited to summary disposition.

The Court should deny Petitioners' request for summary vacatur. The Court also should deny Petitioners' request for expedited briefing because they have not demonstrated that adhering to the standard briefing schedule "will cause irreparable injury."[1]

---

[1] As our merits brief will explain, Petitioners also lack standing.

## BACKGROUND

### A.     Statutory background

The Clean Air Act directs EPA to list "categories of stationary sources" and to promulgate standards of performance for new sources within each category. 42 U.S.C. § 7411(b)(1)(A)–(B). These standards must reflect the "best system of emission reduction" that EPA "determines has been adequately demonstrated," which is selected after considering costs, health and environmental impacts, and energy requirements. *Id.* § 7411(a)(1).

Promulgation of a new-source standard triggers EPA's authority to address emissions from existing sources in that source category under certain conditions. *Id.* § 7411(d). As with new sources, EPA identifies the "best system of emission reduction" for existing sources and from there identifies the pollution reductions. *Id.* § 7411(a)(1), (d)(1)*.* These regulations—referred to as "emission guidelines"— set forth the requirements for states to submit plans to EPA for approval detailing how they will develop, implement, and enforce their own standards for in-state existing sources. *Id.* § 7411(d)(1)–(2). For any state that chooses not to submit a plan or submits an unsatisfactory plan, EPA directly regulates existing sources in the state's stead. *Id.*

EPA's implementing regulations govern states' submission and EPA's approval of state plans. 40 C.F.R. part 60, subpart Ba. EPA may supersede those

3

general procedures in emission guidelines for specific industries. *Id.*
§ 60.20a(a)(1).

### A.    Factual background

### 1.  The 2024 Rule

In March 2024, EPA set new-source performance standards to limit
emissions of volatile organic compounds and methane from 25 subcategories of
new oil and natural-gas sources. 89 Fed. Reg. 16820, 16830 (Mar. 8, 2024). Many
of the 2024 Rule's provisions were novel, including new types of controls and
mechanisms for third parties to monitor emissions. The 2024 Rule also set methane
emissions guidelines for the first time for 20 subcategories covering hundreds of
thousands of existing oil and natural-gas sources. *Id.*

After promulgating the 2024 Rule, EPA received 10 petitions for
reconsideration. These petitions raise over 60 distinct technical and policy issues
spanning 13 major topic areas within the 2024 Rule, with some including detailed
technical information and supporting documentation. The day before the 2024
Rule's effective date, EPA granted reconsideration on certain discrete parts of the
rule. 90 Fed. Reg. 3734, 3738 n.9 (Jan. 15, 2025).

### 2.  The Interim and Final Rules

After promulgating the 2024 Rule, EPA determined that states and oil and
gas operators raised credible concerns with certain limited aspects of the 2024 Rule

and promulgated the Interim Rule to extend a narrow subset of deadlines. *See* 90 Fed. Reg. 35966 (July 31, 2025). The Interim Rule did not modify any of the new-source performance standards, or any of the presumptive standards for existing sources. EPA concluded only that certain existing deadlines were infeasible for reasons specific to each deadline and explained that the extensions would "not interfere with, or unreasonably frustrate, the ultimate emission reduction requirements of the [2024 Rule]." *Id.* at 35979; *see, e.g.*, *id.* at 35972 (explaining that many requirements for reducing emissions would continue to apply). In conjunction with the Interim Rule, EPA published an Economic Impact Analysis to assess potential costs and benefits of the action per the requirements of Executive Order 12866. *Id.* at 35980. That analysis quantified forgone emissions reductions compared to the 2024 Rule, where possible. *See* EPA-HQ-OAR-2025-0162-0025 at 2–4.

In the Final Rule, after fully considering and responding to public comments and hearing testimony, EPA reaffirmed the appropriateness of the deadline extensions promulgated in the Interim Rule and extended two additional deadlines. 90 Fed. Reg. 55671 (Dec. 3, 2025). EPA again explained that the standards would continue to "achieve the emission-reduction goals of the [2024 Rule]" while recognizing, through targeted deadline extensions, that additional time was required for regulated parties to comply with certain requirements. *Id.* at 55676.

5

EPA also reaffirmed the findings of the Economic Impact Analysis prepared for the Interim Rule. EPA-HQ-OAR-2025-0162-0672. Thus, the regulatory amendments promulgated in the Interim Rule remain in effect.

### a. Extension of State Plan Submittal Deadline

The 2024 Rule required states *for the first time* to develop plans to implement these emissions guidelines for existing oil and gas facilities. 90 Fed. Reg. at 35977–78 n.46; *see West Virginia v. EPA*, 597 U.S. 697, 710 (2022) ("EPA has used [Section 111(d)] only a handful of times since enactment of the statute in 1970."). This source category is large and complex, and applying emission guidelines to designated facilities is similarly complex. 90 Fed. Reg. at 35977–78. Despite these challenges, the 2024 Rule set a highly ambitious two-year deadline of March 9, 2026, for states to submit plans to implement the emission guidelines. 89 Fed. Reg. at 17008–10. In 2024, EPA found this deadline to be "a reasonable balance" between providing states sufficient time to develop and submit a satisfactory plan and ensuring that timely emission reductions would be achieved. *Id.* at 17010. Over a year into this two-year deadline, EPA found the balance was not, in fact, reasonable.

Despite their best efforts, many states struggled to develop their plans and fell far behind schedule. 90 Fed. Reg. at 35978. Indeed, with the submittal deadline less than a year away, 12 of the 21 states that intended to submit plans had not

identified *how* they planned to implement the emission guidelines' requirements, let alone started to do so. *Id.* at 35977–78. Eighteen states had yet to seek EPA's feedback on significant portions of their draft plans. *Id.*

In the face of these challenges, EPA assisted states with the development of their plans. *Id.* at 35979. Nevertheless, it became clear that the majority of states, if not all, could not meet the March 9, 2026 deadline. *Id.* EPA did not want to set states up to fail, so it extended the state plan submittal deadline to January 22, 2027. *Id.* This allows states, with further assistance from EPA, to devote the time and resources necessary to develop approvable plans in the relatively unfamiliar context of Section 111(d) and existing oil and gas sources. *Id.* The Interim and Final Rules do not modify any of the presumptive standards for existing sources; they simply empower states to meet the requirements for their plans.

### b.  Extension of New-Source Deadlines for Oil and Gas Operators

EPA also extended a limited set of deadlines for oil and gas operators of new sources, primarily relating to compliance assurance; the Agency did not modify any of the new-source *performance* standards.

***Control Devices***. The 2024 Rule finalized new monitoring requirements for flares and enclosed combustion devices (types of control devices) that included vent gas net-heating value, continuous monitoring requirements, and an alternative performance test (sampling demonstration) option. 90 Fed Reg. at 35970. Various

emission points utilize flares and combustion devices to achieve applicable standards. At a basic level, these devices burn oil or gas to reduce emissions. Continuous monitoring requires specialized equipment such as a calorimeter, gas chromatograph, or mass spectrometer. *Id.* Subject to certain caveats, performance testing generally requires a person to collect samples for 14 consecutive days. *Id.* EPA determined that operators raised credible concerns with their ability to obtain the equipment, personnel, and laboratory processing capacity necessary to fulfill the monitoring requirements for the thousands of impacted devices by the 2024 Rule's deadline. *Id.* at 35970–71.

*Covers and Closed-Vent Systems*. The 2024 Rule required inspection of all covers and closed-vent systems within 30 days of startup to ensure the system is operating with no identifiable emissions. *Id.* at 35972. EPA determined that operators raised credible concerns about their ability to continuously meet the no identifiable emissions requirement because even with proper maintenance and normal operation, these systems will eventually leak. *Id.* at 35972–73. EPA determined these serious workability concerns warranted extending the deadline for this component of the inspection requirement for covers and closed-vent systems. *Id.* at 35973.

*Equipment Leaks*. The 2024 Rule included a requirement for natural gas processing plants that, upon detecting a leaking valve, the operator must upgrade to

8

a lower-emitting valve type. *Id.* EPA determined that sources needed additional time to obtain needed low-emitting equipment given the cost and widespread need for such equipment. *Id.* EPA found that industry credibly asserted that this requirement was not technically or economically feasible given the alternative of repairing the existing valve. *Id.* Operators also raised credible concerns with confusing regulatory language. *Id.*

*Process controllers.* EPA originally provided a one-year phase-in period for the new zero-emissions standard for process controllers because the necessary equipment was unlikely to be available quickly enough, and in large enough quantities, to enable compliance. 89 Fed. Reg. at 16929. EPA later determined that more time was warranted because there was still "significant demand" on the equipment, supplies, and service vendors necessary for compliance. 90 Fed. Reg. at 35974. And immediate action was prudent because if operators could not timely obtain and install the necessary equipment, they could be forced to choose between noncompliance and shutdown. *Id.* During the extension, an interim standard continues to apply. *Id.*

*Storage vessels.* The 2024 Rule includes criteria for determining which storage vessels are subject to different requirements based on a source's potential to emit methane and volatile organic compounds. *Id.* EPA found that state, local, and tribal air agencies needed more time to develop legally and practically

9

enforceable limits. *Id.* EPA determined that operators raised credible concerns about the 2024 Rule's process for determining a source's potential to emit, resulting in confusion and possible inconsistencies. *Id.* EPA extended that timeline to allow facilities to obtain additional information and make the requisite decisions. *Id.* at 35975. For the modification provisions, EPA concluded that sources needed additional time to comply that EPA had not anticipated. *Id.*

***Super Emitter Program.*** EPA extended the implementation of the Super Emitter Program due to unanticipated difficulties in implementation. *See id.* at 35976. EPA explained that aspects of this novel Program to date had "proven time- and labor-intensive" and generated "unanticipated concerns about improper attribution" and related issues with enforcement and compliance efforts. *Id.* To afford time to address these mounting concerns, EPA extended the timeline for implementation of the Program but did not revise the Program's structure and requirements. *Id.*

***Flare Pilot Flame and Alarm Requirements***. The 2024 Rule requires that certain combustion devices and flares, used to comply with some standards, include specific features such as continuous burning flames and alarm systems. *Id.* at 35976–77. EPA found that operators raised credible technical concerns regarding their ability to comply with these requirements by the original deadline. Maintaining a continuous flame can pose significant logistical challenges for

10

sources that operate intermittently or at locations far from reliable supplemental fuel supplies. *Id.* at 35977. Industry also experienced challenges with obtaining necessary equipment. *Id.*

## STANDARD OF REVIEW

This Court "rarely" grants summary vacatur and only when the merits are "so clear, plenary briefing, oral argument, and the traditional collegiality of the decisional process would not affect [the Court's] decision." D.C. Cir. Handbook of Practice & Internal Procedures 36. Movants bear the "heavy burden" of establishing that the merits are "so clear" that abbreviated review is justified. *Cascade Broad. Grp. v. FCC*, 822 F.2d 172, 1174 (D.C. Cir. 1987). In cases like this, the scope of review "'is narrow,' and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 567 (2025).

## ARGUMENT

### I.    EPA Reasonably Extended Deadlines.

Petitioners do not dispute the central rationale behind the Interim and Final Rules—that states and oil and gas operators faced challenges complying with the relevant deadlines in the 2024 Rule. Nor do Petitioners dispute that states and oil and gas operators could not have met those deadlines. This is unsurprising, because

11

the record for the Rules demonstrates that EPA had good reason to extend these deadlines.[2] *Supra* at 4–11. With regard to state plan submittals, despite ongoing efforts, a majority of states are far behind schedule in developing their plans. *Supra* at 6–7. Rather than set states up to fail, EPA extended the state plan submittal deadline so that states could devote the time and resources necessary to develop approvable plans with further assistance. *Id*. With regard to certain measures for new sources, oil and gas operators described difficulties in obtaining and installing the necessary equipment and interpreting certain language in the 2024 Rule, among other challenges. *Supra* at 7–11. Petitioners do not dispute these challenges.

Rather, Petitioners incorrectly claim that "the Final Rule ignores emissions impacts" and that EPA "failed to consider an important aspect of the problem." Mot. at 13, 15 (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). But, EPA explained in the Response to Comments that "[t]he emissions impacts of the [Interim Rule] were considered and the EPA determined that the extensions were warranted given those impacts." EPA-HQ-OAR-2025-0162-0673 at 13; *see also* 90 Fed. Reg. at 35972, 35979 (extensions would "not interfere with, or unreasonably frustrate, the ultimate emission

---

[2] Moreover, as EPA explained, each "change included in this final action is severable from the other," because the deadlines operate independently, and each deadline change is separately justified. 90 Fed. Reg. at 35969; *see Am. Fuel & Petrochemical Mfrs. v. EPA*, 3 F.4th 373, 384 (D.C. Cir. 2021).

reduction requirements"). EPA did consider all relevant factors, and *State Farm* does not require EPA to give any one factor more weight. While EPA might not have analyzed impacts in the way that Petitioners prefer or given this consideration superseding weight, EPA's approach in this context was reasonable given the compliance challenges facing states and operators. Moreover, no amount of foregone benefits would have turned an infeasible deadline into a feasible one. Such a dispute is a record-heavy issue not appropriate for resolution on a motion for summary vacatur.

While sometimes unclear, Petitioners appear to claim EPA was required to quantify and weigh forgone benefits against compliance challenges. Mot. at 2, 14–15. However, nothing requires EPA to conduct a formal cost-benefit analysis. *See Portland Cement Ass'n v. Train*, 513 F.2d 506, 508 (D.C. Cir. 1975) (formal cost-benefit analysis not required); *see also Michigan v. EPA*, 576 U.S. 743, 759 (2015) (no requirement "to conduct a formal cost-benefit analysis" when considering relevant factors). And regardless of how much EPA weighed impacts, it is undisputed that states and operators still could not comply with the original deadlines. *See supra* at 4–11.

In any event, Petitioners vastly overestimate the extent to which the Interim and Final Rules will forego emissions reductions from the 2024 Rule. Their estimates—which are approximately *three times* higher than EPA's—are premised

on the bald and unsupported assumption that every oil and gas facility will violate the new-source standards with impunity. *Compare* Mot. at 10, with RTC at 47; EPA-HQ-OAR-2025-0162-0025 at 6; 90 Fed. Reg. at 35980; *see* Proville Mirtich Decl. (App'x at 099) at ¶ 33, nn. 12–13. Oil and gas operators' obligation to achieve the new-source standards (and many of the compliance assurance measures) remains *unchanged*, *see supra* at 7–11, so Petitioners' assumption is unfounded.

At bottom, Petitioners have not demonstrated an error or omission that is "so clear" as to justify summary vacatur. And questions about how EPA considered impacts—which reach far into the details of the record—are not suitable for resolution in a motion for summary vacatur.

## II.    Clean Air Act Section 111 Does Not Require That EPA Do More to Consider Health and Environmental Impacts in Extending the 2024 Rule's Deadlines.

Petitioners incorrectly claim that the plain language of Section 111 of the Clean Air Act, 42 U.S.C. § 7411, required EPA to weigh health and environmental impacts when extending the 2024 Rule's new-source and state plan submittal deadlines. *See* Mot. at 2, 14–15. The statute does not compel such a result here, where both states and oil and gas operators faced real-world, technical, and practical compliance challenges meeting certain of the 2024 Rule's deadlines.

First, Petitioners contend that the "plain language" of Section 111 compels EPA to weigh health and environmental impacts in a particular way whenever the Agency extends compliance or state plan submittal deadlines—no matter the challenges in meeting those deadlines. Mot. at 2. But the plain language of Section 111, 42 U.S.C. § 7411, states no such thing. Tellingly, Petitioners point only to Section 111(b)(1)(B)'s, *id.* § 7411(b)(1)(B), use of the words "limitation" and "reduction" of "emissions." *Id.* These words support a general concept that EPA does not dispute: the purpose of Section 111, *id.* § 7411, is to reduce harmful pollution. But the sentence in which this language appears specifically relates to EPA's considerations "when revising standards"—not to the situation here, where EPA is maintaining the standards but simply extending certain deadlines. *Id.* § 7411(b)(1)(B).

This cannot reasonably be read to require that EPA weigh health and environmental impacts when extending deadlines in a particular way, regardless of the circumstances. "It is a fundamental principle of statutory interpretation that absent provision[s]"—here, a requirement to consider health and environmental impacts in the way Petitioners prefer—"cannot be supplied by the courts." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 677 (2020) (quotation omitted). Critically, this principle also applies "to imposing limits on an agency's discretion that are not supported by the text." *Id.* at 677

15

(quotation omitted). Thus, Petitioners cannot read into the statute a blanket requirement to weigh health and environmental impacts when extending certain deadlines based on practical and technical limitations where none exists.

Next, Petitioners incorrectly argue that EPA erred because the Interim and Final Rules did not evaluate the BSER factors, which include any "nonair quality health and environmental impact and energy requirements." Mot. at 13; *see* 42 U.S.C. § 7411(a)(1) (defining "standard of performance"). But that requirement only applies to setting *standards of performance* under Section 111(b)(1)(B), *id.* § 7411(b)(1)(B), not extending deadlines. As explained above, the Interim and Final Rules did not modify the standards of performance established in the 2024 Rule or the underlying BSER analyses. *Supra* at 7; *see also* Response to Comments at 27 (Rules did not alter or modify BSER).

For example, there is no BSER analysis for net-heating value (one of the compliance assurance requirements for which EPA extended an applicable deadline) because net-heating value is not an affected facility with an associated standard of performance; instead, it is one of several ways sources can ensure they meet certain standards. The 2024 Rule included a standard of performance for storage vessels (a specialized tank) that requires a 95-percent reduction in emissions that *was* based on a BSER analysis. 89 Fed. Reg. at 16830. That analysis demonstrated that sources can comply with a control device, and sources can

16

demonstrate their control device is operating properly by monitoring and testing the net-heating value of the device. *Id.* at 16894. EPA extended the deadline for certain provisions related to this monitoring and testing, but in the meantime storage vessels must still comply with the standard of 95-percent reduction. 90 Fed. Reg. at 35977. Further, EPA did not extend the deadlines for other compliance assurance requirements in the 2024 Rule that ensure control devices are operating at the required efficiency. *Id.* at 35972 (visible emission observation requirements for control devices still apply). This is true for many of the compliance assurance extensions: as EPA explained, other requirements that the Interim and Final Rules did not extend help oil and gas operators attain compliance. *See, e.g.*, *id.* at 35973 (covers and closed-vent systems inspection requirements apply); *id.* at 35975 (obligation to determine potential emissions from storage vessels applies; sources that trigger modification must still comply); *id.* at 35977 (even with extension for pilot flames and alarm systems, combustion devices must meet 95 percent reduction requirement).

Further, Petitioners are incorrect to imply that the definition of "standard of performance" in Section 111(a)(1), 42 U.S.C. § 7411(a)(1), has any bearing on the state plan submittal deadline for existing sources. EPA does not establish standards for existing sources in emission guidelines. And EPA did not conduct any type of BSER analysis to establish the original state plan submittal deadline in the 2024

17

Rule because that deadline is not a "standard of performance." BSER thus is not relevant for the extension of the state plan deadline.

For these reasons, the Clean Air Act did not require EPA to weigh health and environmental impacts when amending state plan submittal and new-source deadlines under the 2024 Rule. Even if the Court believes that the Clean Air Act may require EPA to do more, that holding would be novel and the merits cannot be adequately assessed in the posture of a motion for summary vacatur.

## III. Precedent Does Not Require That EPA Do More to Consider Health and Environmental Impacts.

Petitioners attempt to paper over the lack of statutory language supporting their argument by pointing to decisions in tangentially-related Clean Air Act cases. Mot. at 12–16. But none of those cases governs the instant circumstance, where EPA extended discrete deadlines for state plan submittals and certain new-source deadlines due to states' and oil and gas operators' technical and practical compliance challenges meeting the 2024 Rule's deadlines. *See supra* at 4–11.

For example, Petitioners rely on *American Lung Association v. EPA*. 985 F.3d 914 (D.C. Cir. 2021), *rev'd and remanded sub nom. West Virginia*, 597 U.S. 697. There, this Court held that EPA failed to justify revamping the entire framework for default state plan submittal deadlines in EPA's Section 111(d) implementing regulations that had been in place for over 30 years. *Am. Lung Ass'n*, 985 F.3d at 992. Among other things, the Court noted that "EPA did not document

18

any problems during the decades that the existing timelines had been in place." *Id.* at 993.

The single, discrete extension of states' deadline for their *first ever* emission guideline for these sources at issue here is readily distinguishable. *See supra* at 6. In addition to being a discrete deadline extension, EPA explained in detail the challenges that states faced in meeting the 2024 Rule's state plan submittal deadlines—which Petitioners' Motion does not contest. *See supra* at 6–7; *see also* 90 Fed. Reg. at 35977–79.

Further, the Court should reject Petitioners' attempt to expand the holding in *American Lung* from Section 111(d), 42 U.S.C. § 7411(d) for existing sources to subsection (b) for new sources. Petitioners offer no basis to extend *American Lung* given the meaningful difference between the two subsections.

As with state plan submittals, EPA documented the compliance problems facing operators. *Supra* at 6–7. And the new-source standards promulgated under Section 111(b), 42 U.S.C. § 7411(b), remain unchanged and in place. *Supra* at 7. Thus, unlike in *American Lung*, the new-source extensions here do not pose a concern with "prolonging public exposure to ongoing harms from pollutants emitted by existing source categories." 985 F.3d at 994.

Petitioners' other cases are of no avail. For example, this Court concluded in *Air Alliance Houston v. EPA* that Sections 307(d)(7)(B) and 112(r)(7), 42 U.S.C.

19

§§ 7607(d)(7)(B), 7412(r)(7), did not permit EPA to delay the effective date of a rule for 20 months for the purpose of reconsideration. 906 F.3d 1049, 1060–66 (D.C. Cir. 2018). Section 112 requires EPA to establish compliance dates for hazardous air pollutant standards that are "as expeditious[] as practicable, but in no event later than 3 years after the effective date" of the standard. 42 U.S.C. § 7412(i)(3)(A), (j)(5). Against that backdrop, this Court held that EPA failed to explain its departure from the rationale for setting the original effective and compliance dates. 906 F.3d at 1067. Here, by contrast, EPA extended new-source and state plan submittal deadlines because of oil and gas operators' and states' specific challenges in meeting each deadline—not reconsideration. *See supra* at 4–11.

Further, unlike in *Air Alliance Houston*, here EPA did not delay the effectiveness of the entire 2024 Rule, but only discrete provisions primarily related to compliance assurance measures. The 2024 Rule remains in effect, and the standards of performance remain unchanged by the Interim and Final Rules. Moreover, Congress chose not to so narrowly limit EPA's discretion in setting deadlines under Section 111, 42 U.S.C. § 7411, as it did under Section 112, *id.* § 7412(i)(3)(A), (j)(5). *See Badgerow v. Walters*, 596 U.S. 1, 11 (2022) ("When Congress includes particular language in one section of a statute but omits it in

20

another section of the same Act, we generally take the choice to be deliberate.")
(cleaned up).

Sierra Club v. Costle also does not require EPA to "incorporate the amount
of air pollution as a relevant factor to be weighed" in situations like this one. 657
F.2d 298, 326 (D.C. Cir. 1981); contra Mot. at 2. While Congress subsequently
excised the statutory provision at issue in Costle from the statute, see Clean Air Act
Amendments of 1990, § 403(a), 104 Stat. 2631 (Nov. 15, 1990) (amending the
definition of standard of performance), the quoted language refers to the
predecessor to BSER, which the Interim and Final Rules did not change.

Finally, in Center for Biological Diversity v. NHTSA, the agency used a cost-
benefit analysis to determine the "maximum feasible" fuel economy standard,
quantifying the costs but not the benefits. 538 F.3d 1172, 1198 (9th Cir. 2008). But
again, EPA did not alter the standards here; EPA extended certain deadlines
because they were technically or practically infeasible. Clean Air Council v. Pruitt
is inapposite for the same reason. 862 F.3d 1 (D.C. Cir. 2017). There, EPA delayed
the new-source performance standards themselves, id. at 4–5, whereas here, oil and
gas operators still must comply with the standards.

For these reasons, none of the cases cited by Petitioners require EPA to
weigh health and environmental impacts when extending the discrete deadlines
here based on demonstrated compliance challenges.

21

**III. The Court Should Retain the Standard Merits Briefing Schedule.**

This petition does not warrant expedited review.

First, Petitioners have not made the required showing that review under a standard briefing schedule "will cause irreparable injury" during the time period between a decision reached pursuant to a standard schedule versus an expedited schedule. *See* D.C. Cir. Handbook 34.

Petitioners take issue with EPA's Economic Impact Analysis, but that analysis demonstrates why expedited review is not warranted here.[3] *See* Econ. Impact Mem. at 6, table 3 (no impacts projected until 2028). And even under Petitioners' dramatically inflated estimates of foregone emissions reductions, *see supra* at 13–14, less than four percent of total foregone methane, volatile organic compound, and hazardous air pollutant emissions reductions would occur by the end of 2027. *See* Proville Mirtich Decl. (App'x at 099) ¶ 34, Table 1. And by Petitioners' own admission, there are no impacts whatsoever in 2026 or 2027 from the extension of the state plan submittal deadline. *See id.* ¶¶ 36–37. This case will undoubtably be resolved well before the end of 2027 under a standard schedule, and in the meantime, any impacts are speculative and minimal.

---

[3] EPA quantified forgone benefits in the Economic Impact Analysis but only to comply with an executive order. *See* 90 Fed. Reg. at 35980; Executive Order 12,866 § 1 (Sept. 30, 1993). EPA did not rely on that analysis for the Interim or Final Rules, and EPA's compliance with Executive Order 12,866 is not reviewable. *See Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 7 (D.C. Cir. 1999).

Next, Petitioners' claim (Mot. at 17) that EPA's purported "emergent pattern of deregulating through a series of short-term actions" warrants expedited review disregards the D.C. Circuit's standard for expedited briefing. *See* D.C. Cir. Handbook 34 ("The movant must demonstrate that the delay will cause irreparable injury and that the decision under review is subject to substantial challenge."). The other actions to which Petitioners allude are irrelevant to this case. What is more, Petitioners could have—but did not—seek a stay from the Court.

Lastly, a standard briefing schedule still would provide Petitioners with meaningful judicial review. Specifically, briefing this case in the spring would permit argument and a decision on the merits before the extended compliance deadlines of January 22, 2027.

For these reasons, expedited briefing is not warranted here.

## CONCLUSION

Because Petitioners fail to identify any issue that is "so clear" to warrant summary vacatur, the Court should deny their Motion. The Court also should deny Petitioners' request for expedited briefing because they have not demonstrated that a standard briefing schedule review "will cause irreparable injury."

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

*Of Counsel*:

DEREK MILLS
*Attorney*
U.S. Environmental Protection Agency

*/s/ Laura J. Glickman*
LAURA J. GLICKMAN
*Senior Attorney*
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 598-3056
laura.glickman@usdoj.gov

Dated:   February 6, 2026

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 5,178 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Laura J. Glickman*
LAURA J. GLICKMAN

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2026, I filed the foregoing EPA's Opposition to Second Motion for Summary Vacatur with the Clerk of Court for the United States Court of Appeals for the District of Columbia Circuit using the CM/ECF system which will cause a copy to be served on all counsel of record in this matter.

*/s/ Laura J. Glickman*
LAURA J. GLICKMAN